IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BLANCA VALENZUELA, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3-06CV2322-N |
| SWIFT BEEF COMPANY, INC., *et al.*, | § § § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION TO COMPEL AND
## REQUEST FOR EXPEDITED HEARING BRIEF IN SUPPORT

Plaintiffs file this Motion to Compel and Request for Expedited Hearing and Brief in Support. Because the information sought by Plaintiffs is necessary for them to respond to the rebuttal expert deadline of (as extended by the parties) July 31, 2008, Plaintiffs request that this matter be set for expedited hearing on Monday, July 28, 2008.

### INTRODUCTION

Plaintiffs have moved for class certification. Defendants have designated two experts who intend to give opinions regarding issues related to class certification. One of the experts is an attorney named Robert Divine. According to his Report, he intends to opine that Plaintiffs cannot adequately segregate the legal workers who are part of their proposed class from the illegal workers who are not aprt of the proposed class without "fact-intensive, individualized inquiries concerning each worker, in most cases including testimony from each worker." Appendix at 4. Divine's opinions are completely contradicted by statements made by Defendants in court filings relating to the ICE enforcement action that occurred in October 2007. In that case, Defendants opined that they

could easily and reliably separate legal from illegal workers and had already done so with the assistance of consultant Mark Reed of Border Management Strategies ("BMS").

In order to obtain evidence that would refute the opinions of Mr. Divine, Plaintiffs propounded a subpoena on Mr. Reed and BMS. Appendix at 30-36. Plaintiffs also propounded a Second Request for Production on Defendants requesting information regarding Reed and BMS. Plaintiffs intended to name Reed as a rebuttal expert to the opinions offered by divine. By agreement, the rebuttal expert deadline has been extended to July 31, 2008 with respect to Mr. Reed. In response to the subpoena, Reed and BMS, at the direction of counsel for Swift, produced only a handful of documents, asserted numerous privilege objections and produced a privilege log. Appendix at 37-41-54. In response to Plaintiffs' Second Request for Production, Defendants asserted numerous privilege objections and produced only a handful of documents. Appendix at 100-126. For the reasons set forth more fully below, the asserted privileges should be overruled and BMS and Defendants should be ordered to produce the requested documents.

## FACTS

Contrary to the opinions offered by Mr. Divine, Swift informed this Court in its ICE lawsuit that there were and are numerous methods by which it could identify illegal aliens within its workforce. As Swift stated in its 2006 lawsuit filed to enjoin the December 2006 ICE raids:

- Swift "retain[ed] I-9 expert auditor, Mark Reed," who "determined that trends and patterns may indicate that employees at Marshalltown engaged in identity theft;"

- Swift's review of I-9 forms in October 2006 "identified a number of workers who appear to have deliberately defeated the Basic Pilot verification program and who may have engaged in some form of identity theft."

Appendix at 58, Complaint in the Swift Lawsuit at ¶11; Appendix at 81, Declaration of Jack Shandley, at ¶¶41-42. The documents sought by Plaintiffs in their subpoena to BMS and their

Second Request for Production to Defendants involve the very actions Defendants described to this Court in their lawsuit against ICE to stop the 2007 ICE raids. Plaintiffs are entitled to the requested documents.

## ARGUMENT AND AUTHORITIES

**I.   BMS and Defendants have not met their burden of showing that the requested documents are protected by the attorney-client privilege.**

BMS and Defendants have not met their burden of showing that the requested documents are protected by the attorney-client privilege. In defining the elements of the attorney-client privilege, while not specifically stated by the Federal Circuit, courts have relied on the formulation of the privilege by Wigmore. These elements have been summarized as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*See, e.g., Reed v. Baxter,* 134 F.3d 351, 355-56 (6th Cir. 1998); *U.S. v. Evans,* 113 F.3d 1457, 1461 (7th Cir. 1997) *quoting* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 at 554 (McNaughton rev. 1961). The central inquiry with respect to whether the attorney-client privilege exists is whether the communication was made by a client to an attorney for the purpose of obtaining legal advice or services. *Upjohn Co. v. United States,* 449 U.S. 383, 386, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). The burden of demonstrating the applicability of the privilege rests on the party who invokes it. *Hodges, Grant & Kaufmann v. United States,* 768 F.2d 719, 721 (5th Cir. 1985).

While the attorney-client privilege extends to all situations in which counsel is sought on a legal matter, it protects "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States,* 425 U.S. 391, 403, 96 S. Ct. 1569, 1577, 48 L. Ed. 2d 39 (1976). Hence, the privilege does not protect documents and other

communications simply because they result from an attorney-client relationship. *See Seibu Corp. v. KPMG LLC,* 2002 U.S. Dist. LEXIS 906, 2002 WL 87461 at *2 (N.D. Tex. Jan. 18, 2002) (Kaplan, M.J.). Moreover, courts generally construe the privilege narrowly because "assertion of privileges inhibits the search for truth." *Perkins v. Gregg County,* 891 F. Supp. 361, 362 (E.D. Tex. 1995).

The burden is on the party asserting the privilege to demonstrate how each document or communication satisfies these elements. *See Hodges, Grant & Kaufmann v. United States Government, Dep't of Treasury, IRS* 768 F.2d 719, 721 & n.7 (5th Cir. 1985). A general allegation of privilege is insufficient to meet this burden. *See Nutmeg Insurance Co. v. Atwell, Vogel & Sterling,* 120 F.R.D. 504, 510 (W.D. La. 1988); *Saxholm AS v. Dynal, Inc.,* 164 F.R.D. 331, 333 (E.D.N.Y. 1996). Instead, "a clear showing must be made which sets forth the items or categories objected to and the reasons for that objection." *Lynn Caruso v. Coleman Co.,* 1995 U.S. Dist. LEXIS 8914, 1995 WL 384602 at *1 (E.D. Pa. Jun. 22, 1995). The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the privilege exists. *Id.* Although a privilege log and an *in camera* review of documents may assist the court in conducting its analysis, a party asserting the privilege still must provide "a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." *Pippenger v. Gruppe,* 883 F. Supp. 1201, 1212 (S.D. Ind. 1994); *see also Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C.,* 202 F.R.D. 418, 423 (E.D. Pa. 2001). In fact, "resort to an *in camera* review is appropriate only *after* the burdened party has submitted detailed affidavits and other evidence to the extent possible." *Caruso,* 1995 U.S. Dist. LEXIS 8914.

BMS and Defendants have no evidence that the communications at issue were made for the purposes of the rendition of legal advice. There is no evidence that Swift's lawyers *did anything* with the information provided by Reed and BMS. Rather, the lawyers appear to be nothing more

than a conduit from Reed to Swift set up to allow Swift to invoke the attorney-client privilege. As this Court has noted:

> Recognition of the broader rule does not tolerate attorneys acting as conduits for unprivileged information. Under this approach an attorney can be asked directly about the substance of unprivileged communications received from third parties and cannot resist disclosure on grounds that such information was later conveyed to the client unless, of course, this information was obtained by the attorney part of an investigation necessary to give legal advice.

*In re LTV Sec. Litig.*, 89 F.R.D. 595, 603 (N.D. Tex. 1981). It appears that the only advice being rendered was advice by Reed – a non-lawyer – to Swift regarding methods of detecting illegal immigrants. Such communications are not privileged.

## II. BMS and Defendants have not met their burden of showing that the requested documents are protected by the work product privilege.

BMS and Defendants have not met their burden of showing that the requested documents are protected by the work product privilege. The Federal Rules of Civil Procedure require that a party show that materials were "prepared in anticipation of litigation or for trial" to invoke the work product privilege. Fed. R. Civ. P. 26(b)(3). The rule focuses solely on materials assembled and brought into being in anticipation of litigation. *Piatkowski v. Abdon Callais Offshore, L.L.C.*, 2000 U.S. Dist. LEXIS 12067, 2000 WL 1145825, at *2 (E.D. La. Aug. 11, 2000). Excluded from the rule are materials assembled in the ordinary course of business. *United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982), *cert. denied*, 466 U.S. 944, 80 L. Ed. 2d 473, 104 S. Ct. 1927 (1984). To sustain the work product privilege, the objecting party must show that "the *primary motivating purpose* behind the creation of the document was to aid in possible future litigation." *United States v. Davis*, 636 F.2d 1028, 1039 (5th Cir. 1981) (emphasis original). Conversely, "if the document would have been created regardless of whether litigation was expected to ensue, the document is deemed to have

been created in the ordinary course of business and not in anticipation of litigation." *Piatkowski*, 2000 U.S. Dist. LEXIS 12067 at *2.

BMS and Defendants have made no showing that any of the documents on their privilege log were prepared in anticipation of litigation or for trial. Rather, they appear to have been prepared for the regular business purposes of developing methods and procedures of complying with U.S. immigration laws. In his deposition, Swift corporate representative James Hamilton confirmed that BMS and Reed were hired for business reasons, not in anticipation of litigation or for trial:

> Q. Why was Border Management Strategies hired?
>
> A. Ongoing efforts to make sure that we're fully compliant with employment eligibility and identify verification procedures.

Appendix at 92 (Deposition of James Hamilton). This was confirmed by Swift corporate representative Douglas Schult in his deposition:

> Q. When you say your "consultants," who are you talking about?
>
> A. At that time we retained -- back in March of '06 we retained a company called Border Management Securities, BMS.
>
> Q. Is that headed by a man named Mark Reed, I believe?
>
> A. That's correct.
> Q. Were you involved in that decision to retain BMS?
>
> A. Yes.
>
> Q. What was the purpose of that decision? Why was BMS hired?
>
> A. We had made -- I had set as a KPI for the person that is in charge of compliance at that time, Tim Hill, to go out and build a relationship with ICE and/or find a replacement for the consultant that the company had back in 2000, 2001.

\* \* \* \* \*

> Q. And why was the decision made in March 2006 to hire another outside consultant as opposed to continuing to do some of these things internally?

> A. Because we had in -- it was late 2002 or 2003 when ConAgra sold us, we lost access to Steve Bogue. And Steve had relationships inside of what I think was then called INS. We had had a couple events occur to us, and I don't remember right offhand what they were, but there were a couple things that happened in '05.
>
> I said to Tim, we have got to find a way to replace this because right now we're a stand-alone company and we don't have that type of relationship with the access to that kind of specialization. You need to go figure it out and replace it. And I think his specific KPI was a relationship-building process with the Department of Homeland. But that's why we started running down that road.

Appendix at 94, 98, 99. In fact, Schult denied any connection between the hiring of Reed and BMS and impending legal action by ICE:

> Q. Now March 2006 is when the first subpoenas were served by ICE for the Marshalltown plant; is that right?
>
> A. Marshalltown was the first in March of 2006.
>
> Q. It was the service of those subpoenas that was the impetus for bringing in this Border Management Strategies, correct?
>
> A. No.
>
> Q. At the time it was just coincidental?
>
> A. The answer to the question is no. That's not why we started searching and interviewing Mark Reed.
>
> Q. Why did you, then?
>
> A. Because I had set a KPI for Tim Hill to find a consultant to replace Charlie McClure and/or develop a relationship with the Department of Homeland Defense so that we could get better information and insight on the immigration front. That KPI was set in '05. We began discussions with Mark in, I believe, January of '06.
>
> Q. What's a KPI?
>
> A. Key performance indicator. It's his goal -- one of his goals.

Appendix at 94-95. Finally, in a lawsuit filed against ICE in this Court, Defendants stated:

**PLAINTIFFS' MOTION TO COMPEL**　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 7

> [I]n an attempt to evaluate its own hiring practices to determine what steps, if any, should be taken to ensure compliance with federal law, including the Immigration and Nationality Act ("INA") and anti-discrimination statutes, Swift retained outside immigration experts to review the Company's I-9 files and its hiring practices.

Appendix at 57; *see also* Appendix at 79 (stating that Swift hired Reed and BMS "to further ensure its compliance with employment eligibility requirements."). BMS and Defendants have not met their burden of establishing that BMS was retained in anticipation of litigation or that the requested information is protected by the work product privilege.

Even if BMS and Defendants had established the applicability of the work product privilege, that privilege is not absolute. A party showing "substantial need of the materials in preparation for [its] case" and an inability "without undue hardship to obtain the substantial equivalent" may discover factual and non-opinion work product that does not disclose the "mental impressions, conclusions, opinions or legal theories of an attorney or other representative." Fed. R Civ. P. 26(b)(3). Here, Plaintiffs have a substantial need of the requested materials to refute Defendants' argument that attempts to identify illegal immigrants within its workforce are impossible or impractical. Because Reed and BMS are the only source of such information, Plaintiffs cannot obtain the substantial equivalent of such information without undue hardship.

### III. BMS and Defendants have not met their burden of showing that the requested documents are protected by any other privilege.

BMS and Defendants have not met their burden of showing that the requested documents are protected by any other privilege, including the "consultative expert privilege." *See* Appendix at 42-54, 100-126. BMS and Defendants appear to be referring to Rule 26(b)(4)(B), which states:

> (B) Expert Employed Only for Trial Preparation. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:

>   (i) as provided in Rule 35(b); or
>
>   (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(B). Here, Defendants have offered no evidence that Reed and BMS were retained or employed in anticipation of litigation. Rather, as stated above, it appears they were hired for routine business reasons to assist Swift in complying with U.S. immigration laws. In fact, in the lawsuit with ICE, Swift identified Reed by name in its court filings and detailed the work he had done to ensure Swift's compliance with U.S. immigration laws:

> Mr. Reed reviewed the I-9 forms from the Iowa facility to see whether it complied with I-9 employment verifications procedures. Mr. Reed determined that trends and patterns may indicate that employees at Marshalltown engaged in identify theft.

Appendix at 81. Clearly Reed and BMS were not "consulting only" experts. Even if there were evidence Reed was hired as a consulting expert with respect to potential litigation with ICE, there is no evidence he was hired as a consulting expert in this case; in fact, most of the documents at issue predate the filing of this suit.

Finally, even if the consulting expert privilege applied, Plaintiffs have made a showing of "exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." As stated above, Reed and BMS are the consultants that Defendants hired to attempt to sort illegal from legal employees. They cited their efforts in pleadings filed with this Court. And now they have disavowed BMS' prior efforts, and their own prior statements to this Court, in an attempt to defeat class certification. Because of Defendants' prior reliance on the work of Reed and BMS and the unique knowledge and experience Reed and BMS have with the Defendants' workforce, exceptional circumstances exist under which it is impracticable for Plaintiffs to obtain facts or opinions on the same subject by other means.

## CONCLUSION AND PRAYER

Plaintiffs request that the Court grant this Motion to Compel and award them such other and further relief to which they may be justly entitled.

Respectfully submitted,

/s/ Eric D. Pearson
**Michael E. Heygood**
State Bar No. 00784267
**Eric D. Pearson**
State Bar No. 15690472
**Charles W. Miller**
State Bar No. 24007677
**HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI**
2331 W. Northwest Highway, 2nd Floor
Dallas, Texas 75220
(214) 526-7900 Telephone
(214) 526-7910 Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(b), the undersigned certifies that counsel for the parties have conferred regarding this motion to compel but were unable to reach an agreement. Defendants oppose the motion.

/s/ Eric D. Pearson
Eric D. Pearson

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2008, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system sent a "Notice of Electronic Filing" to the following individuals who have consented in writing to accept this Notice as service of this document by electronic means:

Robert E. Youle
SHERMAN & HOWARD, LLP
633 Seventeenth Street, Suite 3000
Denver, CO 80202

Ken Carroll
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP
901 Main Street, Suite 500
Dallas, Texas 75202

/s/ Eric D. Pearson
Eric D. Pearson