## Declaration of Robert C. Divine

I, Robert C. Divine, declare as follows:

### Qualifications

1.   I am an attorney licensed in Tennessee (active) and North Carolina (inactive) since 1985. A significant portion of my first ten years of practice included representing employers in employment discrimination disputes, but I have practiced immigration law with increasing exclusivity since 1986. From my office in Chattanooga, Tennessee, I manage the Immigration Group of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., a law firm of 540 lawyers and public policy advisors with offices in 13 cities. I lead three other full-time immigration lawyers and numerous paralegals in several other cities in our firm's Immigration Group.

2.   Since 1994, I have been the author of *Immigration Practice*, a comprehensive practical treatise on U.S. immigration law that has been updated and republished annually with few exceptions. I have published numerous articles about immigration topics in law journals, legal publications, and seminar materials over the years. I have been a speaker at scores of conferences and seminars on a wide array of immigration topics. I have been an active member of the American Immigration Lawyers Association (AILA), at times holding an office in a regional chapter of AILA. Currently, I am chair of AILA's Department of State Liaison Committee, formulating questions and working with State Department officers to clarify points of law and procedure. All of those efforts have expanded the breadth and depth of my knowledge of immigration law.

3.   In 2003, I was retained by the U.S. Commission on International Religious Freedom (USCIRF) to serve as a paid expert on asylum law in preparation of its report, as authorized by Section 605 of the International Religious Freedom Act of 1998, to examine and make recommendations on the protection and detention of asylum seekers who are placed in Expedited Removal in the United States.[1] USCIRF was created by the International Religious Freedom Act

---

[1] This service was necessarily interrupted when I accepted the appointment to serve as USCIS Chief

Declaration of Robert C. Divine                              Page 1 of 26

of 1998 to monitor the status of freedom of thought, conscience, and religion or belief abroad, as defined in the Universal Declaration of Human Rights and related international instruments, and to give independent policy recommendations to the President, the Secretary of State, and the Congress.

4.   In July 2004, I was appointed by the President of the United States to serve as the first Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), the world's largest immigration services agency, which is within the U.S. Department of Homeland Security (DHS). From July 2005 until July 2006, I served as acting director and then acting deputy director of USCIS (both under the technical title of Acting Deputy Director). In July 2006, I returned to my duties as Chief Counsel until I resigned in November 2006 and returned to private practice.

5.   USCIS manages the electronic employment verification system originally known as the Basic Pilot and now re-branded by DHS as "E-Verify." During my service as USCIS Acting Deputy Director, Congress was exploring proposals to impose national mandatory use of E-Verify by all U.S. employers, and our agency began to expand the capabilities and resources of the E-Verify program. In managing USCIS and in preparing congressional testimony that I delivered concerning E-Verify on behalf of USCIS as its Acting Deputy Director, I studied and discussed in detail the rules and operations of E-Verify. I have continued to study the rules and practical considerations relating to E-Verify and the Social Security Administration's Numident database which is a significant component of the E-Verify service. I have also studied the rules of the Social Security Administration's "Social Security Number Verification System" by which it makes available the opportunity for employers to query the Numident database directly.

6.   Also while serving in various capacities at USCIS, I was significantly involved in an effort to completely transform the systems that USCIS uses to identify applicants and adjudicate their benefits.[2] In doing so, I studied various identity management systems and conferred with

---

Counsel.

[2] A description of the "Concept of Operations" for the USCIS Transformation Program is available at http://www.uscis.gov/files/nativedocuments/TransformationConOps_Mar07.pdf.

Declaration of Robert C. Divine                                   Page 2 of 26

leaders in other components of DHS about the challenges in determining, tracking and confirming the identity of applicants for immigration benefits, including the use of biometrics.

7. I have served as a testifying an expert two other times that I recall. Several months ago a domestic court in the United Kingdom requested, through one of the parties' counsel, my assessment of the U.S. immigration options of the other party to a child custody dispute. I was paid an hourly fee by the court. More recently I provided an affidavit in litigation similar to this brought against Mohawk Industries, Inc. in the U.S. District Court for the Northern District of Georgia, No. 4:04cv-03-HLM.

Assignment

8. Swift and Company, through its counsel, has retained my services for this action (Blanca Valenzuela et al v. Swift Beef Company et al, No. 3-06CV-2322-N) as an expert witness for a fee at an hourly rate. I have reviewed the plaintiffs' motion and brief to certify class action in this case. Plaintiffs seek to certify a class defined as "[a]ll workers employed from December 15, 2002 to the present as hourly wage earners at one of Swift's seven processing plants ... who had the legal right to work in the United States at the time of their employment." I have been asked to opine on plaintiffs' proposed methodologies for determining the class membership, including the import of a worker's limited English language proficiency and the use of photographs on identity documents presented by workers. I have been asked also to opine on the application of those methodologies, mentioned by plaintiffs for identifying the class, to plaintiffs' task of identifying workers whom Swift hired or harbored with knowledge or reckless disregard for their lack of work authorization.

9. Plaintiffs assert that they can determine who in Swift's past and present workforce has, at the time of employment with Swift, been authorized to work by reviewing SSA, health insurer and other third party notifications to Swift, reviewing Swift's internal investigation documents, and reviewing Swift's I-9 Forms, and querying government and private databases. Brief at 16. They also contend that in establishing Swift's knowledge they may rely on an applicant's or employee's inability to speak English as well as differences between the photos on workers' identity documents and the personal appearance of the workers. Brief at 6.

Declaration of Robert C. Divine                                    Page 3 of 26

10. Based on my experience and understanding as set forth above and below, it is my opinion that plaintiffs' proposed methodologies for determining who is and who is not an authorized U.S. worker—through querying government and private databases and reviewing third party notifications to Swift, and Swift's I-9 Forms—are not valid; plaintiffs' suggested standard for constructive knowledge by an employer in relation to workers who are not fluent in English or who use a translator to complete Form I-9 is contrary to fact, law, and established public policy; plaintiffs' suggested standard for constructive knowledge by an employer based on distinctions between workers' photos and their personal appearance is not practical; and plaintiffs' methodologies for identifying unauthorized workers are equally invalid and impractical for showing which workers were unauthorized and were (allegedly) hired or harbored by Swift with knowledge or reckless disregard of their lack of authorization. In my opinion, an accurate assessment of which workers were or were not authorized, whether for class member identification or for causation and damages, would require at least fact-intensive, individualized inquiries concerning each worker, in most cases including testimony from each worker.

Declaration of Robert C. Divine                              Page 4 of 26

## Analysis

### A. Determining Membership in the Class

#### 1. Database Matching in E-Verify or SSNVS

11. Plaintiffs suggest that they can ascertain which Swift workers "had the legal right to work in the United States at the time of their employment" by having the court order Swift to run its employees' names through a Federal database: "Plaintiffs propose that Swift Defendants submit the names and social security numbers of all of its hourly paid workers during the Class period to the Social Security Administration's free, voluntary, Employment Verification System for matching. § 274A(d)(4). The names that do not match the numbers would be excluded from the class." Brief at 16. In other words, plaintiffs propose that workers who are the subject of a data match from a query including name and social security number (SSN) are authorized, and workers who are the subject of a "no-match" are not authorized. Based on my experience and understanding about the matching service(s) referred to, neither assertion is accurate. In my opinion such data matching of Swift past and present employees cannot establish which workers were in fact work-authorized or not. Thus, in my opinion, including in the class of plaintiffs all workers whose data matched the database would incorporate in the class a set of workers who do not belong in the class. Conversely, excluding from the class workers whose data did not match would remove from the class workers who belong in the class as defined.

12. Plaintiffs confuse the existing databases. Plaintiffs' refer to the "the Social Security Administration's free, voluntary, Employment Verification System," citing § 274A(d)(4).." This confuses terms and systems. The E-Verify electronic employment verification system (actually a service), created pursuant to INA § 274A(d) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1324a(d), operated by USCIS and previously called the "Basic Pilot," is not operated by the Social Security Administration (SSA), although SSA participates in the system and the process.

Declaration of Robert C. Divine                           Page 5 of 26

13. To run a query in E-Verify, an employer must submit a worker's name, SSN, date of birth (DoB), citizenship status (with alien or admission number if not a citizen), and other fields.[3] A query is routed first to data contributed from SSA's "Numident" Master File database that SSA maintains on each social security number holder for purposes of administering social security benefits. For workers who identify themselves as non-citizens in Part 1 of Form I-9, if the SSA data matches the worker's, the E-Verify query moves on to the USCIS databases concerning immigration status to confirm if other data fields about the worker match DHS records of permanent residents or otherwise work-authorized people. I am not aware of a method by which private parties can query USCIS records about aliens' status other than through E-Verify.

14. SSA offers a separate access to the "Numident" data matching capability through three other channels:[4]

- SSA's Social Security Number Verification Service (SSNVS), which employers can access by various methods.
- Employers' submission of W-2 forms to SSA.
- Certain private entities' submission of queries in a broader set of contexts, such as banking transactions.

15. Neither E-Verify nor SSNVS allows the types of queries suggested by the plaintiffs' motion. E-Verify accepts queries only by voluntarily participating employers who can only submit a query about a current employee *at the time he is hired*.[5] E-Verify does not allow any

---

[3] USCIS E-Verify User Manual M-574 (April 2008 version), available at http://www.uscis.gov/files/nativedocuments/E-Verify_Manual.pdf. Other fields include hire date, type of document presented (from a menu), and document expiration date(s), but these data are not matched electronically against a database.

[4] SSA explains the W-2 and No-Match letter process as well as SSNVS through web pages accessible directly from http://www.ssa.gov/employer/noMatchNotices.htm.

[5] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, Title IV, §§ 401-405, as amended by Basic Pilot Program and Expansion Act of 2003, Pub. L. No. 108-156, both codified at 8 U.S.C. § 1324(a). "Except as specifically provided in subsection (e), the Secretary of Homeland Security may not require any person or other entity to participate in a pilot program." *Id.* at § 402(a). "A person or other entity that elects to participate in the basic pilot program described in this subsection agrees to conform to the following procedures *in the case of the hiring* (or recruitment or referral) for employment in the United States of each individual covered by the election." *Id.* at § 403(a) (emphasis added). "Notwithstanding any other provision of law, nothing in this subtitle shall be construed to permit or allow any department, bureau, or other agency of the United States Government to utilize any

Declaration of Robert C. Divine                    Page 6 of 26

queries for workers after hire, and it does not allow queries about non-employees, such as former employees or even applicants. In order to participate in the voluntary E-Verify system, USCIS requires an employer to agree to a Memorandum of Understanding (MOU). The MOU states, "The Employer agrees not to use E-Verify procedures for re-verification, or for employees hired before the date this MOU is in effect."[6] The SSNVS allows queries about existing and former workers, but only to ensure that the records of such employees are correct for the limited purpose of completing Internal Revenue Service (IRS) Form W-2.[7] For use of its "Consent-Based Verification Service" through private providers,[8] SSA requires the "requesting party" to promise that it has obtained specific written consent for such query from each individual SSN holder to be queried using Form SSA-89. The agreement includes the following:

> SSA's verification of an SSN does not provide proof or confirmation of identity. **"NOTE: CBSV is designed to provide you with only a "yes" or "no" verification of whether the SSN verified with SSA's records. CBSV does not verify employment eligibility, nor does it interface with the Department of Homeland Security (DHS) verification system, and it will not satisfy DHS's I-9 requirements."** [emphasis in original]

---

information, data base, or other records assembled under this subtitle for any other purpose other than as provided for under a pilot program." *Id.* at § 404(h)(1).

[6] E-Verify Memorandum of Understanding, Art. II (C)(8), available at http://www.uscis.gov/files/nativedocuments/MOU.pdf.

[7] SSA states, "SSNVS is not for individuals/companies who conduct identity verification, background checks or other related services for employers or other parties," "It is not proper to use SSNVS for non-wage reporting purposes such as identity, credit checks, mortgage applications, etc." and "Anyone who knowingly and willfully uses SSNVS to request or obtain information from SSA under false pretenses violates Federal law and may be punished by a fine, imprisonment or both." See SSNVS Handbook, available online at http://www.ssa.gov/employer/ssnvs_handbk.htm, and "BSO Suite of Services" (both under heading "Proper Use Of SSNVS").

[8] For background, see http://www.ssa.gov/bso/cbsvMarketing.html. That site states that "[t]he CBSV consent and fee-based, third party verification service should not be confused with ... SSNVS, which SSA provides to employers and their agents for wage and tax reporting for hired employees." Nevertheless, aside from the different contexts of use, such as for financial transactions as opposed to employment, the database and its limitations and consequent protections are essentially the same as SSNVS.

Declaration of Robert C. Divine                                    Page 7 of 26

The requesting party must also agree that it is "specifically prohibited from advertising that SSN verification provides or serves as identity verification."[9] Thus, a query of these databases would not be possible under the programs' respective rules.[10]

16. Even if queries about Swift's existing and prior employees could be submitted to E-Verify and/or SSNVS, in my opinion the responses would not determine which workers are authorized to work in the United States and which are not.

17. A data match for a particular worker with the SSA Numident Master File database reflects only that there is a SSA record of a person with the points of data queried and does not mean that the actual worker is in fact authorized to work.   W-2, SSNVS and private service queries at most cover name, SSN, and DoB (with gender an option for SSNVS). Social security numbers have been issued in the past to persons not authorized to work, and more recently they are also issued to persons whose authorization to work may expire. Thus, a match of a non-E-Verify query does not even reflect that the person for whom the SSA record was created is currently authorized to work, and even a person authorized to work today might not have been authorized to work at a time in the past.

18. Only E-Verify queries also include citizenship and confirm aliens' work authorization status in DHS records. Thus, only an E-Verify confirmation provides a high level of confidence that the person whose data is queried is currently authorized to work, but even that confirmation is of questionable value given that the person might have been unauthorized at the time he or she worked for Swift and has only since become authorized. Conceivably, a current E-Verify query might not confirm a person who was authorized at time of hire but whose verification documents

---

[9] User Agreement Between SSA and Requesting Party for Consent Based Social Security Number Verification (CBSV), Articles III, IV and VII, available as a template at http://www.ssa.gov/bso/cbsvPDF/agreement.pdf. For reference to a similar direct matching access for banks, etc., see Congressional Response Report, Monitoring the Use of Employee Verification Programs, at p. 8, n. 21, A-03-06-36122 (September 2006), available at http://www.ssa.gov/oig/ADOBEPDF/A-03-06-36122.pdf.

[10] One court has refused to require a similarly situated employer to participate in data matching for plaintiffs' discovery because it involves a voluntary government process. *Brewer v. Salyer*, 2007 WL 3341479 (E.D. Cal. 2007). In my opinion, however, participation by Swift under the conditions proposed by plaintiffs is not even voluntary—it is not allowed.

Declaration of Robert C. Divine                              Page 8 of 26

or citizenship status (such as through naturalization from permanent residence) have changed. In addition, E-Verify now requires the employer to use its "Photo Tool" to compare (1) the photo on certain recently issued original cards presented by the worker (I-551 permanent resident card or I-766 employment authorization document) with (2) the photo that DHS used to create the card in DHS systems, which will be projected on the employer's computer screen. It is not clear how the system would treat a new query about a worker based on documents presented years ago, but the risk of a nonconfirmation on an authorized worker seems significant.

19. Even if a data match could establish that a person is work authorized, it is not reasonable to assume that the actual worker claiming that identity is in fact that person. SSA emphasizes that its verification of a SSN does not provide proof or confirmation of identity, and it requires third parties providing a SSN matching service to promise not to advertise identity verification.[11]

20. DHS has spoken frequently and openly about the high volume of identity fraud in the United States. A large, multi-jurisdictional raid by ICE of numerous facilities of Swift & Company on December 15, 2006[12] served as a prime example of this phenomenon. Since Swift had used E-Verify for many years before the raids but still was found to employ a significant number of workers who had stolen identities of real people whose data matched in E-Verify. DHS Secretary Chertoff, in a press conference the day after the Swift raids, commented, "while [E-Verify] inoculates a company against one kind of illegal immigration fraud, it doesn't inoculate against all kinds of fraud."[13]

21. Conversely, a data no-match for a particular worker with the SSA Numident database and/or the USCIS alien data records does not reflect that the worker is unauthorized to work in

---

[11] User Agreement, *supra* n. 9.

[12] Referred to at ICE's Worksite Enforcement Fact Sheet at
http://www.ice.gov/pi/news/factsheets/worksite_cases.htm.

[13] Posted on DHS web site at http://www.dhs.gov/xnews/releases/pr_1166047951514.shtm.

Declaration of Robert C. Divine                                    Page 9 of 26

the U.S. SSA states clearly on its web site that employers should not take adverse action on the basis of a mismatch report:[14]

- A mismatch is not a basis, in and of itself, for you to take any adverse action against an employee, such as laying off, suspending, firing or discriminating.
- Company policy should be applied consistently to all workers.
- Any employer that uses the failure of the information to match SSA records to take inappropriate adverse action against a worker may violate State or Federal law.
- The information you receive from SSNVS does not make any statement regarding a worker's immigration status

SSA provides similar warnings to employers when it sends them no-match letters.[15]

22. A worker who is in fact authorized can be the subject of a mismatch for many reasons, including:[16]

- SSA administrative error[17] (such as transcription error or erroneous assignment of a SSN that has previously been assigned to another individual);
- error or omission in data entry of the worker's information submitted in the query to SSA (by whatever means);
- marriage, divorce, or other change of the worker's name since the SSN was obtained or since SSA last recorded a change for that record;

---

[14] SSNVS Handbook, supra, available at http://www.ssa.gov/employer/ssnvs_handbk.htm.

[15] SSA letters to employers giving notice of such a W-2 no-match state that the letter makes "no statement regarding an employee's immigration status," that the employer should not "take any adverse action against an employee, such as laying off, suspending, firing, or discriminating against that individual, just because his or her Social Security number appears on the list," and that "[d]oing so could, in fact, violate State or Federal law and subject you to legal consequences." SSA provides to employers a sample letter to provide to workers affected by a no-match, which directs the employee to check records to make sure the information was correct, and otherwise to go to SSA to resolve the issue, with a special note stating, "This notice does not imply that you intentionally provided incorrect information about your name or Social Security Number, nor does this adversely affect your employment." Sample letter available at http://www.ssa.gov/employer/sampleltr.doc.

[16] SSA on its web site states, "There are a number of reasons why reported information may not agree with our records, such as typographical errors, unreported name changes, inaccurate or incomplete employer records or misuse of a SSN." See http://www.ssa.gov/legislation/nomatch2.htm. Other common errors are mentioned in the Declaration of Kenneth S. Apfel, infra.

[17] Various reports at http://www.ssa.gov/oig/office_of_audit/issueshomeland.htm (Audit Reports by Top Management Issue: Social Security Number Integrity & Protection (Homeland Security & Earnings)) reveal the range of errors that can be made by SSA workers.

Declaration of Robert C. Divine                                    Page 10 of 26

- inconsistent use of name (such as with compound last names used by many of Latin American heritage, with transliterations of names from different alphabets, or with Americanized names taken on); and,

- for E-Verify queries including the citizenship field, naturalization of the worker not reported to SSA.[18]

23. SSA's Office of the Inspector General found that of the 17.8 million discrepancies in the SSA database that could result in a no-match letter, of which 12.7 million (or over 70 percent) would pertain to native born U.S. citizens.[19] The remainder of mismatches includes other authorized workers who are naturalized or otherwise foreign-born citizens, permanent residents, and aliens authorized to work.

24. In short, as stated by a former SSA Commissioner, "SSA does not know whether any employee identified in a no-match letter is unauthorized to work, and indeed, many records in the [data], from which no-match letters are drawn, belong to U.S. citizens and work-authorized non-citizens," and "there is no basis for concluding that any particular employee who is the subject of a no-match letter is unauthorized to work."[20]

25. Recognizing that no-matches can reflect something besides lack of authorization by the worker, USCIS requires employers using E-Verify to follow extensive procedures to allow workers to contest a no-match. USCIS requires the employer first to sign a Memorandum of Understanding (MOU) setting forth mutual obligations. The employer must agree to provide a host of procedures to a worker for whom a "tentative nonconfirmation" (initial no-match) is

---

[18] USCIS has never systematically reported naturalizations to SSA. USCIS has not even required naturalization applicants to submit their social security numbers to USCIS. USCIS has not systematically notified naturalized citizens to go to SSA to update their records in SSA's systems. USCIS and SSA have not yet clearly figured out how to update SSA systems to reflect naturalizations, though they have been trying. The naturalization mismatch occurs when Numident is matched through E-Verify, in which a citizenship code is queried. An employer's query through SSNVS, and a similar query through submission of a W-2, does not include a citizenship code and would not trigger a no-match based on citizenship.

[19] Congressional Response Report, Accuracy of the Social Security Administration's Numident File, at p. 6, A-08-06-26100 (December 2006).

[20] Declaration of Kenneth S. Apfel in Support of Temporary Restraining Order and Preliminary Injunction, at pages 2 and 7, filed in *American Federation of Labor v. Chertoff*, Case No. 3:07-cv-04472-CRB (N.D. Cal.), document # 12.

received, so that the worker can follow up with SSA or USCIS to resolve the no-match. The employer must not take any adverse action based on the tentative nonconfirmation until the worker is allowed time to resolve the issue. Tentative nonconfirmations could arise from the types of mistakes or errors mentioned above. The federal contractor hired by USCIS to evaluate the performance of E-Verify, Westat, has reported as a "data limitation" that "the erroneous tentative nonconfirmation rate for all work-authorized workers verified cannot be measured directly, since the evaluation team has no way to determine accurately which employees are work-authorized."[21] Similarly, the SSA CBVS requires that a requesting party experiencing a no-match must confirm the data with the consenting party and, "[i]f the Requesting Party cannot resolve the data discrepancy, the Requesting Party will refer the individual to a SSA Field Office to determine the nature of the problem."[22]

26. The procedures used and required by SSA and USCIS reflect their knowledge that a no-match with their databases does not reflect that a particular worker is in fact not authorized to work. Only by allowing the worker to interact further with the government agencies who maintain those databases could any fair determination be made about whether the person the worker claims to be is authorized to work. Plaintiffs' methodology proposes no such follow-up. Even when such a step is taken, there remains the question of whether the worker is in fact the actual authorized person. I do not know any means to determine identity by reference to the databases proposed by plaintiffs.

27. Plaintiffs' proposal seems to overlook the fact that data for every one of the workers hired by Swift during the periods covered by the proposed class definition, and those hired back to 1997, were in fact submitted to and verified by the E-Verify system, then called "Basic Pilot." This verification reflected a match against SSA's Numident database and, for workers who did not claim to be U.S. citizens or nationals, a match against INS or DHS records reflecting immigration status authorizing work. In my opinion, E-Verify queries submitted at that time would be more reflective of employment authorization at the time of employment at Swift than

---

[21] "Findings of the Web Basic Pilot Evaluation," report to DHS (Sept. 2007), pp. xix-xx, http://www.uscis.gov/files/article/WebBasicPilotRprtSept2007.pdf.

[22] User Agreement, *supra* n.9, at Art. IX.

Declaration of Robert C. Divine                                    Page 12 of 26

would be queries submitted to E-Verify using the same data today. In my opinion, those successful queries reflect a very high level of probability that people whose data was queried were authorized to work in the United States. The issue for purposes of ascertaining the class, however, is whether the people who worked at Swift were in reality the people whose data they presented to Swift. As discussed below, that issue requires an extraordinarily fact-specific and individualized analysis.

28. From the public reports by DHS about the December 2006 raid of Swift facilities, it appears that all or nearly all of the workers against whom DHS took action had stolen the identity of a real, authorized person. I am not aware of how DHS determined, before the raid, which workers to target, but a review of the main filings and hearing transcript concerning Swift's effort to enjoin the government's raid beforehand reveals that even DHS needed to interview such workers in order to conclude that they were imposters and thus unauthorized. Plaintiffs have not identified methods by which to target specific past and present Swift employees as imposters, and even if they had excellent methods for targeting, in my opinion a factfinder would not be able to conclude that a worker was in fact an imposter without direct interaction with each targeted person.

### 2. Third Party Notifications and Internal Investigations

29. Plaintiffs propose to ascertain class membership by review of "records of notifications from third parties that particular workers are using a social security number issued to someone else." Brief at 13-14. Presumably, plaintiffs refer to the "no-match letters" that SSA sends employers arising from W-2 statements. As discussed above, SSA no-match letters in effect reflect another path by which to query the SSA Numident database, and they do not establish whether a worker was authorized or not. E-Verify includes a match against the SSA Numident database. Thus, I would not expect Swift to have received SSA "no-match" letters concerning employees hired since it started using E-Verify in 1997. Swift might have received notifications from third parties reflecting the possibility that a Swift employee was using an identity also being or having been used by another person somewhere else. Such notification does not normally establish whether the worker is the real owner of the SSN or is an imposter. The testimony and exhibits I have reviewed reflect that Swift had a practice of investigating such

Declaration of Robert C. Divine                                    Page 13 of 26

notifications, including following up on ICE apprehensions in the December 2006 enforcement action. To the extent that such investigations did not lead to a conclusive determination at the time, and the worker is no longer available for interview, it is not likely that an accurate determination can be made. While the results of completed investigation results might be helpful in ascertaining the class, it does not seem likely that the workers identified through corporate investigations as having presented false identities will necessarily be all or even most of the workers who may have been in fact unauthorized among the workers hired by Swift since December 15, 2002 or earlier. Thus, internal investigations alone would not suffice in accurately determining the class and would only serve to exclude the workers who happen to have been discovered and confirmed as imposters. In addition, even as to those identified as imposters through internal and/or ICE investigation, a separate causation and damages analysis would have to be made to determine whether Swift knew at the time of hiring them that they were unauthorized. The fact that Swift identified such workers and took action against them later would tend to suggest that Swift did not hire them with knowledge that they were imposters.

### 3. I-9 Forms

30. Plaintiffs also propose to ascertain membership in the class by reviewing I-9 Forms maintained by Swift for each past and present employee of the company. They state that "improper completion of the I-9 forms creates a presumption that the employer knows the employee is unauthorized," citing 8 C.F.R. 274a.1(l)(1)(i). Brief at 16. Based on my experience and understanding of the I-9 verification process, review of I-9 employment verification forms completed by employers cannot be used to determine which workers were in fact authorized or not.

31. The Form I-9[23] was created for employers to use to verify the identity and employment eligibility of newly hired workers as required by the Immigration Reform and Control Act of 1986.[24] Form I-9 now has four pages (previously three). Two pages are instructions, and the last page is a list of acceptable documents. The employee and an employer representative fill out the

---

[23] Available at http://www.uscis.gov/i-9.

[24] Pub. L. 99-603, Part A.

Declaration of Robert C. Divine                    Page 14 of 26

critical page to evidence that the employee swore to be one of the three categories of authorized workers and that the employer reviewed original documents from the employee reflecting identity and employment eligibility. In section 1, on the day of hire, the employee must first check a box indicating whether he is a (1) citizen or national; (2) lawful permanent resident (adding his alien number); or (3) alien authorized to work (adding his alien or admission number and expiration date). He then signs under oath. Anyone who prepared and/or translated for the worker must sign a separate sworn statement. In section 2, within three days of hire, the employer provides the title, issuing authority, document numbers and expiration dates (if any) of the document(s) that the employee chooses to present from the list on the last page. The employer representative who reviewed the original documents signs a sworn statement. Section 3 is for updating and re-verification, if needed later. The employer is required to accept from the employee documents that reasonably appear on their face to be genuine and relate to the worker, but the employer is not expected to be a document expert.[25]

32. Employers must retain completed Forms I-9 for all employees for 3 years after the date they hire an employee or 1 year after the date employment is terminated, whichever is later. These forms can be retained in paper, microfilm, microfiche, or, more recently, electronically. Thus, it may be that I-9 forms for many Swift workers employed on or after December 15, 2002, or earlier will have been destroyed prior to the filing of this lawsuit in keeping with law.

33. A properly completed Form I-9 by itself does not establish that a worker is authorized to work. In my experience, unauthorized workers often will provide false documents to employers to meet the I-9 requirements. These false documents may reflect (1) the worker's true identity but a false assertion of employment authorization (such as a falsely made social security card, permanent resident card or employment authorization card relating to the person's true identity); (2) a fictitious identity and false claim of employment authorization; or (3) impersonation of a different real and authorized person.[26] The employer must accept the documents as long as they reasonably appear on their face to be genuine and to relate to the individual worker presenting

---

[25] *Collins Foods International, Inc. v. INS,* 948 F.2d 549 (9th Cir. 1991).

[26] "Unauthorized Employment in the United States: Issues and Options," Congressional Research Service, at p. 3 (April 20, 2007), available at http://assets.opencrs.com/rpts/RL33973_20070420.pdf.

Declaration of Robert C. Divine                        Page 15 of 26

himself.[27] Thus, an employer in good faith properly can complete a Form I-9 using false documents without detecting or reflecting that the person is in fact not authorized. Whether a worker was actually who he claimed to be or was truly authorized to work is not likely to be discernable from the face of a Form I-9.

34. Conversely, an employer's failure to complete a Form I-9 correctly for a worker does not establish that a worker is not authorized. Employers frequently make I-9 mistakes and even fail to complete I-9 forms at all for U.S.-born workers, permanent residents, and aliens otherwise authorized to work. Common errors with Forms I-9 include forgetting to complete or retain the form at all, failing to make sure the worker signs the certification or checks one of the boxes in Part 1 about his basis for authorization; accepting the wrong types of documents (such as a copy of a social security card rather than an original; or such as an immigration judge's order granting asylum, which is not acceptable even though an asylee is legally authorized to work); writing down the wrong information or leaving out fields of information about the supplied documents in Part 2; or the employer's representative failing to complete the certification correctly. Even the most blatant errors by an employer in completing a Form I-9 do not establish that the worker was in fact unauthorized. An I-9 irregularity does not establish that a particular worker for whom an I-9 was neglected or completed incorrectly was not in fact an authorized worker.

35. Plaintiffs misstate the law when they state that "improper completion of the I-9 forms creates a presumption that the employer knows the employee is unauthorized," citing 8 C.F.R. 274a.1(l)(1)(i). Brief at 16 (emphasis added). First, under the regulation cited, the failure to complete an I-9 does not create a *presumption* of anything; instead, it allows only an *inference* of constructive knowledge.[28] Second, what an improperly completed or missing I-9 may allow one to infer—constructive knowledge of the employer—says nothing about whether that individual is

---

[27] DHS Employer Handbook at p. 6, available at http://www.uscis.gov/files/nativedocuments/m-274.pdf.

[28] "Constructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition." 8 C.F.R. § 274a.1(l). The inappropriateness of a presumption is further supported by the statute's provisions on "Good faith compliance," which allows the employer to avoid any finding of noncompliance at all if the violations were technical or procedural, the employer made a good faith attempt to comply, and corrects the failure within a 10 days of receiving ICE's explanation of the problem. See INA § 274A(b)(6), 8 U.S.C. § 1324a(b)(6).

Declaration of Robert C. Divine                                        Page 16 of 26

in fact work authorized. In employer sanctions cases under the I-9 rules, the worker's lack of authorization and the employer's knowledge of that lack of authorization are two separate elements among the five elements to be established.[29] When ICE uses the constructive knowledge regulation to establish a "knowingly hires" violation, it asks the fact finder to infer that, *given that the worker was in fact unauthorized as shown by other means*, the employer had *knowledge* of that lack of authorization.[30] In my opinion, the failure of an employer to complete an I-9 correctly does not establish whether the worker was authorized or not, and reviewing such failures would not help to determine the class defined by plaintiffs.

---

[29] *See, e.g., United States v. Aid Maint. Co.* 7 OCAHO 951 (1997) (listing the five elements: "(1) respondent; (2) after November 6, 1986; (3) hired for employment and/or continued to employ in the United States; (4) unauthorized aliens; (5) knowing that those aliens were unauthorized with respect to such employment.").

[30] See *Collins Foods International, Inc. v. INS*, 948 F.2d 549 (9th Cir. 1991) ("Inasmuch as it was uncontroverted that Rodriguez was unauthorized to work in the United States, the only issue to be decided at the hearing was whether Collins Foods knew that Rodriguez was unauthorized at the time of hire."); *New El Rey Sausage Co. v. INS*, 925 F.2d 1153 (9th Cir. 1991) (holding that the employer had violated section 274A(a)(2) of the INA only after INS had first determined that certain employees were unauthorized after running checks on several employees' alien registration numbers, hand delivering to the employer a letter informing it of the results of the checks, and the employers' inaction in exercising any corrective measures).

Declaration of Robert C. Divine                                    Page 17 of 26

**B. Language Ability**

36. I have been asked to address the extent to which a worker's inability to speak English can give rise to a conclusion that the worker is unauthorized to work in the United States. Plaintiffs mention, as evidence of Swift's alleged "Blind Eye Policy" of "ignoring obvious facts which indicate that documents do not relate to the people tendering them, particularly the inability to speak English" Brief at 6. In my opinion, based on my experience and understanding of U.S. immigration and employment law, federal law prohibits an employer from using English language proficiency to determine a worker's employment authorization.

### 1. Prohibition of employment discrimination based on national origin

37. The Equal Employment Opportunity Commission (EEOC) interprets U.S. law to prohibit an employer from using foreign accent or appearance *or English language fluency* as factors in employment decisions such as hiring and selection except to the extent that foreign language ability is required to perform the job.[31] EEOC regulations state:

> The Commission has found that the use of the following selection procedures may be discriminatory on the basis of national origin. Therefore, it will carefully investigate charges involving these selection procedures for both disparate treatment and adverse impact on the basis of national origin. However, the Commission does not consider these to be exceptions to the 'bottom line' concept:
>
> (1) Fluency-in-English requirements, such as denying employment opportunities because of an individual's foreign accent, or inability to communicate well in English
>
> (2)  Training or education requirements which deny employment opportunities to an individual because of his or her foreign training or education, or which require an individual to be foreign trained or educated.

38. Likewise, the DHS Employer Handbook for the I-9 process contains a clear warning against national origin discrimination under the heading "Types of Employment Discrimination Prohibited Under the INA":

> National Origin Discrimination

---

[31] 29 CFR § 1606.6(b); EEOC Compliance Manual, National Origin (December 2002), available at http://www.eeoc.gov/policy/docs/national-origin.html.

Declaration of Robert C. Divine                    Page 18 of 26

This form of discrimination occurs when an employer treats employees differently based on their national origin in regard to hiring, firing, or recruitment or referral for a fee. An employee's national origin relates to the employee's place of birth, country of origin, ancestry, native language, accent, or because he or she is perceived as looking or sounding "foreign." All work-authorized individuals are protected from national origin discrimination.[32]

39.  The expectation that employers lawfully may employ workers with limited or no English language ability is supported by the presence of a translation section for the worker on Form I-9 itself with no suggestion of limiting its use to certain classes of workers.  The DHS Employer Handbook states:[33]

If the employee cannot complete Section 1 without assistance or if he or she needs the Form I-9 translated, someone may assist him or her. The preparer or translator must read the form to the employee, assist him or her in completing Section 1, and have the employee sign or mark the form in the appropriate place. The preparer or translator must then complete the Preparer/ Translator Certification block on the Form I-9.

40.  The Office of Special Counsel for Unfair Immigration-Related Employment Practices (OSC) was created within the Civil Rights Division of the Department of Justice by the Immigration Reform and Control Act to administer the anti-discrimination provisions of IRCA. Congress included these provisions to battle the potential that employers could implement the verification requirements too aggressively to the detriment of authorized workers who may seem foreign. The OSC Employer Guide to Fair Employment[34] at page 4 states:

---

[32] The Handbook also states, "The INA's prohibition against intentional national origin discrimination generally covers employers with 4 to 14 employees." This relates to the limited jurisdiction of the Office of Special Counsel within the Department of Justice. EEOC jurisdiction for national origin discrimination dovetails: 15 or more employees, as noted on pages 15-16 of the Handbook.

[33] Id. at 5. DHS publishes separately a Spanish language version of Form I-9 but limits its use to Puerto Rico. The Employer Handbook states at page 44:

The Form I-9 is available in English and Spanish. However, only employers in Puerto Rico may use the Spanish version to meet the verification and retention requirements of the law. Employers in the 50 states may use the Spanish version as a translation guide for Spanish-speaking employees, but the English version must be completed and retained in the employer's records. Employees may also use or ask for a translator/preparer to assist them in completing the form.

[34] Available at http://www.usdoj.gov/crt/osc/pdf/publications/en_guide0507.pdf.

Declaration of Robert C. Divine                          Page 19 of 26

> Remember that you are free to hire *anyone* who can show documents establishing his or her identity and authorization to work in the United States. Any of the documents (or combination of documents) listed on the back of Form I-9 are acceptable as long as they appear to be reasonably genuine. (emphasis added)

OSC frequently emphasizes that employers must not require more or different documents than are required by the I-9 rules, because that constitutes "document abuse," and OSC especially counsels against requiring more of a worker because of national origin.

41. The OSC Guide and other materials consistently convey the importance of not discriminating against workers on the basis of indicia of foreign origin and not second-guessing how they obtained whatever work authorization documents they present. OSC's page on "Types of Discrimination" includes this statement:

> Employers may not treat individuals differently because of their place of birth, country of origin, ancestry, *native language*, accent, or because they are perceived as looking or sounding "foreign." All U.S. citizens, lawful permanent residents, and work authorized individuals are protected from national origin discrimination.[35]

42. In order to handle calls from authorized U.S. workers who are protected from discrimination, OSC employs interpreters in various languages. OSC publishes much of its educational information, including its "If You Have the Right to Work" posters, in Spanish and some other languages. EEOC has an entire web site in Spanish[36] and some additional information in other languages.

43. I am not aware of any suggestion by a government agency that an employer should assume from lack of English language ability that a worker lacks authorization to work in the United States. Taken as a whole, the authorities and instructions given to employers by the United States government counsel an employer not to consider English language capability in employment decisions concerning any position that does not require such capability for satisfactory performance. In my opinion, an employer who asks an applicant or employee, in relation to a job that does not require English language proficiency for satisfactory performance, to meet additional requirements or provide justification for his failure to have English language

---

[35] Available at http://www.usdoj.gov/crt/osc/htm/Webtypes2005.htm (emphasis added).

[36] See http://www.eeoc.gov/es/index.html.

Declaration of Robert C. Divine                            Page 20 of 26

proficiency in order to be hired or to retain his employment runs a significant risk of liability for national origin discrimination.

### 2. Citizens, Residents and Authorized Workers May Lack English Language Proficiency

44. It is not uncommon for an authorized U.S. worker to lack English language proficiency. I do not speak Spanish. In my own law practice I encounter persons who, as far as I can determine, are authorized aliens, lawful permanent residents, and even U.S. citizens whose English language proficiency is so low that they request that one of my staff who speaks Spanish sit with us and translate in our consultation and assist with translation in completing immigration forms and other documents.[37] I have had clients who seemed to me to be quite proficient in spoken and even written English and who communicated with me quite well in English but who, when confronted with a government form or legal document that they were required to sign, and particularly under oath, would ask for a translator.

45. There is no requirement for English language proficiency in most paths to non-citizen work authorizing status.[38] Even permanent residents are not required to show any English language proficiency. In fact, USCIS publishes in 13 languages the Guidebook, "Welcome to the United States: A Guide for New Immigrants."[39]

---

[37] Through Executive Order 13166 (August 11, 2000) the Federal Government requires agencies and federally funded programs to make special efforts to improve foreign language access to services by the large number of people in the United States who have "Limited English Proficiency (LEP). Extensive information on the LEP initiative is available at http://www.lep.gov.

[38] Certain employment-based temporary and permanent visa categories require either English proficiency according to objective testing or consular interview. It would be highly unlikely for someone who entered on such a visa, such as H-1B specialty occupation or R-1 religious worker, to work as an hourly employee at a meat processing facility.

[39] Available in all 13 languages from http://www.uscis.gov/newimmigrants.

Declaration of Robert C. Divine                                    Page 21 of 26

46. One of the requirements for naturalization to citizenship is English language proficiency. By law, however, there are several exceptions that include large numbers of people.[40]

---

[40] Exemptions pursuant to INA § 312, 8 U.S.C. § 1423, include applicants who:
- have been residing in the United States subsequent to a lawful admission for permanent residence for periods totaling 15 years or more and are over 55 years of age;
- have been residing in the United States subsequent to a lawful admission for permanent residence for periods totaling 20 years or more and are over 50 years of age; or
- have a medically determinable physical or mental impairment, where the impairment affects the applicant's ability to learn English.

Declaration of Robert C. Divine                              Page 22 of 26

47. The naturalization test is not terribly difficult and only tests for rudimentary English. I have had numerous clients who had been naturalized and who continued to prefer to speak with me through a translator.[41]

48. There are several categories of people who can have been born abroad and are automatically citizens at birth, upon returning to the U.S., or upon the naturalization of a parent. Those paths to citizenship require no English test, and those citizens may have very limited English proficiency.[42]

49. Puerto Ricans are U.S. citizens, and the official language of Puerto Rico is Spanish. Persons who have lived in Puerto Rico for their entire lives might not have English language proficiency and are free to travel and work anywhere in the United States.

### 3. Conclusion Concerning Language

50. Based on my experience and understanding of language proficiencies and preferences of a significant body of people in the United States, many of whom are authorized to work in the United States and are even U.S. citizens, and on my understanding of the immigration and employment laws of the United States and the reasonable expectations on employers to comply with U.S. laws, it is my opinion that an employer, faced with a worker who claims to be a U.S.

---

[41] The statute requires that the applicant demonstrate "ability to read, write, and speak...simple words and phrases...in ordinary usage in the English language." INA § 312(a)(1), 8 U.S.C. 1423(a)(1). The components of the language test (and the history and government test also administered in English unless one of the exceptions applies) is set forth at page 37 of the USCIS Guide to Naturalization, available online at http://www.uscis.gov/files/article/M-476.pdf. The applicant gets two chances to pass the English test in one naturalization application, and many applicants pass on the re-test. The sample sentences used for the English test are on the single sheet at the end of the electronic version of the Guide to Naturalization, and the history and government questions are on the several preceding questions. Someone who has a very limited working English proficiency can diligently study and practice those questions, answers and sentences, and the questions and answers to their own naturalization application and have a reasonable chance of passing the test.

[42] Children born abroad of at least one U.S. citizen parent may be U.S. citizens by operation of law, and those born abroad since 1952 have not been required to live in the United States at all in order to retain their citizenship. See INA §§ 301, 309, 8 U.S.C. 1401, 1409. Certain children who were adopted up to age 16 by a U.S. citizen parent may enter the United States as citizens, and there is no screening for English language proficiency. Children of naturalized citizens normally naturalize with their parents, and if they are under age 18 with no English language requirements. INA § 320, 322, 8 U.S.C. 1431, 1433.

Declaration of Robert C. Divine                                      Page 23 of 26

citizen, lawful permanent resident, or an alien otherwise authorized to work and who does not have English language proficiency or requests the assistance of a translator to complete the sworn statement in Section 1 of Form I-9, does not have reason, on that basis alone, to question the credibility of the worker's sworn statement or the authenticity of the worker's identity and work authorizing documents that otherwise appear to be reasonable and to relate to the worker. Finally, it is my opinion that a Form I-9 reflecting that the worker used a translator to complete the Form I-9 in the section of the form provided for that purpose does not tend to establish that the worker was not authorized to work.

### C. Photo Comparison

51. Plaintiffs have suggested that they can ascertain the class by reference to Swift's "hiring workers who appear obviously different than the photographs or descriptions that appear in their stolen or forged identity papers." In my opinion this is unlikely to assist in ascertaining the class.

52. Most importantly, it is unlikely that there is a meaningful difference between the appearance of the workers actually hired and the photo on whatever identity documents they submitted. Undocumented workers know that employers compare their photographs to their appearance. Most often, such workers obtain counterfeit documents that contain a photo of themselves (and, when data verification is expected, the biographic data of the other person whose identity is stolen). Such documents tend to be readily available in the United States. Even when a valid document has been stolen, thieves tend to sell them to persons who resemble any photo in the document. The fact that DHS has not sought any civil or criminal sanctions against Swift arising from its December 2006 raid reinforces my opinion of the unlikelihood of glaring inconsistencies between workers' personal appearances and their identity photos presented to Swift. If such inconsistencies had existed, DHS would tend to have taken action to terminate such practices.

53. Employers are not generally required to make or keep copies of identity documents submitted for I-9 purposes. Photocopies of such documents, when made, often are not of high quality in comparison to the actual photo in the document presented. Even if photocopies were made and kept with I-9 forms, employers with document retention practices tend to destroy the forms when allowed to do so within the latter of three years from date of hire and one year from

Declaration of Robert C. Divine                                    Page 24 of 26

date of termination. Thus, it is likely that there are not photos from which to make comparison with the actual appearance of many workers who have been employed at Swift since December 2002, or earlier.

54. Those workers for whom high quality photocopies of presented identity documents are available may not be still employed or otherwise available, and even if available they cannot be presumed to look the same as they did at the time they were hired. Photos in identity documents can be old at the time of presentation of the document, particularly expired drivers licenses which employers are required to accept for I-9 purposes. Even if a high quality copy of the presented photo identity document is available and the worker is available and was recently hired, the nature of differences from the photo would need to be quite glaring to justify a conclusion of stolen identity. People often do not appear in person on a given day of hire to look a great deal like they did on the day their photo for identification was taken, and employers are not cautioned by DHS in any I-9 guidance materials to be particularly demanding in determining through photo comparison that a document reasonably appears to relate to the person being hired.

55. For these reasons, in my opinion analysis of photo identification documents associated with Forms I-9 is unlikely to assist the court materially in determining which Swift workers since December 15, 2002 or earlier were authorized to work or not.

**D. Causation and Damages**

56. Plaintiffs' proposed methodologies for identifying unauthorized workers for purposes of class membership are equally invalid and impractical, to the extent plaintiff propose using them, for showing which workers were unauthorized and were (allegedly) hired or harbored by Swift with knowledge or reckless disregard of their lack of authorization. This is true in part because of the difficulty in determining identity theft discussed above. Even for workers identified as imposters through corporate and/or ICE investigations, a separate showing would have to be made that, at the time of hire, Swift had knowledge or reckless disregard for each worker's lack of work authorization. In my opinion, an accurate assessment of which workers were or were not authorized, whether for class member identification or for causation and damages, would require

Declaration of Robert C. Divine                                        Page 25 of 26

at least fact-intensive, individualized inquiries concerning each worker, in most cases including testimony from each worker.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of June 2008 at Chattanooga, Hamilton County, Tennessee.

Robert C. Divine

_____

Robert C. Divine

Declaration of Robert C. Divine                                                Page 26 of 26

APP   26

**BAKER DONELSON**
BEARMAN, CALDWELL & BERKOWITZ PC

Home » Attorneys » Biography



**Robert C. Divine**

**Title:**
Shareholder

**Office:**
Chattanooga, Tennessee
Washington, D.C.

**Phone:**
423.752.4416
202.508.3400

**Fax:**
423.752.9533

**Email:**
rdivine@bakerdonelson.com

Initial contact with this attorney by email does not create an attorney-client relationship.

Attorney Quick Search:

A | B | C | D | E | F | G | H | I
J | K | L | M | N | O | P | Q | R
S | T | U | V | W | X | Y | Z

Search [＿＿＿＿＿＿] □

Robert C. Divine, leader of the Firm's Immigration practice group and a shareholder who works from the Firm's Washington, D.C. and Chattanooga offices, concentrates his practice in business immigration and litigation. He has extensive experience serving clients from throughout the world in the arrangement of all types of business-based temporary and permanent immigration status, including specialty occupations (H-1B), individual and blanket international transferee programs (L-1), treaty traders and investors (E-1/E-2), medical workers, religious workers, labor certification, national interest waivers, and extraordinary ability aliens, plus employer compliance. Mr. Divine also has litigated significant business matters, including contract, commercial, product liability, antitrust, ERISA benefits, and business torts (including RICO, misrepresentation, Consumer Protection Act).

By presidential appointment, Mr. Divine served in Washington, D.C. from July 2004 until November 2006 as the first Chief Counsel of United States Citizenship and Immigration Services (USCIS), the world's largest immigration services agency within the Department of Homeland Security (DHS). From July 2005 until July 2006, he served as Acting Director and then Acting Deputy Director of USCIS.

**Publications & Speaking Engagements**

Speaker – "The Campaign Season: A New Focus on Immigration Law," Thomson West Podcast (January 2008)

Author of *Immigration Practice* (Juris Publishing, 2006-07 ed.), a 1,600 page practical treatise on all aspects of U.S. immigration law published originally in 1994 and completely revised and reprinted annually

"10 Immigration Tips for Business Counsel," *Business Law Today* (August 1998)

"Religion in Immigration Law," Immigration Briefings (Federal Publications, July 1998)

"1990 Immigration Law: New Visas, Changed System," *Tennessee Bar Journal* (March/April 1991)

"The New Immigration Law: Problems for Employers, Amnesty for Many," *North Carolina Bar Association Bar Notes* (June/July 1987)

**Professional Honors & Activities**

Listed in The Best Lawyers in America®

American Immigration Lawyers Association — Midsouth and Atlanta Chapters (1986 to present): Lecturer on numerous topics to other immigration attorneys

AV® Peer Review Rated by Martindale-Hubbell

APP   27

"Big Brother" since 1978; past or present board member of Big Brothers Association, Boys Clubs, New Life Homes for [delinquent] Boys, Chattanooga Resource Foundation (ecumenical).

**Admissions**

Tennessee, 1988

North Carolina (Inactive)

**Education**

Vanderbilt University School of Law, J.D., 1985

University of North Carolina, B.A., 1982

- Phi Beta Kappa
- Morehead Scholar

Chairman of Honor Court

©2008 Baker, Donelson, Bearman, Caldwell & Berkowitz, PC | All Rights Res

## DATA AND OTHER INFORMATION CONSIDERED BY ROBERT C. DIVINE

### Filings in *Valenzuela v. Swift*

Plaintiffs' Second Amended Complaint

Order (entered December 20, 2007)

Order (entered May 28, 2008)

Plaintiffs' Motion for Class Certification

Plaintiffs' Brief in Support of Motion for Class Certification

Plaintiffs' Appendix in Support of Motion for Class Certification

Plaintiff Amended Motion for Class Certification

### Additional Materials

All materials referenced in the Declaration of Robert C. Divine in *Valenzuela v. Swift*

"The Form I-9 Process in a Nutshell" issued by the U.S. Citizenship and Immigration Services (October 7, 2005)

"Look at the Facts, Not at the Faces" issued by the Office of Special Counsel for Immigration-Related Unfair Employment Practices

Letter dated February 23, 2007 from Bennie Thompson, Chairman of the House Committee on Homeland Security, to Michael Chertoff, Secretary of the Department of Homeland Security

Letter dated March 1, 2007 from Michael Chertoff, Secretary of the Department of Homeland Security to Bennie Thompson, Chairman of the House Committee on Homeland Security

Preliminary Injunction Hearing Transcript in *Swift & Company v. Immigration and Customs Enforcement Div. of the Dept. of Homeland Security*, Cause No. 2:06CV-314-J in the United States District Court for the Northern District of Texas (*Swift v. ICE*)

ICE's brief and appendix opposing preliminary injunction filed in *Swift v. ICE*

## COMPENSATION RECEIVED BY ROBERT C. DIVINE

Mr. Divine is being compensated at a rate of $500 per hour