## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| **SWIFT & COMPANY** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.** _____ |
| | § | |
| **IMMIGRATION AND CUSTOMS** | § | |
| **ENFORCEMENT DIVISION OF THE** | § | |
| **DEPARTMENT OF HOMELAND** | § | |
| **SECURITY and JULIE L. MYERS** | § | |

---

### DECLARATION OF JACK SHANDLEY ON BEHALF OF SWIFT & COMPANY
### PURSUANT TO 28 U.S.C. § 1746

---

Jack Shandley deposes and states:

I am Senior Vice President, Human Resources for Swift & Company, ("Swift"), which has an office located at 1770 Promontory Circle, Greeley, CO 80634. I am authorized to execute this declaration on behalf of Swift. I am submitting this Declaration in support of a complaint filed by Swift in the United States District Court for the Northern District of Texas, Amarillo Division. I am fully familiar with the facts and circumstances underlying Swift's complaint and the facts set forth in this Declaration, based on personal knowledge.

## MY POSITION AND HISTORY AT SWIFT

1.      I joined Swift as Vice President, Human Resources on April 17, 2000.  Reporting to the Company's chief executive officer, my primary duties include labor relations, local, state, and federal employment compliance, payroll and benefits administration, workforce development and training, production, staff, and management recruiting.  I have been working at Swift for 6 years.

2.      As Senior Vice President (V.P.) of Human Resources ("H.R.").  I supervise the hiring and recruitment of all employees.  This includes managing the employment eligibility of our employees to ensure that they are legally entitled to work in the United States.

## ABOUT SWIFT

3.      Established in 1855, Swift has been in business for approximately 150 years. Swift employs more than 21,000 employees worldwide and processes more than four million cattle, eleven million hogs, and seven hundred thousand sheep annually.  In the United States, Swift employs approximately 15,000 employees.  Today, Swift is the second-largest processor of beef and pork products in the world, and has more than $9 billion in annual sales.  Swift's headquarters are located in Greeley, Colorado with plants in Colorado, Nebraska, Texas, Utah, Iowa, Kentucky, Minnesota and California.  Swift also has several plants in Australia and foreign sales offices in Hong Kong, Japan, Mexico, South Korea, China and Taiwan.

4.      Most Swift employees in the United States are members of the United Food and Commercial Workers ("UFCW").  A smaller number of employees belong to other unions – the Teamsters, International Operating Engineers, and Service Employees International Union – National Conference of Fireman & Oilers.  The Company works closely with these unions to ensure that its hiring practices promote a legally authorized workforce and respect the rights of its employees.  Swift has periodic collective bargaining negotiations with the unions, primarily

APP   66

the UFCW, that result in healthy wages, good benefits, and proper working conditions. Swift and the unions have a common interest in a productive, stable and legally authorized work force.

## EMPLOYMENT VERIFICATION PROCESS

5.      During the 1970s and 1980s, Congress became increasingly concerned about the escalating rate of illegal immigration. After intense debate, Congress passed the Immigration Reform and Control Act ("IRCA") of 1986 (P.L. 99-603, Nov. 6, 1986), 8 U.S.C. § 1324a (2006).

IRCA requires all employers to verify the employee's identity and eligibility to work in the United States. Specifically, section 101(a)(l) of IRCA requires verification of work eligibility, 8 U.S.C. § 1324a(b), and establishes penalties for employers who knowingly hire unauthorized aliens, 8 U.S.C. § 1324a(e). Specifically, the act (1) makes it unlawful to knowingly hire and recruit or refer for a fee aliens who are not authorized to work in the United States, 8 U.S.C. § 1324a(a)(1)(A), (2) requires those who hire and recruit or refer for a fee to verify both the identity and the employment eligibility of hired individuals (including U.S. citizens), 8 U.S.C. § 1324a(b)(1), and (3) makes it unlawful to knowingly continue to employ an alien who is or has become unauthorized to work or to knowingly obtain the services of an unauthorized alien through a contract, 8 U.S.C. § 1324a(a)(2). Depending on the violation, noncompliance with IRCA can result in civil and criminal penalties. *See* 8 U.S.C. §§ 1324a(e) and (f). The law permits employers to continue to employ unauthorized aliens hired before November 6, 1986, (i.e.," grandfathered" aliens) without being sanctioned, but U.S. Customs and Immigration Enforcement (ICE) can deport such aliens. *See generally id.* at 1324a(a)(4).

6.      New employees can various combinations of documents to establish their identity and eligibility to work (e.g., Social Security card and a driver's license). Ten of these documents are issued by the U.S. Citizenship and Immigration Services ("USCIS"). (Submitted as Exhibit 7

is a complete list of documents that establish Identity and Employment Eligibility, Appendix p. 215. On the basis of such documents, employers are required to complete an Employment Eligibility Verification Form (commonly called the "I-9 Form") for each new employee.

7.    IRCA requires that new employees sign Section I of the I-9 Form on or before his or her date of hire and complete Section 2 within three work days of the start of employment. At the time the new employee signs Section 2, he or she must present original documentation that establishes his or her identity and employment eligibility in accordance with the list of acceptable documents found on the back of the I-9 Form.

8.    In completing the I-9 Form, employers certify that they have examined the documents presented by the applicant, that the documents reasonably on their face appear genuine, and that they relate to the individual named. Therefore, in making their certifications, employers are expected to judge whether the documents presented are clearly fraudulent or counterfeit. The completed I-9 Forms are then subject to inspection by both ICE and the Department of Labor. Employers are deemed in compliance with IRCA if they have followed the above I-9 process.

9.    Swift H.R. managers have been trained on the specific I-9 verification procedures and requirements. As such, Swift requires that each new employee complete the I-9 Form and present proper employment eligibility and identity documentation in accordance with IRCA to establish that he or she is authorized to work in the United States.

APP    68

## BASIC PILOT PROGRAM

10.    In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") was passed. (IIRIRA of 1996 was enacted within a larger piece of legislation, as Subdivision D of the Omnibus Consolidated Appropriations Act, 1997, P. L. 104-208, Sept. 30, 1996). IIRIRA required the former Immigration and Naturalization Service ("INS"), now part of the Department of Homeland Security ("DHS"), and SSA to operate three voluntary pilot programs to test electronic means for employers to verify an employee's eligibility to work, one of which was the Basic Pilot Program. The other two pilot programs mandated by IIRIRA—the Citizen Attestation Verification Pilot Program and the Machine-Readable Document Pilot Program—were terminated by DHS in 2003 due to technical difficulties and unintended consequences identified in evaluations of the programs.

11.    The Basic Pilot Program ("Basic Pilot") builds upon the employment verification procedures specified by IRCA. Basic Pilot was designed to test whether pilot verification procedures could improve the existing employment verification process by reducing (1) false claims of U.S. citizenship and document fraud; (2) discrimination against employees; (3) violations of civil liberties and privacy; and (4) the burden on employers to verify employees' work eligibility. The Basic Pilot Program is a part of USCIS's Systematic Alien Verification for Entitlements (SAVE) Program, which provides a variety of verification services for federal, state, and local government agencies.

12.    Basic Pilot provides participating employers with an electronic method to verify their employees' work eligibility. Employers may participate voluntarily in Basic Pilot but are still required to complete I-9 Forms for all newly hired employees in accordance with IRCA.

13.    In the Basic Pilot program, participating employers enter the I-9 Form information about their newly hired employees into a computer and electronically transmit this information to the Federal government. Information submitted by employers is automatically

APP    69

compared with information on the Social Security Administration's ("SSA") primary database, the Numerical Identification File ("NUMIDENT"). This database contains information on name, date of birth, and citizenship status of persons issued Social Security cards, which enables SSA to confirm work authorization for U.S. citizens and some noncitizens who are permanently work authorized.    (A complete chart of the Basic Pilot process is included in GAO Report, *Immigration Enforcement: Weaknesses Hinder Employer Verification and Worksite Enforcement Efforts*, GAO-05-813 (Aug. 2005), submitted as Exhibit 2, Appendix p. 42.)

14.    If the information submitted by the employer matches SSA data, and SSA records confirm work-authorization status, the employer is immediately notified that the employee is verified. If the employer-submitted information is inconsistent with SSA information, the employer is immediately notified that the employee has received a tentative nonconfirmation finding. An SSA tentative nonconfirmation is also issued when the person attests to being a U.S. citizen but SSA records indicate that the person is a noncitizen with unknown work-authorization status. If employer-submitted information and SSA data are consistent for employees attesting to being noncitizens but the SSA database does not permit confirmation of work-authorization, the employer-submitted information is next automatically matched against USCIS's Customer Processing System ("CPS").

15.    If the USCIS automated match is adequate to establish work authorization, the employee is verified immediately. If information on the CPS is inconclusive, Immigration Status Verifiers, who are field office records experts assigned to verify status, check other DHS information to determine work-authorization status. If the Immigration Status Verifier is able to verify work-authorization, the employer is typically notified within one day of case submission that the employee has been verified. If the Immigration Status Verifier cannot verify work-authorization without additional information, USCIS issues a tentative nonconfirmation.

16.    When tentative nonconfirmations are issued, employers are required to notify their employees of the finding.    The employees have the right to contest tentative nonconfirmation findings by contacting SSA or USCIS, as appropriate, to resolve any inaccuracies in their records.    This contesting process is normally limited to ten Federal workdays.  During this time, employers are not permitted to take any adverse actions against employees, based on the finding.    When employees contest their tentative nonconfirmation findings, USCIS informs their employers of the employees' work-authorization status.    When employees do not contest their findings within the allotted time, they receive final nonconfirmation findings.  Employers are required to terminate the employment of employees in three circumstances:  when employees indicate that they do not wish to contest the finding, when employees are found not to be work-authorized, or when employees receive final nonconfirmation findings.

17.    Basic Pilot began operation in November 1997 and was only available to employers with at least one facility in the states of California, Florida, Illinois, New York and Texas.  In March of 1999, it was extended to employers with at least one facility in Nebraska. Basic Pilot was to be in effect until November 2001, however, the Basic Pilot Program Extension and Expansion Act of 2003 (Pub. Law 108-156) extended Basic Pilot to November 2008.

18.    Basic Pilot became available to all employers in all 50 states and the District of Columbia on December 20, 2004.  *See* Notice, Federal Register, Vol. 69, No. 243.  In 2004, a new Web-Based Access method on the Internet was also established for Basic Pilot.  This allowed employers to use the Basic Pilot system from any personal computer with access to an Internet Service Provider (ISP).

## SWIFT'S ENROLLMENT IN BASIC PILOT

19.     To participate in Basic Pilot, each participating Swift facility was required to sign a Memorandum of Understanding ("MOU") that spells out the responsibilities of the SSA, DHS-USCIS, and the employer.  The first MOU was signed in 1996, and in all, Swift entered into 16 MOU's covering its facilities around the country.  Some of these facilities have since been sold.  At this time, Swift currently has MOU's for seven production facilities: Greeley, CO (signed 11/97); Marshalltown, IA (signed 11/97); Grand Island, NE (signed 4/96); Hyrum, UT (signed 11/97); Louisville, KY (signed 11/97); Worthington, MN (signed 11/97); and Cactus, TX (signed 11/97).  (Copies of the MOUs are attached as Exhibit 9, Appendix p. 224-277).  Although the formats of some of the different MOUs vary slightly, all contain the same statutory conditions and terms relevant to this lawsuit.

20.     The agreed upon responsibilities of Swift, SSA and DHS under the MOUs include:

**Responsibilities of the SSA:**

- Upon completion of the I-9 Form by the employee and the employer, and provided the employer complies with the requirements of this MOU, SSA agrees to provide the employer with available information that will allow the employer to confirm the accuracy of Social Security Numbers provided by all newly hired employees and the employment authorization of some newly hired employees.

- SSA agrees to establish a means of automated verification that is designed (in conjunction with the DHS's automated system if necessary) to provide confirmation or tentative nonconfirmation of employees' employment eligibility within three Federal Government work days of the initial inquiry.

- SSA agrees to establish a means of secondary verification (including updating SSA records as may be necessary) for employees who contest SSA tentative

-8-

nonconfirmations that is designed to provide final confirmation or nonconfirmation of the employees' employment eligibility within ten Federal Government work days of the date of referral to SSA, unless it determines that more than ten days may be necessary. In such cases, SSA will provide additional verification instructions.

**Responsibilities of the Department of Homeland Security:**

- Upon completion of the I-9 Form by the employee and the employer, and completion by the employer of SSA verification procedures required prior to initiation of DHS verification procedures, DHS agrees to provide the employer access to selected data from the DHS's database to enable the employer to conduct automated verification checks on newly hired alien employees by electronic means.

- DHS agrees to establish a means of automated verification that is designed (in conjunction with SSA verification procedures) to provide confirmation or tentative nonconfirmation of employees' employment eligibility within three Federal Government work days of the initial inquiry.

- DHS agrees to establish a means of secondary verification (including updating DHS records as may be necessary) for employees who contest DHS tentative nonconfirmations that is designed to provide final confirmation or nonconfirmation of the employees' employment eligibility within ten Federal Government work days of the date of referral to DHS, unless it determines that more than ten days may be necessary. In such cases, DHS will provide additional verification instructions.

APP   73

**Responsibilities of Swift:**

- The employer agrees to become familiar with and comply with the Basic Pilot Manual.

- The employer agrees that all employer representatives performing employment verification queries will complete the Basic Pilot Web-Based Tutorial.

- The employer agrees to comply with established I-9 Form procedures, with one exception: When an employee presents a "List B" identity document, the employer agrees that it will only accept "List B" documents that contain a photograph. (List B documents identified in 8 C.F.R. § 274a.2(b)(1)(B)) can be presented during the Form I-9 process to establish identity). The employer agrees to comply with section 274B of the INA by not discriminating unlawfully against any individual in hiring, firing, or recruitment practices because of his or her national origin or, in the case of a protected individual as defined in section 274B(a)(3) of the INA, because of his or her citizenship status. The employer understands that such illegal practices can include discharging or refusing to hire eligible employees because of their foreign appearance or language, and that any violation of the unfair immigration-related employment practices provisions of the INA could subject the employer to civil penalties pursuant to section 274B of the INA and the termination of its participation in Basic Pilot. If the employer has any questions relating to the anti-discrimination provision, it should contact OSC at 1-800-255-7688 or 1-800-237-2515 (TDD).

- The employer agrees not to take any adverse action against an employee based upon the employee's employment eligibility status while SSA or the DHS is processing the verification request unless the Employer obtains knowledge (as defined in 8 C.F.R. § 274a.1(l)) that the employee is not work authorized. The employer understands that

APP   74

an initial inability of the SSA or DHS automated verification to verify work authorization, or a tentative nonconfirmation, does not mean, and should not be interpreted as, an indication that the employee is not work authorized.

21. Since December 1, 1997, over 57,000 new Swift employees have been screened through the Basic Pilot Program. According to Company records, approximately 1% of new hires received a "final nonconfirmation" letter from Basic Pilot, and Swift promptly terminated their employment.

22. Swift has used Basic Pilot in a consistent, compliant fashion from 1997 until the present and it intends to continue doing so. Swift has operated in good faith by fulfilling its responsibilities under the MOU, and it has relied in good faith on the information provided by the confirmation system.

23. As noted in the MOU, and in Section 403(d) of IIRIRA, "No person or entity participating in a pilot program [including Basic Pilot] shall be civilly or criminally liable under any law for any action taken in good faith reliance on information provided through the confirmation system." Swift understood that this protection was the *quid pro quo* for engaging in the significant compliance efforts required by Basic Pilot.

## PROBLEM OF IDENTITY THEFT DESPITE BASIC PILOT PROGRAM

24. Despite Swift's compliance with and reliance on Basic Pilot, a principal weakness of Basic Pilot is its inability to detect identity theft. Identity theft involves "stealing" another person's personal identifying information – such as Social Security number (SSN), date of birth, and mother's maiden name – and then using the information to fraudulently establish credit, run up debt, take over existing financial accounts, or to undertake other activities in another's name – such as obtaining U.S. work authorization.

25.     Government reports indicate that the current Basic Pilot Program cannot help employers detect identity theft.  "If an unauthorized worker presents valid documentation that belongs to another person authorized to work, the Basic Pilot Program would likely find the worker to be work-authorized.  Similarly, if an employee presents counterfeit documentation that contains valid information and appears authentic, the pilot program may verify the employee as work-authorized."  (*See* GAO Report, *Immigration Enforcement: Weaknesses Hinder Employer Verification and Worksite Enforcement Efforts*, GAO-05-813 (Aug. 2005), submitted as Exhibit 2, Appendix p. 52).

26.     Government reports also note that identity theft (fraudulent use of valid documents or information belonging to others) has undermined the employment verification process by making it difficult for employers who want to comply with the process to ensure they hire only authorized workers.  (See *id.* at Appendix p. 44; *see also Report to Congress on the Basic Pilot Program*, U.S. Citizenship and Immigration Services, June 2004, submitted as Exhibit 3, Appendix p. 93-94.)

27.     Another GAO Report indicated that the Basic Pilot Program cannot help employers detect identity theft, and "the prevalence of identity fraud seemed to be increasing."  (GAO, *Identity Theft: Prevalence and Cost* Appear *to Be Growing*, GAO 02-363 (March 2002), submitted as Exhibit 4, Appendix p. 125).

28.     Mr. Richard Stana, of the GAO, reported that the substantial increase of identity theft can be shown by analyzing a number of data sources.  These data sources can be used as proxies or indicators for gauging the prevalence of such crime.  To determine the prevalence of identity theft, GAO analyzed data from: (i) three national consumer reporting agencies that have call-in centers for reporting identity fraud or theft; (ii) the Federal Trade Commission (FTC), which maintains a database of complaints concerning identity theft; (iii) the SSA/Office of the Inspector General (OIG), which operates a hotline to receive allegations of SSN misuse and

program fraud; and (iv) federal law enforcement agencies—Department of Justice components, Department of the Treasury components, and the Postal Inspection Service—responsible for investigating and prosecuting identity theft related cases. GAO concluded that each of these various sources or measures seemed to indicate that the prevalence of identity theft is growing. (GAO, Statement of Richard Stana, GAO-02-830T (June 2002), submitted as Exhibit 5, Appendix p. 178-191, and GAO, *Identity Theft*, supra, Ex. 4, Appendix p. 125.)

29.    ICE has acknowledged that identity theft is a pervasive problem and discussed the methods by which it is achieved. In testimony before the Senate on August 2, 2006, Michael Everitt, Unit Chief of the ICE Forensic Document Laboratory stated: "Over the years, the FDL has seen many stolen blank passports, which are personalized to create a fraudulent document. These documents are particularly hard to detect because they are genuine blanks. Some criminals use a genuinely issued identity document in a fraudulent manner. There are many ways to do this. The most common method is impersonation, in which one person uses the genuine identity document of another person with similar physical features. Impostors are frequently intercepted at ports of entry along our border with Mexico, after attempting to use stolen or purchased Resident Alien or border crossing cards to enter the United States." (Testimony of Michael Everitt, Hearing on *"Border Insecurity, Take Two: Fake IDS Foil the First Line of Defense"* Before the Senate Finance Committee on August 2, 2006, submitted as Exhibit 6, Appendix p. 198-199.)

30.    Swift believes that the public record is clear that identity theft can defeat the Basic Pilot system, and that the prevalence of identity theft is significant. Despite its good faith reliance on Basic Pilot, Swift appears to have been victimized by identity theft as well, as ICE's statements to the Company indicate that some of the I-9 Forms subpoenaed by the agency relate to individuals that are not authorized to work. The likely reason for this situation is that the

APP    77

individuals in question engaged in identity theft to defeat the Basic Pilot screening that Swift applies to every new employee.

## LIMITS ON SWIFT'S ABILITY TO DETECT IMMIGRATION FRAUD AND IDENTITY THEFT

31.     Swift cannot scrutinize the work authorization of its new hires to the extent that it would prefer.  The Immigration and Nationality Act (INA) prohibits employment discrimination on the basis of national origin and citizenship status.  Specifically, INA section 274B(a)(6) prohibits unfair documentary practices related to verifying the employment eligibility of employees.  Employers may not request more or different documents than are required to verify employment eligibility and identity, reject reasonably genuine-looking documents or specify certain documents over others.  U.S. citizens and all work authorized immigrants are protected from document abuse.  *See* INA, Section 274B(a)(1).

32.     IRCA established an enforcement unit within the Department of Justice -- the Office of the Special Counsel for Immigration-Related Unfair Employment Practices (OSC) -- to prosecute complaints alleging national origin and citizenship status discrimination.  It further authorized the Attorney General to designate administrative law judges to hear discrimination and employer sanctions cases.

33.     Employers are required to accept identification documents presented by job applicants if the documents are not obvious forgeries—that is, if they reasonably on their face appear to be genuine and relate to the individual.

34.     Due to the anti-discrimination provisions of IRCA and the INA, employers may not use Basic Pilot to prescreen prospective employees or to check their existing workforce.

35.     Swift H.R. managers understand that it is unlawful for them to require from a new employee, "more or different documents" than are required to satisfy the I-9 Form.  In addition,

they understand that they cannot reject reasonably genuine-looking documents from a new employee. On the other hand, they understand their obligation to accurately determine a worker's eligibility pursuant to I-9 procedures.

36.    Still, on February 12, 2001, the OSC brought a complaint against Swift for an alleged "pattern and practice" of document-based discrimination, in which it sought civil damages of $2.5 million. Essentially, the government's suit alleged that by trying to verify the authorization of its workforce, Swift was doing more than the anti-discrimination laws allowed. After two years of negotiations and cooperation with the relevant federal agencies, Swift settled the case with no admission of guilt for approximately $200,000.

37.    Swift H.R. managers therefore are acutely aware that they must balance their responsibilities to accurately determine a worker's eligibility without violating the anti-discrimination provisions of IRCA and the INA. Swift does everything it can to obey both sets of laws.

## FURTHER STEPS TAKEN BY SWIFT TO ENSURE IMMIGRATION COMPLIANCE

38.    To further ensure its compliance with employment eligibility regulations, Swift has taken specific voluntary steps to reduce the likelihood that unauthorized aliens would be hired by the Company. This includes:

- Enrolling in the voluntary electronic employment authorization program, Basic Pilot, in 1996, and remaining enrolled to this date, complying at all times with the rules of this program;

- Prohibiting the use of contract workers, to avoid the practice of some companies using contract labor to avoid the employment verification function; unless the contract labor provider agrees itself to use Basic Pilot;

-15-

- Establishing an anonymous Best Work Environment Hotline within the Company, to which employees can (and do) provide confidential information on potentially unauthorized employees or improper employment practices, and requiring management follow-up on all "tips" provided through this process;

- Instituting frequent periodic reviews of the 1-9 Forms and related paperwork completed on new hires, which are conducted by Swift human resources managers who were not involved in the initial hiring decision;

- Conducting annual audits of our 1-9 and related records at each Swift facility through an outside consultant that specializes in IRCA compliance;

- Conducting regular internal training programs for employees and managers who operate and supervise the 1-9 process;

- In February 2006, the Company proactively contacted the Omaha ICE office to discuss building a stronger relationship, additional communications, opportunities and cooperation;

- Implementing additional IT system capabilities and internal procedures to identify applicants terminated at one location and applying at a different Company location.

39.    The above steps satisfy DHS's eleven "Best Hiring Practices" for federal contractors. DHS's Best Hiring practices recommends that employers take steps to further scrutinize its I-9 process, ensure that its employees are properly trained, and provide a mechanism for complaints about employment practices to be anonymously submitted and vigorously pursued. As noted above, Swift implemented these recommended practices to ensure full compliance with immigration laws and the employment eligibility of its workers.

40.    Swift has also considered joining the newly enacted ICE Mutual Agreement between Government and Employers (or "IMAGE") Program to further ensure its compliance

with the employment eligibility process. The IMAGE program is an employer self-compliance initiative established by ICE in June, 2006. The IMAGE program prescribes certain best practices for employers to follow in order to reduce opportunities to inadvertently hire unauthorized workers. These practices include mandating that its members use the Basic Pilot Employment Verification Program administered by USCIS. The IMAGE program is currently under review at Swift.

## SWIFT'S PROMPT COOPERATION WITH ICE'S INVESTIGATION

41.    In March of 2006, Swift promptly replied to administrative subpoenas issued by ICE for all I-9 Forms held at the Company's Marshalltown, Iowa facility. A significant portion of the I-9 Forms relating to that plant's 1300 employees were returned, but 665 were kept for "further review." That event, coupled with a general awareness of increased enforcement by ICE against other employers, caused Swift to retain I-9 expert auditor, Mark Reed, to review our I-9 records retained by the agency to determine what ICE might be considering.

42.    Mr. Reed reviewed the I-9 forms from the Iowa facility to see whether it complied with I-9 employment verifications procedures. Mr. Reed determined that trends and patterns may indicate that employees at Marshalltown engaged in identity theft.

43.    Soon thereafter, Swift was advised by ICE that there were possibly significant indicators of document fraud involving State identification cards and falsely obtained social security cards in many of the I-9s not returned. In addition, the unreturned I-9s were suspected to relate to unauthorized workers.

44.    ICE requested all I-9 Forms at the Company's remaining plants. Swift completed production of all requested I-9 Forms in the late summer of 2006. ICE presently possesses I-9 Forms relating to most of Swift's approximately 15,000 current employees.

45.    I understand that the ICE investigation involves review of all I-9 Form information for each employee.  ICE then compares information from the I-9 Form with information contained in USCIS, SSA, and other data bases for each employee, and also looks for reports of wages earned at multiple locations for the same SSN.  The result of this review of agency databases could reveal document fraud (use of counterfeit documents) and identity fraud (fraudulent use of valid documents or information belonging to others).  However, a private I-9 audit can not detect identity fraud, nor can it detect other forms of document fraud to a greater extent than Basic Pilot.

46.    The Company is concerned that a significant portion of the employees whose I-9s were seized by ICE may have engaged in identity theft, notwithstanding that all of these employees were authorized through Swift's longtime participation in the Basic Pilot Program and all employees had been hired in strict compliance with other applicable immigration rules.  After internal reviews of our procedures were completed by our I-9 auditors, we determined that we have done everything that was legally permissible to identify and deter the employment of unauthorized aliens.

47.    Swift was cautioned by our outside experts not to take any action against suspect employees absent close coordination with ICE at the risk of engaging in a practice of discrimination, and to avoid any suspicion by ICE that Swift was attempting to remove these workers from ICE's jurisdiction and thereby exposing itself to a charge of obstruction of justice.

48.    In fact, in a conversation with Swift's company general counsel and outside counsel, ICE agent Mark Cangemi specifically told Swift that any action it took to review its workforce that resulted in workers leaving the Company might be viewed by the government as some sort of "obstruction of justice."

APP    82

## IMPACT OF MASS SIMULTANEOUS REMOVAL AND
## SWIFT'S DESIRE AND OFFERS TO MITIGATE DAMAGE

49.     If all potentially unauthorized aliens who engaged in identity theft were removed from a Swift worksite in one consolidated removal action, Swift believes that it would suffer serious, irreparable injury.  Swift is aware that removal needs to be accomplished and simply wishes to avoid a mass, one-time removal action that would threaten the operations at one or all of the Company's plants.  In a letter to ICE dated October 9, 2006, Swift advised ICE again of its willingness to cooperate, proposed some alternatives to a simultaneous mass removal action, noted that the Company could suffer irreparable harm in such a removal action, and requested that the agency meet with Swift so that litigation could be avoided.  A copy of this letter is submitted as Exhibit 10, Appendix p. 278-285.

50.     Subsequently, on October 19, 2006, Swift and its representatives met in Washington, D.C. with representatives of DOJ and ICE.  I attended this meeting and at the meeting, Swift renewed its promise of cooperation.  We discussed the catastrophic financial harm a mass removal would cause to Swift, Swift's desire not to have unauthorized workers in our workforce, Swift's pledge of full cooperation in any criminal case, the concept of a phased or planned approach to dealing with unauthorized workers, the impact on the small rural communities in which most of our locations operate that a mass removal would cause and the problems caused by the lack of housing, available qualified applicants, and community resources available if the company tried to hurriedly increase hiring in anticipation of a large scale removal.  We requested that in light of these issues, ICE work with us to arrive at some mutually agreeable procedures to identify and remove unauthorized workers.

51.     Once ICE's instructions to Swift not to take action to review its workforce were lifted during the October 19, 2006 meeting, Swift has in fact taken steps to review its workforce.

The Company has engaged in a process through which groups of workers have their files reviewed and are personally interviewed. The number of the employees interviewed is adjusted to the production needs of the relevant facility. In addition, Swift has increased its hiring pipeline in anticipation of a number of the workers whose files are being more closely examined leaving Swift's employ. These increased hiring efforts are challenging because of the nature of the communities in which Swift's plants are located, but Swift believes that if allowed to complete its own workforce review that it would be able to do all that it legally could to ensure that it has an authorized workforce. Swift believes that if allowed to do so, it could proceed on this graduated basis of review and new hiring and be completed by February 1, 2007.

52.     Swift's current workforce review has resulted in union grievances being filed against Swift at four of its facilities, including Cactus, Texas. The other facilities at which grievances have been filed are Marshalltown, Iowa, Greeley, Colorado, and Worthington, Minnesota. In the grievances, the UFCW alleges that Swift is engaged in improper practices and unfairly impacting the union membership and Swift's workforce. When it began the review process, Swift recognized that the union might file grievances based on the workforce review, but the Company proceeded with its workforce review nonetheless because of its strong desire to have an authorized workforce.

53.     It has been extremely difficult for the Company to plan and decide how to most appropriately proceed in the course of this investigation. For example, during the August/September timeframe, based on comments made by ICE agent Mark Cangemi, Swift was concerned that if it took steps to review its workforce it might be accused by the government of obstruction of justice. Subsequently, at the October 19, 2006 meeting with Swift, ICE and DOJ, ICE directed Swift to do what Swift felt was appropriate to review its workforce. Now, in the most recent contacts with ICE on November 17 and November 20, 2006, ICE has specifically

instructed Swift not take any further action to review its workforce for fear of workers leaving facilities and not being available to ICE.

54.     At the October 19, 2006 meeting, ICE refused to agree to have discussions with Swift about trying to arrive at mutually agreeable removal and identification procedures.  ICE also informed Swift that the Company should take whatever actions it deemed appropriate to review the legality and authorization of its workforce.  Finally, ICE refused to commit to not engage in any mass removal-type enforcement action.

55.     On November 14, 2006, the United States Attorney's office for the Southern District of Iowa sent a letter to Swift's counsel requesting a very broad range of information and documents about Swift's employees, its hiring policies and practices, as well as about Swift's recent efforts to review its own workforce.  (A copy of the letter is submitted as Exhibit 11, Appendix p. 286-287.)  Swift immediately began gathering documents and began to prepare to respond to the government's requests.

56.     On November 17, ICE contacted outside counsel for Swift and requested that Swift cooperate in broad enforcement actions, euphemistically referred to as "consent surveys," scheduled by ICE for December 4.  As outlined on the November 17 call, these actions would include ICE agents coming to six different plants -- Cactus, Texas; Marshalltown, Iowa; Worthington, Minnesota; Grand Island, Nebraska; Hyrum, Utah; and Greeley, Colorado and interrogating all Swift employees, authorized or unauthorized.

57.     On November 20, 2006, there was another call between Swift, its counsel, and ICE.  Representatives from the U.S. Attorney's Office for the Southern District of Iowa also participated in this call.

58.     During the November 20, 2006 call, ICE Agent Matt Allen outlined ICE's specific plans for enforcement actions on December 4.  First, Agent Allen stated that ICE intended to move forward with enforcement actions on December 4 with or without Swift's

-21-

cooperation. He stated, however, that if Swift were to fully cooperate with these enforcement actions it might simplify some of the procedures that ICE would use.

59.    Agent Allen stated that on December 4, ICE intended to have its agents enter the six identified facilities. They would request that the Company shut down all production operations. ICE agents would plan on beginning the interview process in the early morning, at the time that the first shift of plant workers would be arriving at the plant. ICE intends to interview every single Swift employee at the six plants on December 4. For those employees that are identified as non-alien and/or authorized workers, ICE intends that those workers would be released from the interview process. For those workers identified by ICE as potentially unauthorized workers, ICE intends to take them into custody, and transport them away from Swift facilities to ICE processing locations to do further investigation of their status. Depending on the results of that further investigation, the government may take additional action towards individual employees such as deportation or possible criminal arrests.

60.    Following the November 20, 2006 telephone call, Swift's counsel sent a letter to ICE and DOJ officials which repeated Swift's request that the December 4th Plan be postponed. The letter also outlined possible alternative plans that could be used to review the Swift work force at the same time cause less damage to Swift. For example, Swift offered to work with ICE on a plant-by-plant basis to pre-identify employees ICE wanted to question rather than have the plant's entire work force interviewed by government agents. (November 20, 2006 letter submitted as Exhibit 12, Appendix p. 288-289.)

61.    The actions described by the government in connection with its plans for the December 4 enforcement actions would substantially and irreparably harm Swift. They would, for example, have an immediate impact on Swift's production by forcing the closure of the six facilities for the period of time that ICE agents were on the premises of those facilities. It appears that, at a minimum, an entire production day would be lost due to the presence of ICE

-22-

agents. The additional reality is that many of Swift's employees are of the same ethnic background and national origin as employees that may be detained by ICE during the December 4 enforcement actions. We anticipate that many Swift workers would be reluctant to return to work immediately after the enforcement actions and may, in fact, decide never to return to work at the Swift plant. We believe that the December 4 actions would, in effect, remove such a large part of Swift's workforce that for some indeterminate period, the plants could not operate at full efficiency or in a financially positive way.

62.    In the Company's view, ICE's request for the Company to cooperate in the planned December 4 enforcement actions is essentially the same as ICE requesting that the Company agree to participate in irreparably damaging itself.

A.    **Substantial Irreparable Harm to Company.**

63.    Swift would suffer substantial and potentially catastrophic harm if all unauthorized workers were removed in one consolidated action. Such action could cause Swift operations and plants to close and others not to function effectively, including:

    i.    The breach of numerous contracts, including contracts Swift has with cattle and pork suppliers and with customers in the food retail and supermarket industry, which include major customers, Kroger, Kraft, Sara Lee, and Costco;

    ii.    Potential civil liability to our business partners for future damages if a dramatic loss in production capacity were to occur;

    iii.    Long-term loss of customers and good will, impairing Swift's ability to retain current business and grow future business;

    iv.    A resulting decline in Swift's revenue and projected revenue;

    v.    Substantial monetary damage, which would be impossible to calculate reliably; and

    vi.    Damage to its company image and reputation.

APP   87

**B.**     **Substantial Risk of Violence**

64.     A mass simultaneous removal of suspect employees could be dangerous. Swift employees use and have ready access to sharp knives, saws and similar dangerous instruments during the work hours. A confrontational mass arrest may cause employees to resist. ICE agents will have guns. Therefore, if ICE were to remove all employees, in one consolidated action, there is a substantial risk of violence. A negotiated removal process that avoids on-site ICE arrests would be a much safer alternative.

## LESS INTRUSIVE WORKFORCE REVIEW MECHANISMS ARE AVAILABLE

65.     As described above, Swift has made offers to ICE to remove the unauthorized workers. Specifically, Swift has proposed the following alternatives enforcement options:

**A.**     **Staggered Removal Option**

66.     Swift proposed working with ICE to effect a managed or phased removal of individuals from Swift worksites whom ICE suspects of being unauthorized aliens. The Company understands that removal needs to be accomplished and simply wishes to avoid a mass, one-time removal action that would threaten the operations at one or all of the Company's plants.

67.     Based on my H.R. experience in the meatpacking industry, for safety reasons, consultation on removal is necessary in any event. It is much better to call the affected employees into a conference room after they have removed their working gear if they are going to have an interview with law enforcement personnel, as most meatpacking employees use long, sharp knives, saws and similar dangerous instruments during the work hours. This staggered removal is essentially what Swift has been doing, as described in paragraph 52 above, since October 19, 2006.

APP   88

**B.    SSA Mismatch Letter Option**

68.    Swift has also proposed that ICE transmit a "discrepancy" letter containing the social security number of each employee for whom ICE has discovered a discrepancy. Swift would advise the employee to resolve the discrepancy with the USCIS or the local SSA office. If no resolution of the discrepancy occurred within a finite period of days, ICE could send Swift a letter that these individuals were deemed to have received a "final nonconfirmation" under the Basic Pilot Program, and Swift would terminate their employment pursuant to the Basic Pilot MOU.

**C.    Facilitating Service of Notices to Appear in Removal Proceedings**

69.    I understand that Swift employees who are found be unauthorized may be apprehended and provided with Notices to Appear in Removal Proceedings ("NTAs"). As discussed in greater detail in our October 2006 letter, we suggested that we would work with ICE to coordinate the number of NTAs on which Swift is asked for service information, actual service of the NTAs could occur on a reasonable schedule, and the agency's enforcement goals would be met without undue harm to the Company's operations.

70.    Based on the possible alternatives for reviewing the workforce and our own recent successful and productive review of our workforce at the Marshalltown facility, I believe that there are existing options through which the Swift workforce can be reviewed, while at the same time allowing the Company to mitigate the impact caused by the removal of unauthorized workers.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 27, 2006

Jack Shandley

DC 633026v.3

-26-