1           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF TEXAS

2                DALLAS DIVISION

3  Civil Action No. 3-06cv2322-N

4  BLANCA VALENZUELA, MARGIE SALAZAR, JOSE A. SERRATO,

    JOSIE RENDON, CLARA TOVAR, CONSUELO ESPINO, MARIA

5  AVILA, ERNESTINA NAVARRETTE, MARIA E. MUNOZ, AMANDA

    SALCIDO, CANDELARIO G. ORTEGA, MARIA ORTIZ, JOSE

6  OLIVA, RAFAELA CHAVEZ, ELODIA ARROYO, SUSANA CARDIEL,

    GRACIE RIOS and LEONEL RUIZ, individually and on

7  behalf of all others similarly situated,

8  Plaintiffs,

9  v.

10  SWIFT BEEF COMPANY, INC., d/b/a SWIFT COMPANY, SWIFT &

    COMPANY, HICKS, MUSE, TATE & FURST, INC., HM CAPITAL

11  PARTNERS OF DALLAS, LLC and JOHN DOES I-V,

12  Defendants.

13

DEPOSITION OF:  KATHY E. WEBER - April 8, 2008

14

15        PURSUANT TO AGREEMENT, the deposition of KATHY

E. WEBER was taken on behalf of the Plaintiffs at 1770

16  Promontory Circle, Greeley, Colorado 80634, on April 8,

    2008, at 3:05 p.m., before Barbara Birger, Registered Merit

17  Reporter, Certified Realtime Reporter and Notary Public

    within Colorado.

18

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S
2       For the Plaintiffs:        ERIC D. PEARSON, ESQ.
                                   HEYGOOD, ORR, REYES, PEARSON &
3                                     BARTOLOMEI
                                   2331 West Northwest Highway
4                                  2nd Floor
                                   Dallas, Texas 75220
5

        For the Defendant:         ROBERT E. YOULE, ESQ.
6       Swift Beef                 Sherman & Howard
        Company, Inc.              633 17th Street, Suite 3000
7                                  Denver, Colorado 80202
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2   EXAMINATION OF KATHY E. WEBER:                PAGE
     April 8, 2008
 3
     By Mr. Pearson                                  4
 4
 5                                           INITIAL
     DEPOSITION EXHIBITS:                    REFERENCE
 6
      2  Exhibit A, Response to Interrogatory 1        8
 7
     14  Exhibit A and B                             14
 8
                                             INITIAL
 9   DEPOSITION EXHIBITS:   (Previously marked)  REFERENCE
10    1  Swift Beef Company and Swift & Company's    6
         First Supplemental Responses to Putative
11       Class Representatives' First and Second Set
         of Interrogatories
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          WHEREUPON, the following proceedings were taken

2     pursuant to the Federal Rules of Civil Procedure.

3               *     *     *     *     *

4                    KATHY E. WEBER,

5     having been first duly sworn to state the whole truth,

6     testified as follows:

7                    EXAMINATION

8     BY MR. PEARSON:

9          Q.   Would you state your full name for the

10    record, please.

11         A.   Kathy E. Weber.

12         Q.   Is it Ms. or Mrs. Weber?

13         A.   Mrs.

14         Q.   Mrs. Weber, have you had your deposition

15    taken before?

16         A.   Yeah, quite a few years ago.

17         Q.   Okay.  Let me go over some of the ground

18    rules with you.  As you can see, the court reporter

19    seated to your left is taking down everything that you

20    and I both say, so I'll need to ask you to answer out

21    loud to all my questions and avoid using phrases like

22    uh-huh or uh-uh.  Can you do that for me?

23         A.   Yes.

24         Q.   If you don't understand my question, will

25    you let me know and I'll try to rephrase it?

1          A.    Yes.

2          Q.    If you need a break for any reason, let

3    me know and I'll be happy to accommodate you.

4          A.    Okay.

5          Q.    What is your current job title with

6    Swift?

7          A.    The payroll manager.

8          Q.    How long have you been in that position?

9          A.    As the manager?

10          Q.    Yes.

11          A.    Five years, I believe.

12          Q.    Were you with Swift prior to that time?

13          A.    I've been with Swift since 1981.

14          Q.    And can you walk me through your

15    progression of employment from 1981 to the current

16    time?

17          A.    I started as the payroll specialist, and

18    went to a lead position, supervisor, and then manager,

19    all in payroll.

20          Q.    And, I'm sorry, you already told me this,

21    but you've been the payroll manager since what year?

22          A.    I believe it's been five years.   I

23    honestly don't remember when the title changed.

24          Q.    Who do you report to?

25          A.    I report to Theresa Kasperzyk, who is the

1    compensation manager.

2           Q.    What are your primary job duties as

3    payroll manager?

4           A.    To oversee the processing of the payroll

5    every week.  I have four people reporting to me.  Make

6    sure that all the taxes are filed, all of the

7    government regulations are being followed.

8           Q.    Okay.  Anything else?

9           A.    Not anything specific.

10          Q.    Okay.  If you could open that notebook

11    and let me direct you to Exhibit 1.  Exhibit 1,

12    looking at interrogatory No. 1, which is on the top of

13    page 3 right there.  These are written questions and

14    answers that were exchanged in this lawsuit, and the

15    plaintiffs had asked for information relating to

16    employee name, social security number, job title, wage

17    rate, dates of employment, and total number of hours

18    worked, and there were some objections, and then if

19    you look over at the top of page 4 Swift said, "Swift

20    will produce nonarchived information responsive to

21    Interrogatory No. 1 as Exhibits A and B designated as

22    highly confidential."  Do you see that at the top of

23    the page?

24          A.    Oh, yes.

25          Q.    Were you involved at all in providing the

1    information that was produced by Swift in the form of

2    Exhibits A and B?

3          A.    Yes, I was.

4          Q.    And how did you go about obtaining that

5    information?

6          A.    We have a query tool that we can extract

7    data off of our database.

8          Q.    So were you the one who physically did

9    the query to obtain this information?

10          A.    Some of it.

11          Q.    And who assisted you, if anyone?

12          A.    I had an IT support person helping me.

13          Q.    And what criteria -- what was your

14    input -- how did you generate these?

15          A.    I sat with him and told him which fields

16    of data to pull and where to pull it from.

17          Q.    What were the other fields that you could

18    have chosen that you didn't choose to have on these

19    printouts?

20          A.    We have over 2,000 tables on our

21    database, so I don't think I have time to list all

22    those for you.

23          Q.    For example, do you have the -- do you

24    have the employee's address or phone number, or is

25    that part of your database?

8

1        A.    Yes.

2        Q.    And their social security numbers?

3        A.    Yes.

4        Q.    Let me show you what's been marked as

5    Exhibit 2.  And as you can see, this is labeled at the

6    bottom -- I didn't print out the entire Exhibit A and

7    B because, as you can imagine, there were many, many

8    volumes of those.

9        A.    Yes.

10       Q.    I just printed off the first 20 pages as

11   an example.  It's listed as Exhibit A, response to

12   Interrogatory No. 1, correct?

13       A.    Yes.

14       Q.    Do you know why the social security

15   numbers were not included on this printout?

16       A.    For security purposes.

17       Q.    That information is available and was

18   available in the database?

19       A.    Yes.

20       Q.    And what years were you able to access in

21   this computer database to print out information?

22       A.    We have everything from 2003 forward.

23   And if they had a record in 2002 it just came over

24   with a mass load from our Legacy payroll system

25   because we converted to a new software.  So it wasn't

1    detailed information.

2              Q.    So the information that came over from

3    the old software system into the new system was not as

4    detailed?

5              A.    No.

6              Q.    The new system being PeopleSoft?

7              A.    Yes.

8              Q.    And what was the old system?

9              A.    It was a homegrown, in-house system that

10   ConAgra had.  It was called People System.

11             Q.    Is that -- is the data from that system

12   still available somewhere?

13             A.    No.

14             Q.    Is it available in printed form

15   somewhere?

16             A.    No.

17             Q.    Is it available archived somewhere?

18             A.    At ConAgra.

19             Q.    What's the current relationship, if any,

20   between ConAgra and Swift?

21             A.    Not very.

22             MR. YOULE:  Not very good.

23             Q.   (BY MR. PEARSON)  Explain that to me.

24             A.    Well, I mean, the relationship was

25   severed when we were sold to an investment

1    corporation, and they had an agreement with us to give

2    us information for a certain period of time.  Anything

3    before that period of time is their data.  They own

4    it.

5              Q.    So if I wanted to get information similar

6    to what's on Exhibit A for years prior to 2003, in the

7    same level of detail, I would have to go to ConAgra?

8              A.    I would assume so, yes.

9              Q.    Swift doesn't have access to that either

10   in a computer form or written form anywhere?

11             A.    No, we do not.

12             Q.    And when these printed out -- as you can

13   see on the example I've given you as Exhibit 2 are the

14   first 20 pages or so -- this doesn't appear to be in

15   alphabetical order or hire date order or any other

16   type of order; is that correct?

17             A.    That's correct.

18             Q.    Is there not some kind of sorting

19   function that would allow you to do that, or did you

20   choose not to do that?

21             A.    It comes out an employee ID number, I

22   believe.  So whatever the first assigned number was.

23             Q.    You'll see the employee listed at the

24   very top of the page you've got Mark Tassin in

25   Louisville, then it has hire date and rehire date

1    under the same date.  Can you explain what that means?

2         A.   Because he came over in that sketchy

3    record of 2002, so he had data -- W-2 information in

4    2002.  So we had to bring the record over to issue a

5    W-2.  But he was termed at the time, so then he was

6    rehired in 1993.  So his hire and rehire date would be

7    the same.

8         Q.   But even though these pages all say

9    either terminate or rehire, these were people that

10   were just employed one time and then terminated?

11             MR. YOULE:  Objection to form.

12        Q.   (BY MR. PEARSON)  I'm not sure I

13   understand.

14             MR. YOULE:  I think it depends on which

15   employees you're talking about.

16        Q.   (BY MR. PEARSON)  Let's go down five

17   lines to Fabian Perez in Greeley, do you see the hire

18   date of 10/2/2000?

19        A.   Uh-huh.

20        Q.   Can you answer yes or no?

21        A.   Yes.  I'm sorry.

22        Q.   What would that represent, that date?

23        A.   I'm sorry, you're talking about the

24   Greeley person?

25        Q.   Right.  The fifth line down, Fabian

1    Perez, Greeley, the first time his name is mentioned.

2    It shows a hire date of 10/2/2000.

3        A.    His original hire date was 10/2 of 2000,

4    and somewhere in there he terminated.    Then he was

5    rehired in 2003, terminated in 2004.

6        Q.    Okay.

7        A.    There could be a multitude of coming and

8    going in between there.    We're giving you the original

9    hire date, and if they were rehired any time past that

10    date and whatever their term date is.

11        Q.    Okay.    Understood.    So if you go down

12    towards the bottom of the page there is the name Bert

13    Bowen, in Greeley?

14        A.    Yes.

15        Q.    This would show that he was hired in

16    December of 1996.    At some point he was terminated,

17    then he was rehired on March 18 of 2003?

18        A.    Yes.

19        Q.    Then he was terminated again on May 14,

20    2003; is that right?

21            MR. YOULE:    Well, or he terminated.

22        A.    He terminated.

23        Q.    (BY MR. PEARSON)    His employment

24    terminated?

25        A.    Yes.

1        Q.   If he had been rehired after that date,

2    it would be listed here directly beneath?  It wouldn't

3    be on some other page, right, it would be right

4    underneath where his name is there?

5        A.   Yes, it should be right underneath.

6        Q.   These hourly wage rates that are listed,

7    that would be the person's wage rate at what point in

8    time?

9        A.   The current one that was on the record

10   for that one.

11       Q.   At the time you printed this document?

12       A.   Yes.

13       Q.   So if they are an active employee, that's

14   what their current wage rate is; is that correct?

15       A.   Yes.

16       Q.   And if they are someone whose employment

17   has terminated, that's what their pay was when they

18   were terminated?

19       A.   Yes.

20       Q.   And were you able, working with your IT

21   person, to obtain records for all of the Swift

22   employees that had been employed since 2002 to provide

23   this information?

24       A.   Yes.

25       Q.   Let me show you what's been marked --

1          MR. YOULE:  Just for the record, the

2     interrogatory asked people who worked for hourly

3     wages.  That's what we responded.  Your question

4     actually said all employees.  So I want to make clear

5     that we answered the interrogatory.  We didn't provide

6     the other information.

7          MR. PEARSON:  Okay.  Understood.

8     Understood.

9          Q.   (BY MR. PEARSON)  Now let me show you

10    what I've marked as Exhibit 14.  Do you know why these

11    printouts were divided into Exhibit A and B and they

12    look a little different in form?  Are they telling us

13    different things?  Is there a different software

14    package?  Do you know why the difference?

15         A.    They are just telling us different

16    things.

17         Q.    All right.  What is Exhibit 14 telling us

18    that's different from Exhibit 2 that I've shown you?

19         A.    It's telling us the total number of hours

20    worked and the total dollars earned for each calendar

21    year for that employee.

22         Q.    Okay.  And the wage information was only

23    available from 2003 forward; is that right?

24         A.    Yes.

25         Q.    And the information that was on Exhibit 2

1    went back to sometime in 2002?

2          A.    Yes.

3          Q.    Okay.  And what database did you use to

4    produce Exhibit 14?  Was it the same database?

5          A.    PeopleSoft, yes.

6          Q.    And, again, that information would have

7    also had the social security numbers of the people?

8          A.    Yes.

9          Q.    But you chose not to put that on the

10   printout?

11         A.    Exactly.

12         Q.    Now I see there's different location

13   codes.

14         A.    Yes.

15         Q.    Do you have -- do you know or is there

16   somewhere -- a key that tells us what each location

17   is?

18              MR. YOULE:  There is, actually, and we

19   can provide that.

20         Q.    (BY MR. PEARSON)  I won't bother to ask

21   you all that.

22              MR. YOULE:  She might actually know some

23   of these.

24         A.    130 is Louisville.  I don't know how many

25   more you have on here.

1    Q.    (BY MR. PEARSON)   I wrote them all down.

2    I can throw them at you.

3          A.    I can maybe tell you some.

4          Q.    195?

5          A.    Is Greeley beef.

6          Q.    482?

7          A.    It's either Omaha or Nampa.   I get those

8    two mixed up because they are similar numbers.

9          Q.    And what about 486?

10         A.    I don't know.

11         Q.    Is it 486?

12         A.    That's probably Omaha or Nampa.   Those

13   two are the two.

14         Q.    What about 534?

15         A.    That's Cactus or Dumas, however you want

16   to refer to it.

17         Q.    709?

18         A.    Is Wet Blue Tanning.

19         Q.    717?

20         A.    Is Grand Island.

21         Q.    809?

22         A.    Hyrum.

23         Q.    And 1055?

24         A.    Worthington.

25         Q.    And 1465?

1          A.    Marshalltown.

2          Q.    And 1828?

3          A.    Is Miller Brothers.

4          Q.    What is that?

5          A.    The trucking.    That's the trucking

6    company.

7          Q.    Okay.    And on Exhibit 14, the name at the

8    top of the page, Ronald Mattingly, for example.

9          A.    Yes.

10         Q.    If he was employed in 2004 and 2005, you

11   would find his name again later in the printout under

12   those years?

13         A.    Yes.

14         Q.    And the Exhibits A and B that were

15   produced were accurate as of the date they were

16   provided?

17         A.    Yes.

18         Q.    And that was in the last month or so that

19   those were provided?

20              MR. YOULE:    Whatever the date of the

21   first interrogatory answers are.    And to be completely

22   accurate, it would have been sometime before then.

23   Probably within the two weeks before the date of the

24   interrogatory answers.

25         Q.    (BY MR. PEARSON)    Would you look at

1    Exhibit 1 in the notebook, please.

2         A.    Where are we at now?

3         Q.    Would you turn to page 5.

4         A.    Okay.

5         Q.    And interrogatory No. 3 asks for total

6    number of hourly wage earners, total number of hours

7    worked, then total wages.  And that information is

8    included on the next page of the interrogatory

9    answers.  Do you see that chart there?

10        A.    Yes.

11        Q.    Were you involved in the production of

12   that chart or that information?

13        A.    I believe I was.

14        Q.    How did you go about obtaining that

15   information?

16        A.    From the same database.

17        Q.    Would that database allow you to take,

18   for example, Greeley beef in 2003 and break it down on

19   a month-by-month basis?

20        A.    Yes, it would.

21        Q.    Do you know, does Swift maintain a

22   database or hard copies of I-9 forms that are filled

23   out by its employees?

24        A.    I don't deal with the I-9 forms.

25        Q.    Other than printing out the Exhibits A

1    and B to the interrogatory answers and getting the

2    data for this chart that we're looking at on

3    Exhibit 2, were you asked to do anything else in

4    responding to discovery from the plaintiffs in this

5    lawsuit?

6                MR. YOULE:  Do you know?  Go ahead and

7    answer.

8            A.    The ICE list.

9            Q.    (BY MR. PEARSON)  Tell me about that.

10           A.    It's just not a database but an Excel

11   spreadsheet that I was maintaining to try to identify

12   the employees from the ICE raids.  To the best of my

13   knowledge, the people that were missing because we

14   were trying to get them paid their final checks.

15           Q.    And how were you able to -- how were you

16   able to prepare that list?  What did you have to do?

17           A.    Each one of the plants sent a list of all

18   of the employees that were missing, and based on that

19   we tried to identify who picked up checks, who didn't,

20   who hadn't received checks.

21           Q.    Did ICE provide Swift with a list of

22   names --

23           A.    No.

24           Q.    -- of any kind?

25           A.    No.

1          MR. PEARSON:  I meant to bring the

2     request for production responses, and I thought I did.

3     Do you happen to have those?

4          MR. YOULE:  I do not have them.  I have

5     only the interrogatory answers.

6          Q.   (BY MR. PEARSON)  There was a list of --

7     was the list that you compiled the list of people

8     whose jobs were terminated after the ICE raids or

9     people that were arrested or both?

10         A.   I'm not -- well, I guess I'm not sure how

11    they identified them.  We just had a list of people

12    that we needed to go out and terminate for one reason

13    or another.

14         Q.   And who asked you to produce that list?

15         MR. YOULE:  Are you talking about the

16    list we produced as an interrogatory exhibit, or the

17    list that was provided by the plants to her?

18         Q.   (BY MR. PEARSON)  My understanding is

19    that outside of this lawsuit you were involved in

20    getting a list together of people who you had to find

21    them so you could get them their final paycheck?

22         A.   Yes.

23         Q.   Who asked you to do that?

24         A.   Well, we do it as part of our process,

25    our due diligence, to make sure that the employees are

1   paid.  From there it was for the department of labor

2   to make sure that everyone was paid.

3          Q.   And you were able, just through the names

4   of the people that were -- had not shown up for work

5   since the time of the ICE raids, figure out who was

6   missing and who needed to get a paycheck?

7          A.   Yes.

8          Q.   There were also produced sort of a list

9   or roster of people who had issues that were reported

10  to the Social Security Administration about their

11  employment.  Have you been involved at all in that

12  list -- compiling that list?

13         A.   No.

14         Q.   And we were -- the plaintiffs were also

15  provided with a list of all the people who have been

16  terminated over time because of issues related to

17  identity theft or lack of proper documentation or

18  potential immigration issues.  Did you have any hand

19  in producing that list?

20         A.   I don't believe that I was involved in

21  that list, no.

22         Q.   Other than compiling the information

23  that's in this chart in Exhibit 2 and printing out the

24  documents that were labeled Exhibit A and B to the

25  interrogatories and compiling the ICE list you've

1    testified about, were you asked to compile any other

2    information in response to the plaintiffs' discovery

3    request in this lawsuit?

4         A.    No.

5              MR. YOULE:    Actually, let me refresh her

6    memory here.

7              (Discussion off the record.)

8         A.    Yes, I'm sorry, I was asked to provide --

9              MR. YOULE:    Actually, I think she was

10   involved in Exhibit C, D, and E as well as what you

11   have already covered.

12             MR. PEARSON:    Do you have those handy so

13   I can take a look at them?

14             MR. YOULE:    I do.

15        Q.    (BY MR. PEARSON)    Exhibit C, it states on

16   the bottom it is in response to interrogatory 2A,

17   correct?

18        A.    Yes.

19        Q.    Let's look at Exhibit 1 in your notebook

20   and see what that 2A was.

21             MR. YOULE:    It's on page 4, Kathy.

22        Q.    (BY MR. PEARSON)    2A was, "The name and

23   social security number of each person who worked for

24   hourly wages in a Swift facility who you are aware was

25   arrested by US Immigration Customs Enforcement, or

1     other law enforcement officials, for violating US

2     immigration laws."  Did I read that correctly?

3           A.    Yes.

4           Q.    And you helped compile Exhibit C in

5     response to that interrogatory 2A?

6           A.    Yes.

7           Q.    And how did you go about compiling that

8     information?

9           A.    The plants submitted lists of who they

10    were confident were illegal -- or had been arrested as

11    illegal, and from there we terminated them with a

12    termination code that reflected that.

13          Q.    And that's what is shown in -- that's

14    what was shown in Exhibit C to the interrogatories?

15          A.    Yes.

16          Q.    And are these only people that were

17    terminated in the ICE raid or had been terminated at

18    some prior time based on concerns Swift had about

19    their immigration status or potential identity theft?

20          A.    I believe that that list, the request was

21    just for that period of time.

22          Q.    Okay.  Let's look at -- you also handed

23    me Exhibit D, which is -- was the response to

24    interrogatory No. 2B, correct?

25          A.    Yes.

1        Q.    And interrogatory No. 2B asked for, "The

2    name and social security number of each person for

3    calendar years between January 1, 2000, to the present

4    for whom Swift was notified by a third party, e.g.,

5    Medicaid or the Social Security Administration, that

6    the person was using a social security number that was

7    also being used by another person."  Is that correct?

8        A.    I honestly don't believe I was involved

9    in this particular request for earnings discrepancy

10   letters.

11       Q.    So you don't think that you compiled this

12   Exhibit D?

13       A.    I honestly don't believe so.

14       Q.    Where would someone at Swift obtain the

15   information that would allow you to print out a name

16   of people that had been involved in social security

17   discrepancy letters?  Is there a database that has

18   that somewhere?

19       A.    It would be our database.  The same

20   database.  And I believe it would be based on what

21   type of a term code they used.

22       Q.    What are the different term codes?

23       A.    I can only probably tell you a couple off

24   the top of my head.

25       Q.    Okay.

1        A.    One would be invalid falsification.

2    Another would be undetermined identity.    Those types

3    of things.

4        Q.    If Swift got a Social Security

5    Administration discrepancy letter on a particular

6    employee but that issue was eventually resolved to

7    Swift's satisfaction and the employee was not

8    terminated, would that be indicated in the database?

9        A.    No.

10        Q.    So the database would only reflect people

11   whose employment was terminated because of an issue

12   arising from an SSA discrepancy letter?

13            MR. YOULE:    Objection to form for lack of

14   foundation.    Do you know?

15        A.    No, I don't know.    It isn't -- no,

16   because that's not always the case.

17        Q.    (BY MR. PEARSON)    I'm just trying to

18   figure out how this Exhibit D would have been

19   compiled.

20            MR. YOULE:    Do you know?

21            THE DEPONENT:    I honestly don't.

22        Q.    (BY MR. PEARSON)    But what would be -- if

23   this database -- if you got in and typed this name,

24   Michael Abeyta, A-b-e-y-t-a, in your PeopleSoft and

25   you pulled up that employee, would there be an

1    indication -- if that employee had been terminated,

2    would that be indicated on the database you have

3    access to?

4        A.    Yes.   There would be an indication that

5    he had been terminated for some reason, yes.

6        Q.    And would there be a code there for

7    whatever the reason?

8        A.    There would be a code there for what the

9    reason was.

10       Q.    And one reason could be issues relating

11   to identity theft?

12       A.    Yes, one could be.

13       Q.    And another could be inability to prove

14   immigration status?

15       A.    Could be.

16       Q.    But, again, if there had been a Social

17   Security Administration discrepancy letter but that

18   had been resolved, that's not going to show on the

19   database?

20       A.    No, it would not.

21       Q.    Only people that had been terminated

22   would be indicated there?

23       A.    Yes.

24       Q.    Okay.   Exhibit E was, I think, the wage

25   rates for the various plants?

1       A.    Yes.

2       Q.    Did you compile that as well?

3       A.    Yes.

4       Q.    How were you able to do that?

5       A.    We have tables that we can extract the

6    data from.

7       Q.    Now I'm trying to understand why in

8    Exhibits A and B the plaintiffs were not provided with

9    social security numbers but they were in Exhibits C

10    and D.  Do you know why that was done or what the

11    decision making was there?

12            MR. YOULE:  I can answer that.  In

13    Exhibits C and D, to the best of our information,

14    those were not real people with real social security

15    numbers, and they certainly weren't Swift employees

16    past or present.

17       Q.    (BY MR. PEARSON)  Okay.  I can't ask you

18    questions, really, but I can see if you can answer it.

19    So, for example, Michael Abeyta at the top of

20    Exhibit 2B, is it your understanding that would be the

21    claimed name and the claimed social security number of

22    an employee that Swift employed, but in reality that

23    wasn't the person's name and social security number?

24       A.    I can't tell you that that's exactly what

25    his problem was without seeing his termination reason.

1          Q.    And what about this Exhibit C that you

2    did have some input on, Joel Clemente, then there is a

3    social security number.  Is it your understanding that

4    this name and social security number were what were

5    being claimed by the employee?

6          A.    Yes.

7          Q.    Based on the fact they were terminated,

8    it's Swift's belief that the person you had working

9    for you under that name and social security was not

10   that person with that social security number?

11         A.    Exactly.

12         Q.    You're not so sure about that with

13   Exhibit D; is that correct?

14         A.    No, I am not.

15              MR. PEARSON:  If you'll agree to give me

16   that key code so I can make sure all these plant

17   numbers --

18              MR. YOULE:  Sure.

19              MR. PEARSON:  I have no further

20   questions.

21              MR. YOULE:  No questions.

22              WHEREUPON, the within proceedings were

23   concluded at the approximate hour of 3:39 p.m. on the

24   8th day of April, 2008.

25

1        I, KATHY E. WEBER, do hereby certify that
2    I have read the above and foregoing deposition and
3    that the same is a true and accurate transcription of
4    my testimony, except for attached amendments, if any.
5        Amendments attached    (  ) Yes  (  ) No
6
7
8
9                    _____

                     KATHY E. WEBER
10
11
12
13        The signature above of KATHY E. WEBER was
14    subscribed and sworn to before me in the county of
15    _____, state of Colorado, this _____ day of
16    _____, 2008.
17
18
19
20                    _____

                     Notary Public

                     My commission expires
21
22
23
24    Blanca Valenzuela 4/8/08 (bb)
25

1                    REPORTER'S CERTIFICATE

2    STATE OF COLORADO          )
                                ) ss.
3    CITY AND COUNTY OF DENVER  )

4              I, BARBARA BIRGER, Registered Merit
     Reporter, Certified Realtime Reporter, and Notary
5    Public, State of Colorado, do hereby certify that
     previous to the commencement of the examination, the
6    said KATHY E. WEBER was duly sworn by me to testify to
     the truth in relation to the matters in controversy
7    between the parties hereto; that the said deposition
     was taken in machine shorthand by me at the time and
8    place aforesaid and was thereafter reduced to
     typewritten form herein; that the foregoing is a true
9    transcript of the questions asked, testimony given,
     and proceedings had.

10

             I further certify that I am not employed
11   by, related to, nor counsel for any of the parties
     herein, nor otherwise interested in the outcome of
12   this litigation.

13           IN WITNESS WHEREOF, I have affixed my
     signature this 14th day of April, 2008.

14

             My commission expires November 26, 2010.
15

16

     __X__ Reading and Signing was requested.
17

     _____ Reading and Signing was waived.
18

     _____ Reading and Signing is not required.
19

20

21

22

23

24

25

130