1           IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF TEXAS

2                 DALLAS DIVISION

3   Civil Action No. 3-06cv2322-N

4   BLANCA VALENZUELA, MARGIE SALAZAR, JOSE A. SERRATO,
    JOSIE RENDON, CLARA TOVAR, CONSUELO ESPINO, MARIA

5   AVILA, ERNESTINA NAVARRETTE, MARIA E. MUNOZ, AMANDA
    SALCIDO, CANDELARIO G. ORTEGA, MARIA ORTIZ, JOSE

6   OLIVA, RAFAELA CHAVEZ, ELODIA ARROYO, SUSANA CARDIEL,
    GRACIE RIOS and LEONEL RUIZ, individually and on

7   behalf of all others similarly situated,

8   Plaintiffs,

9   v.

10  SWIFT BEEF COMPANY, INC., d/b/a SWIFT COMPANY, SWIFT &
    COMPANY, HICKS, MUSE, TATE & FURST, INC., HM CAPITAL

11  PARTNERS OF DALLAS, LLC, and JOHN DOES I-V,

12  Defendants.

13  _____

DEPOSITION OF:  JAMES A.R. HAMILTON - April 9, 2008

14  _____

15        PURSUANT TO NOTICE, the deposition of
    JAMES A.R. HAMILTON was taken on behalf of the

16  Plaintiffs at 1770 Promontory Circle, Greeley,
    Colorado 80634, on April 9, 2008, at 8:50 a.m.,

17  before Sharon L. Szotak, Registered Professional
    Reporter, Certified Realtime Reporter, and Notary

18  Public within Colorado.

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2    For the Plaintiffs:      ERIC D. PEARSON, ESQ.
                               Heygood, Orr, Reyes &
 3                               Bartolomei
                               2331 West Northwest Highway
 4                             Second Floor
                               Dallas, Texas 75220
 5
      For the Defendants:      ROBERT E. YOULE, ESQ.
 6                             Sherman & Howard LLC
                               633 17th Street, Suite 3000
 7                             Denver, Colorado 80202
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
 5
```

1                            I N D E X

2   EXAMINATION OF JAMES A.R. HAMILTON:
    April 9, 2008                                    PAGE

3

    By Mr. Pearson                                     4

4

5                                                   INITIAL
    DEPOSITION EXHIBITS:                           REFERENCE

6

    1    Swift Beef Company and Swift & Company's      27
7        First Supplemental Responses to Putative
         Class Representatives' First and Second
8        Set of Interrogatories

9   2    Swift Beef Company and Swift & Company's      28
         Second Supplemental Responses to Putative
10       Class Representatives' First and Second
         Set of Interrogatories

11

12  5    List labeled "Group 3," with attachments      56

12  6    Lists of Employees                            76

13

14  7    Form dated 8/18/06 for Claudia Lima Cruz,     69
         with attachments

15  8    Lists of Employees                            117

16  9    Lists of Employees with Social Security       67
         Numbers

17

18  10   Lists of Employees                            115

19  11   Letter to Cangemi from Shandley, 7/5/06,      122
         with attachments

20  16   Lists of Employees with Social Security       133
         Numbers

21

22  17   Lists of Employees                            134

23  18   Article entitled "Immigration raids could     36
         affect wages, meat prices"

24

25

4

1          WHEREUPON, the following proceedings

2     were taken pursuant to the Federal Rules of Civil

3     Procedure.

4              *      *      *      *      *

5              JAMES A.R. HAMILTON,

6     having been first duly sworn to state the whole truth,

7     testified as follows:

8                   EXAMINATION

9     BY MR. PEARSON:

10         Q.    Would you please state your full name for

11    the record.

12         A.    James Ashley Robson Hamilton.

13         Q.    Mr. Hamilton, my name is Eric Pearson.  I

14    represent the plaintiffs in this lawsuit.

15              Have you ever had your deposition taken

16    before today?

17         A.    Yes.

18         Q.    I'm going to go over some of the ground

19    rules with you.  You obviously understand that the

20    court reporter seated to your left is taking down

21    everything that you and I say, correct?

22         A.    Yes.

23         Q.    In order to make her job easier, I need to

24    ask you to answer out loud to all of my questions and

25    avoid nodding your head or using phrases like uh-huh or

1    huh-uh.  Can you do that for me?

2         A.   Yes.

3         Q.   If you don't understand my question, will

4    you please let me know and I'll try to rephrase it?

5         A.   Yes.

6         Q.   Do you understand that when your

7    deposition is completed, your testimony will be printed

8    up in a booklet form and you will have an opportunity

9    to review it for accuracy?

10        A.   Yes.

11        Q.   And you understand that the testimony

12   you're giving today has the same force and effect as if

13   you were giving it in front of a judge and jury?  Do

14   you understand that?

15        A.   Yes.

16        Q.   Do you understand that your deposition

17   testimony can be used at the trial of this case?

18        A.   Yes.

19        Q.   What's your current job position with

20   Swift?

21        A.   Do you mean my title?

22        Q.   We'll start with that, yeah.

23        A.   I'm the director of corporate compliance.

24        Q.   How long have you had that position or

25   that title?

1        A.    August 2006, I believe.

2        Q.    What are your job duties?

3        A.    I'm responsible for the employment law

4    compliance.  Not Sarbannes-Oxley.

5        Q.    Who do you report to?

6        A.    I report to Doug Schult.

7        Q.    Do you have any direct reports to you?

8        A.    Yes.

9        Q.    Who are they?

10        A.    Nubia Chavez, Ruben Flores.

11        Q.    Anyone else?

12        A.    No.

13        Q.    Do you have any legal training?  Are you a

14    lawyer?

15        A.    I'm not a lawyer.

16        Q.    Do you interact with the legal department

17    in carrying out your day-to-day job responsibilities?

18        A.    Yes.

19        Q.    Anyone in particular?

20        A.    Chris Gaddis, Chad Hamilton.

21        Q.    Who had -- was there someone called

22    director of corporate compliance prior to you taking

23    that position in approximately August 2006?  Or was

24    that a newly created position?

25        A.    The position -- the position's not a new

1    position.  I don't know if the title was the same.

2         Q.   Did you replace -- when you took that

3    position in August 2006 or thereabouts, did you replace

4    someone else who had had that position?

5         A.   It was not a direct replacement.

6         Q.   Okay.  Had there been someone who was in

7    charge of employment law compliance for Swift prior to

8    you taking on those responsibilities in approximately

9    August 2006?

10        A.   Yes.

11        Q.   And who was that?

12        A.   Tim Hill.

13        Q.   And how long had he been in that role?  Do

14   you know?

15        A.   I don't know.

16        Q.   Do you know if he had someone before him

17   doing that job?

18        A.   I don't know.

19        Q.   How long have you been with Swift in one

20   capacity or another?

21        A.   1995.  August of 1995.

22        Q.   Can you walk me through just briefly in

23   general terms your job history with Swift from 1995 to

24   August of 2006?

25        A.   Yes.

1           Q.    Okay.   What was your first position?

2           A.    My first position was quality control

3     inspector.

4           Q.    What did that entail?

5           A.    It entailed making sure that the product

6     met the specifications for the customers.

7           Q.    Were you working at one of the facilities

8     or here in the corporate -- or wherever the corporate

9     headquarters was at the time?

10          A.    One of the facilities.

11          Q.    Which one was that?

12          A.    Worthington, Minnesota.

13          Q.    How long were you in that position?

14          A.    Approximately one year.

15          Q.    What was your next position?

16          A.    My next position was assistant human

17    resource manager.

18          Q.    Was that for a particular plant?

19          A.    Yes.

20          Q.    Worthington?

21          A.    Yes.

22          Q.    How long were you in that position?

23          A.    Approximately one year.

24          Q.    What was your next position?

25          A.    Employee relations manager.

9

1          Q.   What did that involve?

2          A.   That involved working with the HR

3     director, ultimately to replace the HR director, with

4     specific function -- duties on reducing employee

5     turnover.

6          Q.   Was that at the Worthington plant?

7          A.   Yes.

8          Q.   What steps did you take to help reduce

9     employee turnover?

10         A.   I spent a lot of time working in the

11    community.

12         Q.   Doing what?

13         A.   Quite a number of things.

14         Q.   Just give me some examples.

15         A.   Meeting with city officials, serving on

16    different boards, working with the school district,

17    soccer fields.

18         Q.   Were those things just trying to improve

19    the community and to make it a more appealing place to

20    live?  Or how did that tie into retaining employees?

21         A.   There had been a study by Dr. Joseph Diaz

22    at Southwest State University that indicated that

23    employee retention was directly tied to community.

24         Q.   And the types of efforts that you just

25    described, did those occur at other plants, to your

1    knowledge?

2         A.    I believe so.

3         Q.    Was that a companywide decision to become

4    involved in those types of areas?

5         A.    Not initially.  My initial responses were

6    my own.  I can't answer for the rest of the company at

7    that time.

8         Q.    Did that eventually sort of become a

9    corporatewide philosophy, that in order to help retain

10   employees, you'd go into the community and try to

11   improve the community?

12        A.    With my involvement at the corporate

13   level, to my knowledge, it's always been a corporate

14   philosophy to reduce turnover.  And that involves

15   getting outside the four walls of the plant.

16        Q.    What was your next position after employee

17   relations manager?

18        A.    HR director.

19        Q.    And was that plant specific, or is that

20   the Worthington plant?

21        A.    Yes.

22        Q.    What year -- how long were you in that

23   prior position of employee relations manager?

24        A.    Let me think.  Maybe seven years.

25        Q.    And then as HR director of the Worthington

1      plant, what were your job duties in that position?

2            A.    I was responsible for the entire human

3      resource function of the facility.

4            Q.    Did that include hiring practices?

5            A.    Yes.

6            Q.    How long were you in that position?

7            A.    Three years.

8            Q.    And what was your next position?

9            A.    Director of corporate compliance.

10           Q.    Which is your current position?

11           A.    Yes.

12           Q.    Let me ask you to take a look at this

13     Exhibit 13 from the Doug Schult deposition.  And I want

14     to just make sure that I understand which topics you're

15     testifying on today.

16                 MR. PEARSON:  And I'm happy -- if you and

17     I just want to reach an agreement or I can ask him.

18     Whatever you prefer.  I'm just referring to your

19     February 21st letter.

20                 MR. YOULE:  Well, if you look at -- if you

21     look at Mr. Higgins' January 25th letter, which was

22     marked in Mr. Schult's deposition as Exhibit 13,

23     Mr. Hamilton, as opposed to Mr. Schult yesterday,

24     wasn't requested in individual deposition.  So why

25     don't you just go through and ask him.  I'm not sure he

1    knows.

2            MR. PEARSON:  Okay.

3            Q.   (BY MR. PEARSON)  Are you looking at

4    Exhibit 13, the letter there?

5            A.   Yes.

6            Q.   Starting off on the second page where you

7    just were, looking at topic 10 and 11, would you read

8    those to yourself.  And my question is, to your

9    knowledge, are you the person most knowledgeable on

10   those topics to testify on behalf of Swift?

11           A.   Yes.

12           Q.   And if you would turn to the next page and

13   read to yourself topics 16 through 20.  And I'm going

14   to ask you the same question.

15           A.   Yes.

16           Q.   Okay.  And finally on the next page,

17   topics 22 through 25, the same question.

18           A.   (The deponent perused the exhibit.)

19                Yes.

20           Q.   Have you ever been interviewed by ICE with

21   respect to any issues relating to the employment of

22   illegal aliens or persons who have committed identity

23   theft?

24           A.   Would you rephrase the question.

25           Q.   Sure.  You're aware of the ICE

1    investigation that occurred in 2006 and then culminated

2    in the ICE raids in December 2006, correct?

3         A.   Yes.

4         Q.   Were you ever interviewed by ICE or any

5    other governmental agency relating to those issues?

6         A.   No.

7         Q.   Have you ever been interviewed by the FBI?

8         A.   No.

9         Q.   Or anyone with the Justice Department?

10        A.   Yes.

11        Q.   Okay.  And when were you interviewed by

12    the Justice Department?

13        A.   I was interviewed by the Justice

14    Department somewhere between 2000 and 2002.

15        Q.   What did that relate to?

16        A.   That related to a charge of discrimination

17    brought by the Office of Special Counsel that we were,

18    in fact, going too far to try to verify the work status

19    of our employees.

20        Q.   Any other interviews by the Justice

21    Department besides that one?

22        A.   No.

23        Q.   I want to talk a little bit to you about

24    different hiring practices of Swift.  Does Swift --

25    since your time with the company, has Swift ever

1    engaged in recruiting efforts for employees at its

2    processing plants in foreign countries?

3        A.   No.

4        Q.   Never placed any radio TV, or newspaper

5    ads in any foreign countries?

6        A.   No.

7        Q.   What languages does Swift use in its

8    advertising or written materials intended to recruit

9    employees for its processing plants?

10       A.   I don't know that I can answer every

11   language.  We've got a lot of languages in the plants.

12       Q.   Okay.  Obviously English and Spanish; is

13   that correct?

14       A.   Yes.

15       Q.   And what about the Mayan dialect?  Are you

16   familiar with that?

17       A.   The what?

18       Q.   Mayan.  Spoken by people from Guatamala?

19       A.   I didn't know there was a Mayan dialect.

20       Q.   Do you know what language people from

21   Guatamala speak, if it's a dialect of Spanish?

22       A.   No.

23       Q.   Who would be knowledgeable as to what

24   languages Swift uses in its written materials related

25   to recruiting or hiring production plant employees?

1          A.   Well, I'm knowledgeable.  And each of the

2    plants, if they had any additional languages that they

3    used, would also be knowledgeable.  The HR director at

4    each facility.

5          Q.   Does Swift use advertisements for

6    recruiting?

7          A.   Yes.

8          Q.   And who is in charge of producing those

9    advertisements?  Is there a department within Swift, or

10   is there an outside vendor that does that?

11         A.   Well, there's not a department within

12   Swift.

13         Q.   Do you use an outside vendor, then?

14         A.   Not a particular vendor.

15         Q.   Okay.  Well, for example, in 2006 when

16   Swift decided to hire additional employees due to the

17   imminent ICE raids, and there was advertising done, who

18   was in charge of that advertising?

19         A.   Well, depending on each location.  If I

20   wanted to hire somebody -- for example, if I'm in the

21   Worthington plant and I want to hire somebody, I'd

22   contact the local radio station and ask to run an ad.

23         Q.   And who writes the copy?  Someone from

24   Swift or someone from the -- do you hire an outside

25   vendor for that?

1          A.    Typically we would give a radio station --

2    for example, using my example of Worthington, if I was

3    to contact the local radio station and ask them to run

4    an ad, I'd give them some details of the job.  And then

5    they would put that in the form of an ad for our

6    approval.

7          Q.    And in 2006 when there was an effort made

8    to -- Mr. Schult said overhire or overstaff the plants

9    in anticipation of the ICE raids, was the advertising

10   directed from corporate, or was it done on a

11   plant-by-plant basis?

12         A.    On a plant-by-plant basis.

13         Q.    Were you involved in any way in that

14   personally?

15         A.    At some point, I was, yes.

16         Q.    And what was your involvement?

17         A.    My involvement was related -- I think I

18   got involved after the raids.  I think your question

19   was prior.

20         Q.    Okay.  What did you do after the raids in

21   that area?

22         A.    After the raids, I helped coordinate

23   recruiting efforts related specifically to the Cactus

24   facility.

25         Q.    And what were the recruiting efforts at

1     the Cactus facility post raid?

2              A.    That's a very broad question.

3              Q.    Well, tell me some of the things -- I

4     mean, tell me some of the things that you did to try to

5     recruit for the Cactus plant after the ICE raids?

6              A.    We went to local area job services.  We

7     placed an ad on a billboard.  We had a hamburger feed

8     outside the Tyson plant in Amarillo.  We drove to every

9     town that had a similarly situated industry within a

10    multi-state area.

11             Q.    Did you have any input on the increase in

12    wages in October 2006 at the various processing

13    centers?

14             A.    No.

15             Q.    You were aware of that, I assume?

16             A.    Was I aware?

17             Q.    Yes.

18             A.    A little bit.  I couldn't tell you the

19    details.

20             Q.    Were you aware of the opening of

21    recruitment centers or hiring centers in El Paso and

22    McAllen in that time frame?

23             A.    Yes.

24             Q.    And those centers were recruiting for all

25    the production facilities?

1       A.   Initially they recruited specifically for

2   the Cactus plant, because that had the greatest need.

3   But at some point, then, we recruited for any facility

4   that had a need.

5       Q.   Did you participate in the decision to

6   place those recruiting centers in El Paso and McAllen?

7       A.   Yes.

8       Q.   And why were those cities chosen?

9       A.   Those cities were chosen because they had

10   favorable wage comparisons, high unemployment, and

11   dense populations.

12       Q.   Why did Cactus have the greatest hiring

13   need?

14       A.   I don't know.

15       Q.   Had they just lost the most emplyees?  Or

16   when you say Cactus had the greatest need, what do you

17   mean by that?

18       A.   They had the greatest number of -- they

19   had the largest number of shortage.  The shortage was

20   greater there than in other locations.

21       Q.   Does Swift also use workforce recruitment

22   centers to hire?

23       A.   Yes.

24       Q.   And how does that work?

25       A.   For example, when we went to the Tyson

1    facility in Amarillo, contact the local workforce

2    center and schedule a time to be there.  And then we

3    include in our advertising on the radio or the

4    newspaper or the billboard or whatever it is we're

5    going to advertise that we're going to be at that

6    workforce center available to do interviews.

7         Q.    And are those workforce recruitment

8    centers private businesses, or is that some type of

9    government agency?

10        A.    Government agency.

11        Q.    Do you know who runs that?

12        A.    Each state has their own set of workforce

13   centers.

14        Q.    Did those workforce centers also typically

15   make job postings on the Internet?

16        A.    Yes.

17        Q.    And does Swift monitor those, the content?

18        A.    I'm not sure I understand the question.

19        Q.    Does Swift have any input on the content

20   of those job postings on the Internet?

21        A.    Yes.

22        Q.    And what is that?  Do you write the

23   posting or do you just review it and approve it?

24        A.    Well, it can be done one of two ways.  One

25   is, we can post it directly.  Or one is, it would be

1    similar to a radio ad where we give them the

2    information and they post it and show it to us for

3    approval.

4        Q.    Is any tracking done as to who is

5    accessing those job postings on the Internet?

6        A.    Tracking?  I'm not sure I understand your

7    question.

8        Q.    Well, for example, my law firm, we have a

9    website and we can track each month how many hits we're

10   getting and actually where they're coming from

11   geographically.

12       A.    I don't believe so, no.

13       Q.    And what is outreach recruiting?

14       A.    Outreach recruiting would mean recruiting

15   outside the community.

16       Q.    And what about the use of employment

17   agencies?  Have employment agencies ever been used for

18   hiring?

19       A.    Yes.

20       Q.    And when was that?

21       A.    After the raid in 2006.

22       Q.    It had not been done prior to that point?

23       A.    I think that we gave a written answer.

24   Generally the answer is no.  In a couple particular

25   locations, Santa Fe Springs, the answer is yes.

1    Q.    And why, in general terms, were employment

2    agencies not used in the past?

3    A.    I don't know.

4    Q.    That was not a decision you had any input

5    in?

6    A.    We've never used them.

7    Q.    Why did you start using them, then, in

8    particular in -- after the ICE raids?

9    A.    Because we had a shortage of employees in

10   Cactus.

11   Q.    So were employment agencies utilized just

12   for the Cactus plant or for other facilities, as well?

13   A.    We -- you know, I don't know that I know

14   the answer to that.

15   Q.    What, if anything, did Swift do to ensure

16   that these employment agencies were following

17   immigration laws in their hiring practices?

18   A.    Well, I met with the group from the agency

19   Manpower that we were going to bring in, and went

20   through a full version of Connect the Dots.  I met with

21   them on-site to verify what their practices were.  We

22   spent quite a bit of time on that.

23   Q.    How were the employment agencies paid?

24   Were they paid per applicant or per hire or on an

25   hourly basis?  Or how were they paid?

1          A.    I don't know that.

2          Q.    Do you know who would know that?

3          A.    Doug Schult I believe would be the best

4     person to answer that question.

5          Q.    Aside from the actual application process

6     itself, what, if anything, did Swift do in its hiring

7     and recruiting efforts to discourage illegal aliens

8     from applying for positions at Swift?

9          A.    I'm not sure I understand your question.

10          Q.    I'm going to talk to you a little bit

11     later about when someone actually comes to Swift and

12     applies for a job, what the process is and what, if

13     anything, Swift does to make sure it doesn't hire

14     illegal aliens.

15              Setting that aside, what, if anything,

16     does Swift do, just in its marketing and its

17     interaction with these recruitment centers and its

18     outreach recruiting and employment agencies -- what

19     does it do, if anything, to prevent illegal aliens from

20     applying for jobs at Swift?

21              MR. YOULE:  Objection to form.  You can

22     answer if you understand the question.

23          A.    I'm not sure I understand the question.

24          Q.    I understand that once somebody shows up

25     at a Swift plant and starts to fill out an application,

1    that there are certain procedures that Swift follows,

2    for example, Basic Pilot and Connect the Dots.

3    Correct?

4        A.    That's correct.

5        Q.    And some of those procedures are designed

6    to prevent illegal aliens from being hired, correct?

7        A.    That's correct.

8        Q.    And to prevent people who have committed

9    identity theft from being hired, correct?

10       A.    I'm not -- well, if we're talking about

11    being hired, it sounds to me like that's prehire.

12       Q.    Right.   I'm talking about prehire now.

13       A.    Then I'm not understanding your question.

14       Q.    Okay.   What I'm trying to figure out -- I

15    understand that once somebody shows up at a plant and

16    applies for a job, there are certain steps that Swift

17    takes to assist it in making sure that illegal aliens

18    are not hired.   For example, Basic Pilot and Connect

19    the Dots, correct?

20       A.    That's correct.

21       Q.    What I'm trying to figure out is, is there

22    anything Swift does to discourage those people from

23    even showing up in the way that it recruits or

24    advertises or works with these outreach centers?

25       A.    We work with legitimate state -- we go to

24

1    state agencies, that sort of thing.  We advertise

2    through legitimate regular channels, well known radio

3    stations, newspapers.

4        Q.   Does Swift ever put out the message that

5    illegal aliens should not apply to their processing

6    facilities?

7            MR. YOULE:  Objection to form.  You can

8    answer.

9        A.   I don't understand what you mean by that

10   question.

11       Q.   Is there any effort to communicate to

12   potential job applicants before they arrive at a plant

13   that Swift is not interested in hiring illegal aliens?

14       A.   Yes.

15       Q.   And what is that?

16       A.   We have postings in the plant.

17       Q.   Anything else?

18       A.   I'm not sure I quite understand your

19   question, but I think that's -- would be one way that's

20   responsive.

21       Q.   Does Swift also use employee referrals to

22   hire employees?  One employee referring someone to the

23   plant?

24       A.   Yes.

25       Q.   And those employees who refer someone to

25

1    the plant, are they paid some kind of bonus or do they

2    get any benefit from that?

3        A.    Yes.

4        Q.    What do they get?

5        A.    Well, it depends on each plant's

6    particular hiring bonus program as to the dollar

7    amount, but there's a certain dollar amount.

8        Q.    It's just a fixed one-time payment?

9        A.    Each plant has -- would have the potential

10   to have a plan that might differ slightly from a

11   different plant.

12       Q.    Do you know what the plan was in Cactus?

13       A.    Not off the top of my head, no.

14       Q.    Have you ever heard of the term "coyote"?

15       A.    Yes.

16       Q.    And when I use that term, I mean people

17   that smuggle illegal aliens into the country.

18       A.    Yes.

19       Q.    Has Swift ever done any kind of internal

20   investigation to ensure that the people it's hiring

21   were not brought into this country by coyotes?

22       A.    I don't understand the question.

23       Q.    Does Swift undertake any efforts to ensure

24   that its job applicants are not people who came into

25   the country illegally through the aid of a coyote?

1          A.    I guess I don't understand that.

2                MR. PEARSON:   Can you just reread the

3      question.

4                (The last question was read back as

5      follows:  "Does Swift undertake any efforts to ensure

6      that its job applicants are not people who came into

7      the country illegally through the aid of a coyote?")

8          A.    Can you give me an example?

9          Q.    (BY MR. PEARSON)  Well, has Swift ever

10     investigated whether any of its own employees are

11     interacting with coyotes to help bring in illegal

12     workers?

13         A.    I guess I don't -- that's a little broad

14     for me.

15               MR. YOULE:  You're distinguishing -- as I

16     understand the question, you're distinguishing the

17     situation of someone being brought in by a coyote as

18     opposed to all of Swift's efforts with respect to

19     vetting out potentially illegal aliens?

20               MR. PEARSON:  Yes.

21               MR. YOULE:  In other words, a particular

22     let's focus only on the coyote issue as opposed to

23     everything else?

24               MR. PEARSON:  Yes, exactly.

25         A.    I don't know that -- I don't know how we'd

1    go about investigating whether coyotes exist.  I don't

2    know how we'd --

3        Q.   (BY MR. PEARSON)  Has any Swift employee,

4    to your knowledge, ever been investigated for

5    interacting with a coyote?

6        A.   Not to my knowledge.

7        Q.   Let me ask you to look at -- I'll take

8    that book back from you.  I'll ask you to look at

9    Exhibit 1.

10       A.   Okay.

11       Q.   These are interrogatory -- first

12   supplemental interrogatory answers.  And I want to

13   direct you to interrogatory number 6 on page 9, if you

14   would, please.

15       A.   Okay.

16       Q.   And could you read that to yourself, and

17   I'm going to ask you some questions about it.

18       A.   Okay.

19            (The deponent perused the exhibit.)

20            Okay.

21       Q.   Is the answer to interrogatory number 6

22   contained in Exhibit 1 accurate, to the best of your

23   knowledge?

24       A.   We supplemented that, but, yes.

25       Q.   Let's go ahead and look at that

1    supplementation, which I think is at Exhibit 2.

2              A.    Okay.

3              Q.    Did you have some role in supplementing

4    the answer to that interrogatory?

5              A.    Yes.

6              Q.    And what role was that?

7              A.    Discussing, debating the language, as to

8    whether that was the best representation.

9              Q.    And if you compare the answer to

10   interrogatory number 6 in Exhibit 1 to the answer in

11   Exhibit 2, you'll see that, looking at Exhibit 1, the

12   first sentence in the answer to interrogatory number 6

13   in Exhibit 1 says, "Swift employs uniform procedures

14   across all facilities to determine if a prospective

15   hourly employee has the legal right to be employed in

16   the United States."  Did I read that accurately?

17             A.    I'm sorry.  I was looking at the

18   document.

19             Q.    Okay.  Going back to Exhibit 1.

20             A.    Okay.

21             Q.    The first sentence of the answer to

22   interrogatory number 6 in Exhibit 1 reads, "Swift

23   employs uniform procedures across all facilities to

24   determine if a prospective hourly employee has the

25   legal right to be employed in the United States."  Did

1         I read that accurately?

2              A.   Yes.

3              Q.   And that sentence was omitted in the

4    answer to interrogatory number 6 in Exhibit 2; is that

5    right?

6              A.   That's correct.

7              Q.   And why was that done?

8              A.   I think that was an omission.

9              Q.   Unintentional?

10             A.   Unintentional.

11             Q.   Okay.  And looking also at the answer --

12   so that statement -- let me back up.

13             The statement that I read from the answer

14   to interrogatory number 6 in Exhibit 1, which said,

15   "Swift employs uniform procedures across all facilities

16   to determine if a prospective hourly employee has the

17   legal right to be employed in the United States," that

18   statement is accurate?

19             A.   That's correct.

20             Q.   And to the extent it was omitted in the

21   response to interrogatory number 6 in Exhibit 2, that

22   was unintentional?

23             A.   That's correct.

24             Q.   Looking at Exhibit 1, the same

25   interrogatory number 6, the last paragraph reads, in

1     part, "In 2006, the U.S. Department of Homeland

2     Security released the Image Program, a series of best

3     practices to be used by U.S. employers to maintain a

4     legal workforce.  Almost immediately thereafter, Swift,

5     in partnership with a third-party contractor, Border

6     Management Strategies, developed Connect the Dots, a

7     set of procedures based upon the government's Image

8     Program.  Swift implemented Connect the Dots in or

9     about August of 2006."  Did I read that correctly?

10          A.    Yes.

11          Q.    If you compare that paragraph to the final

12    paragraph in interrogatory number 6 of Exhibit 2,

13    you'll see that the introductory portion of that that

14    talks about the Image Program has been deleted.  Do you

15    see that?

16          A.    Yes.

17          Q.    Was that intentional or unintentional?

18          A.    That was intentional.

19          Q.    And why was that done?

20          A.    It's a nuance difference, but it's a

21    timing issue.

22          Q.    Can you explain that?

23          A.    We -- we were looking to work with Border

24    Management Strategies, who knew about the Image

25    Program, but we were looking to work with them prior to

31

1       any knowledge of the Image Program that was being

2       introduced.  So it's related to the timing of knowledge

3       about the Image Program and our working with Border

4       Management Strategies to develop our own policies and

5       procedures.  It's a nuance difference.

6              Q.    And to this day, Swift has not joined the

7       Image Program, correct?

8              A.    That's correct.

9              Q.    Why was Border Management Strategies

10      hired?

11             A.    Ongoing efforts to make sure that we're

12      fully compliant with employment eligibility and

13      identity verification procedures.

14             Q.    Going back for a minute -- we're not going

15      to talk about those just right now.

16                   Going back for a minute to the hiring

17      practices of Swift, what, if anything, has Swift

18      historically done to assist potential job applicants

19      with transportation issues?

20             A.    After the raids, we began busing people

21      from Amarillo to the Cactus facility.

22             Q.    Had that ever happened prior to the raids?

23             A.    Not to my knowledge.

24             Q.    Were there other transportation

25      initiatives undertaken by Swift other than with respect

32

1    to the Cactus facility?

2            A.    Not to my knowledge.

3            Q.    Were job --

4            A.    I'm sorry.  Yes.

5            Q.    Okay.  And what was that?

6            A.    We had ride share, and we -- we instituted

7    ride share after the raids in Marshalltown.

8            Q.    And what does that entail?

9            A.    We promoted and facilitated employees

10   working together to carpool from Des Moines to the

11   Marshalltown facility.

12           Q.    Were job applicants at any of the

13   production facilities reimbursed for bus transportation

14   to the plants?

15           A.    Yes.

16           Q.    And was that at more than one facility?

17           A.    Yes, I think so.

18           Q.    And did that happen prior to the ICE raids

19   or only after the ICE raids?

20           A.    Well, that's happened prior to the ICE

21   raids and after.

22           Q.    Focusing on the prior to the ICE raids,

23   was that a general practice or just an occasional

24   thing?  Or how was that policy of reimbursement for

25   transportation handled?

1          A.    That was a -- rare would be a better word.

2          Q.    And on what occasions was that done?

3          A.    If we needed a staffing -- if we had a

4     staffing issue potentially in a plant, and we had to

5     recruit, say, more than 60 miles away.  An individual

6     plant may make the decision to reimburse either mileage

7     or something of that nature for somebody to drive to

8     the facility.

9          Q.    Okay.  And what about relocation expenses?

10    Has Swift paid those for potential employees?

11         A.    Yes.

12         Q.    And when has that been done?

13         A.    Again, rarely prior.  Afterwards, we had,

14    of course, more frequent.

15         Q.    And what type of relocation expense

16    reimbursement was there?

17         A.    It was mileage would be common.  Meal

18    tickets or some kind of reimbursement for food

19    expenses.  Maybe a short period of time of housing.

20         Q.    Housing meaning you paid their rent?

21         A.    Generally staying in a motel.

22         Q.    Did Swift also subsidize the rent for some

23    of its workers?

24         A.    I believe that that has been done.  And

25    subsidize, I mean an initial payment toward getting

34

1       somebody into an apartment.

2              Q.    Was that done both before and after the

3       raids?

4              A.    Yes.

5              Q.    And what about working with local builders

6       to help subsidize them to actually build additional

7       living facilities?  Has that been done?

8              A.    Yes.

9              Q.    And was that done both before and after

10      the raids?

11             A.    No.

12             Q.    Just after the raids?

13             A.    Yes.

14             Q.    And where was that done?

15             A.    In Cactus.

16             Q.    And explain how that worked.

17             A.    There was a tornado in the town of Cactus

18      that destroyed 300 homes.  And so we were busing people

19      from Amarillo.  So we helped to incentivize some

20      builders to repair, rebuild, or build new places.

21             Q.    Has Swift ever had dormitories or any

22      other kind of residential facility that it owned or

23      operated for its workers?

24             A.    No.

25             Q.    Any other assistance for job applicants

1    other than transportation or housing, the things we've

2    already talked about?

3           A.    I don't believe so, no.

4           Q.    Were you involved in the decision to hire

5    Border Management Strategies?

6           A.    No.

7           Q.    Do you know who did that?  Whose decision

8    that was?

9           A.    Yes.

10           Q.    Who was that?

11           A.    That was Doug Schult.

12           Q.    And who was the principal of Border

13    Management Strategies?

14           A.    Mark Reed.

15           Q.    Have you interacted with him personally?

16           A.    Yes.

17           Q.    Do you know what his experience or

18    background is?

19           A.    Yes.

20           Q.    What is it?

21           A.    He was the district director for

22    immigration for a 19-state area.  I think he was also

23    in charge, at one point, of the El Paso intelligence

24    center.  He was a high ranking immigration official.

25           Q.    Do you consider him knowledgeable on

1      immigration issues?

2              A.    Yes.

3              Q.    And knowledgeable about the hiring and

4      employment of illegal aliens, issues relating to that?

5              A.    Yes.

6              Q.    Let me ask you to turn to Exhibit 18, if

7      you would, in your notebook.

8              A.    Okay.

9              Q.    This is from an Internet article.  And if

10     you'll look at the third paragraph of Exhibit 18, it

11     reads, "The meat packing industry has become dependent

12     on an unauthorized labor force, and it is not good

13     government to destroy an entire industry.  In some way,

14     there is going to be a meeting of the minds, said Mark

15     Reed, a former immigration regional director who now

16     runs his own consulting business, Border Management

17     Strategies, in Tucson, Arizona."  Did I read that

18     correctly?

19             A.    Yes.

20             Q.    That first part of Mr. Reed's statement,

21     "The meat packing industry has become dependent on an

22     unauthorized labor force," do you agree or disagree

23     with that statement?

24             MR. YOULE:  Objection to form.

25             A.    I have no way of knowing what he bases

1    that information on.

2          Q.    Well, do you agree that that's an accurate

3    statement?

4          A.    I can't agree or disagree without knowing

5    how or what he makes his opinion on.

6          Q.    Okay.  Well, putting aside what Mr. Reed

7    said, do you agree or disagree that the meat packing

8    industry has become dependent on an unauthorized labor

9    force?

10         A.    Personally, I disagree.

11         Q.    Do you disagree that -- strike that.

12               Isn't it true that prior to the ICE raids

13   in December 2006, that at least 10 percent of Swift's

14   workforce at its processing facilities was composed of

15   illegal aliens?

16         A.    Not to my knowledge.

17               MR. YOULE:  Objection to form for lack of

18   foundation.

19         Q.    Isn't it true that prior to the ICE raids

20   in December 2006, at least 10 percent of Swift's

21   employees in its production facilities were people who

22   committed identity theft?

23               MR. YOULE:  Same objection.  You can

24   answer.

25         A.    Not to my knowledge.

38

1        Q.   The 1300 or so employees that were

2   arrested by ICE in the raids and whose jobs were

3   terminated, do you know why they were arrested?

4        A.   Do I know why?

5        Q.   Yes.

6        A.   No, I don't know why.

7        Q.   Well, why did Swift terminate those

8   employees?

9        A.   Why did Swift terminate them?

10       Q.   Yes.

11       A.   Because immigration gave us a list of

12   names that they believe -- that they had taken from the

13   plants and that they believed were engaged in identity

14   fraud.  And so we terminated those people.

15       Q.   And if Swift did not believe those people

16   had committed identity theft, they wouldn't have

17   terminated them, correct?

18       A.   That's correct.

19       Q.   And it's true, isn't it, that identity

20   theft by employees at the Swift plants was typically

21   committed by illegal aliens?  Isn't that true?

22       MR. YOULE:  Objection to form for lack of

23   foundation.

24       A.   I don't know.

25       Q.   You don't know whether most of the people

1    who Swift terminated for committing identity theft were

2    illegal aliens?

3            MR. YOULE:  Same objection.

4        A.   I don't know.

5        Q.   Do you have a belief?

6        A.   I don't have any belief.  No basis for my

7    belief.

8        Q.   The people -- I mean, we'll look at the

9    list later, but all of the people that were terminated

10   by -- well, almost all the people that were terminated

11   by Swift as a result of the ICE raids had Spanish

12   surnames, correct?  Hispanic surnames?

13       A.   All?

14       Q.   The vast majority.

15       A.   I don't know.

16       Q.   You've never looked at the list?

17       A.   I have.

18       Q.   Do you deny that there's connection

19   between identity theft and illegal alien status?

20           MR. YOULE:  Objection to form.  Could you

21   rephrase that?

22       Q.   I'm just trying to understand why you are

23   arguing with the notion that these people who committed

24   identity theft were, for the most part, illegal aliens.

25           MR. YOULE:  Objection to form.  You're

1    assuming that they committed identity theft.  What he

2    testified is that that's what the government told

3    Swift.  There's a big difference there.

4              MR. PEARSON:  That's fine.

5        Q.   (BY MR. PEARSON)   You don't just

6    terminate employees because someone makes an accusation

7    unless you think there's some merit to that accusation;

8    isn't that right?

9        A.   That's correct.

10       Q.   For example, we'll look at some documents

11   here later.  Swift will get anonymous tips from someone

12   saying Jose Morales in your plant is an illegal alien

13   as an example.  Those kind of tips come in, correct?

14       A.   That's correct.

15       Q.   And Swift doesn't just terminate Jose

16   Morales; they investigate it first, right?

17       A.   That's correct.

18       Q.   And if they believe he's committed

19   identity theft or is an illegal alien, they terminate

20   him.  And if they don't believe that, they don't

21   terminate him, right?

22       A.   No.

23       Q.   That's not correct?

24       A.   That's not correct.

25       Q.   Okay.  What was wrong about my statement?

1    What was inaccurate?

2        A.    If an employee admits that they've been

3    engaged in identity theft, then we will terminate them.

4    If the employee doesn't admit it, but we have doubts,

5    we'll refer them to the Social Security Administration

6    to verify that information.    The Social Security

7    Administration will verify that that person is indeed

8    authorized to work or that person will not return to

9    work.

10        Q.    The 400 or so employees that were

11    terminated in or about October 2006 by Swift, why were

12    they terminated?

13        A.    I'm sorry.    I apologize.    I missed that

14    question.

15        Q.    Let me start over.

16            In or about October of 2006, prior to the

17    ICE raids, Swift terminated -- strike that.

18            In or about October 2006, about 400 or so

19    employees of Swift either voluntarily quit or were

20    terminated from their employment as a result of an

21    investigation that was conducted and assessment of

22    their application papers, correct?

23        A.    That's correct.

24        Q.    And why were those 400 or so people -- the

25    ones that were terminated by Swift, why were they

1      terminated?

2              A.    Because they admitted to identity theft.

3              Q.    And the 1300 or so that --

4              A.    Let me rephrase that.

5              Q.    Sure.

6              A.    You've been using the word identity theft.

7      They admitted that they weren't who they said they

8      were.

9              Q.    And the 1300 or so employees of Swift that

10     were terminated as a result of the ICE raids were also

11     suspected of having committed identity theft, correct?

12             A.    Suspected by?

13             Q.    Swift.

14             A.    By Swift?

15             Q.    Yes.

16             A.    No.

17             Q.    Suspected by who?

18             A.    Immigration arrested the people.

19             Q.    Right.

20             A.    Immigration told us that they weren't

21     authorized.  So if -- I suppose immigration, based upon

22     their investigation, suspected it.

23             Q.    And Swift had no reason to doubt that

24     belief by ICE, correct?

25             A.    Immigration told us, this is the list of

43

1     people that we've taken, and we believe that they're

2     not authorized to work and terminated them.

3          Q.   Did it concern you, in your position as

4     director of corporate compliance, that in the October

5     to December 2006 time frame, more than 10 percent of

6     the employees at Swift's production facilities were

7     terminated or quit because of issues relating to

8     illegal immigrant status or possible identity theft?

9               MR. YOULE:   Objection to form for lack of

10    foundation.

11         A.   Would you rephrase the question?

12              MR. PEARSON:   Can you read it back,

13    please.

14              (The last question was read back as

15    follows:  "Did it concern you, in your position as

16    director of corporate compliance, that in the October

17    to December 2006 time frame, more than 10 percent of

18    the employees at Swift's production facilities were

19    terminated or quit because of issues relating to

20    illegal immigrant status or possible identity

21    theft?")

22         A.   No.

23         Q.   Why did it not concern you?

24         A.   Because we've done everything that we've

25    been able to do to verify the employment eligibility

1    and identity of our employees.

2          Q.    Well, Swift's efforts in that regard were

3    stepped up dramatically after it received the subpoenas

4    from ICE in March of 2006, correct?

5              MR. YOULE:    Objection to form.

6          A.    No.

7          Q.    When was Connect the Dots instituted?

8          A.    After we engaged Border Management

9    Strategies.

10         Q.    Which was when?

11         A.    Which was prior to receiving any

12   subpoenas.

13         Q.    Connect the Dots was actually implemented

14   as a program sometime after March 2006, correct?

15         A.    The implementation involved the

16   development, the discussions, the planning.  And all of

17   that was over a time continuum.  The actual full

18   rollout was in August.  I believe that's correct.

19         Q.    Of 2006?

20         A.    Of 2006.

21         Q.    And Swift provided training to its

22   employees on various issues relating to identity theft

23   in that March, April, May 2006 time frame, correct?

24         A.    I don't recall the dates of the training.

25   I don't think it was March, April, May.

1          Q.    Was it June of '06?

2          A.    I'm thinking it was more summer, but I

3    don't -- I don't recall specifically the date.

4          Q.    Summer of 2006?

5          A.    Yes.

6          Q.    And is that training that had not been

7    given previously?

8          A.    Part of the training had been given

9    previously.  Part of it was an expansion.

10         Q.    And the role that Border Management

11   Strategies took on was a much broader role than Swift's

12   prior consultant, Mr. McClure, had had; isn't that

13   right?

14         A.    That's right.

15         Q.    When was the contractually signed with

16   Border Management Strategies?

17         A.    I don't know.

18         Q.    Was it in 2006?

19         A.    Yes.

20         Q.    Was it after March of 2006?

21         A.    I don't know.

22         Q.    Prior to 2006, what level of employee was

23   allowed to actually hire someone?  Did you have to be a

24   manager?  Or what was the position of the people doing

25   the hiring?

1          A.    We have employment managers at most of our

2     locations.

3          Q.    Were they doing all the hiring?

4          A.    In most cases, the employment manager was

5     the person doing the hiring.  And sometimes there would

6     be two or three people involved in that activity,

7     depending on the size of the plant and the applicant

8     flow.

9          Q.    Anyone else?

10          A.    No.

11          Q.    And I'll find it later when we're talking,

12     but I thought I saw something in Swift's written

13     materials about some of the steps they were taking in

14     2006 that they were narrowing the number or position of

15     people who could do hiring.  Do you remember -- does

16     that ring a bell to you?

17          A.    I don't believe that narrowing is the

18     word.

19          Q.    Well, what word would you use?

20          A.    We were -- I don't know that we had that

21     concept exactly, so --

22          Q.    There was no change in the number or types

23     or level of employees who could do hiring?

24          A.    Well, we had -- no.  In 2006, not until

25     after the raids we didn't have a change.