1                    IN THE UNITED STATES DISTRICT COURT

                        FOR THE DISTRICT OF TEXAS

2                             DALLAS DIVISION

3         Civil Action No. 3-06cv2322-N

4         BLANCA VALENZUELA, MARGIE SALAZAR, JOSE A. SERRATO,

          JOSIE RENDON, CLARA TOVAR, CONSUELO ESPINO, MARIA

5         AVILA, ERNESTINA NAVARRETTE, MARIA E. MUNOZ, AMANDA

          SALCIDO, CANDELARIO G. ORTEGA, MARIA ORTIZ, JOSE

6         OLIVA, RAFAELA CHAVEZ, ELODIA ARROYO, SUSANA CARDIEL,

          GRACIE RIOS and LEONEL RUIZ, individually and on

7         behalf of all others similarly situated,

8         Plaintiffs,

9         v.

10        SWIFT BEEF COMPANY, INC., d/b/a SWIFT COMPANY, SWIFT &

          COMPANY, HICKS, MUSE, TATE & FURST, INC., HM CAPITAL

11        PARTNERS OF DALLAS, LLC, and JOHN DOES I-V,

12        Defendants.

3         _____

          DEPOSITION OF:   ERIC A. RAY - April 9, 2008

14

15        _____

                    PURSUANT TO NOTICE, the deposition of

          ERIC A. RAY was taken on behalf of the Plaintiffs at

16        1770 Promontory Circle, Greeley, Colorado 80634, on

          April 9, 2008, at 2:00 p.m., before Sharon L. Szotak,

17        Registered Professional Reporter, Certified Realtime

          Reporter, and Notary Public within Colorado.

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2    For the Plaintiffs:      ERIC D. PEARSON, ESQ.

                             Heygood, Orr, Reyes &
3                              Bartolomei

                             2331 West Northwest Highway
4                            Second Floor

                             Dallas, Texas 75220

5

     For the Defendants:     ROBERT E. YOULE, ESQ.
6                            Sherman & Howard LLC

                             633 17th Street, Suite 3000
7                            Denver, Colorado 80202

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2      EXAMINATION OF ERIC A. RAY:                    PAGE
       April 9, 2008

3

       By Mr. Pearson                                  4

4

5                                                    INITIAL

       DEPOSITION EXHIBITS:   (Previously marked)    REFERENCE

6

       7    Form dated 8/18/06 for Claudia Lima Cruz,      15
7             with attachments

8      11   Letter to Cangemi from Shandley, 7/5/06,       13
              with attachments

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          WHEREUPON, the following proceedings

2     were taken pursuant to the Federal Rules of Civil

3     Procedure.

4                    *     *     *     *     *

5                    ERIC A. RAY,

6     having been first duly sworn to state the whole truth,

7     testified as follows:

8                    EXAMINATION

9     BY MR. PEARSON:

10          Q.    Mr. Ray, would you state your full name

11     for the record, please.

12          A.    My name is Eric Allen Ray.

13          Q.    And where do you currently work, Mr. Ray?

14          A.    JBS Swift Company at the Greeley beef

15     plant and lamb plant.

16          Q.    What is your position?

17          A.    Director of human resources.

18          Q.    For both of those plants?

19          A.    Yes.

20          Q.    How long have you had that position?

21          A.    Since July.

22          Q.    July of 2007?

23          A.    Yes.

24          Q.    What was your position prior to that?

25          A.    I was the director of human resources in

1    our Cactus facility.

2         Q.   How long were you in that position?

3         A.   Approximately a year and a half.

4         Q.   Where had you been prior to that?

5         A.   I worked at our Louisville, Kentucky,

6    facility.  It's a pork plant.

7         Q.   In what capacity?

8         A.   As HR manager.

9         Q.   Is that a different position than HR

10   director?

11        A.   Yes.

12        Q.   Is that one level below that, or --

13        A.   Yes.

14        Q.   Would you report to the HR director?

15        A.   Yes.

16        Q.   And for how long had you been in that

17   position?

18        A.   I was in that position approximately two

19   years.

20        Q.   And what about prior to your time in

21   Louisville, where were you?

22        A.   I worked for a staffing agency in

23   Cookville, Tennessee.

24        Q.   So your first position with Swift was at

25   the Louisville pork facility?

1          A.   Yes.

2          Q.   Why did you leave Cactus to go to Greeley

3     in 2007?

4          A.   The opportunity to come to Greeley.

5          Q.   And leave Cactus?  Who had had your

6     position in Greeley prior you taking the job?

7          A.   Dwayne Newkirk.

8          Q.   Do you know why he left?

9          A.   No.

10          Q.   Who took your position in Cactus?

11          A.   Michael Herrera.

12          Q.   What were your duties as director of human

13     resources in Cactus?

14          A.   It was anything related to human

15     resources.

16          Q.   So that would include hiring?

17          A.   Yes.

18          Q.   Okay.  And you also worked on compliance

19     issues relating to immigration laws?

20          A.   Yes.

21          Q.   And is that the same with your current

22     position in Greeley?

23          A.   Yes.

24          Q.   Did you have -- have you had any input in

25     the development of any policies or procedures at Swift

1    for reviewing the paperwork of job applicants to its

2    processing facilities?

3              MR. YOULE:  Could you break that down?

4    You have two different questions.  First was input into

5    policies and the second one was -- I thought it was if

6    he actually engaged in the activity.

7              MR. PEARSON:  Okay.  I'll try to make a

8    better question.

9         Q.   (BY MR. PEARSON)  There's been some prior

10   testimony of some evolution in the procedures that

11   Swift used for hiring with respect to trying to ferret

12   out illegal aliens.  Are you familiar with those types

13   of changes to the policies and procedures?

14        A.   Yes.

15        Q.   As an HR director at Cactus and then at

16   Greeley, did you have any firsthand involvement in

17   implementing those changes?

18        A.   Those changes were presented to us.

19        Q.   And then you just carried them out?

20        A.   Yes.

21        Q.   But did you have any input on what the

22   changes were going to be before they were made, or you

23   just were told, here's the new policies and procedures

24   and to carry them out?

25        A.   We were told that that's what the policies

1    were.

2         Q.    When you were the director of human

3    resources in Cactus, tell me what, if anything, Swift

4    did to prevent illegal immigrants from being hired in

5    its Cactus facility.

6         A.    We followed the procedures set forth in

7    the employers handbook for completing an I-9.    Followed

8    the I-9 in a nutshell.    Used -- I don't remember what

9    it was called then, if it was E-Verify or Basic Pilot,

10    but whichever, you know, of those phrases it was called

11    then.    We did those things.

12         Q.    And were the policies and procedures that

13    were employed at the Cactus facility to try to prevent

14    Swift from hiring illegal aliens, were those policies

15    and procedures that were dictated by Swift corporate?

16         A.    Yes.

17         Q.    And is that still true today at Greeley?

18         A.    Yes.

19         Q.    Was it -- from your experience going from

20    Cactus to Greeley, were there any differences in the

21    way Swift went about trying to prevent illegal

22    immigrants from being hired at the two facilities?

23         A.    No.

24         Q.    It was pretty uniform between the

25    different facilities, from what you saw?

1          A.    Yes.

2          Q.    And when you were the director of human

3    resources in Cactus, what, if anything, did Swift do to

4    prevent people who had committed identity theft from

5    being hired at that facility?

6          A.    It was the things that we just talked

7    about.

8          Q.    And was it your understanding that most

9    people who committed identity theft who were applying

10   to Swift facilities were illegal immigrants?

11         MR. YOULE:  Objection to form for lack of

12   foundation.  You can answer if you can.

13         A.    I don't really understand the question.

14         Q.    When you were the director of human

15   resources at Cactus, did you equate identity theft with

16   someone being an illegal immigrant?

17         A.    Not necessarily.

18         Q.    Was it your experience that the vast

19   majority of people who either you knew had committed

20   identity theft or you suspected had committed identity

21   theft were illegal aliens?

22         MR. YOULE:  Objection to form for lack of

23   foundation.  You can answer if you can.

24         A.    Again, I don't know.

25         Q.    Well, from your experience as director of

1    human resources, could you -- did you ever see an

2    occasion on which someone who you did not think was an

3    illegal immigrant was committing identity theft for

4    some reason other than because they were not legally

5    entitled to work in this country?

6        A.   Yes.

7        Q.   Give me -- tell me about that, or give me

8    some examples of that.

9        A.   I don't remember anything exact, but there

10    was an individual who was using his -- well, he was

11    using his father's identity, because he had worked for

12    us previously and his father had not.  And he had a

13    poor work history, and his father obviously would not

14    have had one.  I couldn't remember the name.

15        Q.   Was that an isolated incident that you

16    remember?

17        A.   There may have been a couple other similar

18    to that, but I don't remember.

19        Q.   When you were the director of human

20    resources at Cactus, were you ever involved in

21    terminating an employee who was suspected of identity

22    theft?

23        A.   Yes.

24        Q.   And on those instances in which you

25    terminated an employee who was suspected of identity

1    theft, why were you terminating them?

2            A.    More times than not, they would tell us

3    that they weren't who they said they were.

4            Q.    And why would that be a basis for

5    termination?

6            A.    Because they had falsified the information

7    that they provided to us and weren't eligible to work

8    in the United States.

9            Q.    How did you know that because they

10   falsified the information, that they were not eligible

11   to work in the United States?

12           A.    Because they would tell us.

13           Q.    I mean, give me -- just sort of paraphrase

14   what kind of things they would say.  What would be a

15   typical statement?

16           A.    Well, they'd tell us that they bought

17   their papers from somebody else, or that they didn't

18   have good papers so they were using these, that they

19   weren't legal to work.

20           Q.    And in those instances, the termination by

21   Swift was not because of the use of improper documents;

22   it was because that person wasn't legally entitled to

23   work in the United States?

24               MR. YOULE:  Objection to form.

25           Q.    Is that correct?

1          A.   Could you ask that again?

2          Q.   Sure.   When someone was terminated because

3     they, for example, admitted that they had been using

4     false papers, the reason they were terminated was

5     because they were not entitled to legally work in the

6     United States; is that right?

7               MR. YOULE:   Same objection.

8          A.   I guess I don't understand what you're

9     saying.  I mean, they told us that they were

10    unauthorized to work.

11         Q.   And is that why they were terminated?

12         A.   Yes.

13         Q.   Because other employees under other

14    circumstances could admit to using false papers in the

15    past, and they could still be retained by Swift if they

16    had obtained the right to work legally in the United

17    States; is that right?

18         A.   I don't know of any of those situations

19    happening.

20         Q.   What -- when you were director of human

21    resources at Cactus, what was the self-reporting policy

22    of Swift about employees who self-reported that they

23    had used false papers in the past?

24         A.   I'm unaware that that situation ever

25    occurred --

1       Q.   Okay.

2       A.   -- when I was there.

3       Q.   Has that occurred at Greeley?

4       A.   Not since I've been here, no.

5       Q.   Are you -- as director of human resources

6  at Cactus and then at Greeley, are you aware of what

7  the official policy is on someone who self-reports that

8  they have been working at your plant for some period of

9  time under a false identity, but now they've obtained

10  the right to work legally in the United States and they

11  want to continue to work for your company?

12       A.   I'm not aware specifically -- I mean, I

13  don't have it on the tip of my tongue.  It's not

14  something that typically occurs.

15       Q.   Well, it's not something that you're aware

16  of is what you're saying.

17       A.   No.

18       Q.   Let me show you some documents that are in

19  that notebook in front of you.

20       A.   Okay.

21       Q.   Looking at Exhibit 11, and turning to

22  the -- I guess the fourth page.  The number in the

23  bottom right-hand corner would be 8188.  Do you see

24  that?

25       A.   Okay.

1          Q.   Have you ever seen that before?

2          A.   Yes.

3          Q.   And what is this document?

4          A.   This is our employment eligibility and

5     identity verification policy.

6          Q.   And if you'd turn to the bottom of page

7     8194, do you see at the bottom of the page it says,

8     "Note:  Self-reporting protocol"?

9          A.   Okay.

10         Q.   And it says, "In the event that an

11    employee voluntarily reports that he or she is employed

12    by Swift under a false name and/or Social Security

13    number, paren, or otherwise has engaged in identity

14    fraud, paren, the employee's employment may be

15    continued only upon the approval of the vice president,

16    human resources field ops and labor relations or the

17    senior vice president of human resources provided that

18    the employee must reapply for employment, successfully

19    complete the employment application process, and

20    complete the EEIVP, which includes the processing of a

21    new I-9."  Did I read that correctly?

22         A.   Yes.

23         Q.   Were you aware of that protocol prior to

24    today?

25         A.   I knew we had a protocol.  I mean, I don't

1    know what the -- that's something we don't run across.

2        Q.   So, for example, if we look back at

3    Exhibit 7 -- well, let me ask you another question.  So

4    you knew there was a protocol, but you didn't know

5    specifically what it was?

6        A.   I would have had to look at it.

7        Q.   Okay.  For example, if you'd turn to the

8    page number 3883 at the bottom right-hand corner.  I

9    think it's the fourth page in.  You're in the right

10   exhibit.  It's the sixth page in.  There you go.

11       For example, this employee, Lucas Garcia

12   Bernabe, a/k/a Augustin Gonzales Ramos, it says,

13   "Employee came to HR and stated that he has been

14   working under different documents but now has his real

15   documents."  And the resolution was, "Verified

16   employment authorization card, dots connected."  Do you

17   see that?

18       A.   Yes.

19       Q.   In your time as director of HR at Cactus

20   and Greeley, you never had a situation where someone

21   came forward and said they had been working under false

22   papers but now had the right papers?

23       A.   I don't recall any of that.

24       Q.   Would that type of person have come to you

25   or to someone else to self-report?

1        A.    They would have came to me eventually.

2    Even if it had been through one of my other HR folks,

3    it would have came to me.

4        Q.    And you don't recall that happening?

5        A.    No.

6        Q.    What is a tips form or tips sheet?

7        A.    It's this sheet we're looking at.

8        Q.    And when was that instituted at Swift?

9             MR. YOULE:  Let's be clear.  Are you

10   talking about this particular sheet or the entire tips

11   policy?

12        Q.    I guess we'll start with the kind of tips

13   policy, whatever that may have been.

14        A.    I have to look at the policy, but I

15   believe that -- I mean, my guess --

16             MR. YOULE:  Don't guess.

17        A.    I don't -- I don't know when it was.  I

18   mean, I'd have to look.

19        Q.    When you were director of human resources

20   at Cactus, were you aware of a problem with illegal

21   immigrants being employed at that facility?

22        A.    No.

23        Q.    Were you aware of there being a problem

24   with persons who had committed identity left being

25   employed at that facility?

1          A.    No.

2          Q.    Did you ever become aware of such a

3    problem?

4          A.    No.

5          Q.    Were you at the Cactus plant when the ICE

6    raids occurred in December 2006?

7          A.    Yes.

8          Q.    What was your understanding as to what

9    those raids involved?

10          A.    My understanding is, it was ICE agents

11    verifying eligibility for work for employees.

12          Q.    And how many employees did you lose at

13    that Cactus plant as a result of those raids?

14          A.    200 and something.

15          Q.    Out of how many total?

16          A.    Almost 3,000.

17          Q.    At that facility, there were almost

18    3,000?

19          A.    I believe that's close.

20          Q.    If the ICE -- I don't have an extra one

21    for an exhibit, but if ICE claimed they arrested 297

22    employees at the Cactus facility as part of their

23    raids in December 2006, would you disagree with that

24    number?

25          A.    No.  I never got an official number list

1      from ICE.

2              Q.    And did Swift terminate the employment of

3      the people that had been arrested by ICE in the

4      December 2006 raids?

5              A.    Yes.

6              Q.    Why was that done?

7              A.    Unresolved identity.

8              Q.    Meaning what?

9              A.    That their identity was unresolved.

10             Q.    When were those employees terminated?

11             A.    I believe -- it was shortly after the

12     event.

13             Q.    Were all the people that were terminated

14     from the Cactus facility people that never returned to

15     work after the ICE raids, or had some of them returned

16     to the plant?

17             A.    I think, in the days following, some folks

18     had returned to the plant.

19             Q.    And those folks who had been detained by

20     ICE in the raids and then returned to the plant, how

21     did you deal with them as far as whether they could

22     continue to work there or not?

23             A.    I believe -- well, there were some

24     individuals that we contacted the ICE agents and asked

25     are they authorized or not.  And they would tell us yes

1    or no.

2            Q.    And were you involved in the efforts to

3    hire replacements for those workers who had been

4    terminated as a result of the ICE raids?

5            A.    Yes.

6            Q.    What was your specific role in that?

7            A.    I was the lead at, you know, building that

8    facility back.

9            Q.    What efforts did you undertake to rehire

10    workers for that facility?

11            A.    Many.  We recruited heavily in our local

12    area.  We recruited kind of in outwardly going circles

13    further and further away from the facility.

14            Q.    Were there some recruiting centers open

15    that were recruiting for all the different facilities?

16            A.    Yes.

17            Q.    Where were those located?

18            A.    There was one in El Paso and one in

19    McAllen.

20            Q.    And why were those areas chosen?

21            A.    Well, when we first started the process of

22    rebuilding in Cactus, we looked at areas with high

23    unemployment, high population, areas with industrial or

24    agricultural work.  And through that process, I think

25    we ended up in those locations.

1        Q.   How long did it take you to get the

2  staffing levels back up to where they had been in

3  Cactus before the ICE raids?

4        A.   I believe it was in May.

5        Q.   Of 2007?

6        A.   Yes.

7        Q.   What role did you have in Swift's actions

8  in or around October 2006 in interviewing certain

9  employees who were suspected of possibly committing

10  identity theft?

11        A.   Very little.

12        Q.   Okay.  There's been -- my understanding

13  from previous testimony is that Swift took certain

14  criteria that had been developed by a company called

15  Border Management Strategies and selected a group of

16  employees who -- for which there were certain

17  indicators that they might have committed identity

18  theft, and then pulled those people out to interview

19  them.  Are you familiar with that process?

20        A.   I'm familiar that there was a process.

21        Q.   Were you involved in it at all?

22        A.   My part of that process was making sure

23  that there were rooms available.  I was not involved in

24  the interviewing.  And then ensuring that the employees

25  that were requested got to the interviews.

1      Q.   That was it?

2      A.   Uh-huh.

3           MR. YOULE:  You need to say yes.

4      A.   Yes.  I'm sorry.

5      Q.   That's all right.

6           How many employees did you lose from the

7  Cactus facility as a result of that action?

8      A.   I don't know.

9      Q.   Was it five?  Was it a hundred?

10      A.   I don't know what the number was.  It was

11  more than five.

12      Q.   Other than what you were told by corporate

13  on any changes that occurred in 2006 about hiring or

14  trying to ferret out illegal aliens, did you do

15  anything on your own, as the director of human

16  resources at Cactus, to address those issues?

17      A.   No.  Followed the policies.

18      Q.   The policies set by corporate?

19      A.   Yes.

20      Q.   Were you allowed to develop your own

21  policies for each plant, or were you supposed to follow

22  what came down from corporate?

23      A.   I don't know that that ever came up.

24      Q.   And have you developed any of your own

25  policies and procedures that you use in Greeley other

1    than what has been handed down from corporate?

2        A.   No.

3        Q.   Has the -- from your observations, did the

4    ethnic makeup of the workforce at Cactus change from

5    before the ICE raids to after?

6        A.   Not significantly.

7        Q.   Noticeably in any way?

8        A.   Yes.

9        Q.   In what respect?

10       A.   I think, as we hired more and more people

11   that lived in Amarillo, it changed.

12       Q.   It changed how?  More whites?  Your

13   African Americans?  More what?

14       A.   That's the thing.  I don't know if it was.

15   It was -- we probably, at that point -- no.  I don't

16   know that there was a change after the ICE raids.

17       Q.   What were you getting at when you started

18   to talk about Amarillo?

19       A.   I think there was a period of time in

20   which we saw a larger portion -- or a large -- larger

21   population of African -- east Africans that began

22   working for us.  I don't remember when that was,

23   though.

24       Q.   That was at Cactus?

25       A.   Yes.

1        Q.    East African being like --

2        A.    Sudan.

3        Q.    And you don't know whether that was before

4    or after the raids?

5        A.    No.   Because we began recruiting more

6    aggressively in Amarillo even before.   It was the

7    summer before.

8        Q.    And what was your understanding as to why

9    that was being done?

10       A.    That facility has a very small local

11   population base.   And for us to be able to have an

12   applicant flow sufficient, you have to go to larger

13   populations.

14       Q.    But was there an effort from sort of March

15   of 2006 forward to start building up the staffing

16   levels at these plants in anticipation of the ICE

17   raids?

18       A.    No.

19            MR. YOULE:   Objection to form for lack of

20   foundation.

21       Q.    Were you aware of that?

22       A.    No.

23       Q.    You were never told in 2006 to try to

24   overstaff or overhire at Cactus in anticipation of the

25   ICE raids?

1        A.    No.

2        Q.    Doug Schult never told you that that was

3    happening?

4        A.    No.

5        Q.    Did you increase your hiring or recruiting

6    efforts at any point in 2006 prior to the ICE raids?

7        A.    Yes.

8        Q.    When was that?

9        A.    I don't recall.  But it would have been

10   prior to our peak season.

11       Q.    Were you told why that was being done?

12       A.    It's peak season.  The opportunity for the

13   facility to run more hours.

14       Q.    Were you aware of the wage increases that

15   occurred in October of 2006?

16       A.    There was a point where we increased the

17   starting pay, but it didn't really affect wages.

18       Q.    Well, it affected the wages for the new

19   hires, right?

20       A.    Yes.

21       Q.    Do you know why that was done?

22       A.    To maintain competitive and be

23   competitive.

24       Q.    Competitive with who?

25       A.    I would imagine with our competition.

1      Q.   Were you aware that ICE -- when did you

2   become aware, when you were at Cactus, that ICE was

3   looking into or conducting some kind of investigation

4   regarding Swift processing facilities?

5      A.   I guess I would have been first aware when

6   they subpoenaed our I-9s.

7      Q.   Was that when they subpoenaed the I-9s at

8   Cactus or when they had done that through a different

9   plant?

10      A.   In Cactus is when I would have first

11   thought that there was something going on there.

12      Q.   And who was involved in pulling those I-9s

13   together?

14      A.   The HR directors in each facility would be

15   in charge of theirs.  For ours, it was our entire HR

16   staff.

17      Q.   And did you send the originals or copies

18   to ICE?

19      A.   We sent the originals.

20      Q.   Did Cactus receive those back yet from

21   ICE?

22      A.   I don't know.

23      Q.   Has Greeley -- did Greeley receive theirs

24   back from ICE?

25      A.   Yes.

1          Q.    So is it your testimony that there was

2     nothing unusual about the step-up in hiring that

3     occurred in the fall of 2006 at Swift processing plants

4     prior to the ICE raids?

5               MR. YOULE:   Objection to form for lack of

6     foundation.   You can answer if you know.

7          A.    I don't know -- I mean, I know that we

8     did.   I don't know why.

9          Q.    Nobody told you?

10         A.    No.   I don't remember that, no.

11         Q.    At the time that you were at the Cactus

12     plant, were any of the employees -- strike that.

13               At the time you were at the Cactus plant,

14     were any of the management level employees ever

15     investigated for possibly being involved in hiring

16     illegal immigrants or helping them with false identity

17     documents?

18         A.    Not that I remember.

19         Q.    Did that ever happen in Greeley when you

20     were there?

21         A.    No.

22         Q.    What was the ethnic composition of the

23     workers at the Louisville facility compared to, let's

24     say, Cactus or Greeley?

25               MR. YOULE:   Objection to form for lack of

1  foundation.

2          Q.    From when you were there at Louisville to

3  when you were at Cactus and then Greeley?

4          MR. YOULE:  Same objection.  You can

5  answer if you know.

6          A.    Louisville was a metropolitan city, very

7  diverse.  You know, people from all races and

8  ethnicities at that facility.

9          Q.    What about -- how does that compare to

10  Cactus or Greeley?

11          A.    In Cactus and Greeley, there's more of a

12  Hispanic workforce.

13          Q.    More so than at Louisville?

14          A.    Yes.

15          Q.    Were you aware at Cactus of a large number

16  of workers from Guatamala who worked there at the

17  facility?

18          A.    No.

19          Q.    Or any other country besides Mexico?  Any

20  other foreign country?

21          A.    No.

22          Q.    Were there issues at Cactus when you were

23  there of workers speaking or writing some dialect of

24  Spanish or some other language other than English or

25  Spanish?

```
 1          A.   Yes.

 2          Q.   Tell me about that.

 3          A.   It was my understanding that there were

 4    people who did not -- I don't speak Spanish -- who did

 5    not speak the traditional Spanish.  And there were

 6    communication issues.

 7          Q.   And how did you deal with those?

 8          A.   I would find an employee who was able to

 9    speak either English and that dialect or Spanish and

10    that dialect.

11          Q.   Do you recall what any of the dialects

12    were?

13          A.   No.

14          Q.   What, if anything -- what benefits, if

15    any, has Swift provided to employees -- strike that.

16               Has Swift in the past provided some kind

17    of subsidy for transportation costs for job applicants

18    to their plants?

19          A.   For job applicants?

20          Q.   Yes.

21          A.   Not that I'm aware of.

22          Q.   What about for new hires?

23          A.   Yes.

24          Q.   And when did that occur?  Or when has that

25    occurred?
```

1          A.    I believe it would have been, like, April

2     of -- April of 2007.

3          Q.    Were you still at Cactus then, or were you

4     at Greeley?

5          A.    Cactus.

6          Q.    And tell me what you know about that.

7          A.    We had a large number of employees who

8     were living in Amarillo, because there was no housing

9     in Cactus.  There had just been a tornado that came

10    through Cactus and destroyed this small town's housing.

11    So they were living in Amarillo.  And to assist and

12    offset that cost, we provided buses for those folks

13    living in Amarillo.

14         Q.    Buses to come to work each day?

15         A.    Yes.

16         Q.    And what about anything that was done to

17    subsidize or assist with housing?

18         A.    If there were some folks who were

19    relocating from outside a certain area, then they would

20    be provided a certain amount of assistance in their

21    first month's rent.  Those type things.

22         Q.    And when did that first happen, to your

23    knowledge?

24         A.    Probably would have been about the same

25    time, in April of '07.

1        Q.    Since -- we discussed a minute ago what

2    happened in October of 2006 where there were groups of

3    employees who were interviewed because there were

4    concerns about their potentially being involved in

5    identity theft, correct?

6        A.    Yes.

7        Q.    Has that happened -- to your knowledge,

8    has that happened in Cactus or Greeley since October

9    2006?

10       A.    No.

11       Q.    Do you know why not?

12       A.    No.

13       Q.    Other than the subpoena for I-9 forms that

14   came to the Cactus facility sometime in 2006, are you

15   aware of any other subpoenas to either the Cactus or

16   Greeley facility since then?

17       A.    From who?

18       Q.    I guess from any governmental agency.

19       A.    Oh.  Yes.

20       Q.    Tell me about that.

21       A.    I think there's a lot of lawsuits that

22   were related to that that we received subpoenas from --

23   for.

24       Q.    Putting aside civil lawsuits and focusing

25   more on a governmental entity like ICE or Homeland

1   Security or Justice Department, are you aware of any

2   subpoenas like those?

3           A.    I don't remember any, no.

4           Q.    Are you aware that Border Management

5   Services -- Border Management Services --

6                 MR. YOULE:   Strategies.

7           Q.    Is it Strategies?

8           A.    Strategies.

9           Q.    Border Management Strategies does an

10  annual audit of the various plants?

11          A.    Yes.

12          Q.    And do you recall what their assessment of

13  the Cactus facility was for 2007?

14          A.    No.

15          Q.    Was it good marks, bad marks?  Average?

16  Do you remember?

17          A.    There's been a lot that's happened since

18  then.  I don't remember.

19          Q.    What about at Greeley?

20          A.    In the last recently, it was good.

21          Q.    And how were those audits -- how were

22  those results conveyed to you?  Was it in writing?

23          A.    Yes.

24          Q.    And is it like a letter grade, or how is

25  it graded?

1          A.    I don't know for sure.

2          Q.    But you were happy with the Greeley

3    audit?

4          A.    Yes.

5          Q.    Were there ever any -- strike that.

6                Were you ever aware, when you were in

7    Cactus, of any coyotes who were assisting people to

8    come into the country illegally so that they could work

9    for Swift?

10         A.    No.

11         Q.    Were any employees at Cactus ever

12   investigated for working with coyotes in that regard?

13         A.    No.

14         Q.    Other than the employee -- the hourly

15   production employees who were arrested by ICE in

16   December 2006, in the time you were at the Cactus

17   facility, was anyone arrested for potential immigration

18   violations or identity theft?

19         A.    Yeah, I believe there were.  Yes.

20         Q.    And who were those people?

21         A.    I don't know.

22         Q.    Were they management or were they

23   production employees?

24         A.    Production employees.

25         Q.    So that had occurred both before the raid

1    and after the raid?

2         A.    I don't remember.

3         Q.    Were you aware of any management level

4    employees at the Cactus facility ever being arrested

5    for potential immigration violations or identity

6    theft?

7         A.    No.

8         Q.    Are you aware of any investigation that

9    Swift has conducted of a man named Oscar Ariaga at the

10   Swift Cactus facility.

11        A.    I'm aware of Oscar.

12        Q.    Are you aware of any investigation of him

13   by Swift?

14        A.    Nothing that -- no.  I mean, nothing that

15   would show anything.

16        Q.    What do you mean by nothing that would

17   show anything?

18        A.    Oscar is an HR manager at that facility.

19   And there are a lot of people in town that didn't like

20   him for different reasons.  And people alleged all

21   kinds of things about Oscar, but nothing ever had

22   substance.

23        Q.    Is he still there?

24        A.    Yes.

25        Q.    And he's the HR manager?

1      A.   Yes.

2      Q.   And was he the HR manager under you when

3  you were the HR director?

4      A.   Yes.

5      Q.   Were the allegations made against

6  Mr. Ariaga investigated?

7      A.   Yes.

8      Q.   By who?

9      A.   By me.

10     Q.   Tell me some of the -- in general terms,

11  what were some of the allegations?

12     A.   I don't remember exactly all of them.

13  There were issues about -- you know, that Oscar would

14  play favoritism toward people.  There were allegations

15  that he would only hire -- approve for rehire his

16  friends or people that he knew or people that had done

17  him favors on other things.

18         Most of the allegations were brought to me

19  by Oscar himself.  He had heard a rumor in the

20  community, and I would investigate it.

21     Q.   Were there ever allegations that he was

22  involved in helping workers obtain fraudulent identity

23  documents?

24     A.   I don't remember that.

25     Q.   Were there ever any allegations that you

1    heard that he was involved in working with coyotes?

2        A.    I don't remember that.

3        Q.    And did anyone other than you ever

4    investigate the allegations that you described to me

5    about Mr. Ariaga?

6        A.    Not that I'm aware of.

7        Q.    Did you ever report any of the

8    allegations about Mr. Ariaga to any of your superiors

9    at Swift?

10        A.    I believe that I discussed them with

11    Doug.

12        Q.    Doug Schult?

13        A.    Yeah.

14        Q.    And what did you tell him and what did he

15    tell you?

16        A.    What we had found and what we were doing.

17        Q.    Did he approve?

18            MR. YOULE:    Objection to form for lack of

19    foundation.

20        A.    I don't know.

21        Q.    He never told you to do anything different

22    than what you were doing?

23        A.    No.

24        Q.    And who is your HR manager now at the

25    Greeley facility?

```
 1          A.   It's a vacant position.

 2          Q.   Are you looking for a replacement?

 3          A.   Yes.

 4               MR. PEARSON:  Why don't you give me a

 5     couple minutes to look over my notes.

 6               MR. YOULE:  Sure.

 7               (Recess taken, 2:42 p.m. to 2:47 p.m.)

 8          Q.   (BY MR. PEARSON)  You said that Mr. Ariaga

 9     was not well liked by some people in the community?

10          A.   Yes.

11          Q.   Do you know why that is?

12          A.   Probably because he fired them.

13          Q.   Why?  Was he responsible for firings

14     or --

15          A.   He would handle most of the discipline

16     issues.

17          Q.   Would those decisions typically be made by

18     you, though, and then carried out by him, or --

19          A.   No.

20          Q.   Who would make the decision?

21          A.   He would.

22          Q.   Have you ever been interviewed by ICE, the

23     Department of Homeland Security, the Justice

24     Department, or the FBI?

25          A.   Yes.
```

1        Q.    When was that?

2        A.    I don't remember.  It was in '07.

3        Q.    And which agency was it?

4        A.    I think there was an ICE -- there was an

5    ICE representative there, and maybe somebody from the

6    Department of Justice.

7        Q.    Where did that occur?

8        A.    In Amarillo.

9        Q.    And what was the purpose of that?

10            MR. YOULE:  Objection to form for lack of

11    foundation.

12        Q.    You can answer if you can.

13            MR. YOULE:  Were you told?

14            THE DEPONENT:  Yes.

15            MR. YOULE:  Okay.  Go ahead.

16        A.    It was related to a lawsuit that the UFCW

17    had filed against the United States government.

18        Q.    (BY MR. PEARSON)  What was that lawsuit

19    about?

20        A.    That the -- my understanding is that the

21    UFCW was saying that the government's actions on the

22    day of the raid were inappropriate.

23        Q.    And what kinds of questions were you

24    asked?  What were the topics of the questions?

25        A.    What happened that day.

1          Q.    Any other time that you've been

2     interviewed by any of those agencies I mentioned?

3          A.    Not that I remember.

4          Q.    Other than the employees who were arrested

5     during the ICE raids of December 2006, are you aware of

6     any other employees at the Cactus facility that were

7     interviewed by ICE, DHS, the FBI, or the Justice

8     Department?

9          A.    Yes.

10         Q.    Who?

11         A.    I don't know the names.

12         Q.    What were they being interviewed about?

13         A.    I believe it was in regards to the

14    employment eligibility status.

15         Q.    And were those hourly workers?

16         A.    Yes.

17         Q.    And when did that occur?

18         A.    It was in '07.

19         Q.    And what happened to those employees?

20         A.    They took them.

21         Q.    How many was that?  How many people?

22         A.    I don't remember.

23         Q.    Do you know when in '07 that was?

24         A.    It would have been -- I don't remember

25    exactly.  Late spring, early summer.

1          Q.   Was it more than a handful of people, or

2     just a handful?

3          A.   A handful.

4          Q.   Were those all production workers?

5          A.   As I remember, yes.

6          Q.   Other than the -- and were those folks all

7     terminated by Swift?

8          A.   I don't remember.

9          Q.   Were you ever told by ICE what the status

10    was, the immigration status, of those people?

11         A.   I don't know.

12         Q.   Other than the employees at the Greeley

13    facility who were arrested in the December 2006 ICE

14    raids, were you aware of any other employees in Greeley

15    who have been interviewed by ICE, DHS, FBI, or Justice

16    Department?

17         A.   Yes.

18         Q.   Who were those?

19         A.   I don't know their names.

20         Q.   Were they also employees who were being

21    interviewed about their immigration status?

22         A.   No.  I don't know what they were being

23    interviewed about.

24         Q.   When did that occur?

25         A.   Since I've been in Greeley.

```
1          Q.   Which has been since when?

2          A.   Since July of '07.

3          Q.   Were those production workers or

4     management or --

5          A.   Yes, production workers.

6          Q.   Were they arrested?

7          A.   No.

8          Q.   Were they terminated by Swift?

9          A.   No.

10         Q.   As the director of human resources for the

11    Greeley plant, wasn't it -- strike that.

12              Weren't you concerned about wanting to

13    know what the purpose of those interviews had been?

14         A.   Yes.

15         Q.   Did you ask the employees or ICE or anyone

16    else?

17         A.   No.  ICE wouldn't tell you necessarily.

18         Q.   Did you ask the workers?

19         A.   No.

20         Q.   Why not?

21         A.   I didn't see any need to.

22         Q.   It didn't bother you that they had been

23    interviewed by ICE?

24         A.   No.

25         Q.   Was that something that occurred
```

1     regularly, or was that unusual?

2              A.   Unusual.

3              Q.   And are those particular workers still

4     there, to your knowledge?

5              A.   I have no idea.

6              Q.   Did you ask ICE why they would interview

7     those particular workers in Greeley?

8              A.   Yes.

9              Q.   What did they tell you?

10             A.   They had warrants.

11             Q.   That's all they told you?

12             A.   Uh-huh.

13             Q.   Anything else they told you?

14             A.   No.

15             Q.   I don't know if I just asked you this or

16    not, but were those folks arrested?

17             A.   No.

18             Q.   And has that occurred only once since

19    you've been in Greeley?

20             A.   No.

21             Q.   It's occurred more than once?

22             A.   Yes.

23             Q.   Approximately how many times?

24             A.   Maybe two or three times.

25             Q.   And on any of those occasions, did you

1    learn either from the employee or from ICE why those

2    people were being interviewed?

3         A.    I don't remember, no.

4         Q.    When was the most recent time that

5    happened?

6         A.    I don't know.

7         Q.    The last few months?

8         A.    Probably.  I've only been there a few

9    months, so it's not --

10         Q.    Well, how long have you been at Greeley?

11    Since when?

12         A.    Since July.

13         Q.    Well, I mean, you know, when I say last

14    few months, January, February, March of '08.

15         A.    I don't remember any during that time.

16         Q.    Were any of those employees that you aware

17    of being interviewed by ICE at the Greeley facility

18    terminated because of information that was learned at

19    that time?

20         A.    I don't remember.

21         Q.    Both at Cactus and then in Greeley, when

22    you became aware that ICE was interviewing a particular

23    employee, did you then go and do any kind of an audit

24    or review of their paperwork?

25         A.    Yeah.

1       Q.   When?

2       A.   I don't remember dates.  I mean --

3       Q.   No.  But, I mean, was that each time that

4  would happen, you would do that?  Or just on some

5  occasions?

6       A.   There were a lot -- I mean, there were

7  occasions where law enforcement would come to speak to

8  an employee.  It might be to serve a warrant, it might

9  not be.  Every time we're not going to review that

10  employee's records.

11      Q.   Why not?

12      A.   Why would we?  I didn't see any reason to.

13      Q.   Well, on the occasions on which you did,

14  why did you?

15      A.   If the employee was arrested or if we

16  were told that there was an issue with the identity

17  theft.

18      Q.   On those occasions at Cactus and Greeley

19  on which you were aware that employees had been

20  interviewed by ICE, did you ever sit down and try to

21  interview those employees to see what they talked about

22  with ICE?

23      A.   No.

24      Q.   And why not?

25      A.   Didn't see any need to.

1              MR. PEARSON:  I'll pass the witness.

2              MR. YOULE:  No questions.

3              WHEREUPON, the within proceedings were

4    concluded at the approximate hour of 2:57 p.m. on the

5    9th day of April, 2008.

6                   *        *        *        *        *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, ERIC A. RAY, do hereby certify that I have

2     read the above and foregoing deposition and that the

3     same is a true and accurate transcription of my

4     testimony, except for attached amendments, if any.

5          Amendments attached    ( ) Yes    ( ) No

6

7                     _____

                      ERIC A. RAY

8

9

10         The signature above of ERIC A. RAY was

11    subscribed and sworn to before me in the county of

12    _____, state of Colorado, this _____ day

13    of _____, 2008.

14

15                    _____

                      Notary Public

                      My commission expires:

16

17

18

19

20

21

22

23    Blanca Valenzuela 4/9/08(sz)

24

25

```
 1                    REPORTER'S CERTIFICATE
 2      STATE OF COLORADO        )
                                 )  ss.
 3      CITY AND COUNTY OF DENVER )
 4           I, SHARON L. SZOTAK, Registered Professional
        Reporter, Certified Realtime Reporter, and Notary
 5      Public, State of Colorado, do hereby certify that
        previous to the commencement of the examination, the
 6      said ERIC A. RAY was duly sworn by me to testify to the
        truth in relation to the matters in controversy between
 7      the parties hereto; that the said deposition was taken
        in machine shorthand by me at the time and place
 8      aforesaid and was thereafter reduced to typewritten
        form; that the foregoing is a true transcript of the
 9      questions asked, testimony given, and proceedings had.
10           I further certify that I am not employed by,
        related to, nor of counsel for any of the parties
11      herein, nor otherwise interested in the outcome of this
        litigation.
12
             IN WITNESS WHEREOF, I have affixed my
13      signature this 14th day of April, 2008.
14           My commission expires June 10, 2008.
15
16      __X__ Reading and Signing was requested.
17      _____ Reading and Signing was waived.
18      _____ Reading and Signing is not required.
19
20
21
22
23
24
25
```