IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF TEXAS

2        DALLAS DIVISION

3    Civil Action No. 3-06cv2322-N

4    BLANCA VALENZUELA, MARGIE SALAZAR, JOSE A. SERRATO,

JOSIE RENDON, CLARA TOVAR, CONSUELO ESPINO, MARIA

5    AVILA, ERNESTINA NAVARRETTE, MARIA E. MUNOZ, AMANDA

SALCIDO, CANDELARIO G. ORTEGA, MARIA ORTIZ, JOSE

6    OLIVA, RAFAELA CHAVEZ, ELODIA ARROYO, SUSANA CARDIEL,

GRACIE RIOS and LEONEL RUIZ, individually and on

7    behalf of all others similarly situated,

8    Plaintiffs,

9    v.

10   SWIFT BEEF COMPANY, INC., d/b/a SWIFT COMPANY, SWIFT &

COMPANY, HICKS, MUSE, TATE & FURST, INC., HM CAPITAL

11   PARTNERS OF DALLAS, LLC and JOHN DOES I-V,

12   Defendants.

---

13

DEPOSITION OF:  DOUGLAS W. SCHULT - April 8, 2008

14

---

15            PURSUANT TO AGREEMENT, the deposition of

DOUGLAS W. SCHULT was taken on behalf of the Plaintiffs at

16   1770 Promontory Circle, Greeley, Colorado 80634, on

April 8, 2008, at 9:05 a.m., before Barbara Birger,

17   Registered Merit Reporter, Certified Realtime Reporter and

Notary Public within Colorado.

18

19

20

21

22

23

24

5

A P P E A R A N C E S

2   For the Plaintiffs:        ERIC D. PEARSON, ESQ.
                               Heygood, Orr, Reyes, Pearson &
3                                Bartolomei
                               2331 West Northwest Highway
4                              2nd Floor
                               Dallas, Texas 75220

5

    For the Defendant:         ROBERT E. YOULE, ESQ.
6   Swift Beef                 Sherman & Howard
    Company, Inc.              633 17th Street, Suite 3000
7                              Denver, Colorado 80202

8

9                                                      )

10

·

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X
 2    EXAMINATION OF DOUGLAS W. SCHULT:              PAGE
      April 8, 2008
 3
      By Mr. Pearson                                  6
 4
 5                                                 INITIAL
      DEPOSITION EXHIBITS:                         REFERENCE
 6
      1  Swift Beef Company and Swift & Company's     26
 7         First Supplemental Responses to Putative
           Class Representatives' First and Second Set
 8         of Interrogatories
 9    3  List of plants and contract terms           26
10    4  PowerPoint Presentation entitled, "Swift    66
           & Company Contract Negotiations, Cactus,
11         Texas -  UFW Local 540"
12    5  PowerPoint Presentation entitled, "Swift    80
           & Company"

 J
      6  PowerPoint Presentation Entitled, "Contract 85
14         Negotiations, Greeley, GI - Cactus"
15    7  Spreadsheet                                 43
16    8  Document Entitled, "Participated in         93
           Making Decision to Raise Hourly Wages
17         2006 and 2007"
18    9  E-mail to Miller, Henley and Shandley       119
           from Schult, 10/13/06, Subject:  Rapid
19         Response Recruiting Plan, with attachments
20   10  Start Rate Recap as of October 2006,        139
           with attachments
21
     11  PowerPoint Presentation entitled,  "Swift   144
22         & Company Strategic Sourcing"
23   12  PowerPoint Presentation Entitled, "Swift    148
           & Company Rapid Response"
24
`5
```

644

13  Fax to Carroll and Youle from Heygood,          9
    1/25/08, Re:  Blanca Valenzuela,
2   et al. vs. Swift Beef Company, Inc., et al.
    Civil Case No. 3:06-CV-02322, with attachments

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          WHEREUPON, the following proceedings were taken

2     pursuant to the Federal Rules of Civil Procedure.

3               *     *     *     *     *

4          MR. PEARSON:  This is Eric Pearson,

5     counsel for the plaintiffs, and I've been informed by

6     counsel for the defendants that they are objecting to

7     the presence of a videographer because we did not

8     notice these as video depositions.

9               It's our position that these depositions

10    were taken by agreement without the necessity of any

11    notice whatsoever, and that it's improper to insist

12    that a notice of a video deposition was necessary when

13    these were taken by agreement and no notice of any

14    kind was sent and no insistence was made that a notice

15    had to be sent.

16               But in order to move forward with the

17    depositions, I've instructed the videographer pack up

18    her things, and we will take these stenographically

19    without a videotape.  That's it.

20          MR. YOULE:  That's fine.

21          DOUGLAS W. SCHULT,

22    having been first duly sworn to state the whole truth,

23    testified as follows:

24

25

646

1                    EXAMINATION

2    BY MR. PEARSON:

3         Q.   Would you state your full name for the

4    record.

5         A.   Douglas W. Schult.

6         Q.   My name is Eric Pearson, I represent the

7    plaintiffs in this case, and we're here taking your

8    deposition today.

9              Have you had your deposition taken

10   before?

11        A.   Yes, I have.

12        Q.   So you generally know the ground rules

13   and procedures that are followed in a deposition?

14        A.   Yes.

15        Q.   Obviously the court reporter to your left

16   is taking down everything that you and I say.   In

17   order to make her job easier, I need to ask you to

18   answer out loud to all my questions and avoid using

19   phrases like uh-uh or uh-huh.   If you would do that

20   for me, I would appreciate that.   Can we agree on it?

21        A.   Okay.

22        Q.   If you don't understand my question, will

23   you tell me and I'll try to rephrase.

24        A.   I will.

25        Q.   If you need a break, I'll be happy to

accommodate.

2       A.   Okay.

3       Q.   Your written deposition testimony will be

4   printed up in a booklet form, and you'll have an

5   opportunity to review that and make any corrections to

6   ensure that it's accurate; do you understand that?

7       A.   Yes.

8       Q.   And you understand that the testimony

9   you're giving here today has the same force and effect

10  as if you were testifying in front of a judge and

11  jury; do you understand that?

12      A.   Yes.

13      Q.   Who is your current employer, Mr. Schult?

14      A.   JBS Swift & Company.

15      Q.   And is that a Brazilian company?

16      A.   The parent is owned -- is the

17  Brazilian-based company.

18      Q.   That's JBS?

19      A.   Yes.  I don't know the exact title of the

20  company, but it's JBS.

21      Q.   How long have you been with JBS Swift in

22  one form or another?

23      A.   Since June of 2000.

24      Q.   And what position did you start at in

25  June of 2000?

648

A.    Basically the same position I'm in today.

2    It's titled differently.  Back at that point it was

3    vice-president of field operations for human

4    resources.

5        Q.    And as of today, who's your direct

6    superior?

7        A.    Jack Shandley.

8        Q.    What is his title?

9        A.    Senior vice-president of HR, human

10    resources and administration.

11        Q.    And how many people, if any, report

12    directly to you?

13        A.    Right now I have, let's see, three direct

14    reports, and then several indirect reports.

15        Q.    Who are the direct reports?

16        A.    James Hamilton.

17        Q.    Okay.

18        A.    And Ruben Flores.

19        Q.    Is there one other?  I thought you said

20    three.

21        A.    Just the two.

22        Q.    What is Mr. Hamilton's position?

23        A.    He heads up our compliance for human

24    resources.

25        Q.    What about Ruben Flores?

649

A.    He heads up our college recruiting and

2  relations, as well as he just recently took over the

3  corporate staffing function and handles some community

4  relations activities.

5          Q.    Mr. Hamilton and Mr. Flores, do they

6  office here in this building?

7          A.    Yes.

8          Q.    And who does Mr. Shandley report to?

9          A.    Wesley Bastista, CEO.

10          Q.    Mr. Shandley, does he office in this

11  building?

12          A.    Yes.

13          Q.    And where does Mr. Bastista office?

14          A.    This building.

15          Q.    I'm going to ask you to turn to

16  Exhibit 13, which is a series of letters discussing

17  the topics on which we were seeking a corporate

18  representative to testify.  And if you look, I just

19  want to walk through and verify the ones I believe

20  you've been designated on based on communications from

21  your lawyer and make sure we're on the same page here.

22          If you turn to the second page of

23  Exhibit 13, looking at topics 4, 5, and 6, are those

24  topics on which you have been designated to testify as

25  a corporate representative of Swift in this

litigation?

2            MR. YOULE:  Objection to form for lack of

3    foundation.  You can answer.

4         A.   Yes.

5         Q.   (BY MR. PEARSON)  And what about topic

6    No. 9?

7            MR. YOULE:  Same objection.  You can

8    answer.

9         A.   Yes.

10        Q.   (BY MR. PEARSON)  And the next page,

11   topics 12 through 15, are those topics on which you

12   have been designated to testify as a corporate

13   representative of Swift in this litigation?

14            MR. YOULE:  Same objection, you can

15   answer.  12 through?

16            MR. PEARSON:  15.

17        A.   Yes.

18        Q.   (BY MR. PEARSON)  And lastly, topic

19   No. 21, same question?

20        A.   Yes.

21        Q.   Which of the production -- are all of

22   Swift's production facilities, other than the Hyrum,

23   Utah, facility, unionized?

24            A.   The production facilities, yes.  We have

25   some distribution centers, relatively small -- I'm

1    trying to think offhand -- one in Grand Island.  The

2    Denver SDC -- Swift distribution center.

3          Q.    The processing facility is in Grand

4    Island?

5          A.    That's correct.

6          Q.    Is the primary union at all the

7    production facilities that have a union the United

8    Food and Commercial Workers Union?

9          A.    That's the primary one, not the only

10    one.

11          Q.    Are the majority of the employees at

12    those unionized processing plants members of that

13    particular union?

14          A.    They are represented by that particular

15    union.  I don't know what the membership is, the more

16    technical term.

17          Q.    Very well.  And is it true that you

18    personally have been involved in negotiating every

19    labor agreement involving those Swift production

20    facilities since the year 2000?

21          A.    That's correct.

22          Q.    In what capacity have you been involved

23    in negotiating those labor agreements?

24          A.    Various capacities.  I've taken the lead

25    in coordinating the internal development of the

1    internal strategy and so forth within the

2    organization.  Depending upon the contract, I may or

3    may not be the chief spokesperson at the table.

4         Q.   In the various capacities in which you

5    have acted in negotiating labor agreements for the

6    Swift production facilities, you have been acting on

7    behalf of Swift corporate; is that correct?

8              MR. YOULE:  Objection to form.  What do

9    you mean when you say "Swift corporate"?

10        Q.   (BY MR. PEARSON)  The interests of the

11   company overall as opposed to the interests of a

12   particular plant?

13        A.   I guess I'm not sure how to answer your

14   question.  There's interest, obviously, to the company

15   overall, but there's local interest as well, local

16   issues that would be more important to the plant than

17   to necessarily corporate.

18        Q.   And as between the interests of the plant

19   and the interests of corporate, which of those

20   interests are you representing?

21        A.   Both.

22        Q.   And if there's a conflict between those

23   interests, which are you representing?

24        A.   I'll resolve the conflict internally

25   through the corporation.

1          Q.    And how is that done?

2          A.    I'll take it back through the senior

3    management team.

4          Q.    Who is on that senior management team?

5          A.    It can start anywhere from the CEO to the

6    CFO to the COO.  It's going to depend upon what the

7    issue is and which contract it is.

8          Q.    I want to walk through just sort of the

9    process from beginning to end in general terms, then

10   we'll go back in and talk more specifically.  Let's

11   say hypothetically a contract -- let me back up for a

12   minute.

13              Explain what a collective bargaining

14   agreement is, if you would.

15         A.    It's an agreement -- it's a formal

16   agreement reached between labor and management that

17   dictate the hour -- or wages, hours, and working

18   conditions for the employees who are represented by

19   that union.

20         Q.    And are the collective bargaining

21   agreements, which I'll call CBAs, are those plant

22   specific or union-wide or are there both sometimes?

23         A.    What do you mean "union-wide"?

24         Q.    Well, is there one CBA for each plant?

25         A.    Yes.

1          Q.    Are there any agreements between Swift

2     and the United Food and Commercial Workers Union that

3     apply to more than one Swift facility?

4          A.    No.

5          Q.    And let's kind of walk through how the

6     process works.  Let's say hypothetically the contract

7     under which the Cactus facility is operating is

8     expiring.  First of all, let me ask you:  How far in

9     advance of the expiration of an ongoing CBA does Swift

10    normally start the process of negotiating a new CBA?

11         A.    Oh, internally we'll start, say, ten

12    weeks in front.  Typically as far as actual meeting at

13    the table with the union and company representatives

14    at the formal table negotiations, probably six to

15    seven weeks before expiration.

16         Q.    Let's start with what happens ten weeks

17    before when you start the process internally.  What

18    does that entail?

19         A.    What we do is we'll get with the plant

20    management team, ask them to begin the process of

21    reviewing what changes they would like to see in the

22    collective bargaining agreements, whether it's

23    language, changes, and so forth.  They will focus

24    primarily on language, and then any local issues that

25    have come up over the last collective bargaining

1      agreement.  We will then in turn at a corporate level

2      begin to do the same thing, but also look at the

3      economics.

4            Q.    When you say "look at the economics," can

5      you describe what that means?

6            A.    Look at the wage rates, look at the

7      benefits, and do comparisons on those wages and

8      benefits.

9            Q.    Comparisons between what and what?

10           A.    It's going to depend upon which contract

11     it is.  If it's a beef contract, we'll look at our

12     beef plants, but we'll also look heavily at the

13     industry and review what recent settlements have been

14     made in the beef industry.  So we're looking probably

15     at the industry overall at that point and comparing

16     wage rates and then again, as I said, looking at

17     recent settlements in unionized facilities.

18           Q.    And that term "settlements," that

19     obviously has a different meaning than in a legal

20     context.  Can you explain what that means by "recent

21     settlements"?

22           A.    Well, contracts that have been negotiated

23     and ratified by our competitors and different labor

24     unions.  And the settlements being, what did they

25     settle for?  What wage rates?  What was the terms?

1    What, if any, benefit changes occurred inside that

2    agreement?

3        Q.    Is Oscar Arriaga corporate, or is he at

4    one of the plants?

5        A.    He's at the Cactus plant.

6        Q.    And Eric Ray?

7        A.    Eric was -- he's been at three plants for

8    us, so he's still out at a plant location, currently

9    in Greeley, Colorado.

10       Q.    So who at the plant -- you mentioned

11   earlier about the internal discussions as part of the

12   collective bargaining process that you get together

13   with the plant management team.  What positions

14   normally would be involved in that from the plant?

15       A.    The primary ones are going to be the

16   general manager, the HR director, some limited

17   involvement from the controller.  We may ask them to

18   get involved in helping us cost some issues out.  And

19   then the operations managers of the facility, the

20   local people will get feedback from them on, again,

21   issues or items that they would like to see changed in

22   the labor agreement.

23       Q.    We're going to look at it here in a

24   moment, but in one of the documents that's been

25   produced it mentioned someone with the title benefits

1    as being involved in these discussions as well.  Is

2    that normally someone from corporate or at one of the

3    plants?

4        A.   It would be corporate.

5        Q.   And what is their function?

6        A.   On the benefits side it's going to be --

7    when I refer to benefits, it's going to be health

8    care.  They will get involved in making

9    recommendations as to what the plan design should look

10   like, what contributions for health care should look

11   like.  There is another side to benefits, and that's

12   on the retirement plans, but that's rarely -- I mean,

13   it's not something that changes very often contract to

14   contract.

15       Q.   And in these internal discussions that go

16   on before the collective bargaining process begins, is

17   it corporate that's normally dictating the economic

18   terms of the proposed agreement with the particular

19   plant?

20            MR. YOULE:  Objection to form.  Go ahead

21   and answer if you understand the question.

22       A.   Corporate will approve -- corporate is

23   going to drive the primary wage -- the primary

24   direction on wages and on the major benefits.  They

25   will approve all of the economics.  On a local level

658

1    there are some minor economic issues, or what I would

2    consider more minor, that the general manager and his

3    operations team has some latitude over.  But in the

4    grand scheme of costing out a labor agreement, that's

5    going to be a fairly minor piece of it.

6        Q.   (BY MR. PEARSON)  And when you say that

7    there's some minor economic issues that the local

8    plant managers may have some more input on, what types

9    of issues would those be?

10        A.   Just a couple of examples, premium pay

11    for certain jobs where we pay additional amounts over

12    our base rates for certain jobs, they may want to

13    upgrade a job, so the economics of that.  They may

14    make a decision to provide certain equipment to

15    certain jobs.  That's not something that necessarily

16    corporate is going to get involved in, that's a local

17    decision.

18        Q.   But as far as setting the wage rates,

19    that is a decision that's driven by corporate; is that

20    correct?

21        A.   Correct.

22        Q.   Now these internal discussions that occur

23    that you start about ten weeks before the CBA is

24    expiring, how are they -- do they result in any kind

25    of a plan or a written proposal, or what is the

1  outcome of those internal meetings?

2      A.   What I've done -- and I'm trying to think

3  how far this goes back -- but I think almost all the

4  way back to the first contract since I've been here is

5  we'll do the background, the benchmarking, the

6  costing, and put together a formal recommendation for

7  senior management to look at and to ultimately

8  approve, and that is a written document.

9      Q.   And who in senior management would have

10  the final approval on that?

11      A.   Again, it's going to depend upon which

12  contract it is specifically, if it's a beef contract

13  or a pork contract.  And it's going to depend upon

14  what time frame we're talking about because people in

15  the organization changed over that time frame.

16      Q.   Let's assume it's beef.  And rather than

17  go in with names, give me just titles or positions of

18  the people that would be involved in that approval

19  process.

20      A.   Okay.  Let me go back to prior to JBS

21  because, frankly, right now we haven't had a major one

22  come up since JBS has been involved.  But prior to

23  that it would be the COO and the senior vice-president

24  of human resources administration, the vice-president

25  of operations.  That's really those three.

Q.    And how often do those folks get

2    involved -- I mean, is it typical that they would look

3    at that proposal and say, Look, we're not happy with

4    those wage rates, we need to discuss them or is it a

5    rubber stamp or how does that normally play out?

6        A.    Again, it's going to depend upon the

7    contract and what the circumstances were, what the

8    proposal was.  It's not a rubber stamp.  There's give

9    and take.  We're talking not just economics, we're

10   talking strategy, we're talking length of contract.

11   And so depending upon which contract it was, it could

12   have sent us back and said, We need to do more work on

`3   the benefits, we need more information on wages or any

14   number of things.

15       Q.    Going back to the corporate level and

16   these discussions internally on the wage rates, who at

17   the corporate level would be involved specifically in

18   talking about hourly wage rates in these collective

19   bargaining agreements?

20       A.    Well, myself and those four -- those

21   three individuals.  At one time there was another

22   individual that was involved -- more involved than

23   what we would do today, and he worked on my staff.

24       Q.    Who was that?

25       A.    Tony Harris.

1          Q.    Then when you said in those three

2     individuals, you were talking about the COO, the

3     senior VP for HR and admin, and vice-president of

4     operations?

5          A.    Correct.

6          Q.    Would those three folks be involved in

7     the initial discussions that result in any proposal,

8     or would they just become involved after you had come

9     up with the proposed wage rates and they would look at

10    it and pass judgment on it?

11         A.    My approach was to put a straw man, if

12    you will, put a proposal in front of them and then

13    we'll beat it up from there.

14         Q.    When was Mr. Harris involved?  During

15    what time frame?

16         A.    I'll get close, but -- I'll get close,

17    but I'm not sure exactly.

18         Q.    The best you can.

19         A.    Late 2000 to 2006.

20         Q.    And what was his title?

21         A.    Regional director of human resources.

22         Q.    Why did his involvement cease?  Did he

23    leave the company or change positions?

24         A.    Changed positions.

25         Q.    Has he been replaced in that capacity?

1      A.   We eliminated the position.

2         Q.   So during the time frame from 2000 to

3   2006 when wage rates were being determined within

4   Swift corporate, it was you and Tony Harris that were

5   responsible for making a proposal to senior

6   management, which would be the COO, the senior

7   vice-president for human resources and administration,

8   and the vice-president for operations; is that

9   accurate?

10         MR. YOULE:   Objection to form.   We're

11   talking generally here as opposed to a particular

12   contract, I assume?

13         MR. PEARSON:   I think the question just

14   speaks for itself.

15         MR. YOULE:   Objection to form.

16      Q.   (BY MR. PEARSON)   Is that the process

17   that went on for all the contracts, or did some of

18   them deviate from that process?

19      A.   There may have been some deviation to

20   that.   That would be the standard -- the more typical

21   process it would go through.

22      Q.   Can you think of any examples?

23      A.   I would have to go back through each one

24   of the contracts and think about it.

25      Q.   Is there any reason why one contract

would deviate from that where somebody other than you

2    or Mr. Harris would be looking at the wage rates and

3    making those decisions?

4          A.    Not as far as gathering the background

5    information on the wage rates and things like that.

6    It would have been Tony or myself.  There may have

7    been one other individual, his name is Tim Hill, and

8    he also had the title of regional director of HR, and

9    Tim may have been involved in one or two contracts as

10    far as gathering the background data.

11          Q.    Now obviously, as you just mentioned, one

12    part of that process in determining the wage rates

13    that you would then send to senior management to look

14    at would be gathering background data, right?  That's

15    what you just testified to?

16          A.    Yes.

17          Q.    Then after that data was gathered who, as

18    between you, Mr. Harris, and Mr. Hill, if he was

19    involved, who would determine, based on this data,

20    here is what we're proposing for the wage rates of

21    this particular plan?  Would that be you?

22          A.    As far as what would go into the final

23    proposal to senior management?

24          Q.    Yes, sir.

25          A.    Yes, that would be me.

1       Q.   The other folks, Tony Harris and then

2    maybe Tim Hill on a few occasions, they were simply

3    gathering the background information for you to look

4    at and then make a determination as to what you

5    thought the appropriate wage rates were to go into the

6    proposal to senior management?

7       A.   We would work together on it and develop

8    proposals together, but ultimately I was the one that

9    made the decision as to what went in and what didn't

10   to senior management.

11      Q.   Now you mentioned when I asked earlier

12   about the process, you said maybe ten weeks before the

13   CBA was expiring you would meet internally, and then

14   maybe six to seven weeks before it was expiring you

15   would meet at the table.  I want to talk now about

16   that process at the table.  First of all, what does

17   that phrase mean to you?

18      A.   To me that's the formal negotiations with

19   the union, the company's committee, and the union's

20   bargaining committee.  It is the formal face-to-face

21   negotiation of the collective bargaining agreement.

22      Q.   Does that normally take place in the

23   local city where the plant is or does it take place

24   here in Greeley or how does that work?

25      A.   It's just going to be in the local city

1    or some town close to that.  It won't be here in

2    Greeley unless it's the Greeley contract.

3         Q.    And what goes on?  Just describe for me

4    in general terms that process at the table, how that

5    works?

6         A.    You start out with noneconomic issues, at

7    least that's the company's approach.  Sometimes the

8    union will give a full proposal, and by that I mean

9    economics and noneconomic items.  The company -- our

10   process is to only give noneconomic proposals to start

11   with.

12              Typically the first day is relatively

13   short, it's an exchange of written proposals.  After

14   the first day you begin to take each proposal, company

15   and union, and work through them.  Work through all

16   the noneconomics first, and then maybe some

17   noneconomics get carried over into the economic

18   issues, but then focus on the economic issues.

19              There are minutes taken by each side, not

20   people from the outside, they are part of the

21   committees -- various committees.  Sometimes we'll

22   break down into subcommittees, if there is a

23   particular issue that's going to take too much time at

24   the main table with the full bargaining committees,

25   and ask them to address items away from the table and

1    then bring it back to the table.

2           You go through sessions where you're at

3    the table negotiating face-to-face.  You have caucus

4    sessions where you go back and discuss amongst

5    yourselves the dialogue that occurred at the table and

6    what we're going to talk about at the next session

7    when we go in, and it just goes back and forth like

8    that until you reach agreement.

9           Q.   And so there's two groups, a company

10   group and then a union representative group; is that

11   right?

12          A.   That's right.

13          Q.   Let's go ahead and look at -- let me

14   offer Exhibit 3.  Actually, let me back up to

15   Exhibit 1, if we could, which are some interrogatory

16   numbers in this lawsuit.  If you look at interrogatory

17   No. 7 on page 10.  The interrogatory was, "For every

18   one of the labor contracts, please identify the name

19   of each individual who participated in the

20   negotiations for such on behalf of management and

21   briefly describe the role they played."

22          And the answer is, "Individuals who

23   participated on behalf of Swift in the negotiations of

24   the labor contracts are set forth on the attached

25   Exhibit F, which has been supplemented from its

1    previous disclosure."

2              Did I read that portion of that

3    correctly?

4         A.   Yes.

5         Q.   If you'll turn to Exhibit 3 where we were

6    a minute ago, it's labeled Supplemental Exhibit F,

7    paren, Supplemental Answer to Interrogatory No. 7.  I

8    just want to verify, is this a chart of the people

9    involved on behalf of Swift in the negotiation of the

10   various collective bargaining agreements with the

11   production facilities?

12        A.   Yeah, as best we could put it together.

13        Q.   So, for example, looking at the first

14   page at the Cactus plant, the December 2005 to

15   December 2010 contract, that shows you and Mr. Harris

16   involved, and it lists your position as labor

17   relations, correct?

18        A.   Our function at the table is labor

19   relations, yeah.  The column is titled Position, but

20   we were saying this is the role they play because I

21   think that was the question in the interrogatory.

22        Q.   And what do you mean by that term, the

23   role we played was labor relations?  What does that

24   mean in general terms?

25        A.   Our role was to take the lead in the

1   contract negotiations and deal directly with the

2   union.

3        Q.   And in those at-the-table negotiations,

4   who normally takes the lead?  Let's say from among

5   this group here in the 2005 to 2010 contract, who

6   would take the lead on behalf of Swift in negotiating

7   that particular CBA?

8        A.   At the table it would either be Tony or

9   myself, depending upon the agreement.

10        Q.   Do you remember on that particular

11   agreement who it was?

12        A.   It was split.  Tony took the lead to

13   start with, and then he got sick, and so I had to come

14   in and finish it up.

15        Q.   Was it typical that in the negotiations

16   of these various collective bargaining agreements that

17   someone with the position title here of labor

18   relations would be the one taking the lead at the

19   table?

20        A.   Yes, he would be the chief spokesperson.

21        Q.   And when the issue of wages came up,

22   assuming it did at the table negotiations, who would

23   be the point person from Swift on those wage issues?

24        MR. YOULE:  Are you talking about this

25   particular contract, or more generally?

1          MR. PEARSON:  More generally.

2          A.    The labor relations lead.

3          Q.    (BY MR. PEARSON)  Would there be anybody

4    else who would have input on wages at these

5    at-the-table negotiations from the Swift side other

6    than the person with the position on Exhibit 3 listed

7    as labor relations?

8          A.    To some degree the general manager.

9          Q.    And when you say "to some degree," kind

10   of give me a feel for what that is.

11         A.    The ultimate decision of what was going

12   to be paid or not paid was going to be made by senior

13   management, not the people sitting at the table.

14         Q.    But from among the people sitting at the

15   table, who had the ultimate authority?

16         A.    The chief spokesperson, labor, based on

17   what senior management approved.

18         Q.    So let's look at another one of these.

19   Let's look at the 2001 to 2005 Cactus contract.  At

20   the table would you have been the person who had the

21   ultimate authority on wages?

22         A.    Yes.

23         Q.    And now when you say with the approval of

24   management, I want to make sure I understand that.

25   Was it a situation where you would go into these

1    negotiations with a certain range that had been

2    approved by management, or would you actually have to

3    consult with senior management during the negotiation

4    process to get approval?

5         A.    We would go in with a range that had been

6    preapproved, and that would include more than just the

7    money, it would include the term and things like that.

8    Probably in 80 to 90 percent of the cases there would

9    be dialogue with senior management towards the end on

10   the final settlement.

11        Q.    And would that normally just be done over

12   the phone or would you have to come back for a meeting

13   or how would that work?

14        A.    Both.

15        Q.    Would there be a -- was there a formal

16   approval process, any kind of documents that were

17   checked off on by senior management, or was it verbal?

18        A.    Verbal.

19        Q.    Were any notes or minutes of those

20   meetings taken?

21        A.    No.

22        Q.    How often was it that you had to get

23   authorization from senior management to deviate from

24   the preapproved range you had been given?  Was that

25   typical or atypical that would happen?

1          A.    I would say it's fairly typical.

2          Q.    And let's look at one of these -- well,

3     in general terms, this Exhibit 3 talks about who was

4     at the table from Swift.  Not giving me names but

5     positions, let's say with the Cactus contract 2005 to

6     2010, who would be at the table for the union?  Again

7     not names but positions.

8          A.    In Cactus' case, the president of the

9     local would be present, not at all the sessions.  I

10    would say 25 percent of the time.  When he was

11    present, he would be the chief spokesperson.  When he

12    wasn't, it would be handed off to the business

13    representative that serviced the plant -- Cactus plant

14    for that local.  They would also have what is called a

15    walking steward would be part of the committee.

16         Q.    Walking steward?

17         A.    Yes.  It's a full-time steward.

18         Q.    Tell me what that term -- I know what

19    that term means in a restaurant.

20         A.    They walk around the plant, that's how

21    they get the terminology.  Literally, they walk around

22    the plant, so they call it a walking steward.

23         Q.    But they are a union employee rather than

24    a Swift employee?

25         A.    They are a union-appointed employee

1    that's paid for by the company as part of the

2    collective bargaining agreement.

3           Q.    Who else would be involved, if any?

4           A.    They would have bargaining

5    representatives from the plant.  They go through a

6    nomination and an election process, and depending upon

7    the local, it will dictate how many other committee

8    members there are.  In some cases there will be a

9    representative from the international union present.

10   I would say probably two-thirds of the time there is

11   an international representative present at the table

12   for some portion of the negotiation.

13          Q.    And from your interaction and

14   communications with the various union participants at

15   these at-the-table sessions, do you have an

16   understanding as to whether the international union

17   gives some type of preapproval similar to the way that

18   the senior management at Swift gives to you prior to

19   the time they arrive at the table?

20          A.    No.

21          Q.    You know that doesn't happen, or you

22   don't know either way or . . .

23          A.    I don't know that that happens.

24          Q.    You don't know one way or the other?

25          A.    I know that the international has

1    dialogue with the local unions on these major

2    contracts.  I don't know to what extent that dialogue

3    occurs or to what extent they set preapproved limits

4    with them.

5         Q.   So you've never had somebody from the

6    local say, hey, I'm going to have to go to the

7    international or that, or . . .

8         A.   Sure, on certain issues.

9         Q.   What types of issues?

10        A.   Contract term as far as the length of the

11   contract.  Let me think.  It could be a safety issue,

12   something to deal with a safety committee.  It could

13   be a language issue.

14             An example was we were negotiating the

15   language on nondiscrimination and language that

16   referenced that if an employee filed a grievance and

17   that grievance was still pending and then turned

18   around and filed a grievance with an agency as in the

19   EEOC or state agency or something like that, that the

20   grievance would be withdrawn without precedent.  That

21   is an example of language that they said had to go to

22   the international because they were concerned about

23   the impact that language would have not only in that

24   contract but all the contracts around the country.

25        Q.   From your interaction with the union

1    representatives at the table and these negotiations,

2    did you have a sense for who was involved from the

3    union side in determining wage rates at a particular

4    plant?

5              MR. YOULE:  Objection to form.  Are we on

6    Cactus or general?

7              MR. PEARSON:  General terms.

8         A.   Go ahead and repeat the question again.

9         Q.   (BY MR. PEARSON)  Not talking about

10   Cactus in specific, but in general terms when you were

11   at the table with these union representatives, what --

12   who normally took the lead on wage issues for the

13   union?  Again not name, but title or position.

14        A.   It would be the -- it appeared to me --

15   or it appears to me that it's the president of the

16   local typically, and there is varying degrees of

17   involvement by the international or somebody from the

18   international.

19        Q.   On the occasions when you were at the

20   table and there was someone from the local and someone

21   from the international present and wage issues were

22   being discussed, would one of those normally take the

23   lead or did it vary or . . .

24        A.   I think it depends upon what -- I think

25   it depends upon how significant the wage issue was.

1    If the settlement parameters were within whatever they

2    determined collectively is acceptable terms, the local

3    was there, there was probably less involvement by the

4    international.  On the other hand, if the local's

5    ideas of settlement weren't within those parameters,

6    there was a lot more influence exerted.

7        Q.   Can you think of a specific example that

8    sort of illustrates that?

9        A.   Sure.  The first -- well, the 2000 -- you

10   were referencing Cactus, I can reference other

11   contracts, but the 2001-2005 contract in Cactus, the

12   international representatives were not at the table,

13   but we were getting close to being deadlocked on

14   wages, and I called the international union and told

15   them that I felt that the local's proposed wage

16   settlement was not realistic.  At that point the

17   international got more involved.

18       Q.   And that obviously got settled?

19       A.   Yes, for your country.  Greeley,

20   Colorado, the last contract we negotiated in Greeley,

21   Colorado.  So that's the operating engineers.

22       Q.   Greeley beef?

23       A.   2004 to 2009 is the date that that

24   contract expires.  The Local 7 is based out of Denver.

25   The president of the local was the chief spokesperson.

1    We had a staff representative from the international

2    union at the table, but it wasn't until the regional

3    vice-president came to the table that we had a

4    settlement.

5              In other cases, for example like

6    Louisville, Kentucky, I believe that the international

7    knows what's going on at the table, but that local

8    seemed to be a lot more in tune with wage rates, and

9    they didn't need as much oversight from the

10    international.  It's really going to depend upon the

11    local, it's going to depend upon what the local's view

12    of wage structures are and what ours are.

13              Take Marshalltown, Iowa.  Marshalltown,

14    Iowa, there has always been an international rep sit

15    through the entire negotiations.  Worthington,

16    Minnesota, relatively small local, new president, they

17    have always had a national rep take the chief

18    spokesperson's position since I've been involved.  So

19    varying degrees.

20        Q.   Has it been your observation that the

21    international union has some interest in having some

22    consistency in wage rates among the various Swift

23    processing plants?

24        A.   It's been my observation that the

25    international is focused more on all the meat

1    processing settlements, not just Swift to Swift or

2    Tyson to Tyson, but collectively as an industry where

3    these settlements are coming out.

4         Q.   Other than -- who are the big players in

5    the meat processing industry besides Swift and Tyson?

6    Are there others that are significant?

7         A.   Cargill Meat Solutions, Smithville Foods.

8    And under Smithville there's John Morrell, Farmland

9    Foods.  Kind of an umbrella.  There are -- let's see,

10   National Beef.  Those would be the big ones.  Then

11   there's some that are -- they are not as big, but

12   Seaboard Farms, the Austin -- Quality Pork, they have

13   influence on more kind of a regional level, if you

14   will.  We all compete globally, but from a contract

15   standpoint maybe more on a regional level.

16        Q.   Following up on my last question.  From

17   your observations, is the international union for the

18   United Food and Commercial Workers Union -- strike

19   that.

20             Is the international of the United Food

21   and Commercial Workers Union, from your observation,

22   interested in maintaining some consistency in wage

23   rates among the various major beef processing plants

24   in the United States?

25        A.   I think that -- yes, they are interested

1    in trying to make sure that there's some consistency

2    so that they don't have, you know, breakaways on their

3    hands.  I would say it seems to me to be more focused

4    on the wage settlement than the wage rates.

5          Q.    And I'm not sure I appreciate that

6    distinction.  Could you explain that to me?

7          A.    Yeah.  If you look at the industry and

8    how it pays its employees, there's really only three

9    elements or three tiers, start rate, base rate, and

10   then premium pay.  The primary focus for most

11   everybody is the base rate.  That's the minimum that I

12   can pay somebody after X amount of time.

13              So when you say, you know, the industry

14   wages, that's going to be -- that will be the

15   indicator -- or the key indicator of wages in the

16   industry and then, therefore, in individual plants.

17   But the base wage in some of these facilities can be

18   substantially different from one plant to another one,

19   or one company to another one.

20              This is just my view, it seems to me that

21   the international, once that's occurred, isn't so much

22   focused on that deviation as much as what the future

23   settlements for that location is going to be.  So if

24   they have got a plant or facility that's, for whatever

25   reason, substantially behind the rest of the industry,

1    they have not exercised the force of taking that plant

2    out on strike to close that gap as much as it appears

3    to be focused on what the future settlement is.  If

4    the settlement is within a range for the industry, it

5    seems like they get contracts.

6         Q.   So is it fair to say the method by which

7    the unions attempt to obtain consistency is by

8    negotiating on upcoming collective bargaining

9    agreements versus trying to in the midst of a contract

10   change the pay; is that what you are saying?

11        A.   No, that's not what I'm saying.

12        Q.   I'm not following.

13        A.   I'm not going to change the pay in the

14   midst of the contract.

15        Q.   When you say they seemed more focused on

16   future settlements than wages, can you explain that to

17   me again?

18        A.   Let me explain it by giving you an

19   example.  Seaboard Farms is a contract that is

20   substantially below most of the industry in the pork

21   industry.  When I say "below," it's the base rate, yet

22   they have negotiated several contracts and it remains

23   below the industry.

24             So to me, when I look at that and try to

25   rationalize that, I'm the international union, which

1    I'm not, but looking at it and saying, how do you

2    rationalize that?  The only way you can rationalize it

3    is by the settlement as they come up for that

4    contract.  Are the settlements within the, quote,

5    norms for the industry.  Otherwise I don't know how

6    you rationalize that if you're the union.

7        Q.   Maybe I don't understand the settlements.

8    I thought settlements simply meant the terms of a new

9    collective bargaining agreement.  Is that not what

10   that means?

11       A.   When I talk about settlements now, I'm

12   focused about wages because that's where your

13   questions have been.

14       Q.   Explain to me what that term means as far

15   as wages.  You are talking about settlements.

16       A.   The increases to the employees wage

17   rates.

18       Q.   As reflected in a new collective

19   bargaining agreement?

20       A.   Right.

21       Q.   But taking the Seaboard as an example, if

22   they are consistently negotiating new wage settlements

23   and collective bargaining agreements that are still

24   behind the industry, I guess I'm not understanding how

25   that makes sense to you when you are saying you are

1    trying to figure out how it makes sense or how you can

2    rationalize it.  I guess I'm not following there.

3              A.   I said the only way I can rationalize

4    that if I'm in the union's position, which I'm not,

5    but as an interested observer trying to figure out how

6    does that go on, how do they, the international union,

7    allow that to go on?  The only way I can rationalize

8    it is that while they are behind the industry, but the

9    wage settlements they are getting are consistent with

10   the new increases -- maybe that's the difference, is

11   that the new wage increases are consistent or slightly

12   above the industry settlements on new wage increases.

13             Q.   So does that mean they are not closing

14   the gap but they are staying about the same behind, is

15   that what you are saying?

16             A.   It's going to depend upon the contract

17   that's under water.  But, yeah, they are going to

18   consistently be behind.

19             Q.   For example, if the average increase is

20   50 cents an hour, if Seaboard is getting a

21   50-cent-an-hour increase, then they accept that even

22   though that still keeps them behind the industry

23   average?

24             A.   Again, that's my observation because they

25   get new contracts doing it that way, so somebody is

1    accepting it.

2        Q.    When you talked about the different three

3    tiers, you talked about the start rate and the base

4    rate.  Explain to me how the start rate and the base

5    rate differ.

6        A.    The start rate will be the minimum that

7    somebody comes in right off the street and begins to

8    work at.  In most of these labor agreements there's a

9    progression -- a wage progression, so it's already

10   laid out and says you will start at X and you will get

11   a wage increase in these intervals until you reach the

12   base rate.  Those intervals can be anywhere from

13   probably as low as -- I think it's 90 days to as long

14   as 18 to 24 months.

15            So it's setting a floor when you first

16   walk in, and then it sets another floor after I've

17   been there X period of time, this is the minimum I can

18   make.

19       Q.    And is it the base rate that's typically

20   the one that's focused on most?

21       A.    Yes.

22       Q.    And once you reach the base rate, that's

23   still a floor?  That's still a minimum?

24       A.    Yes.

25       Q.    And you can get more than that?

1          A.    Yes.

2          Q.    So if we look -- for example, let's look

3    at Exhibit 7 -- let me back up for a second.  Let's

4    tie this into the interrogatory.  The interrogatories

5    are Exhibit 1.  Interrogatory No. 4 on page 8, the

6    interrogatory was, "For each of the Swift facilities

7    please provide the starting wage for each category of

8    hourly worker by job title for each month from June 1,

9    2006, to June 30, 2007."

10          Then after some objections the answer

11    was, "Responsive information is set forth in

12    Exhibit E," which I put in here.  If you'll flip to

13    tab 7, you'll see it's labeled Exhibit E, response to

14    interrogatory No. 4.  I want to talk about that for a

15    minute.

16          So is it fair to say that these are the

17    wage rates during the requested time frame for the

18    various Swift facilities and the various positions at

19    those facilities?

20          A.    Without reviewing this entire document, I

21    don't know because I didn't prepare it.

22          Q.    Assume with me that's what this is.

23    Let's talk a little bit about it.  These different

24    brackets, are those job positions, or what does that

25    mean?  Like bracket 11, bracket 12?

1          A.    I'm sorry, where are you at?

2          Q.    Page 1, under the title Job Description,

3    it gives the bracket numbers.

4          A.    Okay.

5          Q.    Are those just different positions?

6          A.    You know, I got to tell you, I don't

7    know, because I don't know how they have this laid

8    out.

9          Q.    Let's look down about midway through on

10   this first page, there's a heading for base; do you

11   see that?

12         A.    Correct.

13         Q.    And then it lists the effective date, the

14   employee grade is 000, then it lists a minimum wage

15   rate of $11 and a maximum wage rate of 11.80.  And

16   that's for the Marshalltown plant, correct, that's

17   what this says?

18         A.    Right.

19         Q.    I want to talk for a moment -- explain,

20   if you would, this minimum versus maximum wage rate

21   and how that's reflected, if it is, in the collective

22   bargaining agreements?

23         A.    I don't know what they are calling -- I

24   don't know how they have set this up on the minimum

25   wage rate and the maximum wage rate.  I can tell you

1       what I think it is.

2               Q.   Okay.

3               A.   The minimum wage rate in this appears to

4       me to be the start rate -- what I would call the start

5       rate because it's $11 an hour.  And at this point in

6       time the effective date, being October 16, 2006, I

7       believe that was the start rate.

8                    The maximum wage to me appears to be the

9       base rate.  I would not have used that terminology if

10      I put this together, I would have used base rate or

11      wage rate because maximum means something different to

12      me.

13              Q.   Okay.  Let's find another example to see

14      if this is -- is the one plant in particular that you

15      are more familiar with than the other, or pretty much

16      all of them?

17              A.   That's fine.

18              Q.   Let's flip to page 3, and about --

19      there's a base rate about 6 or 7 lines down, base rate

20      for Swift FP, Greeley.  Those are the same numbers,

21      that's bizarre.  Let's go down about two-thirds of the

22      way down, there is the 129, 2007 Grand Island base

23      rate on page 3.

24              A.   Correct.  I got it.

25              Q.   Was that the effective date of the most

1    recent CBA for Grand Island?

2        A.    Yeah, I think it is.

3        Q.    And you see those rates of 11 -- again,

4    it lists 11.75 and 11.75, that's bizarre.  Does that

5    make any sense to you for Grand Island?

6        A.    Yes.

7        Q.    And can you explain that to me?

8        A.    The decision was made -- in almost every

9    one of these collective bargaining agreements, when

10   you negotiate the start rate, it is a minimum -- it's

11   a minimum rate of pay, as I talked before, it's a

12   floor -- but I need to word that differently.

13        We reach agreement with the union that

14   these are the minimums that we'll pay on the start

15   rate and the minimum progression structure, how long

16   it takes me to get to base.  But the way we word it in

17   the collective bargaining agreements is so we can

18   increase those, if we so chose, without going to the

19   union and renegotiating it.  All we need to do is

20   notify them.

21        Q.    So -- go ahead.

22        A.    So the reason this makes sense to me is

23   that in October of '06 we took the start rate and

24   matched it with the base rate.

25        Q.    For Grand Island, or for all your

1   facilities?

2         A.   For Grand Island, for Greeley, for

3   Cactus, for Worthington.  And then in Marshalltown --

4   Marshalltown was one contract.  I think it was the

5   only one that we didn't have the minimum start rate

6   and minimum progression language, so we actually had

7   to sit down and negotiate with them.  We did not

8   increase it in Louisville, Santa Fe Springs, at the

9   lamb plant, or the distribution centers.

10         Q.   So make sure I understand, in the

11   collective bargaining agreement there would be a

12   minimum start rate for various positions; is that

13   right?

14         A.   And start rate for the plant, period.

15         Q.   Okay.  It wouldn't be position by

16   position?

17         A.   No, not when we're referring to the start

18   rate.

19         Q.   What about these minimum progression

20   structures, would that be position by position, or

21   plant-wide?

22         A.   Plant-wide.

23         Q.   And what about the base rates, would

24   those be --

25         A.   Plant-wide, we have some plants where

1    there's a different base rate for first processing or

2    the slaughter side, and second processing or the

3    fabrication side.

4         Q.    So I thought I had seen in some different

5    documents that there's some significant differences in

6    wage rates within the plant depending on what a

7    particular worker is doing; isn't that true?

8         A.    That's correct.

9         Q.    And how, if at all, is that reflected in

10   the collective bargaining agreement?

11        A.    By what I call premium pay or grade pay.

12        Q.    Okay.  So the premium pay is the -- is

13   where you deviate position by position?

14        A.    That's correct.

15        Q.    And are those also minimums?

16        A.    In those cases they are going to be set.

17   It is the rate of pay for that job.

18        Q.    So what -- I guess I'm trying to figure

19   out, let's say the Cactus plant, what percentage of

20   jobs are tied into the start and base rates, and what

21   percentage are tied into the premium pay?  Is it the

22   vast majority of workers are on the minimum start and

23   base and a small number are on premium pay, or do you

24   have a feel for that?

25        A.    Keep in mind that the start is just -- I

1    mean, that's the beginning.  I know I'm going to at

2    least get to the base rate irrespective of what job

3    I'm doing is a matter of time and qualification.  You

4    know, I would -- this is a guess because I guess I

5    haven't really looked at it this way, but I would say

6    that two-thirds of the jobs, or maybe a little bit

7    more than that, pay some rate above base, so they are

8    paying some grade or some premium.

9          Q.   Okay.  And those are set, that's not

10   something that there is a progression or that's just a

11   set hourly wage?

12         A.   It's a set rate.

13         Q.   And it doesn't change based on longevity

14   or how long you're in that position?

15         A.   Not in any of our unionized facilities,

16   no.

17         Q.   And other than I think you mentioned

18   there was one plant at Marshalltown where you couldn't

19   increase the pay, you had to go back and renegotiate.

20   Was that Marshalltown?

21         A.   That's my -- yeah, it was Marshalltown.

22   But I believe that was the only one that we didn't

23   have the minimum start and progression language in, so

24   we actually had to negotiate a different start rate.

25         Q.   Which I'm assuming they gladly

1    negotiated?

2         A.   I don't know that it was gladly, but they

3    negotiated it.

4         Q.   Is there some reason they wouldn't want

5    their employees to get a raise?

6         A.   It only applies to the new people and not

7    the people that are currently working there.

8         Q.   Let's talk for a couple minutes about how

9    contracts -- how the wages are set at the Hyrum, Utah,

10    facility.  Among the processing plants, if I'm not

11    mistaken, that's the only one that's not unionized?

12         A.   Of the major processing plants, that's

13    correct.

14         Q.   Walk me through in general terms how

15    wages are set at that plant.  Obviously there is not a

16    collective bargaining agreement in place, or how does

17    that work?

18         A.   As far as going back internally how the

19    process works and so forth just like we did on the

20    others?

21         Q.   Sure.  That's fine.

22         A.   It's primarily the same way as the other

23    plants, even though there is no union there.  They

24    have some differences in how they pay people.  For

25    example, there, longevity does make a difference on

1    the jobs.  They go through an annual -- what we call

2    an annual review process, so we're looking at the wage

3    and benefit structure and policies on an annual basis

4    rather than the collective bargaining agreements being

5    anywhere from three- to five-year terms.

6            Q.    So wages in the Hyrum, Utah, plant are

7    set annually?

8            A.    Yes.

9            Q.    So is it a situation where there is no

10    negotiation, Swift just decides what it's going to

11    pay?

12            A.    There is no bargaining representative for

13    the work force, so we have the -- we go through

14    primarily the same process we would go through

15    internally, make a recommendation, then implement the

16    changes, announce the changes for the employees.

17            Q.    Have there been any attempts to unionize

18    that plant?

19            A.    Not in my history here.

20            Q.    So since 2000 there have not been?

21            A.    No.

22            Q.    Are wage rates at the Hyrum, Utah, plant

23    generally lower than the unionized plants?

24            A.    When you factor in their longevity pay

25    and their -- and their rate structure, they are very

1    close to the unionized facilities.  If you look only

2    at the base and don't factor that in, which would be a

3    mistake, then they would appear to be further behind.

4         Q.   When the internal -- going back to the

5    unionized plants, I guess let's talk about all the

6    plants.  During these internal discussions that lead

7    up to a proposal being made to senior management, are

8    there any specific or unique factors at a particular

9    plant that influence your proposal?

10        A.   Well, what I was talking about before, to

11   me it's a little bit of a funnel almost, it's going to

12   depend upon which species is up for negotiations, is

13   it the beef plant or pork plant because there are

14   differences by industry.

15        Q.   Can I interrupt for a quick second there.

16   Among the processing facilities, I know there's

17   Greeley beef and Greeley lamb, right?

18        A.   Correct.

19        Q.   Of the others, Cactus, Worthington,

20   Marshalltown, Hyrum, Louisville, and Grand Island, are

21   those all beef, or are some of those pork?

22        A.   Some of those are pork.

23        Q.   Which of those are pork?

24        A.   Marshalltown, Worthington, Louisville.

25        Q.   Sorry for interrupting you.  You were

1    saying there was a difference between beef and pork?

2         A.    Right.  So depending upon which species

3    is being reviewed or up for negotiations, we'll look

4    at the wage rates and the wage settlements specific to

5    that industry, so that's how we start.  Then we'll

6    look at, is there -- if we look at kind of national

7    settlements, we'll look at what kind of settlements

8    have occurred more regionally.

9              Again, we all compete globally, but

10    regionally is there a competitor within that region.

11    For example, in Worthington, Minnesota, there's two

12    major competitors within -- I think within 45 minutes

13    to an hour of the plant, which means we're competing

14    with them for raw materials, and to some extent for

15    the work force.  So we will look and say, okay, what

16    are they paying and have the recent settlements been

17    at those regional kind of competitors.

18         Q.    Anything else?

19         A.    Let me go back and ask you what your

20    original question was again.

21         Q.    Sure.  Whether there are any unique or

22    specific factors that you are looking at on a

23    plant-by-plant basis?

24         A.    The reason I went down that road is to

25    the extent there is a regional settlement that's

1    occurred in a Sioux Falls Morrell plant or a plant --

2    two plants that we watch in Cactus or the Friona and

3    Plainview Cargill Meat Solutions plants, those can

4    have influence on the contracts that were -- on the

5    contract we're negotiating.  So my example, Cactus and

6    Worthington.

7              Every once in a while you'll get into

8    some unique situations with a given facility, its

9    competitiveness and the cost structure of that given

10   facility.  But one example that is not in this group

11   here but we had a plant one time in Nampa, Idaho, that

12   is a very small plant, and it was not competitive, we

13   actually ended up doing two one-year contracts there

14   with very little wage increases because of that.  So

15   that uniqueness came into play in that particular

16   case.

17             Lamb plant, when we negotiate that

18   contract, it's again a totally separate industry, so

19   we're looking at the cost structure of that industry.

20        Q.   As among the beef and pork processing

21   plants, are there any unique factors that come to mind

22   between those plants other than looking at regional

23   settlements?

24        A.   Within our --

25        Q.   That go into your formulation of your

695

1    proposals on this collective bargaining agreement.

2            MR. YOULE:  Objection, form.  Do you mean

3    differences between beef on the one hand and pork on

4    the other, or collectively?

5            MR. PEARSON:  Yeah, that was a bad

6    question.  Let me try again.

7        Q.   (BY MR. PEARSON)  Let's back up.  You

8    mentioned there is a difference between beef and pork.

9    Could you just explain that?  I mean, I know what beef

10   and pork are.

11       A.   One has short legs, one has long legs?

12   Well, for example, if you look at our plants, our pork

13   plants pay probably, just when you are looking at the

14   base rate, 60 cents more an hour on average than our

15   beef plants do.

16       Q.   Why is that?

17       A.   Part of it is the history of those

18   industries because they are different.  It's red meat,

19   but they are different industries.  They compete

20   differently.

21       Q.   Let me give you an example that may be

22   helpful to get my question out better.  Let's say as

23   between -- let's say the Grand Island beef facility

24   and the Cactus beef facility, when you are sitting

25   down to set wage rates that you are going to put in

1    your proposal to senior management, are there any

2    unique factors that apply to Cactus or Grand Island

3    that might result in different proposals on the wage

4    rates of those plants?

5            MR. YOULE:  You mean other than what he's

6    already explained, or do you want him to go back?

7            MR. PEARSON:  I guess whatever his

8    response is to that question.

9            MR. YOULE:  Objection to form, asked and

10    answered, but go ahead.

11            A.    What comes to my mind is what's happening

12    in that regional market with our competitors.  Again,

13    I referenced in Cactus' case the Friona and Plainview

14    plant.  There is also a plant in Texas that's a

15    Teamsters plant that's a Tyson plant.  Those are all

16    major competitors.  We will watch very, very closely

17    what happens there.

18            When we go to Grand Island, we are not

19    looking at Friona and Plainview, we're looking at

20    Lexington, Nebraska, which is a Tyson plant about

21    40 miles down the road.  We are looking at Tyson in

22    Dakota City, Nebraska, and we're looking at Cargill

23    Meat Solutions in Skyland Nebraska.  So if there is

24    something different and unique in how they are paying

25    people or what their settlements have been or what

 1    their wage rates are, that's what we'll be more

 2    typical to react to.

 3         Q.    (BY MR. PEARSON)   But because the same

 4    union is involved in, again, my example, both Grand

 5    Island and Cactus -- well, strike that.

 6             These wage rates are public information,

 7    is that true, or are they not public?

 8         A.    They are fairly public.  You can get the

 9    information.

10         Q.    So if you paid $5 more an hour at Cactus

11    than Grand Island, the people at Grand Island would

12    know about it?

13         A.    I don't know whether the people of Grand

14    Island know about it.  I think the union would know

15    about it.

16         Q.    Right.  And you mentioned that you're

17    certainly -- while you do look at the regional

18    competitors, you are competing nationally as well, not

19    just regionally for these workers; is that true?

20         A.    When I talk about competing regionally

21    and nationally, I'm talking about from a competitive

22    cost structure standpoint.

23         Q.    As far as wage rates for your workers,

24    the level of competition is nationwide or . . .

25             MR. YOULE:  Objection to form.

1      Q.    (BY MR. PEARSON)  I guess what I'm

2    getting at, isn't it true that many of these workers

3    in the beef industry are fairly transient and they

4    will go to where the best jobs and the best pay is?

5      A.    There is a certain portion of the

6    employees in the industry that appear to be fairly

7    mobile and will move from area to area.  I'm sure

8    wages and benefits have some impact on that.

9      Q.    And because of that, it's important for

10    Swift to maintain some consistency in wage rates among

11    its various processing plants, correct?

12            MR. YOULE:  Objection to form.

13      Q.    (BY MR. PEARSON)  You can answer unless

14    he tells you not to.

15            MR. YOULE:  Go ahead, yes.

16      A.    My answer would be that's not what's

17    going to drive it.  You got the wrong driver.

18      Q.    (BY MR. PEARSON)  Why is that?

19      A.    Because it's the cost structure that's

20    going to drive the decision.  It's the economics of

21    running the plant that's going to drive the decision.

22    When we sit down and look at the wages and the

23    benefits, what's driving it for the most part isn't

24    can we get or can't we get a work force, it's what the

25    economic impact of giving a 50 cent increase over a 30

1    cent increase and what is that going to do if the

2    economics are the same between us and Tyson, what does

3    that do to us relative to our competition because the

4    margins are so thin in this business.

5              When I sit down with the COO and so forth

6    and discuss this, that's what we cost out.  What's

7    this going to cost me today versus where I'm going to

8    be four or five years from now with your proposal.

9         Q.   So what is driving the wages is the

10   economic impact overall vis-a-vis your competitors?

11        A.   Correct.  That's the primary driver.  And

12   we would be foolish to say we're not going to give any

13   wage increase.  First off, we wouldn't get a contract

14   that way.  Secondly, at some point in time we would

15   fall far enough behind it would affect our ability to

16   attract workers.

17        Q.   So when you say the primary factor

18   driving wages is the economic impact in relation to

19   your competitors, can you expand on that a little bit?

20   Are you basically saying, well, you know, if we paid

21   this much at this plant it would do this to our

22   profits and, therefore, we would be less competitive

23   or cost structure would go -- I mean, what do you mean

24   by that?

25        A.   Next to the raw material, labor is our