## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
BLANCA VALENZUELA, MARGIE  )
SALAZAR, JOSE E. SERRATO,  )
JOSIE RENDON, CLARA TOVAR, )
CONSUELO ESPINO, MARIA     )
AVILA, ERNESTINA           )
NAVARRETTE, MARIA E.       )
MUNOZ, AMANDA SALCIDO,     )
CANDELARIO G. ORTEGA,      )
MARIA ORTIZ, JOSE OLIVA,   )
RAFAELA CHAVEZ, ELODIA     )
ARROYO, SUSANA CARDIEL,    )
GRACIE RIOS, AND LEONEL    )
RUIZ, Individually and on  )
behalf of all others       )
similarly situated,        )
                           )   CIVIL ACTION NO.
       Plaintiffs,         )   3:06-cv-02322-N
                           )
vs.                        )   ECF
                           )
SWIFT BEEF COMPANY, INC.   )
D/B/A SWIFT COMPANY,       )
SWIFT & COMPANY, HICKS,    )
MUSE, TATE & FURST, INC.,  )
HM CAPITAL PARTNERS OF     )
DALLAS, LLC, and JOHN      )
DOES I-V,                  )
                           )
       Defendants.         )
```

———————————————————————
ORAL DEPOSITION OF
MARIA ORTIZ
JULY 10, 2008
———————————————————————

## Page 2

ORAL DEPOSITION OF MARIA ORTIZ, produced as a witness at the instance of the defendants and duly sworn, was taken in the above-styled and numbered cause on the 10th day of July, 2008, from 10:43 a.m. to 11:41 a.m., before Angie Weaver, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Mullin, Hoard & Brown, L.L.P., 500 S. Taylor, Suite 800, in the City of Amarillo, County of Potter, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 3

APPEARANCES

FOR THE PLAINTIFFS:
    Ms. Claudia M. Cano
    HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
    2331 W. Northwest Highway, 2nd Floor
    Dallas, Texas 75220
    Telephone:  (214) 526-7900
    E-mail: cano@reyeslaw.com

FOR THE DEFENDANTS:
    Mr. Brian G. Eberle
    SHERMAN & HOWARD, L.L.C.
    633 Seventeenth Street, Suite 3000
    Denver, Colorado 80202-3622
    Telephone:  (303) 297-2900
    E-mail: beberle@shermanhoward.com

ALSO PRESENT:
    Mr. Leonel Ruiz Melendez
    Ms. Linda Foster, Interpreter

## Page 4

INDEX

|  |  | PAGE |
|---|---|---|
| Stipulations | --------------------------------- | 2 |
| Appearances | --------------------------------- | 3 |
| Exhibit Index | --------------------------------- | 4 |
| Objections | --------------------------------- | 4 |
| WITNESS: |  |  |
| MARIA ORTIZ |  |  |
| Examination by MR. EBERLE |  | 5 |
| Signature and Changes | --------------------- | 30 |
| Reporter's Certificate | --------------------- | 31 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Contrato De Empleo | 10 |
| 2 | Original Complaint | 17 |
| 3 | First Amended Complaint | 19 |
| 4 | Plaintiffs' Second Amended Complaint | 20 |

OBJECTIONS

|  | PAGE | LINE |
|---|---|---|
| By Ms. Cano | 12 | 25 |
| By Ms. Cano | 14 | 10 |
| By Ms. Cano | 18 | 4 |
| By Ms. Cano | 18 | 18 |
| By Ms. Cano | 20 | 18 |
| By Ms. Cano | 22 | 13 |
| By Ms. Cano | 26 | 10 |
| By Ms. Cano | 26 | 15 |
| By Ms. Cano | 29 | 7 |

**Page 5**

1         (Ms. Linda Foster sworn as interpreter.)
2                    MARIA ORTIZ,
3    having been first duly sworn, testified through the duly
4    sworn interpreter as follows:
5                    EXAMINATION
6    BY MR. EBERLE:
7         Q.   Could you state your name and spell your last
8    name.
9         A.   You want my last name?
10        Q.   State your full name, please.
11        A.   Maria Ortiz.
12        Q.   Can you spell your last name.
13        A.   O-R-T-I-Z.
14        Q.   And I think you may have heard already, but my
15   name is Brian Eberle, and I am one of the attorneys for
16   Swift, so I'll be asking you some questions today about
17   the litigation.
18        A.   Yes.
19        Q.   Do you speak any English?
20        A.   No.  No, I understand a little, but not much.
21        Q.   And are you able to read much English?
22        A.   Some words.
23        Q.   Is it your preference to have documents in
24   English translated for you so that you can read them in
25   Spanish?

**Page 6**

1         A.   In Spanish.
2         Q.   As you know, we have an interpreter here today,
3    and I'm going to ask questions in English and Ms. Foster
4    will interpret them for you into Spanish, and then your
5    answer will be in Spanish and she will interpret it back
6    into English.
7         A.   Yes, sir.
8         Q.   And I just want to review a few procedural
9    rules.  One is that we cannot talk at the same time.  We
10   need to wait for each other to finish before the other one
11   speaks.  Is that okay?
12        A.   Yes.
13        Q.   And even if you think you understand a question
14   in English, it will be easier if you allow Ms. Foster to
15   interpret in Spanish and then all of your answers will be
16   in Spanish, if that's okay.
17        A.   In Spanish, yes.
18        Q.   And all of your answers need to be verbal, in
19   other words, yes or a no or in words.  Is that okay?
20        A.   Yes.
21        Q.   And whenever I ask a question, I will assume
22   that you understand it unless you tell me otherwise.  So
23   if for any reason you don't understand a question I'm
24   asking, will you let me know.
25        A.   Yes.

**Page 7**

1         Q.   Do you understand that you have been sworn under
2    oath?
3         A.   Yes.
4         Q.   And even though this is an informal setting
5    today, do you understand that it's just the same as if you
6    were giving testimony in a court of law?
7         A.   Yes.
8         Q.   And we can take a break any time that you want,
9    so just let me know if you want to take a break.
10        A.   Yes, sir.
11        Q.   When did you first start working for Swift at
12   the Cactus, Texas, plant?
13        A.   In '87.
14        Q.   And when we talk today about the Cactus plant,
15   do you understand that that is the beef processing plant
16   operated by Swift in the areas around Cactus and Dumas,
17   Texas?
18        A.   Yes.
19        Q.   Now, I understand that you had a deposition
20   taken in a different case sometime in the last two years
21   or so.
22        A.   Yes.
23        Q.   And I understand from that deposition that you
24   last received wages from Swift on February 10, 2003.  Does
25   that sound right?

**Page 8**

1         A.   Yes.
2         Q.   Did you ever return to work at Swift after
3    February 10, 2003?
4              MS. CANO:  You mean as an employee?
5              MR. EBERLE:  As an employee.
6         A.   For Swift, no.
7         Q.   And I also understand that you were injured
8    while working at Swift in around February of 2001; is that
9    right?
10        A.   Yes.
11        Q.   Can you tell me what jobs you worked at Swift
12   after your injury in February of 2001.
13        A.   Well, I was in New Mexico taking care of my
14   mother.
15        Q.   No, I'm talking about after you were injured in
16   February of 2001, what work you did between then and
17   February 10, 2003.
18        A.   You're talking about the plant?
19        Q.   Yes.
20        A.   Are you referring to the last job?
21        Q.   Why don't we start with the first job after your
22   injury, whatever that was there at the plant.
23        A.   The first job?  I was never removed from where I
24   was.
25        Q.   And what were you doing?

## Page 9

1    A.    I was ticketing the ears.

2    Q.    Let me back up.  I want to know, after you were

3 injured in February of 2001, between that time and when

4 you left working at Swift, what work did you do?

5    A.    Okay.  Well, I was making -- well, we were

6 making gloves.

7    Q.    And was that for the whole two-year time, then?

8    A.    During those two years?  No.

9    Q.    What did you do after doing gloves, if anything?

10    A.    After the gloves?  After that, I was sent home.

11    Q.    And that was in February of 2003?

12    A.    Yes.

13    Q.    Were you a member of a union during the time you

14 were working at Swift?

15    A.    Yes.

16    Q.    And I understand you were born in Mexico.

17    A.    Yes, I was born in Mexico.

18    Q.    When did you move to the United States?

19    A.    In '75.

20    Q.    And I believe you were naturalized as a United

21 States citizen.

22    A.    Yes.

23    Q.    And when was that?

24    A.    In '81.

25    Q.    Did you review any documents to prepare for your

## Page 10

1 deposition today?

2    A.    No.

3    Q.    And did you meet with anyone, other than your

4 attorney, to prepare for today?

5    A.    No.

6    Q.    And other than your attorney who is present

7 today, are there any other attorneys representing you and

8 the proposed class in this case?

9    A.    No, not another person.

10    Q.    No one besides the attorney that's here today?

11    A.    No.  No one else.

12         MS. CANO:  Well, the law firm.  There are

13 others that are actually -- also have appeared in the

14 case.

15    A.    That's correct.

16         MR. EBERLE:  Let me go off the record for

17 just a second.

18         (Discussion off the record.)

19         (Deposition Exhibit No. 1 marked for

20         identification.)

21    Q.    (BY MR. EBERLE)  Do you prefer if I call you

22 Ms. or Mrs.?

23    A.    Mrs.

24    Q.    Mrs. Ortiz, let me hand you what's been marked

25 as Deposition Exhibit 1.  Is it your handwriting that

## Page 11

1 appears at the top of the first page of Exhibit 1?

2    A.    Yes, sir.

3    Q.    And that's your name there?

4    A.    Yes, sir.

5    Q.    And on the right side of the first page, is that

6 your handwriting as well?

7    A.    Where are we talking about?

8    Q.    On the very right -- the right side of the page,

9 is that your handwriting?

10    A.    I don't see my handwriting on this.

11    Q.    If you'd go to the second page of Exhibit 1,

12 does your signature appear on that page?

13    A.    Here I do.

14    Q.    Okay.  And you're pointing at the written

15 language in sort of the middle of the page, on the left?

16    A.    Yes.

17    Q.    Now, I notice that there's not a date on the

18 second page of Exhibit 1.  Do you remember approximately

19 when you would have signed this document?

20    A.    No, I don't recall it.

21    Q.    Do you remember where you were when you signed

22 it?

23    A.    Well, I don't recall that.

24    Q.    Could you have been at your home or at the

25 attorneys' office?

## Page 12

1    A.    I'd say it was with my attorneys.

2    Q.    But you're not sure?

3    A.    No.

4    Q.    Did you ask to have this Exhibit 1 provided to

5 you in Spanish?

6    A.    In Spanish?  I don't recall it.

7    Q.    In the lower right portion of the second page of

8 Exhibit 1, there's a law firm name, the Heygood firm.  Do

9 you see that?

10    A.    It's an attorney's name?

11    Q.    Yes.

12    A.    Yes.  Yes.

13    Q.    And how did you hear about the Heygood law firm?

14    A.    How did I become aware of it?

15    Q.    Yes.

16    A.    I don't recall that.

17    Q.    Before you signed Exhibit 1, do you recall

18 having any communications with anyone from the Heygood law

19 firm?

20    A.    Yes.

21    Q.    And approximately when would that have been?

22    A.    Well, it was about a little over a year.

23    Q.    Without telling me what was said, can you tell

24 me approximately how many communications you may have had.

25         MS. CANO:  Objection, form.  Are we agreed

**Page 13**

1 that objection to form will cover all form objections
2 except as to privilege and responsiveness?
3          MR. EBERLE:  That's fine.
4          MS. CANO:  Thank you.
5     Q.  Let me ask the question again.  Without telling
6 me the specific communications, approximately how many
7 times did you have communications with someone from the
8 Heygood law firm before you signed Exhibit 1, if you remember?
9     A.  I don't recall it.
10    Q.  And do you recall who at the Heygood law firm
11 you communicated with?
12    A.  From this law firm, this one here?
13    Q.  Yes.
14    A.  Are we -- was it a Mr. Reyes, the attorney
15 Reyes?
16          MS. CANO:  Based on what you remember.  If
17 you don't know, just tell him you don't know.
18    A.  I don't recall it.
19    Q.  Before you signed Exhibit 1, did you contact any
20 other attorneys about representing you and the proposed
21 class in this case?
22    A.  No.
23    Q.  Have you ever checked any references for any of
24 the attorneys at the Heygood law firm?
25    A.  Could you repeat the question.

**Page 14**

1     Q.  Yes.  Have you ever checked any references for
2 any attorneys at the Heygood law firm?
3     A.  The references?  I don't understand that.
4     Q.  Okay.  In other words, did you attempt to check
5 what types of work or what quality lawyers worked at the
6 Heygood law firm?
7     A.  No.
8     Q.  Do you know what experience the attorneys at the
9 Heygood law firm have in class actions?
10          MS. CANO:  Objection, form.  Objection,
11 relevance of that question.
12          THE REPORTER:  I'm sorry.  I didn't hear
13 you.
14          MS. CANO:  Objection to the relevance of
15 that question.  As a matter of fact, I'm going to instruct
16 you not to answer that question.  I don't think it's
17 relevant to any issue in this matter.
18          MR. EBERLE:  So it's your position that the
19 experience of the Heygood law firm in class actions is
20 irrelevant to the Court's determination of class
21 certification?
22          MS. CANO:  I think that your questioning
23 her about that is not relevant.
24          MR. EBERLE:  Well, she's a class
25 representative, so our position is that her knowledge or

**Page 15**

1 lack thereof about the experience of the Heygood law firm
2 in class actions is relevant.
3          MS. CANO:  Well, you can rephrase your
4 question, then, and I'll consider it again.
5     Q.  Well, my question was:  Do you know what
6 experience the attorneys at the Heygood law firm have in
7 class actions?
8          MS. CANO:  That's fine.  You can answer.
9     A.  No.
10    Q.  Do you know what types of legal work the
11 attorneys at the Heygood law firm do?
12    A.  I don't know how to answer that question.
13    Q.  Do you know what types of work they do at the
14 Heygood law firm?
15    A.  Well, no.
16    Q.  Are you aware of any of the costs associated
17 with this class action?
18    A.  No.
19    Q.  Do you understand whether you are responsible
20 for paying any of the costs associated with this class
21 action?
22    A.  No.
23    Q.  Do you know whether your attorneys in this case
24 have hired any expert witnesses?
25    A.  No, sir.

**Page 16**

1     Q.  Do you know how much has been paid by your
2 attorneys to any expert witnesses?
3     A.  No.
4     Q.  Do you know how much it might cost to provide
5 notice of this class to class members?
6     A.  No.
7     Q.  What is your understanding of the claims you are
8 asserting in this case on behalf of yourself and the
9 class?
10    A.  I don't know.
11    Q.  Do you know whether a class certification motion
12 has been filed?
13    A.  No, I don't know.
14    Q.  What is your understanding of the people who are
15 members of the proposed class in this case?
16    A.  I don't understand.
17    Q.  There is a class being proposed in this case.
18 Do you understand that?
19    A.  No.
20    Q.  Do you understand that you have been proposed as
21 a class representative?
22    A.  I have?
23    Q.  Yes.
24    A.  No.
25    Q.  So I take it you don't know whether you have any

Page 17

1 responsibilities to any of the other members of the class?
2    A.    Could you repeat that, please.
3    Q.    Yes.  Do you know whether you have any
4 responsibilities to other members of the class in this
5 case?
6    A.    No, I don't know.
7            (Deposition Exhibit No. 2 marked for
8            identification.)
9    Q.    I'm handing you what's been marked as Exhibit 2.
10 Have you ever seen this document before?
11    A.    I don't recall it.
12    Q.    Has Exhibit 2 ever been translated into Spanish
13 for you?
14    A.    No.
15    Q.    One of the defendants named on the first page of
16 Exhibit 2 is Hicks, Muse, Tate & Furst.  Do you know who
17 that is?
18    A.    I don't understand.
19    Q.    If we look at the front page, one of the
20 defendants is Hicks, Muse, Tate & Furst.  Do you know what
21 that company is?
22    A.    What company?  Swift Company.
23    Q.    Okay.  And how is that company related to Swift,
24 if you know?
25    A.    I don't understand.

Page 18

1    Q.    Obviously, Hicks Muse is different than Swift,
2 and I just wanted to know if you know what the
3 relationship is between those two companies.
4            MS. CANO:  Objection, form.
5    A.    I don't know.
6    Q.    Do you know what claims are being asserted
7 against Hicks Muse in this litigation?
8    A.    I don't understand.
9    Q.    Well, Hicks Muse is named as a defendant.  Do
10 you see that?
11    A.    Yes.
12    Q.    And my question is:  Do you know what claims are
13 being asserted against that company?  What did they do
14 wrong, if anything?
15    A.    Well, it's just that they have had people that
16 are undocumented.
17    Q.    And what is wrong with that?
18            MS. CANO:  Objection, form.
19    A.    It's just that those of us that do have
20 documents have been fired.
21    Q.    Do you know whether or not Hicks Muse has been
22 dismissed as a defendant in this case?
23    A.    I don't know.
24            (Deposition Exhibit No. 3 marked for
25            identification.)

Page 19

1    Q.    You've been handed what's been marked as
2 Exhibit 3, and this is a First Amended Complaint that I'll
3 represent was filed on December 28, 2006.  Do you recall
4 ever seeing a copy of Exhibit 3 before?
5    A.    A copy of it?
6    Q.    Yes.
7    A.    I don't recall it.
8    Q.    Do you recall whether Exhibit 3 was ever
9 translated into Spanish for you?
10    A.    I don't recall it.
11    Q.    Do you know what changes were made, if any,
12 between Exhibit 3, the First Amended Complaint, and
13 Exhibit 2, the Original Complaint?
14    A.    I don't know.
15    Q.    And on Exhibit 3, there's another defendant
16 named HM Capital Partners of Dallas, LLC.  Do you see
17 that?
18    A.    Yes.
19    Q.    What do you know about HM Capital Partners, if
20 anything?
21    A.    I don't know.
22    Q.    Do you know whether or not HM Capital Partners
23 has been dismissed as a defendant in this case?
24    A.    I don't know.
25            (Deposition Exhibit No. 4 marked for

Page 20

1            identification.)
2    Q.    You've been handed what's been marked as
3 Exhibit 4.  This is a Plaintiffs' Second Amended Complaint
4 that was filed on March 14, 2008.  Have you ever seen
5 Exhibit 4 before?
6    A.    I don't -- I don't recall it.
7    Q.    And has Exhibit 4 ever been translated into
8 Spanish for you?
9    A.    I don't recall it.
10    Q.    And do you know what changes, if any, were made
11 between Exhibit 4, which is the Second Amended Complaint,
12 and Exhibit 3, which was the First Amended Complaint?
13    A.    I don't know.
14    Q.    When you were working at Swift, were you aware
15 of any information that Swift had hired anyone at the
16 Cactus plant who was not legally authorized to work in the
17 United States?
18            MS. CANO:  Objection, form.
19    A.    I'm not sure I understand.
20    Q.    Well, let's start with when you stopped working
21 for Swift, which was, I believe, February 10, 2003,
22 correct?
23    A.    Yes.
24    Q.    So prior to that time, while you were working
25 for Swift, did you know any information about Swift hiring

**Page 21**

1 employees who were not legally authorized to work in the
2 United States?
3    A.    It was said that there were some people that
4 were undocumented.
5    Q.    And this was while you were working at Swift?
6    A.    Yes.
7    Q.    And who was it that said this?
8    A.    These were just rumors that we heard there.
9    Q.    And what, if anything, in more detail can you
10 tell me about those rumors?
11    A.    Well, that was it, that there were just some
12 people that didn't have documents.  I didn't know names.
13    Q.    That was going to be my next question.  Did you
14 know by nationalities, for example, people from Guatemala
15 or other areas, that those people were rumored to be
16 undocumented?
17    A.    They would just say that they were from
18 everywhere.
19    Q.    Who is the "they" that was saying this?
20    A.    These were the rumors that were going on in the
21 plant.
22    Q.    Do you recall any specific conversations with
23 other Swift employees about that subject?
24    A.    I don't recall it.
25    Q.    When you were working at Swift, were you aware

**Page 22**

1 of any information that Swift had hired anyone at its
2 plants other than in Cactus, Texas, who were not legally
3 authorized to work in the United States?
4    A.    No.
5    Q.    And I think you said you started working at
6 Swift -- was it 1987?
7    A.    '87, yes.
8    Q.    From 1987 until February 10, 2003, were there
9 any immigration raids by government authorities that took
10 place at Cactus' plant?
11    A.    While I was there?
12    Q.    Yes.
13          MS. CANO:  Objection, form.
14    A.    No.
15    Q.    When you were working at the plant in Cactus for
16 Swift, to your knowledge, did any immigration raids by
17 government authorities take place at any Swift plants
18 other than Cactus?
19    A.    I don't know.
20    Q.    And when you were working at the Swift plant in
21 Cactus, were you aware of any immigration raids planned by
22 government authorities at the Cactus plant?
23    A.    I don't know.
24    Q.    When you were working for Swift at the plant in
25 Cactus, were you aware of any information that Swift had

**Page 23**

1 helped any workers to obtain false documents relating to
2 their identity or immigration status?
3    A.    It was said that they were helping them, but I
4 wouldn't know who was.
5    Q.    And who said that?
6    A.    These were the rumors that were going on in the
7 plant.
8    Q.    And do you recall any specific conversations
9 with anyone regarding that subject?
10    A.    No.
11    Q.    And can you identify or name any workers at the
12 Swift plant who were given false documents by Swift?
13    A.    No, I don't recall names.
14          MS. CANO:  Could you repeat that last
15 question.  I'm sorry.
16          (The record was read as requested.)
17          MS. CANO:  I'm sorry.  Go ahead.  Thank
18 you.
19    Q.    And your answer is you can't identify them by
20 name?
21    A.    That I can't.
22    Q.    Is it because you don't recall or that you never
23 knew any specific names?
24    A.    I never knew of any name.
25    Q.    Backing up to my earlier question about rumors

**Page 24**

1 that Swift had hired undocumented workers, is it the same
2 that you don't know -- excuse me -- that you never knew
3 any specific people who worked at Swift that did not have
4 proper documentation?
5    A.    No, I wasn't aware of -- I didn't -- I didn't
6 know of any.  This was -- this was what was being said.
7    Q.    But you never knew any specific names of Swift
8 workers who were not properly documented?
9    A.    No, I didn't know any.  And there were a lot
10 of -- we were a lot of people working there.
11    Q.    And while you were working at the Swift plant in
12 Cactus, were you aware of any information that Swift
13 provided illegal immigrants with advice on how to avoid
14 detection by government authorities?
15    A.    No.
16    Q.    When you were working for Swift, were you aware
17 of any information that Swift provided illegal immigrants
18 with advice on how to be hired or rehired despite their
19 illegal immigrant status?
20    A.    No, I don't know.
21    Q.    And the only Swift plant that you worked at was
22 the one in Cactus, correct?
23    A.    Cactus, yes, sir.
24    Q.    Do you have any information about the hiring
25 practices at any of Swift's other plants besides Cactus?

**Page 25**

1    A.    I don't know.

2    Q.    While you were working for Swift, did you

3  believe that your wages had been reduced because Swift had

4  hired illegal immigrants at the Cactus plant?

5    A.    Could you repeat that question again.

6    Q.    Yes.  While you were working at Swift, did you

7  believe that your wages had been reduced because Swift had

8  hired illegal immigrants at the Cactus plant?

9    A.    I don't know how to answer.  I don't know what

10  that word means.

11    Q.    Which word don't you understand?

12    A.    About the money you said was being --

13    Q.    Let me try again.  While you were working for

14  Swift, did you believe that you were paid less per hour

15  because Swift had hired illegal immigrants?

16    A.    Well, I don't know.

17    Q.    Do you believe that today?

18    A.    Well, I don't know.

19    Q.    While you were working at Swift, did you hear

20  any other employees say that they thought they were being

21  paid less because Swift had hired illegal immigrants?

22    A.    Well, I don't know.  It was -- it was rumored

23  that they were paying illegal aliens less.

24    Q.    And do you remember any specific conversations

25  with anyone about that subject?

**Page 26**

1    A.    No.

2    Q.    But these rumors were taking place while you

3  were working at Swift?

4    A.    Yes.

5    Q.    And were these rumors occurring during the

6  entire time you were working at Swift?

7    A.    Yes.

8    Q.    But you can't tell me anything more specific

9  about that?

10         MS. CANO:  Objection, form.

11    A.    No.

12    Q.    While you were working at Swift, did you believe

13  that your hourly rate was lower because Swift had harbored

14  any illegal immigrants at the Cactus plant?

15         MS. CANO:  Objection, form, and objection

16  just to the portion of the translation as to harbor.  I

17  believe that the translation is a little bit different,

18  but -- if you could rephrase it, that might help clear up

19  the harbor.

20         MR. EBERLE:  Well, why don't we go off the

21  record for a second.

22         (Discussion off the record.)

23    Q.    (BY MR. EBERLE)  While you were working for

24  Swift, did you believe that your pay was less because

25  Swift had provided false documents to any illegal

**Page 27**

1  immigrants?

2    A.    I don't know.

3    Q.    And while you were working for Swift, did you

4  believe that your pay was less because Swift had helped

5  illegal immigrants avoid detection by government

6  authorities?

7    A.    I don't recall it.

8    Q.    And while you were working for Swift, did you

9  believe that your pay was less because Swift had provided

10  advice to illegal immigrants on how to be hired or rehired

11  at the Cactus plant?

12    A.    I don't know.

13    Q.    So you were no longer being paid by Swift after

14  February 10, 2003.  We talked about that before, correct?

15    A.    I wasn't.

16    Q.    And so after you stopped working at Swift, did

17  you receive any information that Swift had hired illegal

18  immigrants at the Cactus plant?

19    A.    That's what was being said.

20    Q.    And again, do you recall any specific

21  conversations with anyone about that subject?

22    A.    No.

23    Q.    And after you were no longer working at the

24  Swift plant, did you receive any information that Swift

25  had assisted illegal immigrants in obtaining false

**Page 28**

1  documents?

2    A.    Well, that's what they said.

3    Q.    And again, were these just rumors?

4    A.    These were rumors.

5    Q.    And you can't tell me any specific conversation

6  that you had with anyone regarding that?

7    A.    No.

8    Q.    And you can't identify any specific individuals

9  who were provided false documents by Swift?

10    A.    No.

11    Q.    And after you were no longer working at Swift,

12  did you have any information about whether Swift had hired

13  illegal immigrants at any plants other than in Cactus?

14    A.    No.

15         MR. EBERLE:  Why don't we take a break.

16  We've been going for about an hour.

17         (Recess from 11:29 a.m. to 11:39 a.m.)

18    Q.    (BY MR. EBERLE)  Going back to Exhibit 1, which

19  was the agreement you signed with the law firm, my

20  question relate to the actual document, but after

21  you signed Exhibit 1, have you had any communications with

22  the Heygood law firm?  Don't tell me the substance of

23  them, just whether or not you've had any.

24    A.    With this attorney?

25    Q.    Well, with anyone from that law firm.

## Page 29

```
1    A.   By communication, you're talking if we have
2 spoken?
3    Q.   Yes.
4    A.   With them, with Reyes.
5    Q.   And when did those conversations take place, if
6 you remember?
7         MS. CANO:  Objection, form.
8    A.   I don't recall it.
9    Q.   Have you received any documents in the mail or
10 otherwise from the Heygood law firm regarding this case?
11   A.   I don't recall it, but no.
12        MR. EBERLE:  I think that's all I have.
13 Thank you.
14        MS. CANO:  We'll reserve our questions.
15        (End of Proceedings.)
16
17
18
19
20
21
22
23
24
25
```

## Page 30

```
1         CHANGES AND SIGNATURE
2 PAGE LINE  CHANGE              REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9    I, MARIA ORTIZ, have read the foregoing deposition
10 and hereby affix my signature that same is true and
11 correct, except as noted above.
12
                     _____
13                          MARIA ORTIZ
14 STATE OF  _____)
15 COUNTY OF _____)
16   Before me, _____, on this day
   personally appeared MARIA ORTIZ, known to me or proved to
17 me on the oath of _____ or through
   _____ (description of identity card
18 or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged to
19 me that he/she executed the same for the purpose and
   consideration therein expressed.
20
   Given under my hand and seal of office on this
21 _____ day of _____, 2008.
22
23                    _____
                      NOTARY PUBLIC IN AND FOR
24                    THE STATE OF _____
25 My Commission Expires: _____
```

## Page 31

```
1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                 DALLAS DIVISION
3 BLANCA VALENZUELA, MARGIE  )
  SALAZAR, JOSE E. SERRATO,  )
4 JOSIE RENDON, CLARA TOVAR, )
  CONSUELO ESPINO, MARIA     )
5 AVILA, ERNESTINA           )
  NAVARRETTE, MARIA E.       )
6 MUNOZ, AMANDA SALCIDO,     )
  CANDELARIO G. ORTEGA,      )
7 MARIA ORTIZ, JOSE OLIVA,   )
  RAFAELA CHAVEZ, ELODIA     )
8 ARROYO, SUSANA CARDIEL,    )
  GRACIE RIOS, AND LEONEL    )
9 RUIZ, Individually and on  )
  behalf of all others       )
10 similarly situated,        )  CIVIL ACTION NO.
                             )  3:06-cv-02322-N
11        Plaintiffs,        )
                             )
12 vs.                       )       ECF
                             )
13 SWIFT BEEF COMPANY, INC.  )
   D/B/A SWIFT COMPANY,      )
14 SWIFT & COMPANY, HICKS,   )
   MUSE, TATE & FURST, INC., )
15 HM CAPITAL PARTNERS OF     )
   DALLAS, LLC, and JOHN     )
16 DOES I-V,                 )
                             )
17       Defendants.         )
18         REPORTER'S CERTIFICATION
19       ORAL DEPOSITION OF MARIA ORTIZ
20              JULY 10, 2008
21   I, ANGIE WEAVER, Certified Shorthand Reporter in and
22 for the State of Texas, hereby certify to the following:
23   That the witness, MARIA ORTIZ, was duly sworn by the
24 officer and that the transcript of the oral deposition is
25 a true record of the testimony given by the witness and
```

## Page 32

```
1 any exhibits marked as evidence.
2    That the deposition transcript was submitted on
3 _____, 2008 to the witness or to the attorney
4 for the witness for examination, signature, and return to
5 me by _____, 2008.
6    That the amount of time used by each party at the
7 deposition is as follows:
8    MR. BRIAN G. EBERLE - (00:47)
9    That pursuant to information given to the deposition
10 officer at the time said testimony was taken, the
11 following includes all parties of record:
12   Ms. Claudia M. Cano, Attorney for Plaintiffs
13   Mr. Brian G. Eberle, Attorney for Defendants
14   I further certify that I am neither counsel for,
15 related to, nor employed by any of the parties in the
16 action in which this proceeding was taken, and further
17 that I am not financially or otherwise interested in the
18 outcome of this action.
19   Certified to by me on this _____ day of
20 _____, 2008.
21
22
                       _____
23                     ANGIE WEAVER, CSR
                       Texas CSR #4450 (Exp. 12/31/08)
                       Firm No. 23
24                     AMARILLO COURT REPORTING, INC.
                       P. O. Box 19628
25                     Amarillo, Texas 79114
                       (806) 374-4091
```

CHANGES AND SIGNATURE

PAGE LINE  CHANGE/*ADDITION*          REASON

21  3   *In addition, a man who was employed @*
*SWIFT during the time I was also employed told me*
*he was from Guatemala and illegal. I do not*
*remember his name.*

_____

_____

     I, MARIA ORTIZ, have read the foregoing deposition
and hereby affix my signature that same is true and
correct, except as noted above.

                    *Maria Ortiz*
                    MARIA ORTIZ

STATE OF    *TEXAS* )

COUNTY OF  *MOORE*       )

     Before me,  *CLAUDIA M. CANO*  , on this day
personally appeared MARIA ORTIZ, known to me, or proved to
me on the oath of _____ or through
_____ (description of identity card
or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged to
me that he/she executed the same for the purpose and
consideration therein expressed.

     Given under my hand and seal of office on this
*6th* day of *August*          , 2008.

┌─────────────────────────┐
│  CLAUDIA M. CANO        │
│  Notary Public, State of Texas │
│  My Commission Expires  │           *(signature)*
│  November 16, 2011      │
└─────────────────────────┘         NOTARY PUBLIC IN AND FOR
                                    THE STATE OF  *TEXAS*

My Commission Expires:  *11-16-11*

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3  BLANCA VALENZUELA, MARGIE )
    SALAZAR, JOSE E. SERRATO, )
 4  JOSIE RENDON, CLARA TOVAR,)
    CONSUELO ESPINO, MARIA    )
 5  AVILA, ERNESTINA          )
    NAVARRETTE, MARIA E.      )
 6  MUNOZ, AMANDA SALCIDO,    )
    CANDELARIO G. ORTEGA,     )
 7  MARIA ORTIZ, JOSE OLIVA,  )
    RAFAELA CHAVEZ, ELODIA    )
 8  ARROYO, SUSANA CARDIEL,   )
    GRACIE RIOS, AND LEONEL   )
 9  RUIZ, Individually and on )
    behalf of all others      )
10  similarly situated,       )
                              )  CIVIL ACTION NO.
11         Plaintiffs,        )  3:06-cv-02322-N
                              )
12  vs.                       )  ECF
                              )
13  SWIFT BEEF COMPANY, INC.  )
    D/B/A SWIFT COMPANY,      )
14  SWIFT & COMPANY, HICKS,   )
    MUSE, TATE & FURST, INC., )
15  HM CAPITAL PARTNERS OF    )
    DALLAS, LLC, and JOHN     )
16  DOES I-V,                 )
                              )
17         Defendants.        )
18
19
20                ORAL DEPOSITION OF
21               LEONEL RUIZ MELENDEZ
22                  JULY 10, 2008
23
24
25
```

## Page 2

```
 1       ORAL DEPOSITION OF LEONEL RUIZ MELENDEZ, produced as
 2  a witness at the instance of the Defendants and duly
 3  sworn, was taken in the above-styled and numbered cause on
 4  the 10th day of July, 2008, from 11:44 a.m. to 1:18 p.m.,
 5  before Angie Weaver, Certified Shorthand Reporter in and
 6  for the State of Texas, reported by computerized stenotype
 7  machine at the offices of Mullin, Hoard & Brown, L.L.P.,
 8  500 S. Taylor, Suite 800, in the City of Amarillo, County
 9  of Potter, State of Texas, pursuant to the Federal Rules
10  of Civil Procedure and the provisions stated on the record
11  or attached hereto.
```

## Page 3

```
 1                     APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4     Ms. Claudia M. Cano
        HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
 5     2331 W. Northwest Highway, 2nd Floor
        Dallas, Texas 75220
 6     Telephone:  (214) 526-7900
        E-mail: cano@reyeslaw.com
 7
 8  FOR THE DEFENDANTS:
 9     Mr. Brian G. Eberle
        SHERMAN & HOWARD, L.L.C.
10     633 Seventeenth Street, Suite 3000
        Denver, Colorado 80202-3622
11     Telephone:  (303) 297-2900
        E-mail: beberle@shermanhoward.com
12
13  ALSO PRESENT:
14     Ms. Maria Ortiz
        Ms. Linda Foster, Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                       INDEX
 2                                                PAGE
 3  Stipulations ---------------------------------   2
 4  Appearances ----------------------------------   3
 5  Exhibit Index --------------------------------   4
 6  Objections -----------------------------------   4
 7  WITNESS:
 8  LEONEL RUIZ MELENDEZ
 9     Examination by MR. EBERLE                     5
10     Examination by MS. CANO                      37
11     Further Examination by MR. EBERLE           39
12  Signature and Changes ------------------------  40
13  Reporter's Certificate -----------------------  41
14
15                     EXHIBITS
16  EXHIBIT         DESCRIPTION             PAGE
17  5        Attorney Employment Contract    12
18
19                    OBJECTIONS
20                                    PAGE   LINE
21  By Ms. Cano                        19     17
       By Ms. Cano                     20     15
22  By Ms. Cano                        24      6
       By Ms. Cano                     26     24
23  By Ms. Cano                        28     11
       By Ms. Cano                     28     20
24  By Ms. Cano                        36     18
25
```

**Page 5**

1      (Ms. Linda Foster sworn as interpreter.)

2              LEONEL RUIZ MELENDEZ,

3   having been first duly sworn, testified through the duly

4   sworn interpreter as follows:

5              EXAMINATION

6   BY MR. EBERLE:

7      Q.   Can you please state your full name.

8      A.   Leonel Ruiz Melendez.

9      Q.   And can you spell your last name, please.

10     A.   R-U-I-Z.

11     Q.   And, Mr. Ruiz, do you speak any English?

12     A.   No.  No.  Very little.  No, sir.

13     Q.   And are you able to read any English?

14     A.   No.

15     Q.   Is it your preference to have documents in

16  English translated for you so that you can read them in

17  Spanish?

18     A.   That's correct.

19     Q.   And I believe we talked about this, or at least

20  I understood it perhaps in Spanish off the record, that

21  I'm going to ask you questions in English, Ms. Foster will

22  interpret them for you into Spanish, and then you will

23  answer the questions in Spanish, and she will interpret

24  them into English so that the court reporter can write

25  them down.  Is that okay?

**Page 6**

1      A.   Yes.  Yes, that's correct.

2      Q.   And a few procedural rules.  One is that only

3   one of us may speak at a time, so we may need to pause

4   periodically to make sure we don't talk over each other.

5   Is that okay?

6      A.   Yes.  Yes, that's correct.

7      Q.   And even if you think you understand a question

8   I'm asking in English, Ms. Foster will interpret all

9   questions into Spanish and you should always answer in

10  Spanish.  Okay?

11     A.   Yes, that's correct.

12     Q.   And we also need to have all of your answers be

13  verbal, in other words, a yes or a no or in some words

14  rather than a nod of the head.  Is that okay?

15     A.   Yes.  Correct.

16     Q.   Whenever I ask a question, I will assume that

17  you understand it unless you tell me otherwise.  So if for

18  any reason you don't understand a question, will you let

19  me know.

20     A.   Correct.

21     Q.   Do you understand that you have been sworn under

22  oath?

23     A.   Yes, that's correct.

24     Q.   And even though this is an informal setting

25  today, do you understand that it's just the same as if you

**Page 7**

1   were giving testimony in a court of law?

2      A.   Yes.  Correct.

3      Q.   And we can take a break any time if you need

4   one, so just let me know.

5      A.   Yes.  Correct.

6      Q.   When did you first start working for Swift at

7   its Cactus plant?

8      A.   It was May the 1st, 1985.

9      Q.   And when we talk today about the Cactus, Texas,

10  plant, do you understand that that is the beef processing

11  plant operated by Swift in the area around Cactus and

12  Dumas, Texas?

13     A.   Yes.  Correct.

14     Q.   And you had your deposition taken in another

15  lawsuit against Swift previously, correct?

16     A.   Yes.  Correct.

17     Q.   And I understand from that deposition that the

18  last day you received wages from Swift was January 24,

19  2003; is that right?

20     A.   January 24th?

21     Q.   2003.

22     A.   No.  No.

23     Q.   What do you recall about when you last were paid

24  by Swift to work at its Cactus plant?

25     A.   Well, it was from September to the present.

**Page 8**

1      Q.   Let me ask it differently.  When do you recall

2   the last day that you worked for Swift?  What was the

3   date, if you remember?

4      A.   I'm not really sure, but it was around the 17th

5   or the 19th of January.

6      Q.   In 2003?

7      A.   Yes.  Correct.  Yes.  Yes.  Yes.

8      Q.   Did you ever return to work at Swift after that

9   date?

10     A.   No, not at all.

11     Q.   And I understand that you were injured while

12  working at Swift in February of 1994; is that right?

13     A.   Yes.  Correct.  I did.

14     Q.   And did a doctor order any work restrictions for

15  you after that injury?

16     A.   Yes.  Correct.

17     Q.   Were those work restrictions ever lifted during

18  the time you continued to work at Swift?

19     A.   No, not at all.

20     Q.   At the time you stopped working at Swift, what

21  was the job you had at the Cactus plant?

22     A.   I was unwrapping the gloves, giving out the

23  uniforms for people to wear.

24     Q.   Where in the plant were you involved with

25  unwrapping the gloves?

**Page 9**

1    A.   In the room that was assigned for that job.
2    Q.   And where -- was that next to the floor?
3    A.   Yes, next to the floor.
4    Q.   Were you a member of the union while you were
5  working for Swift?
6    A.   I was a member for a while.
7    Q.   Okay.  Did you resign from the union at some
8  point?
9    A.   That's correct.  Yes, I did.
10   Q.   And why was that?
11   A.   The reason I resigned is because the union never
12  helped me at all.
13   Q.   And how were you expecting them to help you?
14   A.   I expected the union to help me out, and it
15  never helped me out at all.
16   Q.   But more specifically, what were you expecting
17  them to help you with?  Was it with a job assignment or
18  wages or -- what was it?
19   A.   With my job.
20   Q.   With the work assignment that you had?
21   A.   Not with that job.  I used to do a different job
22  before.
23   Q.   And it was in that job at Swift that you felt
24  the union wasn't representing you?
25   A.   Because the supervisor had me working with the

**Page 10**

1  knife, and with the restrictions I had, I shouldn't -- I
2  shouldn't have to have been raising my arms.
3    Q.   And when you resigned from the union, did you
4  ever rejoin before you stopped working at Swift?
5    A.   No.  No.  No.  No, I never went back to the
6  union at all.
7    Q.   Do you remember approximately what year it was
8  that you resigned from the union?
9    A.   No, I don't recall it.  I really don't.
10   Q.   Was it before 2000?
11   A.   Yes, it was before, that's correct.
12   Q.   Were you born in Mexico?
13   A.   That's correct, yes.
14   Q.   And when did you move to the United States?
15   A.   I moved here in April.
16   Q.   What year, though?
17   A.   '85.
18   Q.   When you applied to work for Swift, were you a
19  citizen of the United States?
20   A.   I was a resident.
21   Q.   But were you a citizen?
22   A.   No.
23   Q.   And did you have a work visa at that time?
24   A.   Yes.  Correct.
25   Q.   And since you started working at Swift in 1985,

**Page 11**

1  did you become a U.S. citizen?
2    A.   No.  No, I'm still a resident today.  I am not
3  an American citizen.
4    Q.   Okay.  So you're a resident alien; is that
5  right?
6    A.   Correct.  Yes, I am.
7    Q.   Did you review any documents to prepare for your
8  deposition today?
9    A.   Yes.  Correct.
10   Q.   What did you review?
11   A.   The documents we have with our attorney.
12        MS. CANO:  He actually didn't review any
13  records, but -- explain to him what reviewing means.
14   Q.   Before we came today -- I know we're looking at
15  documents here.  But before we came today, did you review
16  any documents to prepare for the deposition?
17   A.   No.  No.  No.  No, not anything like this, no.
18   Q.   And did you meet with anyone other than your
19  attorney that's here today to prepare for the deposition?
20   A.   No.  It was just her.
21   Q.   And besides your attorney today, are there any
22  other attorneys representing you and the proposed class in
23  this case?
24   A.   It's just her.
25        (Deposition Exhibit No. 5 marked for

**Page 12**

1        identification.)
2    Q.   You've been handed what's been marked as
3  Exhibit 5.  And does your handwriting appear at the top of
4  Exhibit 5 on the first page, the name?
5    A.   Are you asking me if this is my handwriting?
6    Q.   Yes.
7    A.   Yes, it is.  It is my handwriting.
8    Q.   And on the second page of Exhibit 5, is that
9  your signature in the middle of the page?
10   A.   Yes, this is my signature, that's correct.
11   Q.   And this indicates on the second page that you
12  signed Exhibit 5 on January 8, 2007; is that correct?
13   A.   Yes.  Yes.  Correct.
14   Q.   Where were you when you signed Exhibit 2, if you
15  remember?  I mean, excuse me, Exhibit 5.
16   A.   No, I don't recall it.
17   Q.   Do you think you were at home?
18   A.   I don't recall it.  I don't recall where it was.
19   Q.   The second page of Exhibit 5 has the name of a
20  law firm, the Heygood law firm.  Do you see that?
21   A.   Yes.  Yes, that's correct.
22   Q.   How did you hear about the Heygood law firm?
23   A.   It was through Attorney Domingo Garcia that I
24  heard about this law firm.
25   Q.   And Mr. Garcia was your attorney in the other

## Page 13

1  litigation against Swift; is that right?
2      A.   That's correct.
3      Q.   Did you have any communications with anyone from
4  the Heygood law firm before you signed Exhibit 5?
5      A.   Yes.
6      Q.   When did those take place?
7      A.   Well, I don't recall that.
8      Q.   Was it shortly before you signed Exhibit 5?
9      A.   Yes, that's correct.
10     Q.   Do you remember who it was at the Heygood law
11 firm that you communicated with?
12     A.   No.  Well, I don't recall it, but I did.
13     Q.   Before you signed Exhibit 5, had you contacted
14 any other attorneys about representing you and the
15 proposed class in this case?
16     A.   No.
17     Q.   Have you ever checked any references for any of
18 the attorneys at the Heygood law firm?
19     A.   No, I don't recall it.
20     Q.   Do you know what experience the attorneys at the
21 Heygood law firm have in class actions?
22     A.   No.  No.  No, I don't recall it.  I don't know.
23     Q.   And do you know what types of legal work in
24 general the attorneys at the law -- the Heygood law firm
25 do?

## Page 14

1      A.   No.  That's up to them.  They are the ones.
2      Q.   Are you aware of any of the costs associated
3  with this class action?
4      A.   No.  No, that's up to them, my attorneys.
5      Q.   Do you understand whether you have any
6  responsibility for paying any of the costs associated with
7  this class action?
8      A.   Could you repeat that question again.
9      Q.   Yes.  Do you understand whether you are
10 responsible for paying any of the costs associated with
11 this class action?
12     A.   I don't know.  I don't know.
13     Q.   Do you know whether your attorneys have hired
14 any expert witnesses in this case?
15     A.   No, I don't recall that.  I don't know.
16     Q.   And do you know how much has been paid, if
17 anything, by your attorneys to any expert witnesses?
18     A.   No, I don't know.  I don't know.
19     Q.   Do you know how much it might cost to provide
20 notice of this case to class members?
21     A.   No, I don't know.
22     Q.   What is your understanding of the claims you and
23 the class are asserting in this case?
24     A.   You would have to ask the attorneys.
25     Q.   And do you know whether a classification motion

## Page 15

1  has been filed?
2      A.   I don't know.
3      Q.   What is your understanding of the people who are
4  members of the proposed class in this case?
5      A.   I'm sorry.  Could you repeat that question
6  again.
7      Q.   Yes.  What is your understanding of the people
8  who are members of the proposed class in this case?
9      A.   My understanding is we want to know why our job
10 was taken away from us.
11     Q.   But do you have any understanding about who the
12 other members of the class would be regarding those
13 claims?
14     A.   Could you repeat that question again.
15     Q.   Yes.  Do you have any understanding about who
16 the other people are that are proposed to be members of
17 the class to pursue those claims?
18     A.   Are there other people, members, I mean, besides
19 the ones that are here today -- that are here today to --
20     Q.   And that's my question.  Do you know whether
21 there are any other people?
22     A.   I don't know.
23     Q.   Do you understand that you have been proposed as
24 a class representative in this case?
25     A.   I don't know.

## Page 16

1      Q.   And do you know whether you would have any
2  responsibilities to other members of the class?
3      A.   I don't know.
4      Q.   Let me hand you what's been previously marked as
5  Exhibit 2.  This is the Original Complaint that was filed
6  on December 15, 2006.  Have you ever seen this document
7  before?
8      A.   Yes.  Yes, I have.  Yes.  Yes.
9      Q.   And do you recall when you saw it the first
10 time?
11     A.   I don't recall that, but --
12     Q.   And do you recall whether Exhibit 2 has ever
13 been translated into Spanish for you?
14     A.   No, I don't recall that.
15     Q.   On the first page of Exhibit 2, there is a
16 defendant identified as Hicks, Muse, Tate & Furst.  Do you
17 see that?
18     A.   Yes.  Yes.
19     Q.   Do you know who that company is?
20     A.   It's not Swift?
21     Q.   That's my question.  Do you know whether they
22 have a relationship to Swift, yes or no, or you don't
23 know?
24     A.   I don't know.
25     Q.   And do you know what claims are being asserted

**Page 17**

1  against Hicks Muse in this Original Complaint?
2      A.   I don't know.
3      Q.   Do you know whether or not Hicks Muse has been
4  dismissed as a defendant in this case?
5      A.   I don't know that.
6      Q.   Let me hand you what's been marked as Exhibit 3,
7  which is the First Amended Complaint that was filed on
8  December 28, 2006.  Do you recall seeing this document
9  before?
10     A.   Yes.
11     Q.   And do you recall when you first saw it?
12     A.   No, I don't recall that.  I don't recall it.
13     Q.   And has Exhibit 3 ever been translated into
14  Spanish for you?
15     A.   No.
16     Q.   Do you know what changes, if any, were made from
17  Exhibit 2, which was the Original Complaint, to Exhibit 3,
18  which is the First Amended Complaint we're looking at now?
19     A.   I don't know.
20     Q.   Let me hand you what's been marked as Exhibit 4.
21  This is the Plaintiffs' Second Amended Complaint that was
22  filed on March 14, 2008.  Do you recall having seen
23  Exhibit 4 before?
24     A.   Yes.
25     Q.   And do you recall when you first saw it?

**Page 18**

1      A.   No.  No, I don't really recall it.
2      Q.   Do you recall Exhibit 4 ever being translated
3  for you into Spanish?
4      A.   No.  No.
5      Q.   And do you know what changes were made from the
6  First Amended Complaint, which was Exhibit 3, and the
7  Second Amended Complaint, which is Exhibit 4 that we're
8  looking at now?
9      A.   I don't know.
10     Q.   When you were working for Swift, were you aware
11  of any information that Swift had hired anyone at the
12  Cactus plant who was not legally authorized to work in the
13  United States?
14     A.   I met some people.
15     Q.   And can you tell me their names.
16     A.   One was Jesus Ortiz.  Or those are the names
17  they had there.  Pedro Vargas.
18     Q.   Anyone else that you can remember?
19     A.   Guerrero Hernandez.
20     Q.   Anyone else?
21     A.   Those three people.
22     Q.   And I think, as you mentioned, those three
23  people had those names, but you don't know whether those
24  were their real names?
25     A.   Okay.  Two I do know.  It's just the last one

**Page 19**

1  that -- the two I do.
2      Q.   Okay.  Which two do you know their actual names?
3      A.   Jesus and Guerrero.
4      Q.   And those were their real names?
5      A.   That I knew of, yes.  Yes.
6      Q.   And was it your understanding, though, that they
7  were not legally authorized to work in the United States?
8      A.   That's correct, yes.
9      Q.   And when did you learn this information about
10  those two?
11     A.   Okay.  The reason that I became aware of it,
12  okay, when they were called to the office and they go up
13  to the supervisor and tell him, we want these two people
14  at the office, okay, and the reason why they were pulled
15  out was because of their documents.
16     Q.   Did those two continue to work --
17          MS. CANO:  Objection, nonresponsive.
18     Q.   And did those two continue to work at Swift after
19  they were pulled out and sent to the office?
20     A.   No, not at all.
21     Q.   Do you remember the approximate time frame when
22  that happened?
23     A.   This was between '85 and '86.
24     Q.   Okay.  So 1985 and 1986?
25     A.   Yes.  Correct.

**Page 20**

1      Q.   And what was the name of the third person whose
2  real name you didn't know?
3      A.   Okay.  It was Pedro Vargas.
4      Q.   And what did you know about that person, as far
5  as whether they were legally authorized to work in the
6  United States?
7      A.   It was -- the same thing happened to him that
8  happened to the other two.  He was called over.
9      Q.   And approximately when did that happen?
10     A.   It was approximately the same time.
11     Q.   Were you aware of any other information while
12  you were working for Swift that the company had hired
13  anyone at the Cactus plant who was not legally authorized
14  to work in the United States, besides those three?
15          MS. CANO:  Objection, form.
16     A.   Well, there were a lot of people, but I didn't
17  know them.
18     Q.   And when you say there were a lot of people,
19  what did you know about that?
20     A.   Because they were the ones talking about it.
21     Q.   So you heard people who were employed at Swift
22  saying that they were not legally authorized to work in
23  the United States?
24     A.   Among themselves, conversations they had.  I
25  can't tell you the name of these people because, of

**Page 21**

1  course, there they had -- they were using different names.

2     Q.    And during what time frame did you overhear

3  these conversations?

4     A.    Okay.  Well, this was later on, like in 2001,

5  2002.

6     Q.    Were there any particular nationalities of

7  people who worked at Swift who you understood were talking

8  about their not being legally authorized to work in the

9  United States?

10    A.    Well, yes.  There were like the -- referring to

11 the ones from Guatemala.

12    Q.    And what did you know about that?

13    A.    They were -- they were here, coming as illegal

14 aliens.

15    Q.    In what time frame did that occur?

16    A.    It was during that time, that period of time.

17    Q.    So in 2001?

18    A.    2002, yes.

19    Q.    But other than the three people whose names you

20 gave earlier, you don't know the names of any other

21 individuals who worked at Swift who may not have been

22 legally authorized to work in the United States?

23    A.    Well, no.  But there were a lot of people.

24    Q.    And just so I'm clear, you knew that at least as

25 of 2001 and the first half of 2002?

**Page 22**

1     A.    More or less, yes.

2     Q.    When you were working for Swift, were you aware

3  of any information that Swift had hired anyone at plants

4  other than in Cactus, Texas, who were not legally

5  authorized to work in the United States?

6     A.    Well, no.  Where I became aware of it was there

7  at Cactus.

8     Q.    And did you have any information while you were

9  working at Swift about who was employed at any of the

10 other Swift plants besides Cactus?

11    A.    No, I don't know about the other ones.

12    Q.    And you never worked for Swift, other than the

13 Cactus plant, correct?

14    A.    Correct.  That's correct.

15    Q.    During the time that you worked for Swift at the

16 Cactus plant from 1985 to January of 2003, were there any

17 immigration raids by government authorities that took

18 place?

19    A.    No, not at all, not during that time that I was

20 there.

21    Q.    And to your knowledge, during the time you were

22 working for Swift, were there any immigration raids by

23 government authorities that took place at any Swift plants

24 other than in Cactus?

25    A.    No, it was just on December the 12th there at

**Page 23**

1  the Cactus plant, where they entered all the Swift plants.

2     Q.    And that was in 2006?

3     A.    Was it 2006?  It was December the 12th.

4     Q.    But it was after you left work at Swift?

5     A.    Oh, yes.  Yes, since 2003.  Yes.

6     Q.    During the time you were working at Swift, were

7  you aware of any immigration raids at other Swift plants?

8     A.    It was just that one.

9     Q.    When you were working at Swift from 1985 to

10 January of 2003, were you aware of any immigration raids

11 planned by government authorities at the Cactus plant that

12 never took place?

13    A.    No, I don't know about that.

14    Q.    When you were working for Swift from 1985 to

15 January of 2003, were you aware of any information that

16 Swift had helped any workers at the Cactus plant obtain

17 false documents relating to their identity or immigration

18 status?

19    A.    Well, no.  What I do know is that they were

20 hiring people, and out of the people that they were

21 firing -- or people that would quit, they were hiring

22 people, illegal aliens, and they would use the other

23 names, those other names of those other people that

24 were being -- that they had fired or that had quit so that

25 they could charge them a certain amount of money and give

**Page 24**

1  them the employment.

2     Q.    Okay.  Let me back up and just ask specifically

3  about while you were working for Swift whether you have

4  specific information that anyone at Swift gave false

5  documents to illegal immigrants at the Cactus plant.

6           MS. CANO:  Objection, asked and answered.

7  Objection, form.

8     A.    No, I -- about that, no, no.

9     Q.    Okay.  Then explain to me the other portion.

10 You didn't know about false documents, but you mentioned

11 something about someone being paid money so that an

12 illegal immigrant could work at Swift.  Can you explain

13 that to me.

14    A.    That's correct.  They would hire them.  They

15 would hire the people and give them the employment with

16 people that did -- that did have documents.  Like, for

17 example, I had documents.  I could have been fired or I

18 could have quit, but they would continue hiring illegal

19 aliens, using those names -- or that name.

20    Q.    So do you believe that Swift hired someone after

21 you stopped working at the company, using your name?

22    A.    No, not my name, but a different person.  No,

23 not mine.  Yes.

24    Q.    Can you identify any specific person's name that

25 was used by an illegal immigrant who had been a former

**Page 25**

1 employee of Swift?

2    A.   I really don't recall that because there were a

3 lot of people.

4    Q.   Was there -- are you aware of any information

5 that anyone working at Swift received money from an

6 illegal immigrant to allow them to use a former employee's

7 name?

8    A.   No, I don't know that.

9    Q.   While you were working for Swift from 1985 to

10 January of 2003, were you aware of any information that

11 Swift provided illegal immigrants at the Cactus plant with

12 advice on how to avoid detection by government

13 authorities?

14    A.   I don't know.  I really don't know about that.

15 I don't know about that.

16    Q.   And while you were working at Swift, were you

17 aware of any information that the company provided illegal

18 immigrants with advice on how to be hired or rehired at

19 the Cactus plant?

20    A.   No.  That was just the personnel that was hiring

21 them.  Okay.  Those people that entered the company and

22 working as illegal aliens, they didn't start working there

23 just because they wanted to work there.  Someone had to

24 have brought them in.

25    Q.   And is it your testimony that someone at Swift

**Page 26**

1 told those people that were illegal to work at the

2 company?

3    A.   I believe so, because if I'm here legally -- and

4 I'm talking about people that were there asking --

5 applying for a job legally at Swift with their -- with

6 legal documents, proper legal documents, with their

7 citizenship and everything in order, they were there

8 applying for a job at Swift, and the personnel would tell

9 them that they were not hiring anyone.  They would ask

10 them to leave their phone number so that they could call

11 them back, okay, and they never called them back.

12        Nevertheless, there were a lot of people

13 there from Guatemala.  And I'm not against illegal aliens

14 because I was an illegal alien also, and we all try to get

15 ahead in life any way we can.  But listen to me.  There

16 was -- there were twenty, thirty people from Guatemala,

17 okay, searching for employment, okay, and they already had

18 their application with them.  It was all filled out.

19        Okay.  And they would come up to the chief

20 of personnel, okay, the one that was hiring, and they

21 would go directly to this person in charge of hiring.

22 They were -- there was a physical done on them, and right

23 away they obtained the employment.  Correct.  Yes.

24        MS. CANO:  I think that's enough.  I'm not

25 sure there's any other question.  To the portion that's

**Page 27**

1 nonresponsive, I object.

2    A.   Okay.

3    Q.   And this issue with the Guatemalans, was this in

4 the 2001 and the first half of 2002 time frame?

5    A.   Yes.  Correct.  Yes.

6    Q.   And who was the person in charge of hiring that

7 you mentioned at Swift?

8    A.   Well, there were two or three people, yes.

9    Q.   Do you know their names?

10    A.   I don't recall the names.  But one of the

11 people -- one of these people was -- they let him go from

12 the office.  There was one person, and there was a woman

13 also.

14    Q.   So there was one person who had been let go by

15 Swift that had been working in the personnel department?

16    A.   Yes, there was one -- there were one or two

17 people.

18    Q.   But you don't remember the names of any of

19 these --

20    A.   I don't recall the names.

21    Q.   Now, you mentioned that there had been people

22 who had proper immigration papers or they were authorized

23 to work who applied to Swift and were told to leave their

24 telephone number.  Can you tell me the names of any of

25 those people?

**Page 28**

1    A.   Well, I never knew them by their names.

2    Q.   How did you obtain this information about them,

3 then?

4    A.   Because I was told this by some people.  I mean,

5 this is what was -- this is what was being said.  This was

6 what was -- the conversations that were taking place among

7 themselves.

8    Q.   Just so I'm clear, was this something that was

9 told to you by a third party or information you obtained

10 by overhearing these people talking among themselves?

11        MS. CANO:  Objection, form.

12    A.   Conversations of other people.

13        THE INTERPRETER:  Other people's

14 conversations.  I'm sorry.

15    Q.   And those were conversations that you overheard?

16    A.   Yes, that I overheard.  That's correct.

17    Q.   Okay.  And again, this was in the 2001 and the

18 first half of 2002 time frame?

19    A.   Yes, that's correct.

20        MS. CANO:  Objection, form.

21    Q.   Other than what we've just talked about, when

22 you were working at Swift, were you aware of information

23 that Swift provided illegal immigrants with advice on how

24 to be hired or rehired at the Cactus plant?

25    A.   If I heard?  No, I don't recall it.

**Page 29**

1  Q.  And since you didn't work at any of the other
2  Swift plants besides in Cactus, I take it you don't have
3  any information about whether Swift assisted any workers
4  at those other plants in obtaining false documents or
5  avoiding detection by government authorities?
6  A.  No, it was just there.  I don't know about the
7  other ones.
8  Q.  While you were working at Swift from 1985 to
9  January of 2003, did you believe that you were paid less
10 per hour because Swift had hired illegal immigrants at the
11 Cactus plant?
12 A.  I believe so.  I believe our salaries were low.
13 Q.  Why did you believe that?
14 A.  Because I imagine that since they had illegal
15 aliens there, since they didn't have any right to make any
16 claim about it, they were -- they were in agreement.
17 Q.  Did you believe that in 2001 and during the
18 first half of 2002?
19 A.  Yes, because when all this happened, they right
20 away let anyone that had been injured go.
21 Q.  Okay.  But just so that I'm clear, in 2001 and
22 the first half of 2002, you believed that your pay was
23 less because Swift had hired illegal immigrants at the
24 Cactus plant?
25 A.  I believe so because -- because they were not

**Page 30**

1  paying what they should have been paying the legal aliens.
2  Q.  While you were working at Swift, did you hear
3  anyone else working there that stated they had a similar
4  belief as you that their wages were being lowered because
5  Swift had hired illegal immigrants?
6  A.  No.  No, I don't recall it.
7  Q.  And while you were working at Swift in this time
8  frame from 2001 and during the first half of 2002, did you
9  believe your wages were lower because Swift had provided
10 any false documents to illegal immigrants or otherwise
11 help them avoid government authority detection?
12 A.  I really don't know how they were helping them
13 out.  But why did they hire them?
14 Q.  In any event, you thought your wages were lower,
15 at least as of 2001 and the first half of 2002?
16 A.  Yes, I believe so.  Yes.
17     MR. EBERLE:  Why don't we take a short
18 break, if it's okay.
19     (Recess from 12:39 p.m. to 12:56 p.m.)
20 Q.  (BY MR. EBERLE)  After you stopped working for
21 Swift in January of 2003, did you receive any information
22 that Swift had hired illegal immigrants at the Cactus
23 plant?
24 A.  Yes.
25 Q.  And what information did you receive?

**Page 31**

1  A.  Well, that they were hiring people from
2  Guatemala, and not just from Guatemala, from Mexico and --
3  yes, yes, different -- different races, yes.
4  Q.  And can you identify by name any individuals who
5  Swift hired that were not authorized to work in the United
6  States?
7  A.  Well, there were a lot of people.  Okay?  I
8  believe that just the people from Guatemala, there were --
9  there were a lot of them.
10 Q.  But you can't give me a specific name of any one
11 of those people?
12 A.  Well, they were using different names.  Okay?
13 It would be very difficult to know the name of each
14 person.
15 Q.  And you can't tell me any of those names today
16 because of that difficulty?
17 A.  Okay.  All those people from Guatemala, they had
18 their hardhat, okay, and they had their name on it, and
19 on that hardhat, all the names were Anglo names, American
20 names.  So then if that person did not speak English, no
21 Spanish, they spoke a dialect among them, how could -- how
22 were we expected to believe that that person was an
23 American?
24 Q.  And when you say -- by American, you mean
25 legally authorized to work in the United States?

**Page 32**

1  A.  Yes.  Yes.
2  Q.  And these people you were describing, was this
3  also in that 2001, first half of 2002 time frame?
4  A.  It was during that period of time, yes.
5  Q.  Now, after you left Swift in January of 2003,
6  did you ever return to the plant to work there?
7  A.  No, not at all.
8  Q.  Were you ever at the plant at all after January
9  of 2003?
10 A.  No.  No, not at all.
11 Q.  Did you receive any information from anyone else
12 who was still working at Swift after you left about the
13 company hiring illegal immigrants at the Cactus plant?
14 A.  Well, all the people from Guatemala continued
15 working there.
16 Q.  Were you aware of any information that Swift had
17 hired any new Guatemalans or others who may not have been
18 legally authorized to work in the U.S.?
19 A.  After I left, yes, they continued hiring.
20 Q.  And who provided that information to you since
21 you weren't at the plant yourself?
22 A.  Okay.  Out of all those people we talked about
23 right now -- and I don't want to give out their names
24 because I don't want them to take any retaliation against
25 them.  And I know who these people are and I know their

## Page 33

1  names, but for respect to them, I don't want to hurt them.

2      Q.   And these are people that still work at Swift

3  today, some of them?

4      A.   No, those people were not hired.

5      Q.   Okay.  Let me back up because --

6          MS. CANO:  I think we're confused.

7      Q.   -- I think we're confused.  I'm asking after you

8  left the plant in January of 2003, did anyone who was

9  working and had been hired by Swift provide you with

10 information that the company was hiring illegal

11 immigrants?

12     A.   It was through conversations with other people.

13     Q.   And who are those people?

14     A.   I'm sorry?

15          MS. CANO:  Why don't you ask him to tell

16 you who the people were that told him that information.

17          MR. EBERLE:  Yes, that's -- can you

18 translate that.

19     A.   I know the names of the people that were there

20 applying for a job, but maybe the plant just retaliates

21 against these people.

22          MS. CANO:  Do you want to take a break?

23          MR. EBERLE:  Yeah.  Why don't we go off the

24 record for a second.

25          (Recess from 1:02 p.m. to 1:08 p.m.)

## Page 34

1      Q.   (BY MR. EBERLE)  So we're back on the record,

2  and let me --

3      A.   Yes.

4      Q.   -- try to clarify that we were talking about two

5  different time periods.  One was before you stopped

6  working at Swift, and then the second one is after you

7  left Swift in January of 2003.

8      A.   Okay.  That's correct.

9      Q.   So you told me information about while you were

10 working at Swift and people that you knew who had applied

11 that were legally authorized but did not get jobs,

12 correct?

13     A.   Yes.  Yes, that's correct.  That is correct.

14     Q.   And now what I want to ask you about is after

15 you left Swift, what did you know, if anything, about

16 Swift hiring illegal immigrants at the Cactus plant?

17     A.   They continued hiring.

18     Q.   And how did you know that?

19     A.   It was through a person that told me about it.

20 But I don't want to release that name because I don't want

21 to hurt them.

22     Q.   And is that a person who still works at Swift?

23     A.   I believe -- I believe that person still works

24 there, yes.

25     Q.   And was there anyone besides that person, after

## Page 35

1  you left Swift, who provided you with information about

2  Swift hiring illegal immigrants?

3      A.   It was just that person.  And I just don't want

4  to give the name out of that person.

5      Q.   Let me ask you just a few more questions about

6  the time after you left Swift.

7      A.   Correct.

8      Q.   Do you know whether Swift provided any false

9  documents to illegal immigrants after you left the

10 company?

11     A.   No, I don't know about that.

12     Q.   And after you left Swift, do you know whether

13 Swift gave any advice to illegal immigrants about how to

14 avoid detection by government authorities?

15     A.   No, I don't know about that.

16     Q.   And after you left Swift, do you know whether

17 Swift provided any illegal immigrants with advice about

18 how to be hired or rehired at the Cactus plant?

19     A.   No, I don't know.

20     Q.   And after you left Swift, do you know any

21 information about any employees that Swift hired at plants

22 other than the Cactus plant?

23     A.   No, I don't know that.  I don't know about the

24 other ones.

25     Q.   We talked earlier about your signing Exhibit 5

## Page 36

1  in January of 2007.  Do you remember that?

2      A.   Yes, that's correct.

3      Q.   Have you had any communications with the Heygood

4  law firm since January of 2007 about this case?

5          MS. CANO:  Without telling them what you've

6  discussed.

7      A.   Well, yes.  Yes, yes.

8      Q.   And has that been telephone calls or what form?

9      A.   Yes, by phone.

10     Q.   And how often?

11     A.   It's not very often, but I have had some

12 conversations, two or three times.

13     Q.   And who was that with?

14     A.   Well, it's with the secretaries, and I really

15 don't recall their names.

16     Q.   And was that about setting up your deposition

17 today?

18          MS. CANO:  Objection.  You don't have to

19 answer that question.  That's getting into actual

20 communication.

21     Q.   Did you have any communications after January of

22 2007 with any of the attorneys at the Heygood law firm

23 before today?

24     A.   We're talking about these attorneys, right?

25     Q.   Yes.

## Page 37

1   A.   Yes. Yes.

2   Q.   And how often did that happen?

3   A.   About three or four times, by phone.

4   Q.   And which attorneys, if you remember?

5   A.   With Angel Reyes.

6   Q.   And anyone else?

7   A.   No, just with them and the secretaries, because

8   they're the ones that pick up the phone.

9        MR. EBERLE:  That's all I have.

10       EXAMINATION

11  BY MS. CANO:

12  Q.   I have a few questions so that we can clarify

13  something for the record.

14  A.   Yes.

15  Q.   You were asked questions about the time while

16  you were still employed at Swift.

17  A.   Yes, that's correct.  Yes.

18  Q.   And you were asked questions regarding

19  individuals who applied for positions who were legally in

20  the country.

21  A.   Yes, that's correct.  And that is correct.

22  Q.   And you were asked whether or not you knew those

23  individuals who had applied for positions that were legal

24  but were not hired.

25  A.   Yes, that's correct.

## Page 38

1   Q.   Okay.  And you indicated that you had overheard

2   about who they were.

3   A.   Yes, that's correct.

4   Q.   Do you know who those individuals were that

5   applied but were not hired?

6   A.   Yes, I do know the names, but I don't want -- I

7   don't want to give out those names because I don't want to

8   hurt them.

9   Q.   All right.  And the names of those -- sorry.

10  Those individuals that you knew were not employed but were

11  legal, these were all persons who applied during the time

12  you were yourself employed -- you yourself were employed

13  at Swift?

14  A.   Yes.  Yes, that was before -- that's when I was

15  still working there.

16  Q.   All right.  Are there any individuals that were

17  legal but not hired after they applied for a position, to

18  your knowledge, after you had already stopped working at

19  Swift?

20  A.   Yes, there was one person that told me that she

21  hadn't been hired.

22  Q.   Okay.  And are you in the same situation, that

23  you don't want to give out the name of that person?

24  A.   It's just because I don't want anyone to

25  retaliate against them.  I don't want to hurt them.

## Page 39

1   Q.   I understand.

2        MS. CANO:  Pass the witness.

3        FURTHER EXAMINATION

4   BY MR. EBERLE:

5   Q.   Any of these people that you know the names of,

6   the ones while you were working there and the one person

7   after you left Swift, do you know whether any of them have

8   ever worked for Swift?

9   A.   One of these -- one of these persons had worked

10  there for quite a while, but the other person was --

11  was --

12       MS. CANO:  Seeking.

13  A.   -- was seeking the job for the first time there.

14  Q.   Do you know any -- do any of these people that

15  you know the names of currently work at Swift?

16  A.   No.  No.

17       MR. EBERLE:  I'll pass the witness.

18       MS. CANO:  We'll reserve the remainder of

19  our questions.

20       (End of Proceedings.)

21

22

23

24

25

## Page 40

1        CHANGES AND SIGNATURE

2   PAGE LINE  CHANGE              REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   I, LEONEL RUIZ MELENDEZ, have read the foregoing

10  deposition and hereby affix my signature that same is true

11  and correct, except as noted above.

12

13               _____
                 LEONEL RUIZ MELENDEZ

14  STATE OF       _____)

15  COUNTY OF _____)

16  Before me, _____, on this day
    personally appeared LEONEL RUIZ MELENDEZ, known to me or

17  proved to me on the oath of _____ or through
    _____ (description of identity card

18  or other document) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged to

19  me that he/she executed the same for the purpose and
    consideration therein expressed.

20

    Given under my hand and seal of office on this

21  _____ day of _____, 2008.

22

23               _____

24               NOTARY PUBLIC IN AND FOR
                 THE STATE OF _____

25  My Commission Expires: _____

```
 1                    CHANGES AND SIGNATURE

 2    PAGE LINE  CHANGE                        REASON

 3           _____ add "I saw Fred Perez, Superintendent of Kill Floor,

 4    punch the time cards himself. He would not just

 5    do one but a whole stack. I saw this."

 6           _____ add "The people that worked there had a name

 7    one day and next day used another. The supervisors

 8    themselves did not know their names. I saw this."

 9         I, LEONEL RUIZ MELENDEZ, have read the foregoing

10    deposition and hereby affix my signature that same is true

11    and correct, except as noted above.
```

Leonel Ruiz Melendez

```
13                             LEONEL RUIZ MELENDEZ

14    STATE OF    TEXAS    )

15    COUNTY OF   MOORE         )

16         Before me, CLAUDIA M CANO, on this day
      personally appeared LEONEL RUIZ MELENDEZ, known to me or

17    proved to me on the oath of _____ or through
      _____ (description of identity card

18    or other document) to be the person whose name is
      subscribed to the foregoing instrument and acknowledged to

19    me that he/she executed the same for the purpose and
      consideration therein expressed.

20
         Given under my hand and seal of office on this

21
      6     day of August                2008.

22
      ┌──────────────────────────┐
23    │   CLAUDIA M. CANO         │
      │ Notary Public, State of Texas │
      │  My Commission Expires    │
      │   November 16, 2011       │
24    └──────────────────────────┘   NOTARY PUBLIC IN AND FOR
                                      THE STATE OF  TEXAS

25    My Commission Expires: 11-16-11
```

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 2               DALLAS DIVISION
 3  BLANCA VALENZUELA, MARGIE )
    SALAZAR, JOSE E. SERRATO, )
 4  JOSIE RENDON, CLARA TOVAR,)
    CONSUELO ESPINO, MARIA    )
 5  AVILA, ERNESTINA          )
    NAVARRETTE, MARIA E.      )
 6  MUNOZ, AMANDA SALCIDO,    )
    CANDELARIO G. ORTEGA,     )
 7  MARIA ORTIZ, JOSE OLIVA,  )
    RAFAELA CHAVEZ, ELODIA    )
 8  ARROYO, SUSANA CARDIEL,   )
    GRACIE RIOS, AND LEONEL   )
 9  RUIZ, Individually and on )
    behalf of all others      )
10  similarly situated,       )
                              )  CIVIL ACTION NO.
11        Plaintiffs,         )  3:06-cv-02322-N
                              )
12  vs.                       )       ECF
                              )
13  SWIFT BEEF COMPANY, INC.  )
    D/B/A SWIFT COMPANY,      )
14  SWIFT & COMPANY, HICKS,   )
    MUSE, TATE & FURST, INC., )
15  HM CAPITAL PARTNERS OF    )
    DALLAS, LLC, and JOHN     )
16  DOES I-V,                 )
                              )
17        Defendants.         )
18
19  _____
20          ORAL DEPOSITION OF
21         CANDELARIO G. ORTEGA
22            JULY 11, 2008
    _____
23
24
25
```

**Page 2**

```
 1      ORAL DEPOSITION OF CANDELARIO G. ORTEGA, produced as
 2  a witness at the instance of the Defendants and duly
 3  sworn, was taken in the above-styled and numbered cause on
 4  the 11th of July, 2008, from 9:22 a.m. to 9:59 a.m.,
 5  before Angie Weaver, Certified Shorthand Reporter in and
 6  for the State of Texas, reported by computerized stenotype
 7  machine at the offices of Mullin, Hoard & Brown, L.L.P.,
 8  500 S. Taylor, Suite 800, in the city of Amarillo, County
 9  of Potter, State of Texas, pursuant to the Texas Rules of
10  Civil Procedure and the provisions stated on the record or
11  attached hereto.
```

**Page 3**

```
 1                   APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4    Ms. Claudia M. Cano
      HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
 5    2331 W. Northwest Highway, 2nd Floor
      Dallas, Texas 75220
 6    Telephone:  (214) 526-7900
      E-mail: cano@reyeslaw.com
 7
 8  FOR THE DEFENDANTS:
 9    Mr. Brian G. Eberle
      SHERMAN & HOWARD, L.L.C.
10    633 Seventeenth Street, Suite 3000
      Denver, Colorado 80202-3622
11    Telephone:  (303) 297-2900
      E-mail: beberle@shermanhoward.com
12
13  ALSO PRESENT:
14    Ms. Rafaela Chavez
      Ms. Mary Jane Ortega
15    Ms. Linda Foster, Interpreter
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    INDEX
 2                                              PAGE
 3  Stipulations ------------------------------  2
 4  Appearances -------------------------------  3
 5  Exhibit Index -----------------------------  4
 6  Objections --------------------------------  4
 7  WITNESS:
 8  CANDELARIO G. ORTEGA
 9     Examination by MR. EBERLE                 5
10  Signature and Changes ---------------------  24
11  Reporter's Certificate --------------------  25
12
13                  EXHIBITS
14  EXHIBIT        DESCRIPTION             PAGE
15   7      Attorney Employment Contract     10
16
17                 OBJECTIONS
18                                  PAGE    LINE
19  By Ms. Cano                      12      19
    By Ms. Cano                      13       1
20  By Ms. Cano                      17       1
    By Ms. Cano                      17      10
21  By Ms. Cano                      17      25
    By Ms. Cano                      20       5
22  By Ms. Cano                      20      18
    By Ms. Cano                      21      17
23
24
25
```

**Page 5**

1        (Ms. Linda Foster sworn as interpreter.)

2              CANDELARIO G. ORTEGA,

3   having been first duly sworn, testified through the duly

4   sworn interpreter as follows:

5              EXAMINATION

6   BY MR. EBERLE:

7      Q.   Can you please state your full name.

8      A.   Candelario G. Ortega.

9      Q.   And I introduced myself before.  My name is

10  Brian Eberle, and I'm one of the attorneys for the Swift

11  defendants in this case, so I'll be asking you some

12  questions this morning, if that's okay.

13     A.   That's fine.

14     Q.   Do you speak any English?

15     A.   Yes, more or less.

16     Q.   Are you able to read any English?

17     A.   A little.

18     Q.   And is it your preference to have documents in

19  English translated for you so that you can read them in

20  Spanish?

21     A.   Yes, it's much better for me.

22     Q.   And as you know, we have an interpreter here

23  today, and I'm going to be asking you questions in

24  English, and Ms. Foster will interpret them for you into

25  Spanish, and then you will answer the questions in

**Page 6**

1   Spanish, Ms. Foster will interpret your words into English

2   so that the court reporter can take that down.  Is that

3   okay?

4      A.   That's fine.

5      Q.   And let me review a couple of procedural rules.

6   One is that only one of us may speak at a time, so we may

7   need to pause occasionally to allow Ms. Foster to finish

8   her interpretation.  Is that okay?

9      A.   That's fine.

10     Q.   And even if you think you understand a question

11  I'm asking in English, Ms. Foster will interpret all

12  questions into Spanish.  You should always answer in

13  Spanish.  Okay?

14     A.   That's fine.

15     Q.   And all of your answers need to be verbal so the

16  court reporter can take your answers down, so it will be

17  important for you to answer yes or no or in words rather

18  than with gestures or head nods.  Is that okay?

19     A.   That's fine.

20     Q.   And when I ask a question, I will assume that

21  you understand it unless you tell me otherwise.  So if for

22  any reason you don't understand a question I'm asking,

23  will you let me know.

24     A.   That's fine.

25     Q.   Do you understand that you have been sworn under

**Page 7**

1   oath?

2      A.   Yes.

3      Q.   And even though this is an informal setting, do

4   you understand that it's just the same as if you were

5   giving testimony in a court of law?

6      A.   Yes.

7      Q.   When did you first start working for Swift at

8   its Cactus plant?

9      A.   It was on 9 of '87.

10     Q.   So September of 1987?

11     A.   Yes.

12     Q.   And when we talk about the Cactus plant today,

13  do you understand that we're talking about Swift's beef

14  processing plant located around the Cactus and Dumas area

15  in Texas?

16     A.   Yes.

17     Q.   And I believe you had your deposition taken in

18  the last year or two in another case involving Swift,

19  correct?

20     A.   Yes.

21     Q.   And I understand from that deposition that the

22  last day you received wages from Swift was October 31,

23  2001.

24     A.   Yes.

25     Q.   Did you ever return to work at Swift after that

**Page 8**

1   date?

2      A.   No.

3      Q.   And I also understand that you were injured

4   while working for Swift in approximately May of 1999; is

5   that right?

6      A.   Yes.

7      Q.   And did a doctor order any work restrictions for

8   you after that injury?

9      A.   Yes.

10     Q.   And what were those restrictions?

11     A.   The restrictions he gave me was that I was not

12  to lift over 5 pounds.

13     Q.   Were those restrictions ever lifted between the

14  time of your injury and when you left Swift in October of

15  2001?

16     A.   No.

17     Q.   Were you a member of a union the entire time you

18  were working for Swift?

19     A.   Yes.

20     Q.   Were you born in Mexico?

21     A.   Yes.

22     Q.   And when did you move to the United States?

23     A.   I recall it being in '78.

24     Q.   And when you applied to work for Swift in 1987,

25  were you a U.S. citizen at that time?

**Page 9**

1    A.    I didn't apply in '78.  In '78 was the first
2  time I came to the United States.
3    Q.    I'm sorry.  I meant in 1987.
4    A.    In '87, I already had documents.
5    Q.    Were you a U.S. citizen at that time?
6    A.    I was a resident.
7    Q.    So you were legally authorized to work when you
8  applied for -- when you applied at Swift in 1987?
9    A.    Yes.
10    Q.    Did you ever become a U.S. citizen since then?
11    A.    No, I have not.
12    Q.    And you're still a resident alien, then?
13    A.    Yes.
14    Q.    Did you review any paper to prepare for your
15  deposition today?
16    A.    No.
17    Q.    And did you meet with anyone other than Ms. Cano
18  to prepare for today?
19    A.    No.
20    Q.    Besides Ms. Cano, are there any other attorneys
21  representing you and the proposed class in this case?
22    A.    Just her co-workers, I believe.
23    Q.    And who can you recall among those attorneys?
24  Any names you can provide me with?
25    A.    I don't recall them by name.

**Page 10**

1        (Deposition Exhibit No. 7 marked for
2        identification.)
3    Q.    You've been handed what's been marked as
4  Deposition Exhibit 7.  And I wanted to ask on the second
5  page whether your signature is there in the middle of the
6  page.
7    A.    Yes.
8    Q.    And the date that appears above your signature
9  is January 9, 2007.  Is that the date on which you signed
10  Exhibit 7?
11    A.    Yes.
12    Q.    Do you recall where you were when you signed
13  Exhibit 7?
14    A.    No.
15    Q.    Do you think you might have been at home?
16    A.    I believe it was with the attorneys.
17    Q.    But you don't remember who you might have been
18  meeting with?
19    A.    No.
20    Q.    Next to your signature on the second page of
21  Exhibit 7, there's the name of a law firm, the Heygood Orr
22  firm.  Do you see that?
23    A.    Yes.
24    Q.    And how did you hear about the Heygood firm?
25    A.    I'm sorry.  I'm not sure I understood your

**Page 11**

1  question.
2    Q.    How did you find out about the Heygood law firm?
3    A.    I still don't understand your question.
4    Q.    I'm trying to find out how you came to have
5  them, the Heygood law firm, be your attorneys in this
6  case.
7    A.    It was through Blanca, Blanca Valenzuela.
8    Q.    Before you signed Exhibit 7, do you remember
9  talking with anyone from the Heygood law firm?
10    A.    Yes.
11    Q.    Do you know when that took place?
12    A.    I believe the date's on it.
13    Q.    Okay.  So you think it was around January 9,
14  2007 that you talked with someone from the Heygood law
15  firm about this case?
16    A.    Yes.
17    Q.    Do you remember talking with anyone from the
18  Heygood law firm before that time about this case?
19    A.    No.  No, I don't recall that.
20    Q.    Before you signed Exhibit 7, did you contact any
21  other attorneys about representing you and the proposed
22  class in this case?
23    A.    No.
24    Q.    Did you ever check any references for any of the
25  attorneys at the Heygood law firm?

**Page 12**

1    A.    No.
2    Q.    And do you know what type of work the attorneys
3  at the Heygood law firm do?
4    A.    No.
5    Q.    Do you know whether the attorneys at the Heygood
6  law firm have any experience with class actions?
7    A.    I believe that they do have experience.  That's
8  the reason why they're doing this.
9    Q.    And can you tell me anything more specific about
10  that, what your understanding is about their experience
11  with class actions.
12    A.    No.
13    Q.    Are you aware of any of the costs associated
14  with this class action?
15    A.    No.
16    Q.    Do you understand if you have any responsibility
17  for paying any of the costs associated with this class
18  action?
19        MS. CANO:  Objection, form.
20    A.    No.
21    Q.    Do you know whether your attorneys in this case
22  have hired any expert witnesses?
23    A.    No.
24    Q.    Do you know how much your attorneys have paid to
25  any expert witnesses in this case?

## Page 13

1        MS. CANO:  Objection, form.
2     A.   I don't know.
3     Q.   And do you know how much it might cost to
4   provide notice of this case to class members?
5     A.   No.
6     Q.   What do you know about the claims you are
7   asserting in this case on behalf of yourself and the
8   class?
9     A.   I don't understand that.
10    Q.   What are you claiming that Swift has done wrong
11  in this case?
12    A.   The reason was that they let us go.
13    Q.   You're referring to the employees who were
14  terminated by Swift because of injuries?
15    A.   Yes.
16    Q.   Anything else that you think Swift has done
17  wrong that you're seeking relief for in this case?
18    A.   No.
19    Q.   Do you know whether a class certification motion
20  has been filed in this case?
21    A.   No.
22    Q.   Do you understand that you've been proposed to
23  be a class representative in this case?
24    A.   Yes.
25    Q.   And what do you understand your responsibilities

## Page 14

1   are, if any, to other members of the class?
2     A.   I didn't understand that.
3     Q.   Do you have any obligations to other members of
4   the class as their representative?
5     A.   No.
6     Q.   And do you know what people are being proposed
7   to be included in this class?
8     A.   No.
9     Q.   Let me show you what was marked as Exhibit 2,
10  which was the Original Complaint filed on December 15,
11  2006.  Have you ever seen Exhibit 2 before?
12    A.   Yes.
13    Q.   Do you remember when you first saw it?
14    A.   No, I don't recall.
15    Q.   Do you think it would have been around the time
16  it was filed in December of 2006?
17    A.   Yes.
18    Q.   Was Exhibit 2 ever translated into Spanish for
19  you?
20    A.   It is in Spanish.  No.  I'm sorry.  No, I don't
21  recall it being in Spanish.
22    Q.   And on the first page of Exhibit 2, there is a
23  defendant identified as Hicks, Muse, Tate & Furst.  Do you
24  know who that company is?
25    A.   Which one are you referring to?

## Page 15

1     Q.   Hicks, Muse, Tate & Furst.
2     A.   No.
3     Q.   You don't know who that is?
4     A.   No.
5     Q.   And do you know whether the claims against Hicks
6   Muse have been dismissed in this case?
7     A.   No.
8     Q.   Let me hand you what's been marked as Exhibit 3,
9   which is the First Amended Complaint filed on December 28,
10  2006.  Have you seen Exhibit 3 before?
11    A.   Yes.
12    Q.   And when do you think you first saw it?
13    A.   I'm not sure.
14    Q.   Again, do you think it would been around the
15  time it was filed at the end of December 2006?
16    A.   It could be.
17    Q.   Was Exhibit 3 ever translated into Spanish for
18  you?
19    A.   I don't believe so.
20    Q.   Do you know what changes were made between the
21  First Amended Complaint, which is Exhibit 3, from the
22  Original Complaint, which was Exhibit 2?
23    A.   No.
24    Q.   And on Exhibit 3, there's a defendant called HM
25  Capital Partners of Dallas, LLC.  Do you see that?

## Page 16

1     A.   Yes.
2     Q.   Do you know who HM Capital Partners is?
3     A.   No.
4     Q.   And do you know whether or not HM Capital
5   Partners has been dismissed as a defendant?
6     A.   No.
7     Q.   Let me hand you what's been marked as Exhibit 4,
8   which is Plaintiffs' Second Amended Complaint filed on
9   March 14, 2008.  Have you ever seen Exhibit 4 before?
10    A.   I probably have.
11    Q.   And again, do you remember when you saw it for
12  the first time?
13    A.   It could have been on this same time that it's
14  dated or a little after.
15    Q.   And was Exhibit 4 ever translated into Spanish
16  for you?
17    A.   No.
18    Q.   Do you know what changes were made from the
19  First Amended Complaint, which is Exhibit 3, to this
20  Second Amended Complaint, which is Exhibit 4?
21    A.   No.
22    Q.   When you were working for Swift from 1987 until
23  October of 2001, did you know if Swift hired anyone at the
24  Cactus plant who was not legally authorized to work in the
25  United States?

**Page 17**

1    MS. CANO:  Objection, form.
2    A.    No.
3    Q.    And do you have any information at all about
4  Swift's hiring practices at its plants other than in
5  Cactus, Texas?
6    A.    No.
7    Q.    When you worked at Swift from 1987 until October
8  of 2001, did any immigration raids by government
9  authorities take place at the Cactus plant?
10    MS. CANO:  Objection, form.
11    A.    No.
12    Q.    And when you were working for Swift, were you
13  aware of any immigration raids planned by government
14  authorities at the Cactus plant that never took place?
15    A.    No.
16    Q.    When you worked for Swift from 1987 until
17  October of 2001, did you know if Swift assisted any
18  workers at the Cactus plant in obtaining false documents
19  relating to their identity or immigration status?
20    A.    No.
21    Q.    And when you were working for Swift, did you
22  know if the company provided any illegal immigrants
23  working at the Cactus plant with advice on how to avoid
24  detection by government authorities?
25    MS. CANO:  Objection, form.

**Page 18**

1    A.    No.
2    Q.    And when you were working for Swift, did you
3  know if the company provided illegal immigrants with
4  advice on how to be hired or rehired at the Cactus plant?
5    A.    No.
6    Q.    While you were working at Swift from 1987 to
7  October of 2001, did you believe that your hourly pay was
8  lower because Swift had hired illegal immigrants at the
9  Cactus plant?
10    A.    No.
11    Q.    And while you were working for Swift, did you
12  hear anyone else working at the plant in Cactus say that
13  they thought their hourly pay was lower because Swift had
14  hired illegal immigrants?
15    A.    No.
16    Q.    And while you were working at Swift, did you
17  believe your hourly pay was lower because the company had
18  provided false documents to illegal immigrants?
19    A.    No.
20    Q.    Did you believe your hourly pay was lower while
21  you worked for Swift because the company had helped
22  illegal immigrants avoid detection by government
23  authorities?
24    A.    I wasn't aware of any of that during the time I
25  was working there.  I didn't know if they were hiring

**Page 19**

1  illegal aliens or not.
2    Q.    After you left Swift in October of 2001, did you
3  obtain any information indicating that Swift had hired
4  illegal immigrants at the Cactus plant?
5    A.    Yes.
6    Q.    And what was that information?
7    A.    A friend of mine told me about it.
8    Q.    And who was that?
9    A.    Lloyd Howard or -- I'm sorry.  I just can't
10  pronounce his last name.
11    Q.    Can you spell it for us?
12    A.    No.
13    Q.    And what did this person tell you?
14    A.    He told me that two or three truckloads of
15  illegals had arrived there once we were let go.  And he's
16  a supervisor there at -- or a foreman there at the
17  warehouse at the plant.
18    Q.    Okay.  So this person was a Swift employee?
19    A.    Yes.
20    Q.    And when did he tell you this information?
21    A.    I'm not sure exactly when it was.
22    Q.    Would it have been shortly after you left Swift
23  in October of 2001?
24    A.    Yes.  Yes, it was after.
25    Q.    Was it within a few months, if you can recall,

**Page 20**

1  of when you left Swift?
2    A.    I'm not sure.
3    Q.    Would it have been more than a year after you
4  left Swift?
5    MS. CANO:  Objection, form.
6    A.    No.
7    Q.    And where were you when this person gave you
8  this information?
9    A.    We were at a friend's house.
10    Q.    So you were not at the Cactus plant?
11    A.    No.
12    Q.    Did you ever return to the Cactus plant after
13  you left in October of 2001?
14    A.    No.
15    Q.    Tell me a little bit more about these two or
16  three truckloads.  Were they people from a particular
17  location, such as Guatemala, or somewhere else?
18    MS. CANO:  Objection, form.
19    A.    No.
20    Q.    And was it your understanding from this
21  conversation that the two or three truckloads of people
22  were not legally authorized to work in the United States?
23    A.    Yes.
24    Q.    And were those people, was it your
25  understanding, hired by Swift to work at the Cactus plant?

## Page 21

1    A.    I believe so.

2    Q.    And other than this conversation we've been

3 talking about, after you stopped working at Swift, did you

4 hear any other information about Swift hiring illegal

5 immigrants at the Cactus plant?

6    A.    No.

7    Q.    Going back to when you were still working at

8 Swift prior to October of 2001, did you hear any other

9 people working at Swift say that they thought their hourly

10 pay was lower because Swift had provided false documents

11 to illegal immigrants?

12    A.    No.

13    Q.    And did you hear any other workers at Swift say

14 that they thought their hourly pay was lower because Swift

15 had helped illegal immigrants detect -- avoid detection by

16 government authorities?

17            MS. CANO:   Objection, form.

18    A.    No.

19            MS. CANO:   Did you say a time period for

20 that one?

21            MR. EBERLE:   On that one, I'm still talking

22 about when he was working at Swift.

23            MS. CANO:   Okay.

24    A.    I didn't.

25    Q.    Let's talk now again about the period after you

## Page 22

1 left Swift in October of 2001.

2    A.    Okay.

3    Q.    Did you hear any information about Swift

4 providing false documents to illegal immigrants?

5    A.    No.

6    Q.    And after you left Swift, did you hear any

7 information about the company helping illegal immigrants

8 avoid detection by government authorities?

9    A.    No.

10    Q.    And have you ever heard any information about

11 Swift providing false documents to illegal immigrants at

12 any plants other than in Cactus?

13    A.    No.

14            MR. EBERLE:   Why don't we go ahead and take

15 a break.  I think we're just about done.

16            (Recess from 9:51 a.m. to 9:57 a.m.)

17    Q.    (BY MR. EBERLE)  After you left work at Swift in

18 October of 2001, did you obtain any information that led

19 you to believe that your hourly pay had been lowered while

20 you were working at Swift because the company had hired

21 illegal immigrants?

22    A.    No.

23    Q.    And after you left working at Swift, did you

24 obtain any information leading you to believe that your

25 hourly pay had been lower while you worked at Swift

## Page 23

1 because the company had provided false documents to

2 illegal immigrants?

3    A.    What I believe is that when I was laid off and

4 they hired these other people that were illegal, I believe

5 that we were laid off because they were paying them less

6 money to be able to save money.

7    Q.    And what information do you have that these

8 other workers who you believed were unauthorized were paid

9 less by Swift than you were?

10    A.    I don't have any information.  This is just what

11 I believe.

12    Q.    Did anyone tell you that these workers who you

13 believe were unauthorized were, in fact, being paid less

14 than you had been for the same job?

15    A.    Less?

16    Q.    Yes.

17    A.    Less than they were paying me?

18    Q.    Yes.

19    A.    No, I don't know.

20            MR. EBERLE:   I'll pass the witness.

21            MS. CANO:   We'll reserve our questions.

22            (End of Proceedings.)

23

24

25

## Page 24

1            CHANGES AND SIGNATURE

2 PAGE LINE  CHANGE            REASON

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9    I, CANDELARIO G. ORTEGA, have read the foregoing

10 deposition and hereby affix my signature that same is true

11 and correct, except as noted above.

12

13            _____

                 CANDELARIO G. ORTEGA

14 STATE OF _____)

15 COUNTY OF _____)

16    Before me, _____, on this day

personally appeared CANDELARIO G. ORTEGA, known to me or

17 proved to me on the oath of _____ or through

            _____ (description of identity card

18 or other document) to be the person whose name is

subscribed to the foregoing instrument and acknowledged to

19 me that he/she executed the same for the purpose and

consideration therein expressed.

20

    Given under my hand and seal of office on this

21

_____ day of _____, 2008.

22

23            _____

            NOTARY PUBLIC IN AND FOR

24            THE STATE OF _____

25 My Commission Expires: _____

```
 1                CHANGES AND SIGNATURE
 2     PAGE LINE  CHANGE                        REASON
 3     8    16    Add "I was terminated on 5-1-03" clarify
 4     17   2     Add "But, I was terminated on 5-1-03"
 5     17   20       "         "              "        "
 6     18   10       "         "              "        "
 7     19   2        "         "              "        "
 8     22   19       "         "              "        "
 9          I, CANDELARIO G. ORTEGA, have read the foregoing
10     deposition and hereby affix my signature that same is true
11     and correct, except as noted above.
12
13                         Candelario Ortega
                           CANDELARIO G. ORTEGA
14     STATE OF     TEXAS    )
15     COUNTY OF    MOORE        )
16          Before me,  Claudia M. Cano,  on this day
       personally appeared CANDELARIO G. ORTEGA, known to me or
17     proved to me on the oath of _____ or through
       _____ (description of identity card
18     or other document) to be the person whose name is
       subscribed to the foregoing instrument and acknowledged to
19     me that he/she executed the same for the purpose and
       consideration therein expressed.
20
21          Given under my hand and seal of office on this
       6th day of    August        , 2008.
22
           ┌─────────────────────────────┐
23         │  CLAUDIA M. CANO            │   Claudia M. Cano
           │  Notary Public, State of Texas │
           │  My Commission Expires       │
           │  November 16, 2011          │   NOTARY PUBLIC IN AND FOR
24         └─────────────────────────────┘   THE STATE OF   TEXAS
25     My Commission Expires:  11-16-11
```

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3  BLANCA VALENZUELA, MARGIE )
    SALAZAR, JOSE E. SERRATO, )
 4  JOSIE RENDON, CLARA TOVAR,)
    CONSUELO ESPINO, MARIA    )
 5  AVILA, ERNESTINA          )
    NAVARRETTE, MARIA E.      )
 6  MUNOZ, AMANDA SALCIDO,    )
    CANDELARIO G. ORTEGA,     )
 7  MARIA ORTIZ, JOSE OLIVA,  )
    RAFAELA CHAVEZ, ELODIA    )
 8  ARROYO, SUSANA CARDIEL,   )
    GRACIE RIOS, AND LEONEL   )
 9  RUIZ, Individually and on )
    behalf of all others      )
10  similarly situated,       )
                              )    CIVIL ACTION NO.
11        Plaintiffs,         )    3:06-cv-02322-N
                              )
12  vs.                       )    ECF
                              )
13  SWIFT BEEF COMPANY, INC.  )
    D/B/A SWIFT COMPANY,      )
14  SWIFT & COMPANY, HICKS,   )
    MUSE, TATE & FURST, INC., )
15  HM CAPITAL PARTNERS OF    )
    DALLAS, LLC, and JOHN     )
16  DOES I-V,                 )
                              )
17        Defendants.         )
18
19
20             ORAL DEPOSITION OF
21                RAFAELA CHAVEZ
22                JULY 11, 2008
23
24
25
```

## Page 2

```
 1      ORAL DEPOSITION OF RAFAELA CHAVEZ, produced as a
 2  witness at the instance of the Defendants and duly sworn,
 3  was taken in the above-styled and numbered cause on the
 4  11th day of July, 2008, from 8:39 a.m. to 9:21 a.m.,
 5  before Angie Weaver, Certified Shorthand Reporter in and
 6  for the State of Texas, reported by computerized stenotype
 7  machine at the offices of Mullin, Hoard & Brown, L.L.P.,
 8  500 S. Taylor, Suite 800, in the City of Amarillo, County
 9  of Potter, State of Texas, pursuant to the Federal Rules
10  of Civil Procedure and the provisions stated on the record
11  or attached hereto.
```

## Page 3

```
 1                     APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4      Ms. Claudia M. Cano
        HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
 5      2331 W. Northwest Highway, 2nd Floor
        Dallas, Texas 75220
 6      Telephone:  (214) 526-7900
        E-mail: cano@reyeslaw.com
 7
 8  FOR THE DEFENDANTS:
 9      Mr. Brian G. Eberle
        SHERMAN & HOWARD, L.L.C.
10      633 Seventeenth Street, Suite 3000
        Denver, Colorado 80202-3622
11      Telephone:  (303) 297-2900
        E-mail: beberle@shermanhoward.com
12
13  ALSO PRESENT:
14      Mr. Candelario G. Ortega
        Ms. Linda Foster, Interpreter
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                       INDEX
 2                                                   PAGE
 3  Stipulations --------------------------------    2
 4  Appearances ---------------------------------    3
 5  Exhibit Index -------------------------------    4
 6  Objections ----------------------------------    4
 7  WITNESS:
 8  RAFAELA CHAVEZ
 9      Examination by MR. EBERLE                     6
10  Signature and Changes -----------------------   26
11  Reporter's Certificate ----------------------   27
12
13                     EXHIBITS
14  EXHIBIT        DESCRIPTION               PAGE
15  6          Attorney Employment Contract    12
16
17                    OBJECTIONS
18                                          PAGE   LINE
19  By Ms. Cano                              10     10
       By Ms. Cano                           12      4
20  By Ms. Cano                              13     11
       By Ms. Cano                           14     22
21  By Ms. Cano                              15      4
       By Ms. Cano                           15     19
22  By Ms. Cano                              16     11
       By Ms. Cano                           17     20
23  By Ms. Cano                              17     24
       By Ms. Cano                           18      6
24  By Ms. Cano                              18     11
       By Ms. Cano                           18     17
25  By Ms. Cano                              19      6
```

Page 5

| | PAGE | LINE |
|---|---|---|
| 1 | | |
| 2 By Ms. Cano | 19 | 10 |
| By Ms. Cano | 21 | 14 |
| 3 By Ms. Cano | 21 | 23 |
| By Ms. Cano | 22 | 3 |
| 4 By Ms. Cano | 23 | 6 |
| By Ms. Cano | 23 | 18 |
| 5 By Ms. Cano | 24 | 8 |

Page 7

1   interpret them for you --
2           THE INTERPRETER:  Hold on.  Hold on.
3           (Discussion off the record.)
4       Q.   (BY MR. EBERLE)  Let me go back.  As you know,
5   we have an interpreter here today.  And I'm going to ask
6   questions in English --
7           THE INTERPRETER:  I'm sorry.
8           (Discussion off the record.)
9       Q.   (BY MR. EBERLE)  As you know, we have an
10  interpreter here today.  I'm going to ask questions in
11  English.  Ms. Foster will interpret them for you into
12  Spanish.  You will answer the questions in Spanish, and
13  then Ms. Foster will interpret them into English so the
14  court reporter can write them down.  Is that okay?
15      A.   Yes.
16      Q.   And I want to review a few procedures for you
17  for the deposition.  Only one of us may speak at a time,
18  so we may need to pause from time to time to allow
19  Ms. Foster to finish interpreting.  Is that okay?
20      A.   Okay.  That's fine.
21      Q.   And even if you think you understand a question
22  in English, Ms. Foster will interpret all questions into
23  Spanish, and you should always answer in Spanish.  Okay?
24      A.   That's fine.
25      Q.   All of your answers must be verbal in order for

Page 6

1           (Ms. Linda Foster sworn as interpreter.)
2                   RAFAELA CHAVEZ,
3   having been first duly sworn, testified through the duly
4   sworn interpreter as follows:
5                   EXAMINATION
6   BY MR. EBERLE:
7       Q.   Good morning.
8       A.   Good morning.
9       Q.   Can you please state your full name.
10      A.   Rafaela Chavez.
11      Q.   And my name is Brian Eberle.  I introduced
12  myself before.  And I am one of the attorneys for the
13  Swift defendants in this case, and I'll be asking you some
14  questions this morning, if that's okay.
15      A.   Okay.  That's fine.
16      Q.   Do you speak any English?
17      A.   A little.
18      Q.   And are you able to read any English?
19      A.   A little.
20      Q.   Is it your preference to have documents in
21  English translated for you so that you can read them in
22  Spanish?
23      A.   In Spanish.
24      Q.   As you know, we have an interpreter here today.
25  I'm going to ask questions in English.  Ms. Foster will

Page 8

1   them to be reported by the court reporter, so it will be
2   important for you to answer yes or no or in other words
3   rather than head gestures or something like that.
4       A.   That's fine.
5       Q.   And whenever I ask a question, I will assume
6   that you understand it unless you tell me otherwise.  So
7   if for any reason you don't understand a question, will
8   you let me know.
9       A.   That's fine.
10      Q.   Do you understand that you've been sworn under
11  oath?
12      A.   Yes.
13      Q.   And even though this is an informal setting
14  today, do you understand it's just the same as if you were
15  giving testimony in a court of law?
16      A.   Yes, sir.
17      Q.   And we can take a break any time you want, so
18  just let me know.
19      A.   That's fine.
20      Q.   When did you start working for Swift at its
21  Cactus plant?
22      A.   September 29, 1978.
23      Q.   And when we talk about the Cactus plant today,
24  do you understand that we're talking about Swift's beef
25  processing plant that's in the area around Cactus and

Page 9

1  Dumas, Texas?
2      A.   Yes, sir.
3      Q.   And you had your deposition taken in the last
4  year or two in another case involving Swift, correct?
5      A.   Yes, sir.
6      Q.   And I understand from that deposition that the
7  last day you received wages from Swift was July 10, 2003;
8  is that right?
9      A.   July of 2003.
10     Q.   And did you ever return to work at Swift after
11 that time?
12     A.   No, sir.
13     Q.   And I also understand that you were injured
14 while working for Swift.  When did that occur?
15     A.   Yes.  I don't know the exact dates, but I was
16 injured.
17     Q.   Would that have been sometime around maybe 1992?
18     A.   Well, it's just that I had three injuries, and I
19 just don't recall the exact years.
20     Q.   Did a doctor order any work restrictions for you
21 after any of those injuries?
22     A.   Yes.
23     Q.   And what were those restrictions?
24     A.   On the first one, it was that I couldn't lift
25 more than 10 pounds.  On the second one -- or, rather, I

Page 10

1  should say the third one, I couldn't pull, I couldn't
2  push, and I couldn't do any lifting over 10 pounds.
3      Q.   Were those work restrictions ever lifted between
4  the time you were injured and when you left Swift in July
5  of 2003?
6      A.   I never lifted them because the doctor told me
7  these were permanent restrictions.
8      Q.   And were you moved to a cleaning job as a result
9  of those injuries?
10         MS. CANO:  Objection, form.
11     A.   The cleaning job -- I signed for the cleaning
12 job.
13     Q.   And do you know approximately when that took
14 place, that change in jobs?
15     A.   This was in the '90s, but I'm not really sure
16 when.
17     Q.   It was before, say, 2000?
18     A.   Yes.  Yes, sir.
19     Q.   And did you continue in that cleaning job until
20 the time you left Swift in July of 2003?
21     A.   Until that day.
22     Q.   Were you a member of a union the entire time you
23 were working for Swift?
24     A.   The entire time.
25     Q.   And were you born in Mexico?

Page 11

1      A.   Yes, sir.
2      Q.   And when did you move to the United States?
3      A.   We obtained our legal documents in August of
4  '56.
5      Q.   And when you say legal documents, what does that
6  mean?
7      A.   Our residence passport.  And I became a citizen
8  later on.
9      Q.   Do you remember approximately when you became a
10 citizen?
11     A.   I don't recall the year, but it was before 2000.
12     Q.   Were you a United States citizen when you
13 started working for Swift?
14     A.   No.  I was just a resident.
15     Q.   And you had -- you were legally authorized to
16 work in the United States when you started at Swift?
17     A.   Yes.  Yes.
18     Q.   Did you review any documents to prepare for
19 today?
20     A.   No, I haven't read anything.
21     Q.   And did you meet with anyone, other than
22 Ms. Cano, to prepare for today?
23     A.   No.  No, I haven't prepared anything.
24     Q.   Besides Ms. Cano, are there any other attorneys
25 representing you and the proposed class in this case?

Page 12

1      A.   I believe I just have these attorneys.  I've not
2  seen anyone.  It's just them.
3      Q.   You mean just Ms. Cano, who's here today?
4          MS. CANO:  Objection, form.
5      A.   She's here today.  But I've seen other attorneys
6  before that are also with her.
7      Q.   And who are those attorneys?  Can you tell me
8  their names.
9      A.   It was Domingo Garcia, and I'm sorry, I don't
10 recall the names of the other ones.
11         (Deposition Exhibit No. 6 marked for
12          identification.)
13     Q.   You've been handed what's been marked as
14 Exhibit 6.  And is that your handwriting?  Yes.
15     A.   Yes, sir.  This one here, this signature.
16     Q.   And that signature at the top is your
17 handwriting?
18     A.   Yes, sir.
19     Q.   And we're talking about -- that was on the first
20 page of Exhibit 6.  And if you could turn to the second
21 page, please.  Does your signature appear there as well?
22     A.   Yes.
23     Q.   And the date that's above your signature is
24 January 9, 2007.  Is that the date on which you signed
25 Exhibit 6?

Page 13

1    A.   Yes.
2    Q.   Do you remember where you were when you signed
3  Exhibit 6?
4    A.   I don't.  I don't recall it because we had
5  interviews and -- I just don't recall.
6    Q.   When you say interviews, do you mean you were at
7  your attorneys' office?
8    A.   Yes.
9    Q.   So you think you might have been at your
10 attorneys' office when you signed Exhibit 6?
11        MS. CANO:  Objection, form.
12   A.   I believe so.
13   Q.   If you look on the second page of Exhibit 6,
14 there's a law firm name, the Heygood Orr law firm.  Do you
15 see that?
16   A.   Yes.
17   Q.   How did you hear about the Heygood law firm?
18   A.   Do you mean to ask me how I got in contact with
19 these attorneys?
20   Q.   Correct.
21        MS. CANO:  Without giving any
22 conversations.
23   A.   Okay.  I became aware of these attorneys -- is
24 that what you wanted --
25   Q.   Yes.

Page 14

1    A.   -- because of the people that were already
2  inside of it, that I was told that once I was -- that I
3  was told once I was laid off that I could go into -- I
4  could go in with these attorneys.
5    Q.   And who told you that?
6    A.   The people -- some of the people that were
7  already being interviewed that were already setting this
8  cause.
9    Q.   So it was other people who are named as
10 plaintiffs in this case?
11   A.   Yes, the same ones.  We're all together.
12   Q.   And can you identify any specific person who got
13 you in touch with the Heygood law firm?
14   A.   Well, the head of us all, who is Blanca
15 Valenzuela.
16   Q.   Before you signed Exhibit 6 on January 9 of
17 2007, did you talk with anyone from the Heygood law firm
18 yourself?  And don't tell me the substance, just whether
19 you did or not.
20   A.   Relating what or --
21   Q.   Anything.
22        MS. CANO:  Objection, form.
23   A.   I believe that when I signed the documents, I
24 have to have -- I have to have spoken to someone who gave
25 me this document, but I don't recall who it was.

Page 15

1    Q.   And do you recall any other conversations --
2  again, don't tell me the substance -- other than about the
3  document itself, which is Exhibit 6?
4        MS. CANO:  Objection, form.
5    A.   No.
6    Q.   Before you signed Exhibit 6, did you contact any
7  other attorneys about representing you and the proposed
8  class in this case?
9    A.   No.
10   Q.   Have you ever checked any references for any of
11 the attorneys at the Heygood law firm?
12   A.   No.
13   Q.   Do you know what types of legal work the
14 attorneys at the Heygood law firm do?
15   A.   I don't understand the question.  What do you --
16   Q.   I just wanted to get an idea of whether you know
17 what types of law they practice at the Heygood law firm,
18 what type of legal work do they do, if you know.
19        MS. CANO:  Objection, form.
20   A.   I just believe they're attorneys.  That's what I
21 believe.
22   Q.   From the time you signed Exhibit 6 in January of
23 2007 through yesterday, did you have any communications
24 with any attorneys from the Heygood law firm?
25   A.   Well, they have to be --

Page 16

1        MS. CANO:  Don't talk about -- (discussion
2  in Spanish)
3    A.   They have to be communicating with us about
4  being here and things like this.
5        THE INTERPRETER:  And Ms. Cano said, I
6  don't want you to say anything about the conversations we
7  had.  Listen to the question very carefully.
8    Q.   And what I'd like you to tell me is simply how
9  many times you think you had communications with attorneys
10 from the Heygood law firm since you signed Exhibit 6.
11        MS. CANO:  Objection, form.
12   A.   I don't -- I don't recall how many times.
13   Q.   Are you aware of any of the costs associated
14 with this class action?
15   A.   I have no idea.
16   Q.   Do you understand whether you are responsible
17 for paying any of the costs associated with this class
18 action?
19   A.   No.
20   Q.   So you don't understand one way or the other?
21   A.   No, I don't -- I don't know.
22   Q.   Do you know whether your attorneys in this case
23 have hired any expert witnesses?
24   A.   No, I don't know anything.
25   Q.   And do you know how much those attorneys may

**Page 17**

1  have paid to expert witnesses in this case?
2      A.    No.
3      Q.    Do you know how much it might cost to provide
4  notice in this case to class members?
5      A.    No, I don't know that either.
6      Q.    what do you know about the claims you are
7  asserting in this case on behalf of yourself and the
8  class?
9      A.    what do I know about -- regarding what?
10      Q.    what you're saying -- or what you're claiming on
11  behalf of you and the class that Swift did wrong.
12      A.    I just believe that they let us go to hire other
13  people.
14      Q.    Anything else?
15      A.    I know that's what it's for.
16      Q.    Do you know whether a class certification motion
17  has been filed?
18      A.    Classification?  What do you mean?
19      Q.    Yes.
20          MS. CANO:  Objection, form.
21      Q.    Do you know whether there's been a motion filed
22  with the Court asking that a class of people be certified
23  in this case?
24          MS. CANO:  Objection, form.
25      A.    Certified?

**Page 18**

1      Q.    Do you understand what the word certification
2  means?
3      A.    No.  No.
4      Q.    Do you know what people are being proposed as
5  being members of a class in this case?
6          MS. CANO:  Objection, form.
7      A.    No.
8      Q.    Do you know whether you have any
9  responsibilities as a class representative to other
10  members of the class in this case?
11          MS. CANO:  Objection, form.
12      A.    what kind of responsibilities are you talking
13  about?
14      Q.    well, I'm just wondering whether you believe
15  that you would have any responsibilities at all to other
16  members of the class.
17          MS. CANO:  Objection, form.
18      A.    I don't know.
19      Q.    Do you understand that you have been proposed to
20  be a class representative in this case?
21      A.    Yes.
22      Q.    And what do you understand that to be?
23      A.    I believe that that's the reason why I'm here
24  today, that's the reason why I was brought here today,
25  because I'm one of the members.

**Page 19**

1      Q.    You understand that you have your own individual
2  claims; is that right?
3      A.    Yes.
4      Q.    And do you understand that you're also
5  representing claims by other people in this case?
6          MS. CANO:  Objection, form.
7      A.    Yes.
8      Q.    And what do you understand to be the claims
9  being asserted by the other members of the class?
10          MS. CANO:  Objection, form.  Just for the
11  record, I want to make sure that we still have the same
12  agreement as yesterday, that objection to form preserves
13  all objections to form except as to privilege and
14  responsiveness of the answer.
15          MR. EBERLE:  That's fine.
16          MS. CANO:  Thank you.
17          MR. EBERLE:  Did we get an answer or do we
18  need to go back?
19          THE INTERPRETER:  Did we have an answer?
20          MS. CANO:  No, you didn't get an answer.
21          THE REPORTER:  No.
22          MR. EBERLE:  Can you read the question.
23          (The record was read as requested.)
24      A.    I believe the same ones I am.
25      Q.    Let me hand you what's been marked before as

**Page 20**

1  Exhibit 2, and this is the Original Complaint filed on
2  December 15, 2006.  Have you ever seen this document
3  before?
4      A.    The one from 2006?
5      Q.    Yes.
6      A.    No.
7      Q.    You'll see on the first page of Exhibit 2,
8  there's a defendant called Hicks, Muse, Tate & Furst.  Do
9  you know what that company is?
10      A.    No.
11      Q.    Do you know whether Hicks Muse has been
12  dismissed as a defendant in this case?
13      A.    No, I don't know anything.
14      Q.    Let me hand you what's been marked as Exhibit 3,
15  and this is the First Amended Complaint filed on
16  December 28, 2006.  Have you ever seen Exhibit 3 before?
17      A.    No.
18      Q.    And this complaint -- or amended complaint has a
19  defendant named HM Capital Partners of Dallas, LLC.  Do
20  you see that?
21      A.    Yes.
22      Q.    Do you know who HM Capital Partners is?
23      A.    No.
24      Q.    And do you know whether HM Capital Partners has
25  been dismissed as a defendant in this case?

## Page 21

1      A.   I don't know.

2      Q.   And let me hand you what's been marked as

3  Deposition Exhibit 4.  This is the Second Amended

4  Complaint filed on March 14, 2008.  Have you seen

5  Exhibit 4 before?

6      A.   No.

7      Q.   When you were working for Swift from 1978 until

8  July of 2003, did you know if Swift hired anyone at the

9  Cactus plant who was not legally authorized to work in the

10 United States?

11     A.   That's what was heard.  I don't know.

12     Q.   Okay.  So you heard -- can I call them rumors --

13 about that?

14          MS. CANO:  Objection, form.

15     A.   These were rumors.

16     Q.   But you don't have any specific information

17 about Swift hiring any unauthorized workers at its Cactus

18 plant?

19     A.   I don't have any specifics.

20     Q.   Do you know anything about Swift's hiring

21 practices at any of its plants other than in Cactus,

22 Texas?

23          MS. CANO:  Objection, form.

24     A.   No.  No, I don't know.

25     Q.   When you were working for Swift from 1978 to

## Page 22

1  2003, did any immigration raids by government authorities

2  take place at the Cactus plant?

3          MS. CANO:  Objection, form.

4      A.   After I left in -- after I left in 2003, I did

5  become aware of the raid that there was.

6      Q.   But before you left working at Swift, were you

7  aware of any immigration raids?

8      A.   No.  No, there hadn't been.

9      Q.   And while you were working at Swift, did you

10 become aware of any immigration raids by government

11 authorities that had been planned but did not take place?

12     A.   No, I was never aware of it.

13     Q.   When you were working at Swift from 1978 to

14 2003, did you know if Swift assisted any workers at the

15 Cactus plant in obtaining false documents relating to

16 their identity or immigration status?

17     A.   No, I don't know.

18     Q.   And while you were working at Swift, did you

19 know if Swift provided illegal immigrants working at the

20 Cactus plant with advice on how to avoid detection by

21 government authorities?

22     A.   No.  No, not that either.

23     Q.   When you were working for Swift, did you know if

24 the company provided illegal immigrants with advice on how

25 to be hired or rehired at the Cactus plant?

## Page 23

1      A.   No.

2      Q.   While you were working at Swift from 1978 to

3  2003, did you believe your hourly pay was lower because

4  Swift had hired illegal immigrants at the Cactus plant?

5      A.   Mine was never reduced.

6          MS. CANO:  Objection, nonresponsive.

7          THE INTERPRETER:  Let me change that to

8  lowered.

9      Q.   While you were working for Swift, did you hear

10 anyone else working at the Cactus plant say that they

11 thought their hourly pay was lower because Swift had hired

12 illegal immigrants?

13     A.   No, I didn't hear that said.

14     Q.   While you were working for Swift, did you

15 believe that your hourly pay was lower because Swift had

16 provided false documents to illegal immigrants or helped

17 them avoid detection by government authorities?

18          MS. CANO:  Objection, form.

19     A.   Are you asking me if my pay was lowered?

20     Q.   Yes.

21     A.   Mine was never lowered.

22     Q.   And then while you were working at Swift, did

23 you hear anyone else say that they thought their pay had

24 been lowered because Swift had provided false documents to

25 illegal immigrants?

## Page 24

1      A.   Never.  I never heard that.

2      Q.   After you left Swift in July of 2003, did you

3  hear anything about Swift hiring illegal immigrants at the

4  Cactus plant?

5      A.   That's what was heard.  That's what is still

6  heard.

7      Q.   Okay.  Again, is that just rumors?

8          MS. CANO:  Objection, form.

9      A.   They're rumors.

10     Q.   And who, if anyone, can you recall talking about

11 that subject?

12     A.   Just -- it just comes up in conversations people

13 have.  I have no --

14     Q.   You can't identify a specific person who you've

15 talked to about that subject?

16     A.   These are just rumors that are heard in

17 conversations, not with me, just rumors, just

18 conversations.

19     Q.   And after you left Swift in July of 2003, did

20 you hear anything about Swift providing false documents to

21 illegal immigrants?

22     A.   I haven't heard it.

23     Q.   And did you hear anything about Swift helping

24 illegal immigrants avoid detection by government

25 authorities after you left the company?

## Page 25

```
 1      A.   I haven't heard it.  I barely have any
 2 communication with the people.
 3      Q.   Since you left Swift in July of 2003, have you
 4 returned to the plant at all?
 5      A.   Oh, what did I go back for?  No, it was just
 6 after I was -- I would like go -- I did go back for my
 7 last check.  That's it.
 8      Q.   And have you ever heard any information about
 9 Swift hiring illegal immigrants at plants other than in
10 Cactus?
11      A.   That's what's heard, these rumors, but no.
12      Q.   And have you ever heard any information that
13 Swift has provided false documents to illegal immigrants
14 at plants other than Cactus?
15      A.   No.  No, I don't know.
16           MR. EBERLE:  Why don't we take a break.
17           (Recess from 9:14 a.m. to 9:20 a.m.)
18           MR. EBERLE:  I'll pass the witness.
19           THE WITNESS:  That was it?  Okay.
20           MS. CANO:  Then I'll reserve my questions.
21           (End of Proceedings.)
22
23
24
25
```

## Page 26

```
 1                CHANGES AND SIGNATURE
 2 PAGE LINE  CHANGE                    REASON
 3 _____
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____
 9      I, RAFAELA CHAVEZ, have read the foregoing deposition
10 and hereby affix my signature that same is true and
11 correct, except as noted above.
12
13               _____
14                   RAFAELA CHAVEZ
14 STATE OF  _____)
15 COUNTY OF _____)
16      Before me, _____, on this day
   personally appeared RAFAELA CHAVEZ, known to me or proved
17 to me on the oath of _____ or through
   _____ (description of identity card
18 or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged to
19 me that he/she executed the same for the purpose and
   consideration therein expressed.
20
      Given under my hand and seal of office on this
21 _____ day of _____, 2008.
22
23               _____
                 NOTARY PUBLIC IN AND FOR
24               THE STATE OF _____
25 My Commission Expires: _____
```

## Page 27

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2               DALLAS DIVISION
 3 BLANCA VALENZUELA, MARGIE )
   SALAZAR, JOSE E. SERRATO, )
 4 JOSIE RENDON, CLARA TOVAR,)
   CONSUELO ESPINO, MARIA    )
 5 AVILA, ERNESTINA          )
   NAVARRETTE, MARIA E.      )
 6 MUNOZ, AMANDA SALCIDO,    )
   CANDELARIO G. ORTEGA,     )
 7 MARIA ORTIZ, JOSE OLIVA,  )
   RAFAELA CHAVEZ, ELODIA    )
 8 ARROYO, SUSANA CARDIEL,   )
   GRACIE RIOS, AND LEONEL   )
 9 RUIZ, Individually and on )
   behalf of all others      )
10 similarly situated,       )
                             )  CIVIL ACTION NO.
11      Plaintiffs,          )  3:06-cv-02322-N
                             )
12 vs.                       )        ECF
                             )
13 SWIFT BEEF COMPANY, INC.  )
   D/B/A SWIFT COMPANY,      )
14 SWIFT & COMPANY, HICKS,   )
   MUSE, TATE & FURST, INC., )
15 HM CAPITAL PARTNERS OF    )
   DALLAS, LLC, and JOHN     )
16 DOES I-V,                 )
                             )
17      Defendants.          )
18          REPORTER'S CERTIFICATION
19      ORAL DEPOSITION OF RAFAELA CHAVEZ
20               JULY 11, 2008
21      I, ANGIE WEAVER, Certified Shorthand Reporter in and
22 for the State of Texas, hereby certify to the following:
23      That the witness, RAFAELA CHAVEZ, was duly sworn by
24 the officer and that the transcript of the oral deposition
25 is a true record of the testimony given by the witness and
```

## Page 28

```
 1 any exhibits marked as evidence.
 2      That the deposition transcript was submitted on
 3 _____, 2008 to the witness or to the attorney
 4 for the witness for examination, signature, and return to
 5 me by _____, 2008.
 6      That the amount of time used by each party at the
 7 deposition is as follows:
 8      MR. BRIAN G. EBERLE - (00:35)
 9      That pursuant to information given to the deposition
10 officer at the time said testimony was taken, the
11 following includes all parties of record:
12      Ms. Claudia M. Cano, Attorney for Plaintiffs
13      Mr. Brian G. Eberle, Attorney for Defendants
14      I further certify that I am neither counsel for,
15 related to, nor employed by any of the parties in the
16 action in which this proceeding was taken, and further
17 that I am not financially or otherwise interested in the
18 outcome of this action.
19      Certified to by me on this _____ day of
20 _____, 2008.
21
22
                 _____
23               ANGIE WEAVER, CSR
                 Texas CSR #4450 (Exp. 12/31/08)
                 Firm No. 23
24               AMARILLO COURT REPORTING, INC.
                 P. O. Box 19628
25               Amarillo, Texas 79114
                 (806) 374-4091
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BLANCA VALENZUELA, MARGIE )
SALAZAR, JOSE E. SERRATO, )
JOSIE RENDON, CLARA TOVAR, )
CONSUELO ESPINO, MARIA )
AVILA, ERNESTINA )
NAVARRETTE, MARIA E. )
MUNOZ, AMANDA SALCIDO, )
CANDELARIO G. ORTEGA, )
MARIA ORTIZ, JOSE OLIVA, )
RAFAELA CHAVEZ, ELODIA )
ARROYO, SUSANA CARDIEL, )
GRACIE RIOS, AND LEONEL )
RUIZ, Individually and on )
behalf of all others )
similarly situated, )
                         )   CIVIL ACTION NO.
          Plaintiffs,    )   3:06-cv-02322-N
                         )
vs.                      )        ECF
                         )
SWIFT BEEF COMPANY, INC. )
D/B/A SWIFT COMPANY, )
SWIFT & COMPANY, HICKS, )
MUSE, TATE & FURST, INC., )
HM CAPITAL PARTNERS OF )
DALLAS, LLC, and JOHN )
DOES I-V, )
                         )
          Defendants.    )

-------------------------------
ORAL DEPOSITION OF
ERNESTINA NAVARRETE
AUGUST 7, 2008
-------------------------------

**S35**

**2**

ORAL DEPOSITION OF ERNESTINA NAVARRETE, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on the 7th day of August, 2008, from 1:05 p.m. to 2:10 p.m., before Angie Weaver, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Mullin, Hoard & Brown, L.L.P., 500 S. Taylor, Suite 800, in the City of Amarillo, County of Potter, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**4**

### INDEX

|  | PAGE |
|---|---|
| Stipulations | 2 |
| Appearances | 3 |
| Exhibit Index | 4 |
| Objections | 4 |

WITNESS:
ERNESTINA NAVARRETE
    Examination by MR EBERLE — 5
Signature and Changes — 27
Reporter's Certificate — 28

### EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Attorney Employment Contract | 9 |
| 15 | Leave of Absence; 05-15-02 letter from U.S. Department of Justice, Immigration and Naturalization Service | 17 |

### OBJECTIONS

|  | PAGE | LINE |
|---|---|---|
| By Ms. Cano | 16 | 25 |
| By Ms. Cano | 22 | 14 |

**3**

### APPEARANCES

FOR THE PLAINTIFFS:
  Ms. Claudia M. Cano
  HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
  2331 W. Northwest Highway, 2nd Floor
  Dallas, Texas 75220
  Telephone: (214) 526-7900
  E-mail: cano@reyeslaw.com

FOR THE DEFENDANTS:
  Mr. Brian G. Eberle
  SHERMAN & HOWARD, L.L.C.
  633 Seventeenth Street, Suite 3000
  Denver, Colorado 80202-3622
  Telephone: (303) 297-2900
  E-mail: beberle@shermanhoward.com

ALSO PRESENT:
  Mr. Johnnie Benningfield, Interpreter
  Ms. Rafaela Chavez

**5**

(Mr. Johnnie Benningfield sworn as interpreter.)

ERNESTINA NAVARRETE, having been first duly sworn, testified through the duly sworn interpreter as follows:

EXAMINATION

BY MR. EBERLE:

Q.  Can you please state your full name.

A.  Ernestina Navarrete.

Q.  And can you please spell your last name.

A.  N-A-V-A-R-R-E-T-E.

Q.  And I introduced myself earlier. My name is Brian Eberle, and I am one of the attorneys for the Swift defendants. Do you speak any English?

A.  A little bit, but I prefer Spanish better.

Q.  So it's your preference that we have the interpreter present here today?

A.  Yes.

Q.  Are you able to read in English?

A.  No.

Q.  As you know, we have Mr. Benningfield here today as the interpreter, and I'm going to ask you questions in English. He will interpret them for you into Spanish. Do you understand?

A.  Yes.

**6**

1  Q.  And then you will answer in Spanish and he will
2  interpret those answers back into English for the court
3  reporter to take down.
4  A.  Okay.
5  Q.  Did you have your deposition taken previously in
6  the -- in another case against Swift?
7  A.  Yes.
8  Q.  Okay.  We will follow the same procedures as
9  that deposition, then.  Is that okay?
10  A.  Yes.
11  Q.  All of your answers must be verbal in order for
12  them to be recorded by the court reporter, so it will be
13  important for you to answer yes, no or with words.
14  A.  Okay.
15  Q.  And whenever I ask a question, I will assume
16  that you understand it unless you tell me otherwise.  If
17  for any reason you don't understand a question I'm asking,
18  will you let me know.
19  A.  Yes.
20  Q.  Do you understand that you have been sworn under
21  oath today?
22  A.  Yes.
23  Q.  Even though this is an informal setting, do you
24  understand that it's just the same as if you were
25  testifying in a court of law?

**7**

1  A.  Can you explain that to me one more time.
2  Q.  Yes.  Even though we're not in a court today, do
3  you understand that it's just as if you were giving
4  testimony before a judge?
5  A.  Yes.
6  Q.  When did you first start working for Swift at
7  its Cactus plant?
8  A.  In 2000.  In August of 2000.
9  Q.  When we talk about the Cactus plant today, do
10  you understand that it is Swift's beef processing plant in
11  the area around Cactus and Dumas, Texas?
12  A.  Yes.
13  Q.  And I understand that the last day you received
14  wages from Swift was March 10, 2003.  Is that right?
15  A.  Yes.
16  Q.  Did you ever return to work at Swift after
17  March 10, 2003?
18  A.  No.
19  Q.  Have you ever worked for Swift anywhere other
20  than the Cactus, Texas, plant?
21  A.  No.
22  Q.  I understand that you were injured while working
23  for Swift in approximately December 2001.  Is that right?
24  A.  Yes.
25  Q.  Did a doctor order any work restrictions for you

**8**

1  after that injury?
2  A.  Yes.  I was imposed with the restriction of not
3  lifting heavy things.
4  Q.  Were those restrictions lifted at any time after
5  your injury and before you stopped working for Swift?
6  A.  No.
7  Q.  When you applied to work for Swift in 2000, were
8  you a United States citizen?
9  A.  I was a resident.
10  Q.  Did you have a work visa of some type?
11  A.  Yes, my work permit.  And I currently have my
12  residency.
13  Q.  Were you born in Mexico?
14  A.  Yes.
15  Q.  When did you move to the United States?
16  A.  In '94.
17  Q.  Did you review any documents or papers to
18  prepare for your deposition today?
19  A.  No.
20  Q.  Did you meet with anyone other than Ms. Cano to
21  prepare for your deposition today?
22  A.  No, just with her.
23  Q.  And besides Ms. Cano, are there any other
24  attorneys representing you in this case?
25  A.  Just she and the other one.  What's his name?

**9**

1  MS. CANO:  Just whatever you recall.
2  Q.  So you don't remember the other attorney's name?
3  A.  No.  Right now we're just with her.
4  (Deposition Exhibit No. 14 marked for
5  identification.)
6  Q.  Let me hand you what's been marked as Deposition
7  Exhibit 14.  Does your handwriting appear at the top of
8  Exhibit 14 on the first page?
9  A.  Yes.
10  Q.  And on the second page of Exhibit 14, does your
11  handwriting also appear in the middle of the page?
12  A.  Yes, right here.
13  Q.  And when did you sign Exhibit 14?
14  A.  Here it says January the 9th of 2007.
15  Q.  Do you recall where you were when you signed
16  Exhibit 14?
17  A.  I believe I signed it there in Dumas.
18  Q.  Do you remember if you were with anyone else at
19  the time?
20  A.  This was given to us by the attorneys.
21  Q.  And were you meeting with an attorney at the
22  time you signed Exhibit 14?
23  A.  We were them with Reyes, all of us together.
24  Q.  And who are the all of us referred to?
25  A.  Those of us that are in this case.

**S37**

**10**

1  Q. Just to the right of your name on the second
2  page of Exhibit 14, do you see that there is a typewritten
3  entry for a law firm named Heygood Orr?
4  A. Here is the name. And then it says, by Angel
5  Reyes, and then there's a signature.
6  Q. How did you hear about the Heygood law firm
7  before you signed Exhibit 14?
8  A. They were recommended by Domingo Garcia.
9  Q. Was he your attorney in the other lawsuit
10 against Swift?
11 A. Yes.
12 Q. Before the meeting you described on January 9,
13 2007, do you remember talking to any attorneys at the
14 Heygood law firm?
15 A. I don't recall.
16 Q. Before you signed Exhibit 14, did you contact
17 any other attorneys about representing you and the class
18 in this case?
19 A. Just them.
20 Q. Do you know what experience the attorneys at the
21 Heygood law firm have in class actions?
22 A. I don't understand your question.
23 Q. Yes. Do you know whether the attorneys at the
24 Heygood law firm have other experience in class actions
25 like this one?

**11**

1  A. Well, they helped us in the other case.
2  Q. And that -- you're referring to the case that
3  was separately brought against Swift?
4  A. Well, in the other case, they and Domingo helped
5  us.
6  Q. And you're referring to your other lawsuit
7  against Swift?
8  A. The one in which we were -- our work was
9  terminated on us while we were working there.
10 Q. Before you signed Exhibit 14, did you check any
11 references for any of the attorneys at the Heygood law
12 firm?
13 A. What are you asking me? Did someone refer me to
14 them?
15 Q. No. I'm asking whether you tried to find out
16 from other people information about the Heygood law firm.
17 A. Oh, no.
18 Q. Do you know what types of legal work the
19 attorneys at the Heygood firm do?
20 A. Well, they helped us already in the other case.
21 They helped us in the other case. How can I explain this
22 to you?
23 Q. Other than that case, are you aware of other
24 types of legal work that the Heygood law firm has done?
25 A. No.

**12**

1  Q. Are you aware of any of the costs or expenses
2  for this class action?
3  A. No. Well, there will be no charge if nothing is
4  gained.
5  Q. Let me clarify my question. Separate from
6  monies paid to the attorneys, are there any expenses that
7  you understand might have to be paid for this class
8  action?
9  A. Can you explain that to me one more time.
10 That's kind of difficult for me.
11 Q. Yes. Obviously your attorneys would like to be
12 paid something for working on this case. Separate from
13 those attorneys' fees, are you aware of any costs or
14 expenses that might be incurred in this class action?
15 A. Oh, how can I answer that?
16     MS. CANO: If you understand or if you
17 know. If you don't know, then you can --
18 A. I can't give you an explanation.
19 Q. Do you know if you're responsible for paying any
20 of the costs or expenses in this case?
21 A. No.
22 Q. Do you know whether your attorneys have hired
23 any expert witnesses in this case?
24 A. What is that?
25 Q. Do you know how much it might cost to provide

**13**

1  notice to class members in this case?
2  A. No.
3  Q. Going back to my prior question, do you
4  understand what an expert witness is?
5  A. A witness?
6  Q. Yes, an expert witness.
7  A. Well, there are like detectives, right? Aren't
8  there?
9  Q. Maybe I should just back up and reask whether
10 you're aware of any expert witnesses that have been hired
11 by your attorneys in this case.
12 A. Witnesses?
13     MS. CANO: Do you understand the question?
14 A. No.
15     MS. CANO: It's important that you say you
16 don't understand.
17 A. Okay.
18 Q. Let me just try one more, then. Do you
19 understand what types of expert witnesses might be used in
20 this type of case?
21 A. Are you asking about like private detectives?
22 Q. Whatever your understanding is, if any.
23 A. We have a detective.
24 Q. Okay. Who is that?
25     MS. CANO: I'm not sure if that's -- I'm

14

1   not going to allow her to answer that question.
2       MR. EBERLE: I think I can -- I don't think
3   it's privileged to know who the person is. I can
4   certainly -- if there's some issue about privilege, it
5   would apply to communications with that person.
6       MS. CANO: I'm not going to let her answer
7   any type of question about that.
8       Q. Separate from any private detectives, are you
9   aware of any other types of expert witnesses that might be
10  used in this case?
11      A. No.
12      Q. What do you understand are the claims that you
13  are asserting against Swift in this case?
14      A. Are you asking what benefits I have or what?
15      Q. No. I want to know what you think Swift did
16  wrong as the reason for bringing this lawsuit against
17  Swift.
18      A. They fired -- they terminated us.
19      Q. Anything more specific about what's wrong with
20  terminating your employment?
21      A. Well, they terminated us because our arms were
22  hurt. Our arms had been hurt there, and it was for that
23  reason that they terminated us.
24      Q. Are there any other things that you think Swift
25  has done wrong that you're trying to get relief for in

15

1   this case?
2       A. Yes, because we were fired without reason. We
3   were hurt there and then they threw us out.
4       Q. Anything else?
5       A. No.
6       Q. Do you know whether a motion for class
7   certification has been filed in this case?
8       A. I don't understand that question.
9       Q. Do you understand whether other people in
10  addition to the eighteen named plaintiffs are also seeking
11  to recover money from Swift in this case?
12      A. Are you asking if there are other people besides
13  us?
14      Q. Yes.
15      A. You mean people that they have fired?
16      Q. Yes.
17      A. Well, I don't know any people that they have
18  fired.
19      Q. Do you understand that you have been proposed as
20  a class representative in this case?
21      A. Well, we're here.
22      Q. I understand that you're a plaintiff in this
23  case, but my question is whether you understand that
24  you're also representing other people who are not named as
25  plaintiffs.

16

1       A. Well, that would be Blanca Valenzuela. We're
2   all in the group. We're all on -- we're all on the paper.
3   We're seventeen, we're eighteen, since we're all a group.
4       Q. In addition to that group, however, do you
5   understand that you are representing other current or
6   former Swift employees?
7       A. They were employees of Swift?
8       Q. Yes.
9       A. Yes. Well, they were employees just like I was.
10  They all were.
11      Q. Are you referring to the other sixteen or
12  seventeen plaintiffs?
13      A. Yes.
14      Q. Setting aside that group of seventeen or
15  eighteen people, do you understand that you're
16  representing more current and former employees of Swift?
17      A. That they have previously fired?
18      Q. Or that still work for the company.
19      A. Well, yes. We are a group.
20      Q. I understand that you have a group of seventeen
21  or eighteen plaintiffs, but I'll just ask one more time
22  whether you know or don't know if there are other current
23  or former employees of Swift that you also represent in
24  this case.
25      MS. CANO: Objection, form.

17

1       A. I don't know.
2           (Deposition Exhibit No. 15 marked for
3           identification.)
4       Q. Let me hand you what's been marked as Deposition
5   Exhibit 15. And if we look at the second page, is this a
6   notice that you received from the Immigration and
7   Naturalization Service on May 15, 2002?
8       A. Yes. This sheet?
9       Q. Yes. Was this something that you received, the
10  second page of Exhibit 15?
11      A. Yes.
12      Q. And this is addressed to Ernestina Aguilar?
13      A. Yes. That's my last name from when I was
14  single.
15      Q. What did you understand the second page of
16  Exhibit 15 to be?
17      A. I don't know.
18      Q. Did it require you to go to be interviewed by
19  the Immigration and Naturalization Service?
20      A. Okay. This was when my work permit was going to
21  run out, I think. Because I went in to work in 2000, and
22  the work permit is good for a year, so it was going to run
23  out at this time.
24      Q. So did you go to an interview with the
25  Immigration and Naturalization Service to renew your work

18

1  visa?
2      A.  Yes.  Yes, I also did the 2003.  I have my 2003
3  residency.
4      Q.  What documents did you bring with you to your
5  interview in 2002, if any?
6      A.  I took the work permit letter and this sheet, I
7  believe.  It was like this.
8      Q.  And is the first page of Exhibit 15 your request
9  to Swift to allow you a leave of absence to go to the
10  interview with INS?
11     A.  Yes.  They sent me a letter stating that my work
12  permit was going to run out and I needed to go to
13  immigration.  I have my residency here if you'd like to
14  see it.
15     Q.  I don't question that.  What I was wondering,
16  though, is whether Swift gave you permission to leave work
17  to go to this interview with the INS.
18     A.  Yes.
19     Q.  And you were permitted to return to work at
20  Swift's Cactus plant after your 2002 interview with INS?
21     A.  Yes.
22     Q.  And was it your understanding that the INS
23  determined that you were legally authorized to work in the
24  United States?
25     A.  Yes.

19

1      Q.  Let me hand you what's previously been marked as
2  Deposition Exhibit 2.  This was the Original Complaint in
3  this case filed on December 15, 2006.  Do you recall
4  having seen Exhibit 2 before today?
5      A.  Yes.  It was sent to us in the mail.
6      Q.  Was Exhibit 2 ever translated for you into
7  Spanish?
8      A.  Let me see.  Just this part here above or the
9  whole thing?
10     Q.  The whole thing.
11     A.  I don't remember.  But I do have it at home.  I
12  don't know if it's in English or if it's in Spanish.
13     Q.  You'll see on the first page of Exhibit 2,
14  there's a reference to a defendant, Hicks, Muse, Tate &
15  Furst.  Do you know who that company is?
16     A.  This one right here?
17     Q.  Yes.
18     A.  It's the company.  I just knew it under the name
19  as Swift & Company.
20     Q.  So you thought that Hicks Muse was the same as
21  Swift & Company?
22     A.  No.  I didn't know exactly the meaning of that.
23     Q.  You didn't know the meaning of Hicks Muse?
24     A.  No.
25     Q.  Do you know whether Hicks Muse has been

20

1  dismissed as a defendant in this case?
2      A.  I just know them as Swift & Company.  I didn't
3  know this.
4      Q.  You didn't know that Hicks Muse was a separate
5  defendant in the case?
6      A.  No, I did not know.
7      Q.  Let me hand you what's been marked as Deposition
8  Exhibit 3.
9      A.  Okay.  I have a question.  The phone number on
10  here is no longer the same number.  Is that okay?
11     Q.  Oh, that's fine.  Go back to Exhibit 3.  And
12  this is the First Amended Complaint in this case filed on
13  December 28, 2006.  Do you remember seeing Exhibit 3
14  before today?
15     A.  Well, we've got a lot of papers.  This is the
16  same as the other one, isn't it?
17     Q.  Well, that's one of my questions.  Do you know
18  if there are any differences between Exhibit 2 and
19  Exhibit 3?
20     A.  This one here is in Spanish?  No.
21     Q.  Let me back up and let me ask you that question
22  first.  Do you remember ever receiving Exhibit 3 in
23  Spanish?
24     A.  Yes.  It's that I've received so much that by
25  now, well, I don't know if I have them in English or in

21

1  Spanish.
2      Q.  Before today, have you tried to compare
3  Exhibits 2 and 3 to see how they are different, if at all?
4      A.  This is different.
5      Q.  What is this you're pointing to?
6      A.  This portion here below Swift Company, there's
7  more underneath it than there is on this other one, right?
8      Q.  But separate from trying to compare them right
9  now, have you tried to before today compare what's in
10  Exhibits 2 and 3?
11     A.  Well, they have the same names that we have here
12  below.
13         MS. CANO:  Listen carefully to the
14  question.
15     A.  All I want to know is, before today, not looking
16  at them now, but before today, did you ever try to compare
17  Exhibits 2 and 3 to see if they're different at all?
18     A.  I don't understand your question.
19         MS. CANO:  Maybe you want to ask her what
20  part -- is there some specific word or something --
21         MR. EBERLE:  No, I'm just --
22         MS. CANO:  -- that she doesn't understand.
23     Q.  What I'm trying to find out is whether before
24  today you tried to determine what was different, if at
25  all, between Exhibits 2 and 3.

22

1    MS. CANO:  Do you understand the question?
2    A.  No.
3    Q.  Let me ask you a different question.  You
4    pointed out that HM Capital Partners of Dallas appears on
5    Exhibit 3 but not on Exhibit 2, correct?
6    A.  Which one is it?  Oh, it doesn't show up over
7    here on this one, this one.
8    Q.  So it doesn't show up on Exhibit 2?
9    A.  This portion is the same.  Is that what you're
10   asking me, if this is the same?
11   Q.  All I'm asking is whether HM Capital Partners of
12   Dallas is listed as a defendant in Exhibit 2.  Is it
13   listed here?
14             MS. CANO:  Objection, form.
15   A.  On this document, it is not.  It is here.
16   Q.  So it's not on Exhibit 2, but it is on
17   Exhibit 3?
18   A.  Yes.
19   Q.  Do you know why HM Capital Partners of Dallas
20   was added as a defendant in Exhibit 3?
21   A.  No, I don't know.
22   Q.  Do you know whether HM Capital Partners has been
23   dismissed as a defendant in this case?
24   A.  Is HM Capital Partners one of the defendants
25   here?

23

1    Q.  That's my question to you.  Do you know whether
2    they are?
3    A.  I don't know.  I just know that it is those of
4    us that are here.
5    Q.  And by those of us, you're referring to the
6    plaintiffs?
7    A.  The ones of us that are in the group.
8    Q.  We talked earlier about your working for Swift
9    at the Cactus plant until March 10, 2003, correct?
10   A.  Yes.
11   Q.  While you were working for Swift, did you know
12   whether Swift was hiring any illegal immigrants to work at
13   the Cactus plant?
14   A.  It was spoken there that there were illegals
15   there.
16   Q.  And who was speaking that?
17   A.  The people there would talk about it.
18   Q.  Can you identify any specific person who was
19   talking about that?
20   A.  No, because it would be like while we were at
21   lunch, eating.
22   Q.  When you were working for Swift, did any
23   immigration raids by government authorities take place?
24   A.  No.
25   Q.  When you were working for Swift, did you hear

24

1    anything about Swift providing false documents to illegal
2    immigrants?
3    A.  No.
4    Q.  While you were working for Swift, did you hear
5    anything about Swift giving illegal immigrants advice on
6    how to avoid detection by government authorities?
7    A.  No.
8    Q.  Do you have any information about Swift hiring
9    illegal immigrants at any of its plants other than in
10   Cactus, Texas?
11   A.  No.
12   Q.  Do you know anything about Swift's employment
13   practices at any plants other than in Cactus?
14   A.  No.
15   Q.  While you were working for Swift, did you
16   believe that your hourly pay was lower because illegal
17   immigrants worked at the Cactus plant?
18   A.  No.
19   Q.  Did you hear anyone else working at Swift say
20   that they thought their hourly pay was lower because
21   illegal immigrants worked at the Cactus plant?
22   A.  No.
23   Q.  Have you ever returned to the Cactus plant since
24   you left working there on March 10, 2003?
25   A.  No.

25

1    Q.  Have you heard any information since you left
2    working at Swift about the company hiring illegal
3    immigrants?
4    A.  I do -- I do have a question.  I have a friend
5    of mine, she went there to request work.
6             THE INTERPRETER:  I'm sorry.  The
7    interpreter didn't understand.  May I ask for her to
8    repeat?
9             MR. EBERLE:  Sure.
10   A.  I have a work companion where I work right now,
11   she went to request work.  They did not give work to her,
12   and she has papers.  She said that there were other people
13   there and they did give work to other people, but they did
14   not give work to her.
15   Q.  Okay.  And is there a question that you have
16   about that?
17   A.  Well, is that what you were asking about?
18   Q.  Actually, what I was asking was whether you've
19   heard that Swift at the Cactus plant has given work to
20   people who are not legally authorized to work in the
21   United States.
22   A.  Well, that's the only evidence that I have.
23   Q.  Since you left working for Swift, have you heard
24   any information about the company providing false
25   documents to illegal immigrants?

26

```
1    A.   I haven't heard that.
2         MR. EBERLE:  Why don't we take a break.
3    (Recess from 2:05 p.m. to 2:10 p.m.)
4         MR. EBERLE:  I have no further questions,
5    so I'll pass the witness.
6         MS. CANO:  And we reserve our questions.
7    (End of Proceedings.)
```

28

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
BLANCA VALENZUELA, MARGIE )
SALAZAR, JOSE E. SERRATO, )
JOSIE RENDON, CLARA TOVAR,)
CONSUELO ESPINO, MARIA    )
AVILA, ERNESTINA          )
NAVARRETTE, MARIA E.      )
MUNOZ, AMANDA SALCIDO,    )
CANDELARIO G. ORTEGA,     )
MARIA ORTIZ, JOSE OLIVA,  )
RAFAELA CHAVEZ, ELODIA    )
ARROYO, SUSANA CARDIEL,   )
GRACIE RIOS, AND LEONEL   )
RUIZ, Individually and on )
behalf of all others      )
similarly situated,       )
                          )  CIVIL ACTION NO.
          Plaintiffs,     )  3:06-cv-02322-N
                          )
vs.                       )         ECF
                          )
SWIFT BEEF COMPANY, INC. )
D/B/A SWIFT COMPANY,     )
SWIFT & COMPANY, HICKS,  )
MUSE, TATE & FURST, INC., )
HM CAPITAL PARTNERS OF   )
DALLAS, LLC, and JOHN    )
DOES I-V,                 )
                          )
          Defendants.    )
```

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF ERNESTINA NAVARRETE
AUGUST 7, 2008

I, ANGIE WEAVER, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ERNESTINA NAVARRETE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the

27

CHANGES AND SIGNATURE
PAGE LINE  CHANGE          REASON

_____
_____
_____
_____
_____
_____
_____

I, ERNESTINA NAVARRETE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ERNESTINA NAVARRETE

STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared ERNESTINA NAVARRETE, known to me or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this

_____ day of _____, 2008.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
My Commission Expires: _____

29

witness and any exhibits marked as evidence.

That the deposition transcript was submitted on _____, 2008 to the witness or to the attorney for the witness for examination, signature, and return to me by _____, 2008.

That the amount of time used by each party at the deposition is as follows:

MR. BRIAN G. EBERLE - (01:00)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Ms. Claudia M. Cano, Attorney for Plaintiffs
Mr. Brian G. Eberle, Attorney for Defendants

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me on this _____ day of _____, 2008.

_____

ANGIE WEAVER, CSR
Texas CSR #4450 (Exp. 12/31/08)
Firm No. 23
AMARILLO COURT REPORTING, INC.
P. O. Box 19628
Amarillo, Texas 79114
(806) 374-4091

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BLANCA VALENZUELA, MARGIE )
SALAZAR, JOSE E. SERRATO, )
JOSIE RENDON, CLARA TOVAR, )
CONSUELO ESPINO, MARIA )
AVILA, ERNESTINA )
NAVARRETTE, MARIA E. )
MUNOZ, AMANDA SALCIDO, )
CANDELARIO G. ORTEGA, )
MARIA ORTIZ, JOSE OLIVA, )
RAFAELA CHAVEZ, ELODIA )
ARROYO, SUSANA CARDIEL, )
GRACIE RIOS, AND LEONEL )
RUIZ, Individually and on )
behalf of all others )
similarly situated, )
                             )   CIVIL ACTION NO.
         Plaintiffs,         )   3:06-cv-02322-N
                             )
vs.                          )        ECF
                             )
SWIFT BEEF COMPANY, INC. )
D/B/A SWIFT COMPANY, )
SWIFT & COMPANY, HICKS, )
MUSE, TATE & FURST, INC., )
HM CAPITAL PARTNERS OF )
DALLAS, LLC, and JOHN )
DOES I-V, )
                             )
         Defendants.         )

------------------------------
ORAL DEPOSITION OF
MARGIE SALAZAR
AUGUST 7, 2008
------------------------------

**S43**

**2**

ORAL DEPOSITION OF MARGIE SALAZAR, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on the 7th day of August, 2008, from 8:56 a.m. to 10:14 a.m., before Angie Weaver, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Mullin, Hoard & Brown, L.L.P., 500 S. Taylor, Suite 800, in the City of Amarillo, County of Potter, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**4**

INDEX

|  | PAGE |
|---|---|
| Stipulations | 2 |
| Appearances | 3 |
| Exhibit Index | 4 |
| Objections | 4 |

WITNESS:
MARGIE SALAZAR

| | PAGE |
|---|---|
| Examination by MR. EBERLE | 5 |
| Examination by MS. CANO | 38 |
| Further Examination by MR. EBERLE | 45 |
| Further Examination by MS. CANO | 50 |
| Signature and Changes | 52 |
| Reporter's Certificate | 53 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 12 | Plaintiff Margie Salazar's First Supplemental Objections and Responses to Defendants Swift Beef Company and Swift & Company's First Set of Requests for Admission, Interrogatories, and Requests for Production of Documents | 24 |
| 13 | Attorney Employment Contract | 10 |

OBJECTIONS

| | PAGE | LINE |
|---|---|---|
| By Ms. Cano | 12 | 23 |
| By Ms. Cano | 13 | 6 |
| By Ms. Cano | 21 | 4 |
| By Mr. Eberle | 51 | 21 |

**3**

APPEARANCES

FOR THE PLAINTIFFS:
Ms. Claudia M. Cano
HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
2331 W. Northwest Highway, 2nd Floor
Dallas, Texas 75220
Telephone: (214) 526-7900
E-mail: cano@reyeslaw.com

FOR THE DEFENDANTS:
Mr. Brian G. Eberle
SHERMAN & HOWARD, L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202-3622
Telephone: (303) 297-2900
E-mail: beberle@shermanhoward.com

**5**

(Deposition Exhibit No. 12 marked for identification.)

MARGIE SALAZAR, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. EBERLE:

Q.   Good morning.

A.   Good morning.

Q.   Can you please state your full name and spell your last name.

A.   Margie Salazar, S-A-L-A-Z-A-R.

Q.   And before your deposition, I spoke with Ms. Cano about having a Spanish interpreter for your deposition, and she said that that wouldn't be necessary. Are you okay with going forward without an interpreter today?

A.   Yes.

Q.   And I understand that you previously had your deposition taken in another lawsuit that you filed against Swift; is that right?

A.   Yes.

Q.   What I'd like to do is just go over some of the procedures, because we'll follow the same ones as you had in that other deposition. One thing that's important is that all of your answers will need to be in a verbal form,

6

1  either a yes or a no or some other response, so that the
2  reporter can take down what you actually say.  Is that
3  okay?
4      A.  Yes.
5      Q.  And whenever I ask a question, I'm going to
6  assume that you understand it, so if you don't for any
7  reason, just let me know and I can go ahead and reask it
8  or rephrase it.  Is that okay?
9      A.  Yes.
10     Q.  Do you understand that you're sworn under oath
11 today?
12     A.  Yes.
13     Q.  And even though this is an informal setting, do
14 you understand that it's just the same as if you're
15 testifying in a court of law?
16     A.  Yes.
17     Q.  And we can take a break any time we want.  Like
18 I said, this is an informal setting, so just let me know.
19         What I'd like to do first is show you
20 what's been parked previously as Exhibit 8, and these are
21 the discovery requests that were served by Swift in this
22 case.  And what I'd like to do is just go back to
23 Exhibit 1 to Deposition Exhibit 8, and this is the
24 Plaintiffs' First Amended Petition in the earlier lawsuit
25 that you filed against Swift; is that correct?

7

1      A.  Yes.
2      Q.  Okay.  And I see that you are named as one of
3  the plaintiffs in this case; is that right?
4      A.  Yes.
5      Q.  And if I can, let's go back to paragraph 14 on
6  what's been numbered page 1 -- I'm not sure why it says
7  page 1, but that's what it is here -- of Exhibit 1 to
8  Deposition Exhibit 8.  And I'd like to review the
9  information that is indicated there about your work for
10 Swift.
11         Now, is it correct that the last day that
12 you received wages from Swift was October 14, 2002?
13     A.  Yes.
14     Q.  Okay.  And after you left working at Swift's
15 Cactus plant, did you ever return to work there?
16     A.  After --
17     Q.  October 14, 2002.
18     A.  No, I haven't returned.
19     Q.  And do you understand when I'm referring to the
20 Cactus plant today that I'll be talking about the beef
21 processing plant that Swift operates in the Cactus and
22 Dumas area of Texas?
23     A.  Yes.
24     Q.  The information in Exhibit 1 to Deposition
25 Exhibit 8 indicates that you were first hired to work at

8

1  Swift's Cactus plant on June 29, 1989.  Does that sound
2  right?
3      A.  Yes.
4      Q.  And then it also indicates that you were injured
5  on the job on October 12, 2000; is that right?
6      A.  Yes.
7      Q.  Were there any restrictions that a doctor
8  ordered for you after that injury in October of 2000?
9      A.  It's already been a while and I really don't
10 remember.
11     Q.  Okay.  Did your job that you were doing at Swift
12 change after you were injured?
13     A.  Yes.
14     Q.  And what were you doing after the injury, what
15 kind of work?
16     A.  When I went back, it was just different things.
17 I don't really remember.  It's been so long, you know.
18     Q.  Do you remember whether there were any
19 restrictions on what weight you could lift after you were
20 injured?
21     A.  I don't remember.
22     Q.  When you applied to work for Swift, were you a
23 United States citizen?
24     A.  I am.
25     Q.  Were you born in the United States?

9

1      A.  Yes.
2      Q.  And after you started working for Swift in 1989,
3  did you join the union?
4      A.  Yes, I'm a member -- I was a member -- a union
5  member.
6      Q.  And did you stay a union member during the whole
7  time that you worked for Swift --
8      A.  Yes.
9      Q.  -- from 1989 to 2002?
10     A.  Yes.
11     Q.  Did you review any documents to prepare for your
12 deposition this morning?
13     A.  Just what I had said, just --
14         MS. CANO:  Don't talk about the things that
15 we discussed.  His question is whether you looked at any
16 documents.
17     A.  No.
18     Q.  And besides talking with Ms. Cano, your attorney
19 here today, did you talk with anyone else to prepare for
20 your deposition today?
21     A.  No.
22     Q.  Besides Ms. Cano, are there any other attorneys
23 that are representing you or the proposed class in this
24 case?
25     A.  Well, Mrs. Cano and the attorneys that are with

10

1  her.
2     Q.  Do you know -- can you tell me any of their
3  specific names, as best you can recall this morning.
4     A.  Angel, Angel Reyes.  I really don't know them
5  all.  I just know that there's quite a few of them that
6  are in -- I don't know.  I just know that there's a law
7  firm.
8           (Deposition Exhibit No. 13 marked for
9           identification.)
10     Q.  Let me hand you what's been marked as
11  Exhibit 13.  And if you could look at the second page.
12     A.  Okay.
13     Q.  Does your signature appear kind of in the middle
14  on the left side there?
15     A.  This is my signature.
16     Q.  That is your signature?
17     A.  Uh-huh.
18     Q.  You have to say yes or no.
19     A.  Yes.  I'm sorry.
20     Q.  And it appears that you signed Exhibit 13 on
21  January 8, 2007.  Does that appear to be correct?
22     A.  Yes.
23     Q.  And you'll see that just to the right of your
24  signature, there is the law firm name of the Heygood Orr
25  firm.  Do you see that?

11

1     A.  Yes.
2     Q.  And is that the law firm that you understand is
3  representing you in this case?
4     A.  Yes.
5     Q.  Do you remember where you were when you signed
6  Exhibit 13?  At home or at the lawyers' office or anything
7  like that?
8     A.  I don't recall.
9     Q.  How did you hear about the Heygood law firm, as
10  best you can recall?
11     A.  Well, the -- well, by Domingo Garcia.
12     Q.  And who is he is?
13     A.  He was the attorney for our last lawsuit.
14     Q.  That was the other lawsuit that we looked at
15  before?
16     A.  Yes.
17     Q.  And I should specify.  That was the other
18  lawsuit against Swift that we looked at before?
19     A.  Yes.
20     Q.  Before you signed Exhibit 13, do you remember
21  talking with any of the attorneys at the Heygood law firm?
22  Don't tell me what was said.  I just want to know if you
23  remember talking with anyone.
24     A.  I'm sure they introduced themselves.
25     Q.  But you don't remember any specifics?

12

1           MS. CANO:  You mean specific conversations,
2  or what do you mean?
3           MR. EBERLE:  Correct.
4           MS. CANO:  Not the conversations
5  themselves.  Whether or not you had conversations.
6     A.  Yes, we did, just introducing themselves and --
7     Q.  Before signing Exhibit 13, did you contact any
8  other attorneys about representing you and the proposed
9  class in this case?
10     A.  No.
11     Q.  Have you ever checked any references for any of
12  the attorneys at the Heygood law firm?
13     A.  No, I haven't.
14     Q.  And do you know what experience the attorneys at
15  the Heygood law firm have in class actions?
16     A.  No.
17     Q.  Do you know what types of legal work the
18  attorneys at the Heygood law firm do?
19     A.  No.
20     Q.  Are you aware of any of the costs of this class
21  action, costs or expenses that might be incurred in this
22  class action?
23           MS. CANO:  Objection, calls for
24  speculation.  Did you hear me?  Am I speaking --
25     A.  I'm sorry.  I didn't hear you.

13

1           MS. CANO:  That's all right.  You go ahead,
2  and if you can answer it, do so.
3     Q.  If you can answer -- my question is:  Are you
4  aware of any of the costs or expenses that might be
5  incurred in this class action?
6           MS. CANO:  Same objection.
7     A.  I'm sure there's costs, but I don't know.
8     Q.  Do you understand if you have any responsibility
9  for paying any of those costs?
10     A.  I'm sure there is, but only if it goes ahead
11  with it, if it's brought to -- if it goes ahead and we win
12  the -- or just -- if it goes ahead and -- if we get
13  anything out of it, I'm sure we're going to have to pay.
14     Q.  Do you know whether your attorneys have hired
15  any expert witnesses in this case?
16     A.  I don't know.
17     Q.  And do you know how much your attorneys might
18  have paid to any expert witnesses in this case?
19     A.  No.
20     Q.  Do you know what it might cost to provide notice
21  to members of the class of this class action?
22     A.  No.
23     Q.  Can you tell me what your general understanding
24  is of the claims that are being asserted in this case.
25     A.  I didn't understand you very good.

14

1    Q.  Okay.  What I was interested in is what -- what
2    claims are you making on behalf of yourself and the class
3    against Swift in this case?  What do you think they did
4    wrong, in other words?
5    A.  They're hiring illegals and we're getting paid
6    under -- under wage.  We were getting paid under wages.
7    Q.  So the wages that you were paid were lower
8    because Swift had hired -- or because illegal aliens were
9    working for Swift?
10   A.  Yes.
11   Q.  Anything else more specific than that, or is
12   that just the general allegations?
13   A.  That's just the general.
14   Q.  Do you know whether a class certification motion
15   has been filed in this case?
16   A.  You have to -- you have to -- you have to break
17   it down a little bit because --
18   Q.  Okay.
19   A.  -- I don't understand very good.
20   Q.  That's exactly what you should do when you don't
21   understand, just let me know.
22       Do you know whether a motion has been filed
23   with the Court asking that a class be certified?
24   A.  A motion -- like what do you mean?
25   Q.  A request to the judge to what's called certify

15

1    a class, do you know whether that's happened in this case?
2    A.  I just know that it's being -- I don't
3    understand.
4    Q.  Okay.
5    A.  You have to -- like motion, I don't know what
6    you mean by --
7    Q.  Okay.  Let me ask you a different question,
8    which is, do you know what people are included or proposed
9    to be included in the claims against Swift as members of
10   the class?
11   A.  Yes, me and -- me and the others right here, the
12   first, right here.
13   Q.  Okay.  And so you're pointing at the caption on
14   the first page of Exhibit 8, which lists the -- you and I
15   think there's seventeen other named plaintiffs.
16   A.  Uh-huh.
17   Q.  Do you believe there's anyone else who's
18   asserting claims against Swift in this case?
19   A.  Well, I believe that all of us that are --
20   worked at -- that worked at -- that works at Swift and
21   that worked at Swift that are legally -- have documents to
22   work legally.
23   Q.  And all those people are asserting claims
24   against Swift?  Is that your understanding?
25   A.  Well, I think that everybody should have the

16

1    same right like us.
2    Q.  Do you understand that you have been proposed to
3    be a representative of all the class members in this case?
4    A.  Yes.
5    Q.  And as a class representative, what do you
6    understand your responsibilities are, if any, to the other
7    class members?
8    A.  Fairness.  Fair about it.
9    Q.  And what do you mean by that?
10   A.  Like knowing what I know -- say what I know
11   and -- so it could all be brought up, you know.  That's
12   about it.
13   Q.  Anything else you can think of?
14   A.  Our rights, rights that we have as being a
15   U.S.A. citizen.
16   Q.  Okay.  What do you mean by that?
17   A.  Well, we have rights that -- we're legally here,
18   you know, and they employed illegals.  Well, they -- like
19   they let us go and kept illegals there in our place.
20   Q.  Let me show you what was previously marked as
21   Deposition Exhibit 2, and this is the Original Complaint
22   that was filed in this case on December 15, 2006.  And my
23   question is:  Do you remember having seen a copy of
24   Exhibit 2 before today?
25   A.  Yes.

17

1    Q.  Do you remember when you first saw a copy of
2    Exhibit 2?
3    A.  No, I don't remember.  It's already been a
4    while.
5    Q.  One of the defendants that's listed on the first
6    page of Exhibit 2 is Hicks, Muse, Tate & Furst.  Do you
7    see that?
8    A.  Yes.
9    Q.  Do you know what that company is?
10   A.  No.  No, I don't.
11   Q.  Do you know what claims were being asserted
12   against Hicks Muse in this case?
13   A.  No.
14   Q.  Do you know whether Hicks Muse has been
15   dismissed as a defendant?
16   A.  No.
17   Q.  Let me hand you what's been marked previously as
18   Deposition Exhibit 3, which is the First Amended Complaint
19   in this case that was filed on December 28, 2006.  And my
20   question again is whether you recall having seen Exhibit 3
21   before today.
22   A.  I don't remember.
23   Q.  Do you know -- before today, did you try to
24   determine what the differences are between Exhibit 3,
25   which is the First Amended Complaint, and Exhibit 2, which

18

1  is the Original Complaint?
2      A.  Nothing.  There's nothing --
3      Q.  Well, let me just back up.  My question
4  specifically is:  Before today, did you make any effort to
5  determine what the differences are between Exhibit 3 and
6  Exhibit 2?
7      A.  No.
8      Q.  And on the first page of Exhibit 3, there's a
9  defendant listed as HM Capital Partners of Dallas.  Do you
10  see that?
11      A.  Uh-huh.  Yes.
12      Q.  Do you know what company that is?
13      A.  No.
14      Q.  Do you know what claims were being asserted
15  against HM Capital Partners in this case?
16      A.  No.
17      Q.  Do you know whether HM Capital Partners has been
18  dismissed as a defendant?
19      A.  No, I don't know.
20      Q.  Let me hand you what's been previously marked as
21  Exhibit 4, which is Plaintiffs' Second Amended Complaint
22  that was filed on March 14, 2008.  And my question is
23  whether you recall having seen Exhibit 4 before today.
24      A.  No.
25      Q.  And before today, have you tried to determine

19

1  what changes were made, if any, between Exhibit 4, which
2  is the Plaintiffs' Second Amended Complaint, and
3  Exhibit 3, which is the First Amended Complaint?
4      A.  No.
5      Q.  Let me hand you what was previously marked as
6  Deposition Exhibit 11.  And this is an article entitled
7  Ground Meat that was published on April 5, 2007; is that
8  right?
9      A.  Yes.
10      Q.  And do you recall speaking with a reporter with
11  respect to some of the information that appears in
12  Exhibit 11?
13      A.  Yes.
14      Q.  And have you seen Exhibit 11 before?
15      A.  No.
16      Q.  You haven't seen the actual article itself?
17      A.  No.
18      Q.  Let me have you turn to page 9 of Exhibit 11, if
19  I could.
20      A.  Okay.
21      Q.  And the second paragraph from the bottom, let me
22  just read it.  It says, quote, Serrato, Salazar and others
23  also said that vans, even buses, full of Guatemalans
24  would arrive -- sometimes arrive at the plant, end of
25  quote.  Did I read that correctly?

20

1      A.  Yes.
2      Q.  And do you believe that the Salazar referred
3  there -- to there is you?
4      A.  Yes.
5      Q.  And can you explain to me what you know about
6  vans or buses full of Guatemalans that would arrive.  And
7  I assume -- first of all, let me ask you, was that at the
8  Cactus plant?
9      A.  Yes.
10      Q.  Can you give me a little more details about what
11  happened with respect to these vans or buses.
12      A.  Well, they would just come in with people from
13  down south, from El Paso.  They would come down with
14  people from -- they were Guatemalans.  Most of them were
15  Guatemalans.
16      Q.  Okay.  Let me -- why don't we back up for a
17  second to page 8 of Exhibit 11.  And near the top, the
18  second sentence, let me just read it.  It says, quote,
19  large numbers of Guatemalans had begun arriving at the
20  Cactus plant sometime in 2000, after a Swift plant in
21  Kansas burned down, and most of the new arrivals were
22  short and squat, with Mayan features and little mastery of
23  English or Spanish, end of quote.  Did I read that
24  correctly?
25      A.  Yes.

21

1      Q.  Were some of the vans or buses you're referring
2  to, were those coming from this Swift plant in Kansas that
3  had burned down?
4              MS. CANO:  Objection, calls for
5  speculation.
6      A.  I don't know.
7      Q.  Do you recall that sometime in 2000 that large
8  numbers of Guatemalans began arriving at the Swift plant
9  in Cactus?
10      A.  Yes.
11      Q.  And what can you tell me about that?
12      A.  Well, that we just had a lot of little ones --
13  we used to call them little ones -- working -- coming
14  down.  There were -- I mean, it was numbers of them coming
15  in.
16      Q.  And this was in the 2000 and 2001 time frame, as
17  best you recall?
18      A.  I don't really recall the -- I just know that
19  I -- yeah.  Yes.
20      Q.  And was it your -- well, first of all, did you
21  ever talk yourself with any of these Guatemalans that were
22  arriving at the Swift Cactus plant?
23      A.  Yes, I talked to them.
24      Q.  And what -- tell me what you recall about those
25  conversations.

22

1    A.  I recall asking them their age.  Some of them
2  replied they were thirteen, fourteen.  And I asked them
3  how did they get here, and they said in a van.  But they
4  were never -- they wouldn't speak so much because their
5  language was different from Spanish, you know.  It's
6  different.
7    Q.  It was a different dialect?
8    A.  Uh-huh.  And their names didn't -- I would call
9  them by the name they had on their -- on their hardhat,
10  because when we were hired there, you'd have a hardhat
11  and it would have your name on there so foremans and
12  employees would identify each other, not just call them by
13  hey; they would call them by their name.
14          And we would call them by the name that was
15  on their hardhat and they wouldn't even turn to look or
16  know that we were -- they didn't even have no clue we were
17  calling them until we would just pat them and tell them,
18  you know, he's calling you or the foreman's calling you or
19  pull your meat.
20    Q.  Did you have any conversations with any of these
21  Guatemalans about whether they were legally authorized to
22  work in the United States?
23    A.  They didn't want to talk about that.
24    Q.  So you didn't personally have any conversations
25  about that with them?

23

1    A.  Well, I -- just talking to them, telling them,
2  how did you get here, and they'd tell you they would get
3  in the van.  And then how were they hired, they said --
4  they would say, over there in the office.  We were hired
5  over there in the office.
6    Q.  Did any of these Guatemalans tell you that they
7  weren't legally authorized to work in the United States?
8    A.  Yes.
9    Q.  And how many told you that, as best you can
10  recall?
11    A.  I would say about fifteen -- twelve, fifteen.
12    Q.  And was this, again, in approximately the 2000
13  and 2001 time frame?
14    A.  Yes.
15    Q.  Did you have any conversations with your
16  co-workers at the Swift Cactus plant about the Guatemalans
17  not being authorized to work in the United States?
18    A.  Talk to my co-workers?
19    Q.  Yes.
20    A.  We would talk.  Everybody would talk.  All of us
21  would talk.  It was like -- it was the news of the plant.
22    Q.  Okay.  So would you say it was common knowledge
23  within the plant that these Guatemalans were not legally
24  authorized to work in the United States?
25    A.  I didn't understand what you told me.

24

1    Q.  Well --
2    A.  The word that you used, the big word.
3    Q.  I called it common knowledge.  So did
4  everybody -- did you believe that most people in the plant
5  knew that these Guatemalans were not legally authorized to
6  work in the United States?
7    A.  Yes.  We all knew.
8    Q.  Let me hand you what's been marked as Deposition
9  Exhibit 12.  And these are your discovery responses in
10  this case that you looked at before we started this
11  morning; is that right?
12          MS. CANO:  You can go ahead and look at it
13  again if you want.
14    Q.  Is that correct?
15    A.  Yes.
16    Q.  And if I could have you turn to page 7 of
17  Exhibit 12.
18    A.  Uh-huh.  Okay.
19    Q.  And your response there at about the middle of
20  the page says, quote, when the Kansas plant burned down,
21  Swift, slash, Cactus brought in a lot of Guatemalans to
22  work.  It was heard and said that they did not have legal
23  documents and that they were under age, end of quote.  Did
24  I read that correctly?
25    A.  Yes.

25

1    Q.  And is that what we were just talking about,
2  that these Guatemalans came in after the Kansas plant
3  burned down?
4    A.  Yes.  Some of them came down from the Cactus --
5  from the plant over there in Kansas.
6    Q.  Okay.  And then it sounds like they may have
7  been coming from other areas as well.
8    A.  Yes, uh-huh.
9    Q.  And what was your understanding as to where else
10  some of the Guatemalans were coming from?
11    A.  From El Paso, from down south, because they
12  would put up papers -- well, even the foremens would let
13  us know -- let us know that they were bringing people that
14  was -- that were wanting to work, that wouldn't complain
15  about their work, about being tired or about being --
16  working shorthanded.
17    Q.  Okay.  So explain to me a little bit more about
18  that.  I guess I didn't understand.  What was it -- these
19  were the foremen at the Swift plant in Kansas?
20    A.  The foremens.
21    Q.  I mean, there were more -- the foremen at the
22  Swift plant in Cactus, and what were they telling you?
23    A.  They would tell us -- a lot of us, you know --
24  we were just like -- even general foremen would tell us
25  that they were going to bring people that worked hard,

26

1  that they didn't complain about being tired or getting --
2  something hurting them, you know, their arms or --
3  working, you know -- of the work that they did, they
4  wouldn't complain of it.
5      Q.  And was it your understanding the foremen were
6  referring to these Guatemalan workers?
7      A.  Yes.
8      Q.  And again, was this in the time frame around
9  2000 and 2001?
10      A.  Yes.
11      Q.  And in your response here on page 7 of
12  Exhibit 12, you indicate that it was heard and said that
13  the Guatemalans did not have legal documents.  And I
14  wanted to get a better indication of who it was that heard
15  and said that.  Can you identify any specific employees at
16  Swift?
17      A.  That said that they didn't -- I didn't
18  understand you.  Could you repeat that again.
19      Q.  Yes.  What I'm trying to get is more specifics
20  about who it was that was saying that the Guatemalans who
21  arrived as new workers at the Swift Cactus plant were not
22  legally authorized to work in the United States or didn't
23  have so-called legal documents.
24      A.  Just by their name.  They didn't even know their
25  name.  They couldn't even sign their checks.

27

1      Q.  What I'm asking actually is what -- of your
2  other co-workers, can you identify anybody in particular
3  who was saying that they were not legally authorized to
4  work?
5          MS. CANO:  Do you understand the question?
6          THE WITNESS:  Yes, I do.
7          MS. CANO:  Okay.
8      Q.  Or was it just that everybody was saying it?
9      A.  It was just the talk of the plant, of all the
10  employees.  You know, it was --
11      Q.  And this was in that 2000 and 2001 time frame?
12      A.  Yes.
13      Q.  Let me have you go back to page 5 of Exhibit 12,
14  if I could.  And what I'd like to do is ask you about the
15  very last line on page 5.  It says, quote, overheard from
16  other employees that illegals were employed by Swift, end
17  of quote.  Did I read that correctly?
18      A.  Yes.
19      Q.  And what I'm interested in -- we've talked about
20  these Guatemalans.  Were there other employees of other
21  nationalities that you also had heard were not legally
22  authorized to work in the United States?
23      A.  Mexicans from Mexico.
24      Q.  And when did you hear about that?  Was that,
25  again, in the same 2000, 2001 time frame?

28

1      A.  Yes.
2      Q.  And who, again, was it, if you can recall
3  anybody specific, that was talking about the Mexicans who
4  were not legally authorized to work in the United States,
5  or was this, again, another thing that was -- everyone was
6  talking about?
7      A.  It was just -- it was just people talking,
8  employees talking.
9      Q.  In the preceding paragraph at the bottom of page
10  5 of Exhibit 12, you'd indicated that at one point, you
11  were working, giving out gloves and uniforms to employees;
12  is that correct?
13      A.  Yes.
14      Q.  Was that after you were injured in October of
15  2000, or were you doing that before that time as well?
16      A.  No, it was after.
17      Q.  So that was one of the jobs you had after the
18  injury in October of 2000?
19      A.  Yes.
20      Q.  If you'll go to the top of page 6 of Exhibit 12.
21  You identify the names of three foremen, Raul Cortez, Leo
22  Gutierrez and Joe Gutierrez.  Were those foremen that you
23  worked under?
24      A.  They were -- they were foremens from the floor,
25  yeah.

29

1      Q.  And you had described earlier certain foremen
2  talking about people that would be hired by Swift at the
3  Cactus plant that would be willing to do work even if it
4  was difficult and those sorts of things, correct?
5      A.  Yes.
6      Q.  Are these three of the foremen who were saying
7  those things?
8      A.  Yes, Raul Cortez, Leo Gutierrez.  It was even
9  Alex Garcia.  There's just too many foremens, I mean, that
10  would say that.
11      Q.  Okay.  So there were more than just those three?
12      A.  Yes.  There was plenty.  I mean, there was a lot
13  of them.
14      Q.  In the next paragraph, the second paragraph from
15  the top of page 6, you indicate that you knew when what
16  you've called the Swift bus was going to leave to go south
17  to get people to work at the plant; is that right?
18      A.  Yes.  We would find out because they would tell
19  us.  The foremens would talk about it and say, sooner or
20  later we're going to have people that run -- you know, run
21  the lines that will work without complaining about
22  nothing.
23      Q.  Okay.  And when you refer to going to the south,
24  was that the El Paso and other areas south of Cactus?
25      A.  Yes.  El Paso down to Brownsville, down there,

9

---

30

1  down south, south of Texas -- South Texas.
2      Q.  And I think I asked you this before, but this
3  information about the Swift bus going down to the south to
4  get workers, this was occurring in the 2000 and 2001 time
5  frame?
6      A.  Yes.  Yes.
7      Q.  If you'll go down to the fourth paragraph on
8  page 6 of Exhibit 12.  You have a reference there to after
9  your employment at Swift, you knew a person who said he
10  was from Guatemala and was an illegal working at the Swift
11  Cactus plant; is that right?
12     A.  Yes.
13     Q.  And I think we talked about that you left
14  working at Swift's Cactus plant in October of 2002.
15     A.  Yes.
16     Q.  And so this occurred sometime after that?
17     A.  Yes.
18     Q.  Can you remember approximately how long after
19  you left?
20     A.  It was before the raid.
21     Q.  So before December of 2006?
22     A.  Uh-huh.  It was about -- maybe about a year
23  before.
24     Q.  And where were you when you were talking to this
25  person from Guatemala?

---

31

1      A.  Where was I?
2      Q.  Yeah, as best you can recall.
3      A.  I -- just at the flea market.
4      Q.  One question I forgot to ask is whether you've
5  been back to the Swift plant in Cactus since you stopped
6  working there.
7      A.  No, I haven't.
8      Q.  And I think I may have already asked you this,
9  but you haven't worked at all for Swift since October 14
10  of 2002?
11     A.  No.
12     Q.  Did you ever work for Swift at any of its other
13  plants besides Cactus?
14     A.  No.
15     Q.  Do you have any information about whether Swift
16  employed illegal immigrants at any of the other Swift
17  plants?
18     A.  No, I don't know nothing about that.  I just
19  know the one about Cactus, that's it, because that's where
20  I live, in Dumas.  So I don't know nothing about anything
21  else.
22     Q.  If we go down a couple more paragraphs, in the
23  middle of page 6 of Exhibit 12, you indicate that you knew
24  a woman who has worked at Swift under many different names
25  and at different times.  My first question is:  Do you

---

32

1  believe that woman still works at Swift?
2      A.  Yes.
3      Q.  At the Cactus plant?
4      A.  Yes.
5      Q.  And when do you recall first hearing that this
6  woman was an illegal?
7      A.  I know -- I know her.
8      Q.  Okay.  In what time frame, though, did you first
9  meet this person, as best you can recall?
10     A.  About eight years.
11     Q.  So back to around 2000 or so?
12     A.  Yes.
13     Q.  And over the last eight years, is it your
14  understanding that she's used different names to work at
15  Swift?
16     A.  Yes.
17     Q.  Do you know how many different names she's used?
18     A.  No.
19     Q.  Do you know what name she's currently using?
20     A.  No.
21     Q.  While you were working for Swift at the Cactus
22  plant, did you believe that your hourly pay was lower
23  because illegal immigrants worked for Swift at the Cactus
24  plant?
25     A.  Well, the union tried to get us -- get our -- we

---

33

1  would talk to the union.  We were in the union, so they
2  would have to help us with our wages to go up.  They
3  don't -- it was like we weren't even getting nothing.
4      Q.  So did you believe that your hourly pay was,
5  then, in fact lower because illegal immigrants were
6  working for Swift at the Cactus plant?
7      A.  Yes.
8      Q.  And this was in that 2000 and 2001 time frame
9  that you thought your wages were lower than they should
10  have been because illegal immigrants were working at
11  Swift's Cactus plant?
12     A.  Yes.
13     Q.  Did you hear anyone else working at the Swift
14  Cactus plant say that they felt that their wages were
15  lower because illegal immigrants were working at the
16  plant?
17     A.  Could you repeat that again.
18     Q.  Yeah.  I was just wondering -- you've said that
19  you felt that your wages were lower because there were
20  illegal immigrants working at the plant.  I was just
21  wondering whether you had discussions with other
22  co-workers about that issue.
23     A.  Yes, we did.
24     Q.  And this was in the 2000, 2001 time frame?
25     A.  Yes.

S51

34

1    Q.  And what do you recall being said?
2    A.  Well, our wages were not getting any -- we would
3    just talk about our wages, that we weren't making enough
4    and that the union wasn't helping us get a raise, that
5    every time it was going to renew, the union -- that we
6    were wondering why we wouldn't get any raises.
7    Q.  And do you remember you or anyone else
8    complaining to the union that the wages were lower because
9    there were illegal immigrants working at Swift in this
10    2000 and 2001 time frame?
11    A.  I don't know.  We just -- I don't remember.
12    Q.  After you left the Cactus plant in October of
13    2002, did you hear any information about Swift hiring
14    additional illegal immigrants?
15    A.  After the what?  I'm sorry.
16    Q.  After you left working.  So let's -- I'm going
17    to talk now about after October of 2002, so you're no
18    longer working at the plant.
19    A.  Okay.
20    Q.  Did you hear any information that Swift was
21    hiring more illegal immigrants after that time?
22    A.  Yes, they had a lot of -- it was -- I would
23    still hear.
24    Q.  And what were you hearing?
25    A.  That they had a lot of little ones.  The plant

35

1    was -- it was like -- all you would see, little ones, they
2    would say, friends that still -- I have a lot of friends
3    over there that still talk about it -- that would still
4    talk about it and say, there's a lot of little ones.  I
5    mean, they're taking over because they don't complain
6    about nothing.
7    Q.  While you were still working at Swift, so this
8    is now, again, before October of 2002, did you hear any
9    information about Swift employees providing false
10    documents directly to any illegal immigrants?
11    A.  No.
12    MS. CANO:  Did you understand the question?
13    A.  No, I didn't.  No.  What do you mean employees?
14    Q.  In other words, anyone that was working at
15    Swift, were you aware that --
16    A.  The employees or employees like me?
17    Q.  Anyone.  I mean, someone in management or
18    anybody on the production floor or wherever.  Anyone that
19    was employed by Swift, did you hear anything about them
20    directly giving false documents to illegal immigrants?
21    A.  Hear?  If I heard anything?  It was all coming
22    from the front office.  It was all coming up from human
23    resources.
24    Q.  What was coming up from human resources?
25    A.  That you would just go over there and they'll

36

fix you up.
Q.  Okay.  So it was your understanding that
employees in Swift's human resources department at Cactus
were giving false documents to illegal immigrants?
A.  Yes.
Q.  And did you have any specific information about
who in the human resources department was doing that?
A.  Oscar Arriaga.
Q.  And what did you hear about that?
A.  That you would just talk to him and he'd get you
fixed up.
Q.  And who told you that?
A.  It was -- a lot of people knew.  A lot of us --
a lot of employees there knew.
Q.  And was this in that 2000 to 2001 time frame?
A.  Yes.
Q.  Anyone else that you can identify specifically
in the human resources department at the Cactus plant who
you understood were -- was providing false documents to
illegal immigrants?
A.  I just knew that it was in personnel, that you
just had to talk to someone in personnel and they'd lead
you to that person, or they'd talk to them and then you'll
get called or sent to him.
Q.  But at this point, the only name you can

37

identify is Mr. Arriaga?
A.  Oscar Arriaga.
MR. EBERLE:  Why don't we take a short
break and we'll see if I can wrap things up.
(Recess from 9:49 a.m. to 9:54 a.m.)
Q.  (BY MR. EBERLE)  You mentioned information that
you had received about employees in the Swift human
resources department providing false documents to illegal
immigrants.  Were you aware of any information at any time
that other people outside of Swift, perhaps in Dumas or
Cactus or Amarillo or anywhere else, were providing false
documents to illegal immigrants that ended up working at
the Cactus plant?
MS. CANO:  If you don't understand his
question, tell him to break it down.
A.  Yes, like -- all I know is that I just heard
people say that you could get papers like candy.
Q.  And can you identify any specific names of
people who said that?
A.  No.
Q.  And were you hearing this in that 2000 to 2001
time frame?
A.  Uh-huh.  Yes.
MR. EBERLE:  I have no further questions,
so I'll pass the witness.

11

38

1          EXAMINATION
2    BY MS. CANO:
3          Q.    Tell us whether or not you ever asked anyone
4    that you thought of as a Guatemalan while you were working
5    at Swift their age.
6          A.    I had contact with -- with people, with --
7    talking to them, because they would go get their scrubs or
8    their frock from where I was at, because I worked in the
9    laundry room, and it was just like -- I would ask them how
10   old they were, and one of them told me he was thirteen.
11   And I told him -- he looked so young, so I asked him how
12   old he was and I go, you're young enough to be my son.  I
13   go, how did you get hired here, being thirteen?  And he
14   said, someone in the office hired me.  And --
15         Q.    Did you ever ask how they obtained the documents
16   with which they were working at Swift while you were an
17   employee there?  Do you understand my question?
18         A.    How they got --
19         Q.    Right.  Did you ever ask -- tell me whether or
20   not you ever asked any of them, how did you get the papers
21   or the documents to be able to work here?  In other words,
22   did someone -- who gave them to you or where did you get
23   them?
24         A.    They said that -- I had some -- I had some young
25   boys, some people from Guatemala that said that they paid

39

1    for those documents, that they would pay the person --
2    that they were being deducted some money from their check
3    that they had to pay for.
4          Q.    What check was being deducted from?
5          A.    From their -- they had to go up to the front and
6    go pay -- go pay.  They said that they were being charged
7    about $1,000.
8          Q.    By whom?
9          A.    They just said it was somebody up in the office
10   that -- in personnel.
11         Q.    And when you talk about the office in personnel,
12   who are you referring to?
13         A.    To Oscar Arriaga.
14         Q.    And the company being which one?
15         A.    Swift.
16         Q.    Okay.  And this was something that you
17   personally discussed with some of these employees that
18   were Guatemalan?
19         A.    Yes.  And it was not just one person.  They
20   would bundle up, I guess, because they were the same
21   nationality, and I would talk to them, you know.  It was
22   just like -- they were young boys, young girls, and I
23   would tell them, why do you work here?  It's so hard.  And
24   he goes, we were brought here to work.
25         Q.    Tell us whether or not you asked them, who

40

1    brought you here to work?
2          A.    I asked them that.
3          Q.    And what did they answer?  Or what did -- what
4    did the person answer about that?
5          A.    They would answer that they were brought in a
6    van -- they were brought in the van, but before then, that
7    they were in -- they were just waiting for the van to get
8    them, to come up.
9          Q.    Anything other than that that you remember at
10   this point about where they were picked up by the van --
11         A.    Where --
12         Q.    -- that brought them to work?
13         A.    They were brought from down south, from -- they
14   were transported in a train.
15         Q.    They were transported in a train to --
16         A.    Yes.
17         Q.    -- where?
18         A.    To -- they wouldn't really say where they were
19   because they said they couldn't see because they were in
20   those boxcars.
21         Q.    All right.  Tell us whether or not these people
22   that you were referring to as the Guatemalan employees,
23   whether or not they ever admitted to you that they were,
24   in fact, from Guatemala.
25         A.    I don't understand you.  Like --

41

1          Q.    Oh, I'm sorry.  Let me go back.  You know, we
2    were talking about the Guatemalans --
3          A.    The Guatemalans.
4          Q.    -- who were young and the others who were
5    telling you -- that we've been discussing here.  All
6    right.  Did they ever say to you, yes -- did they ever say
7    to you, yeah, I am from Guatemala, that they said, yeah --
8          A.    Yes.
9          Q.    -- that's where I'm from?
10         A.    Yes, they would say they were from Guatemala and
11   they were here just to work.
12         Q.    Earlier we were talking about how they obtained
13   documents to work at Swift, and you told us that it was
14   the Swift personnel office, correct?
15         A.    Yes.
16         Q.    All right.  Those statements were also from
17   these people who had identified -- or these employees who
18   identified themselves as from Guatemala that you've been
19   discussing here?  I'm sorry.  Who had said that they were
20   from Guatemala that we've been talking about.  Do you
21   understand me?  I might have made it --
22         A.    No.
23         Q.    -- too complicated.  Let me go back.
24         A.    We were talking -- we're only talking about
25   Guatemalans?

S53

42

1    Q.  Yes.  Okay.  I'm just making it too long.  Let
2    me go back and ask you the question.
3    A.  Okay.
4    Q.  Earlier you told me about -- that documents --
5    that you could get false papers from Swift personnel; is
6    that true?
7    A.  Yes.
8    Q.  Okay.  Tell us whether or not it was the
9    Guatemalans that said that to you.
10   A.  Yes, they're the ones that -- I would ask them
11   how would they get there to work, and they would say, in
12   the office --
13   Q.  Did --
14   A.  -- the Swift office, you know, that you would
15   get them there.
16   Q.  Did anyone --
17   A.  I would ask them if they were -- if they had
18   legal papers to work, and they said, no, mi nombre.  They
19   would tell us their name.
20   Q.  And point at --
21   A.  Uh-huh.
22   Q.  -- what?  What did they point at?
23   A.  At their hardhat and say -- they'd say, no es mi
24   nombre.
25   Q.  Which means what in English?

43

1    A.  That's not my name.  My name is Jose or my name
2    is Leo, different -- different names.  But the name that
3    was on their hardhat was not theirs.
4    Q.  Besides saying -- did they ever mention by name
5    anyone in the personnel office at Swift that they had
6    gotten the false papers from?
7    A.  By name?  No, they just said in the office, that
8    they would get them in the office.
9    Q.  Did you ever ask them, did Oscar Arriaga give --
10   help you get these documents?
11   A.  No, they wouldn't say that.  They wouldn't say
12   nothing.  They would just stay quiet about it.
13   Q.  So you did ask them whether it was Oscar
14   Arriaga?
15   A.  Yes, I did ask them.
16   Q.  But they would --
17   A.  They didn't want to say nothing.  They never
18   wanted to say nothing about it.  They'd just say that in
19   the oficina and that they were being charged, that they
20   had to pay; after their paycheck that they would have to
21   pay for it.
22   Q.  For it being what?  The false documents?
23   A.  Uh-huh.
24   Q.  Is that a yes?
25   A.  Yes.  They had to pay for their documents.

44

1    Q.  Were these -- were these things that you were
2    told about paying for documents made by more than one
3    person to you?
4    A.  Yes.
5    Q.  Can you give us an idea of approximately how
6    many you personally talked to that said that -- said this
7    to you.
8    A.  About -- I would say about ten people that I
9    talked to.
10   Q.  Okay.  Other than saying that their names were
11   Jose and Leo, is the other name you --
12   A.  Uh-huh.
13   Q.  Can you tell us the name of any of these people,
14   whether it was the name that was on their hardhat or the
15   name that they gave to you as being their real name?
16   A.  Their name on their hardhat would be like
17   William.  On women, it would be Wilma.  Tony.  There was
18   just so many of them.  Just coming to it right now, I --
19   but every time that we would call them from their name
20   that they had on their hardhat, they wouldn't respond to
21   it until we would tap them and tell them, hey, you know,
22   I'm talking to you they're calling you over there.
23   Q.  And the name that was on the hardhat, that was
24   only a first name?
25   A.  Yes, only a first name.

45

1    Q.  Not a last name?
2    A.  No, not a last name.
3    Q.  All right.  Besides the names on the hardhats
4    that you've just told me about, do you remember any names,
5    other than the ones you've already said, Jose and Leo,
6    that they said were their real names?
7    A.  Adela was one of the girls -- well, was some of
8    the girls.  Adela and Ariana.  Because I would talk to
9    them real good, those two girls.  I would just -- it just
10   came to where, I guess, they would find that communication
11   with you, you know.  That's --
12   Q.  They were friendlier with you?
13   A.  Yes, uh-huh.
14   Q.  Were they also young?
15   A.  They were real young.  I would ask them how old
16   they were because one of them was even pregnant, and I
17   asked her, how old are you?  She said, I'm thirteen.  And
18   I would tell her if she was already seeing a doctor and
19   she would say no.
20   Q.  Pass -- oh, I'm sorry.  Did --
21   A.  That's all.
22          MS. CANO:  Pass the witness.
23          FURTHER EXAMINATION
24   BY MR. EBERLE:
25   Q.  In the questions that you were just responding

46

1  to from Ms. Cano about your conversations with these
2  Guatemalans, did all those conversations take place in the
3  2000 to 2001 time frame?
4      A.  Yes, they did.
5      Q.  And during earlier questioning that I had of
6  you, you mentioned Mr. Arriaga's name as a person in the
7  Cactus personnel department who would provide false
8  documents to illegal immigrants; is that correct?
9      A.  Yes.
10     Q.  I guess I'm not clear now on what the source of
11  that information was that you had, because you've
12  testified just now that the Guatemalans that you talked to
13  wouldn't identify anybody specifically in the personnel
14  department who was helping them out.  So what's your
15  source or who told you that Mr. Arriaga was providing
16  false documents to illegal immigrants?
17     A.  Who told me?
18     Q.  Yes.
19     A.  The Guatemalans.
20     Q.  Okay.  But in response to the questions that you
21  were just asked, you said that they wouldn't -- they
22  didn't want to say who it was.  So now you're saying that
23  they did tell you it was Mr. Arriaga?
24     A.  Well, they would say that it was a person in
25  personnel.

47

1      Q.  Okay.
2      A.  And the only person that works right there in
3  personnel, in that office that they would take me to is
4  Oscar.
5      Q.  Okay.  But they, that is, the Guatemalans, never
6  told you that it was Mr. Arriaga that was providing false
7  documents to them?
8      A.  No, they didn't say that -- they didn't mention
9  his name.  They just said that it was somebody in
10  personnel.  And that girl that was pregnant, that
11  thirteen-year-old girl, I told her to take me to who was
12  hiring them, who had hired her, and she took me to that
13  office.  And the only office that was there that she took
14  me to was Oscar Arriaga.
15     Q.  So is it correct, then, that it's your
16  assumption that it was Mr. Arriaga that was providing
17  false documents to these Guatemalans?
18     A.  Well, she took me to that office, and he's the
19  only one that was there.
20     Q.  No, I understand that.  But they never said it
21  was Mr. Arriaga that was providing false documents?
22     A.  No, they never said -- mentioned his name, like
23  Oscar, no.
24     Q.  Did anyone else ever tell you that Mr. Arriaga
25  was providing false documents to illegal immigrants?

48

1      A.  It was the talk.  It was the talk about --
2  people would talk about it.
3      Q.  And was this in the 2000 to 2001 time frame?
4      A.  Yes.
5      Q.  Anybody specifically that you can identify who
6  would say that they believed Mr. Arriaga was providing
7  false documents to illegal immigrants?
8          MS. CANO:  Do you know what he means by
9  identify?
10         THE WITNESS:  No.
11         MS. CANO:  Make sure that you always ask
12  him or me if you don't understand a specific word.
13         THE WITNESS:  No.
14     Q.  Well, let me reask it, then.  Can you tell me by
15  name anyone who told you that they thought Mr. Arriaga was
16  providing false documents to illegal immigrants?
17     A.  It was the Guatemalans.  They would just be the
18  ones that would say that -- like I told you, they would
19  say it was somebody in the office and they would point out
20  to him.  One of them did.  His name was Herman, this
21  little Guatemalan, Herman.
22     Q.  Okay.  And this was in the 2000 to 2001 time
23  frame?
24     A.  Yes.
25     Q.  And did he specifically point out, that man,

49

Mr. Arriaga, provided false documents to me?
2      A.  He didn't point out.  He just said -- we were
3  there talking and then he said, here comes the man that
4  put me to work here, that gave me what I have, my work
5  here.  And I go, what do you mean?  And he goes, he's the
6  one that employed me here.  I didn't have no papers and he
7  gave me a job here.
8      Q.  Okay.  But this person never said specifically
9  that Mr. Arriaga gave me false documents?
10     A.  No.  He just said that he was employed -- he had
11  employed him there, even though he knew that he didn't
12  have no documents.
13     Q.  And getting away completely from the
14  Guatemalans.  Let's forget about Guatemalans.
15     A.  Okay.
16     Q.  Can you name any person who told you that they
17  believed that Mr. Arriaga was providing false documents to
18  illegal immigrants?
19     A.  Any person?
20     Q.  Yes.
21     A.  No.  It's like we would -- everybody would talk
22  about it.  That's all I can tell you, that a lot of
23  people -- a lot of us -- there were so many employees,
24  2,000 employees, and a lot of us just knew.  I mean, you
25  know, not knew, but we would talk about it.  It was just

---

**50**

1  the talk, talk about Oscar.

2  Q.   And this was in the 2000 to 2001 time frame?

3  A.   Yes.

4       MR. EBERLE: I'll pass the witness.

5       FURTHER EXAMINATION

6  BY MS. CANO:

7  Q.   When the young thirteen-year-old pregnant girl

8  that you told us about earlier took you to the office to

9  show you where she had -- to show you the office, did that

10 office, as far as you know, belong to just one person or

11 to multiple people?

12 A.   Well, in that office, it said personnel.

13 Q.   All right.  And to your knowledge, who was

14 the -- who was in personnel at that office?

15 A.   Oscar Arriaga.  His name was on that desk.  It

16 had one desk in there, one chair, so it was Oscar.

17 Q.   All right.  Did his name appear on a plaque on

18 his desk?

19 A.   Yes, uh-huh.  Yes, ma'am.

20 Q.   And the thirteen-year-old girl that you told us

21 was pregnant, tell me her name again, that she told you

22 was her real name.

23 A.   Adela, Ariana, something like that.  She was --

24 it was with an A.  Ariana.

25 Q.   What was the -- why was she going to show you

---

**51**

1  that?

2  A.   Why did she show me?  Because I asked her.  I

3  go, quien empleo?  That meant, who hired you?  How did you

4  get hired?  And she said, aqui.

5  Q.   Which means?

6  A.   Over here.  I got hired here.  And I told her,

7  show me the -- who hired you.  And she took me to that

8  office, which is over there by the cafeteria.

9  Q.   Which was the personnel office --

10 A.   Yes, it was the personnel.

11 Q.   -- the one that had the desk with Oscar

12 Arriaga's --

13 A.   Yes.

14 Q.   -- name plaque on it?

15 A.   Uh-huh.  Yes.

16 Q.   Did this girl, the one who was pregnant and

17 thirteen years old who showed you the office, ever make

18 any -- did she ever tell you that the person in that

19 office had provided her or helped her obtain false papers

20 with which to work?

21      MR. EBERLE: Object to the form.

22 A.   No.  She just said that he had hired her.

23      MS. CANO: Pass the witness.

24      MR. EBERLE: I have no further questions.

25      (End of Proceedings.)

---

**52**

CHANGES AND SIGNATURE

PAGE LINE  CHANGE           REASON
_____
_____
_____
_____
_____
_____

   I, MARGIE SALAZAR, have read the foregoing deposition
and hereby affix my signature that same is true and
correct, except as noted above.

            _____
                MARGIE SALAZAR
STATE OF _____)
COUNTY OF _____)
   Before me, _____, on this day
personally appeared MARGIE SALAZAR, known to me or proved
to me on the oath of _____ or through
_____ (description of identity card
or other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged to
me that he/she executed the same for the purpose and
consideration therein expressed.

   Given under my hand and seal of office on this

_____ day of _____, 2008.

            _____
                NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
My Commission Expires: _____

---

**53**

        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
                  DALLAS DIVISION
BLANCA VALENZUELA, MARGIE )
SALAZAR, JOSE E. SERRATO, )
JOSIE RENDON, CLARA TOVAR, )
CONSUELO ESPINO, MARIA   )
AVILA, ERNESTINA         )
NAVARRETTE, MARIA E.     )
MUNOZ, AMANDA SALCIDO,   )
CANDELARIO G. ORTEGA,    )
MARIA ORTIZ, JOSE OLIVA, )
RAFAELA CHAVEZ, ELODIA   )
ARROYO, SUSANA CARDIEL,  )
GRACIE RIOS, AND LEONEL  )
RUIZ, Individually and on )
behalf of all others     )
similarly situated,      )
                         )  CIVIL ACTION NO.
       Plaintiffs,   )  3:06-cv-02322-N
                         )
vs.                      )      ECF
                         )
SWIFT BEEF COMPANY, INC. )
D/B/A SWIFT COMPANY,     )
SWIFT & COMPANY, HICKS,  )
MUSE, TATE & FURST, INC., )
HM CAPITAL PARTNERS OF   )
DALLAS, LLC, and JOHN    )
DOES I-V,                )
                         )
       Defendants.   )
          REPORTER'S CERTIFICATION
       ORAL DEPOSITION OF MARGIE SALAZAR
               AUGUST 7, 2008
   I, ANGIE WEAVER, Certified Shorthand Reporter in and
for the State of Texas, hereby certify to the following:
   That the witness, MARGIE SALAZAR, was duly sworn by
the officer and that the transcript of the oral deposition
is a true record of the testimony given by the witness and

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BLANCA VALENZUELA, MARGIE )
SALAZAR, JOSE E. SERRATO, )
JOSIE RENDON, CLARA TOVAR, )
CONSUELO ESPINO, MARIA )
AVILA, ERNESTINA )
NAVARRETTE, MARIA E. )
MUNOZ, AMANDA SALCIDO, )
CANDELARIO G. ORTEGA, )
MARIA ORTIZ, JOSE OLIVA, )
RAFAELA CHAVEZ, ELODIA )
ARROYO, SUSANA CARDIEL, )
GRACIE RIOS, AND LEONEL )
RUIZ, Individually and on )
behalf of all others )
similarly situated, )
                                     )    CIVIL ACTION NO.
            Plaintiffs,              )    3:06-cv-02322-N
                                     )
vs.                                  )        ECF
                                     )
SWIFT BEEF COMPANY, INC. )
D/B/A SWIFT COMPANY, )
SWIFT & COMPANY, HICKS, )
MUSE, TATE & FURST, INC., )
HM CAPITAL PARTNERS OF )
DALLAS, LLC, and JOHN )
DOES I-V, )
                                     )
            Defendants.              )

-------------------------------
ORAL DEPOSITION OF
AMANDA MARIA SALCIDO
AUGUST 6, 2008
-------------------------------

**2**

ORAL DEPOSITION OF AMANDA MARIA SALCIDO, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on the 6th day of August, 2008, from 12:04 p.m. to 1:47 p.m., before Angie Weaver, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Mullin, Hoard & Brown, L.L.P., 500 S. Taylor, Suite 800, in the City of Amarillo, County of Potter, State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**4**

INDEX

                                                            PAGE
Stipulations -------------------------------    1
Appearances -------------------------------    3
Exhibit Index -----------------------------    4
Objections ---------------------------------    5
WITNESS:
AMANDA MARIA SALCIDO
    Examination by MR. EBERLE                    6
Signature and Changes ---------------------   70
Reporter's Certificate ---------------------   71

EXHIBITS
EXHIBIT        DESCRIPTION                     PAGE
8    Defendants' First Set of Requests          8
     for Admission, Interrogatories, and
     Requests for Production of Documents
     to Plaintiffs

9    Plaintiff Amanda Salcido's First           8
     Supplemental Objections and
     Responses to Defendants Swift Beef
     Company and Swift & Company's First
     Set of Requests for Admission,
     Interrogatories, and Requests for
     Production of Documents

10    Attorney Employment Contract             13

11    04-05-07 article by Megan Feldman,        17
      Ground Meat, Native-Born and
      Immigrant Both Get Bled at Swift's
      Beef Plant

**3**

APPEARANCES

FOR THE PLAINTIFFS:
  Ms. Claudia M. Cano
  HEYGOOD, ORR, REYES, PEARSON & BARTOLOMEI
  2331 W. Northwest Highway, 2nd Floor
  Dallas, Texas 75220
  Telephone:  (214) 526-7900
  E-mail: cano@reyeslaw.com

FOR THE DEFENDANTS:
  Mr. Brian G. Eberle
  SHERMAN & HOWARD, L.L.C.
  633 Seventeenth Street, Suite 3000
  Denver, Colorado 80202-3622
  Telephone:  (303) 297-2900
  E-mail: beberle@shermanhoward.com

**5**

OBJECTIONS

|            | PAGE | LINE |
|------------|------|------|
| By Ms. Cano | 10 | 8 |
| By Ms. Cano | 19 | 8 |
| By Ms. Cano | 19 | 14 |
| By Ms. Cano | 28 | 24 |
| By Ms. Cano | 32 | 7 |
| By Ms. Cano | 32 | 15 |
| By Ms. Cano | 41 | 25 |
| By Ms. Cano | 52 | 9 |

---

**6**

1            AMANDA MARIA SALCIDO,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. EBERLE:
5     Q.  Can you please state your full name and spell
6  your last name.
7     A.  Okay.  Amanda Maria Salcido, S-A-L-C-I-D-O.
8     Q.  And my name is Brian Eberle, and I'm one of the
9  attorneys for Swift.  And I just wanted to double-check.
10  Before your deposition, I had conferred with your attorney
11  about whether we should have a Spanish interpreter here
12  today, and she said that wouldn't be necessary.
13     A.  No.
14     Q.  And I just want to make sure that you agree that
15  we don't need to have an interpreter to proceed today.
16     A.  That's fine.  I don't need one.
17     Q.  Okay.  I understand you had your deposition
18  taken in a prior lawsuit against Swift; is that right?
19     A.  Yes.
20     Q.  I just want to make sure -- let you know that
21  we're going to follow the same procedures as before, so
22  basically all your answers need to be verbal in order for
23  the court reporter to write them down, so it will be
24  necessary for you to answer yes or no or with some other
25  words, if that's okay.

**7**

1     A.  Yes.  I'm sorry.
2     Q.  And whenever I ask a question, I will assume
3  that you understand the answer (sic), so if for any reason
4  you don't understand a question, just please let me know.
5  Is that okay?
6     A.  Okay.  I sure will.
7     Q.  One other thing we'll have to be careful about
8  is not talking over each other, so it will be helpful
9  if -- I will try to wait until you're finished answering
10  before I start talking again, and if you can wait until I
11  finish a question.  Even if you know what the answer is,
12  let me finish and then give your answer so that it will be
13  easier for our court reporter to write down your answer.
14  Is that okay?
15     A.  Okay.  That's fine.
16     Q.  Do you understand that you have been sworn under
17  oath?
18     A.  Yes.
19     Q.  And even though this is an informal setting
20  today, do you understand that it's just the same as if
21  you're giving testimony in a court of law?
22     A.  Yes, sir.
23     Q.  And we can take a break at any time, or if you
24  need to get something to drink, just let me know.  That's
25  all right.

**8**

1     A.  Okay.
2        (Deposition Exhibit Nos. 8 and 9 marked for
3        identification.)
4     Q.  Let me hand you what has been marked as
5  Exhibit 8.  And I'll just let you know that these are the
6  discovery requests that you were just reviewing your
7  answers to.  And I'll also hand you what's been marked as
8  Exhibit 9, and these are the answers you just verified.
9        And maybe I could just have you confirm
10  that Exhibit 9 is the answers to the interrogatories and
11  other discovery requests that you just signed.  I think
12  the last page is the verification.
13     A.  Yes.
14     Q.  What I'd like to do is go back and forth between
15  Exhibits 8 and 9 for a second, and if I could have you
16  first take a look at Exhibit 1 to Exhibit 8, the large
17  document.  It's about eight pages back from the beginning.
18  Right there.
19        Do you see that this is the Plaintiffs'
20  First Amended Petition in a case that was filed in the
21  district court of Dallas County, Texas?
22     A.  Yes.  That's the one we did first.
23     Q.  Okay.  That was the first lawsuit in which you
24  were a plaintiff against Swift and some other defendants?
25     A.  Yes, sir.

**9**

1     Q.  And if you could go back about five or six more
2  pages -- actually, probably more than that.  Let's see.
3  In Exhibit 1 to Exhibit 8, it's actually page -- numbered
4  page 5.  Do you see under the subparagraph 13 there that
5  there's some allegations regarding you?
6     A.  Okay.
7     Q.  So you've had a chance to read those
8  allegations?
9     A.  On mine only?
10     Q.  Yes.
11     A.  Yes.
12     Q.  And do those appear to be correct to you?
13     A.  Yes.
14     Q.  So let's just review them, if we can.  First of
15  all, you were first hired by Swift at the Cactus plant on
16  October 28, 1988; is that correct?
17     A.  No, August.
18     Q.  I'm sorry.  August 28, 1988?
19     A.  Yes.
20     Q.  And when we talk about the Cactus plant today,
21  do you understand I'm talking about the processing
22  plant -- the beef processing plant that's in the Cactus
23  and Dumas area of Texas?
24     A.  Yes, sir.
25     Q.  And then the last day that you received wages

**10**

1  from Swift was October 14, 2002; is that right?
2      A.  Yes.
3      Q.  And then you were injured while working for
4  Swift on July 2nd, 2002, correct?
5      A.  Yes, sir.
6      Q.  And did you have a doctor order any restrictions
7  on your work after that injury?
8          MS. CANO:  Objection, form.
9      A.  Can I skip on that one?
10     Q.  What do you mean, skip on it?  Let me just reask
11  it.
12     A.  I just --
13         MS. CANO:  If you know the answer, answer.
14     A.  No.
15         MS. CANO:  If you don't remember --
16     A.  I don't.
17     Q.  You don't remember.  Okay.  You're not -- you
18  don't remember whether there were any restrictions that
19  were placed on your work by a doctor after your injury in
20  July of 2002?
21     A.  The only thing I remember is that they -- I
22  mean, I couldn't lift anything over 50 pounds.  That's
23  what I remember.  That's -- that I remember.  That's the
24  restriction I had.
25     Q.  When you first started working for Swift in

**11**

1  1988, did you join the union at that time?
2      A.  I don't remember.
3      Q.  Were you a member of a union while you were
4  working at Swift, at least for some period of time?
5      A.  Yes.
6      Q.  And was there also a time when you withdrew from
7  the union?
8      A.  Yes, I did.
9      Q.  And why was that?
10     A.  I never did have any need for them because I
11  never got any help that I needed from them.
12     Q.  And do you remember approximately when you
13  withdrew from the union?
14     A.  No, I don't.
15     Q.  Was that within a few years after you first
16  started working there or was it closer to your
17  termination?
18     A.  Like in the middle.
19     Q.  Okay.  So perhaps the mid 1990s, something like
20  that?
21     A.  Somewhere around there.
22     Q.  Did you review any documents or any information
23  to prepare for your deposition today?
24     A.  No.
25     Q.  And besides Ms. Cano, have you talked with any

**12**

1  other attorneys in preparation for your deposition today?
2      A.  No, sir.
3      Q.  Did you talk or meet with anyone else to prepare
4  for your deposition today?
5      A.  No.  I mean, the only thing -- I mean, coming on
6  the way and that was it.  I mean --
7          MS. CANO:  Don't -- just -- he's just
8  asking whether or not you talked to anyone.
9      A.  No.  No, I didn't, not --
10     Q.  And besides Ms. Cano, are there any other
11  attorneys that are representing you and the proposed class
12  in this case?
13     A.  Me or Ms. Cano?
14     Q.  Let me just reask that one.  Besides Ms. Cano --
15     A.  Uh-huh.
16     Q.  -- are there any other attorneys that are
17  representing you or the proposed class in this case?
18     A.  Yes.
19     Q.  And who are those, as best you can recall?
20     A.  Reyes.
21     Q.  Anyone else you can remember?
22     A.  That was his name, Reyes.  That's it.
23     Q.  That's the most -- the best you can recall
24  today?
25         MS. CANO:  If that's all you can remember,

**13**

1  it's all right.
2      A.  I'm just not on --
3          MR. EBERLE:  Do you want to go off the
4  record for just a second?
5          (Discussion off the record.)
6          (Deposition Exhibit No. 10 marked for
7          identification.)
8      Q.  (BY MR. EBERLE)  We're back on the record, and
9  I'm handing you what's been marked as Deposition
10  Exhibit 10.  And first, I wanted to see if your
11  handwriting appears on the first page, at the top of
12  Exhibit 10.
13     A.  Yes.
14     Q.  And then if you go to the second page, is that
15  your signature that appears in the middle of the second
16  page?
17     A.  Yes.
18     Q.  Now, this appears to be what's called an
19  Attorney Employment Contract, but I notice on the second
20  page that there's no -- it's not dated.  Do you happen to
21  recall when you signed Exhibit 10?
22     A.  I don't remember.
23     Q.  And do you remember where you might have been
24  when you signed it, for example, at home or at the
25  attorneys' office or any other place?

14

1   A.  Don't remember.
2   Q.  And there is a typewritten name, Angel Reyes, on
3   the second page of Exhibit 2.  Do you see that, on the
4   right side?
5   A.  Uh-huh.
6   Q.  And he is with the Heygood Orr law firm.  Do you
7   see that?
8   A.  Yes.
9   Q.  How did you hear about the Heygood law firm?
10  A.  Through, I mean, Garcia.
11  Q.  And who is that?
12  A.  Domingo Garcia.  He was another attorney that we
13  had on our first case.
14  Q.  Do you know if Mr. Garcia was also an attorney
15  on this case for the plaintiffs?
16  A.  On this second case?
17  Q.  Yes.
18  A.  No, not that I know of.
19  Q.  You don't think he was?
20  A.  No.
21  Q.  And before you signed Exhibit 10, do you
22  remember having any communications with any of the
23  attorneys at the Heygood law firm?  Don't tell me what
24  they were.  I just want to know if you had any.
25  A.  I don't remember.  I -- we just had so many that

15

1   I don't -- I can't remember right off.  I don't want to
2   say yes and say no.
3   Q.  Okay.  Did you contact any other attorneys about
4   representing you and the proposed class in this case
5   besides the Heygood firm?
6   A.  No, sir.
7   Q.  Have you ever checked any references for any of
8   the attorneys at the Heygood law firm?
9   A.  What do you mean?
10  Q.  Tried to identify who their other clients may
11  have been or get other information about their law firm
12  before you signed Exhibit 10.
13  A.  No.
14  Q.  Do you know what experience the attorneys at the
15  Heygood law firm have in class actions?
16  A.  I know it's quite a bit, but I don't -- I can't
17  recall, I mean, every -- all that they --
18  Q.  You can't remember any of the details?
19  A.  Huh-uh.
20  Q.  Are you aware of any of the costs of this
21  particular class action?
22  A.  What do you -- I mean --
23  Q.  Yeah.  Do you know what any of the costs might
24  be that will be incurred by the plaintiffs to continue
25  this class action?

16

1   A.  I do.
2   Q.  Okay.  And what are those?
3   A.  You're talking about the costs, right --
4   Q.  Yes.
5   A.  -- what it will cost us?  Do I have to answer
6   that or --
7   Q.  Just to the best you can.  If you don't --
8       MS. CANO:  If you know.
9   Q.  If you don't know, that's fine.
10  A.  Okay.  I know we were looking at 40 percent.
11  Q.  Okay.
12  A.  Is that --
13  Q.  Let me just clarify.  I think what you're
14  referring to might be the contingent fee that the lawyers
15  would receive if the case is successful.  Is that what
16  you're referring to?
17  A.  Is that what -- okay.  So you're wanting to know
18  what the case is worth -- I mean, we're looking at?
19  Q.  I'm looking at something different, which is if
20  there are costs that would be incurred to pursue the case,
21  like expert witness fees or things like that.
22      MS. CANO:  Expenses.
23  Q.  Yeah, expenses.  Let's call it that way.  Do you
24  know what the expenses are for this class action?
25  A.  No, I don't.

17

1   Q.  Do you understand if you are responsible for any
2   of those expenses?
3   A.  No.  I mean, I'm not -- never been told,
4   never --
5   Q.  Do you know whether the attorneys in this case
6   have hired any expert witnesses?
7   A.  I don't.
8   Q.  And do you know how much, if anything, your
9   attorneys have paid to any expert witnesses?
10  A.  I don't know.
11  Q.  Do you know how much it might cost to provide
12  notice of this case to other class members?
13  A.  I don't.
14      (Deposition Exhibit No. 11 marked for
15      identification.)
16  Q.  I've handed you what's been marked as Deposition
17  Exhibit 11.  And the first question, I guess, I have is:
18  Have you seen this article before?
19  A.  Yes, I have.
20  Q.  And do you recall that sometime in March or
21  April of 2007 you spoke with a reporter named Megan
22  Feldman?
23  A.  Yes.
24  Q.  And then there's some information that you
25  provided to Ms. Feldman that appears in this article; is

18

1   that right?
2       A.   Yes.
3       Q.   What I'd like to do -- and I'll come back to
4   this article a little bit later, but what I'd like to do
5   first is have you turn to the second page of Exhibit 11.
6   And you'll see the very last paragraph, the first sentence
7   says:  Today Salcido, which is you, correct?
8       A.   Uh-huh.
9       Q.   It says:  Today Salcido is a plaintiff in two
10  separate class action lawsuits against Swift.  One alleges
11  that the company wrongly terminated dozens of injured
12  workers to save on workers' compensation costs, slashing
13  them from $6 million in 2002 to just $600,000 two years
14  later.  Did I read that correctly?
15      A.   Yes, you did.
16      Q.   Okay.  And is the first lawsuit that you had
17  against Swift the one that's referenced there about the
18  termination of injured workers?
19      A.   Uh-huh.  Yes.
20      Q.   And then the article goes on.  It says, quote,
21  another claims the company deliberately and systematically
22  replaced native workers with illegal Guatemalan immigrants
23  in a scheme to depress wages, end of quote.  Did I read
24  that correctly?
25      A.   Uh-huh.

19

1           MS. CANO:  You have to say yes or no.
2       A.   Yes, sir.
3       Q.   And is it your understanding that those are the
4   plaintiffs' claims, including your claim, in this case?
5       A.   Yes, sir.
6       Q.   Do you have any additional understanding of what
7   the case we're here about today concerns?
8           MS. CANO:  Objection, overbroad.
9       A.   The only thing -- I mean, what I say that we're
10  here for is -- I mean, on this case is that we -- I mean,
11  they fired us and they were hiring illegals in place of
12  us.
13      Q.   Okay.  Anything else you can think of right now?
14          MS. CANO:  Objection, form, overbroad.
15      A.   No.  I don't remember.
16      Q.   Do you know whether a class certification motion
17  has been filed in this case?
18      A.   I don't recall.  I mean --
19      Q.   Do you know what people are members of the
20  proposed class?
21      A.   What do you mean?  I mean -- excuse me.
22      Q.   Yeah.  I guess my question is:  Do you know who
23  are the people that are proposed to be included in the
24  class?  How are they defined?
25      A.   Like all the other seventeen?  Is that what

20

1   we're talking about?
2       Q.   That's part of it.
3       A.   That are in the same case?
4       Q.   Yes.  Are there any other people that you
5   understand that are pursuing claims in this case against
6   Swift?
7       A.   Just the ones that are with us.
8       Q.   And with you, you mean the other seventeen
9   named --
10      A.   That's right.
11      Q.   -- plaintiffs?
12      A.   Right.  Yes, sir.  I'm sorry.
13      Q.   Do you understand that you have been proposed to
14  be a class representative in this case?
15      A.   Yes.
16      Q.   And as a class representative, what is your
17  understanding of any responsibilities you have to the
18  other members of the class, if any?
19      A.   I mean, if I'm seeing this right, the way I look
20  at it is that I have to show, you know, that -- what I
21  have seen or what -- I mean, what was going on at the
22  time, why I would think they were hiring illegals and --
23  which I did see when I did work out there.  And that's
24  really about it, I mean, that I know of.  I mean, I can't
25  think of anything else.

21

1       Q.   Okay.
2       A.   I just have to prove that -- or show that, what
3   I did, what I saw, what -- you know, what made me -- what
4   made me think that they did hire illegals and that the
5   plant knew about it, stuff like that.  That's what I -- I
6   mean, I'm thinking that's what this case is about.
7       Q.   Okay.  Let me hand you what was previously
8   marked as Exhibit 2.  And why don't you just kind of
9   glance through that, and my question is going to be
10  whether you recall having seen Exhibit 2, which is the
11  Original Complaint in this case.
12          MR. EBERLE:  Why don't we just go off the
13  record for a second.
14          (Discussion off the record.)
15      A.   No.
16      Q.   (BY MR. EBERLE)  I'm sorry.  So with respect to
17  Exhibit 2, you don't think you've seen that before?
18      A.   I don't remember.
19      Q.   On the very first page of Exhibit 2, if you go
20  to the front, you'll see that under the defendants, there
21  is an entity called Hicks, Muse, Tate & Furst.  Do you see
22  that?
23      A.   Okay.
24      Q.   Do you know who that company is?
25      A.   Swift Company or Hicks?

22

1    Q.   The Hicks Muse company.
2    A.   No, I don't.  I just know Swift.
3    Q.   Do you know whether Hicks Muse has been
4    dismissed as a defendant in this case?
5    A.   No, sir.
6    Q.   Let me hand you what's been marked previously as
7    Exhibit 3, which is the First Amended Complaint that was
8    filed on December 28, 2006.  My question is simply whether
9    you recall having seen Exhibit 3 before.
10   A.   This does look familiar.
11        THE REPORTER:  I'm sorry?
12   A.   It does look familiar.
13   Q.   So you think you saw Exhibit 3 before, as best
14   you can recall?
15   A.   They all look the same.  I'm sorry.  To me, they
16   all look the same.
17   Q.   So nothing stands out in Exhibit 3?
18   A.   No.  I mean, it just -- it doesn't -- I mean,
19   nothing looks different than what all the other ones do,
20   so --
21   Q.   Well, that may tell me --
22   A.   -- to me, I'd be looking at the same thing.
23   Q.   That may tell me your answer to the next
24   question, which is, do you know what the differences are,
25   if any, between Exhibit 2 and Exhibit 3?

23

1    A.   There's a few things down here.  I guess what I
2    mainly look at is right here, and that's --
3    Q.   And right here, you're pointing to the first
4    page --
5    A.   On this exhibit right here, there's -- I mean,
6    right here where it says, civil action, which is not on
7    here -- I mean, the way it -- and yeah, they're a little
8    bit different, but --
9    Q.   Okay.  As far as any of the details in
10   Exhibits 2 and 3, though, have you taken the time before
11   today to go through and try to figure out what --
12   A.   No, I haven't.
13   Q.   -- the differences are?
14   A.   No, I haven't.
15   Q.   And on the first page of Exhibit 3 -- if you
16   could take a look at the first page of 3, you'll see that
17   on this one, there's a defendant called Capital
18   Partners -- HM Capital Partners of Dallas.
19   A.   Uh-huh.
20   Q.   Do you see that?
21   A.   Right here, yeah.
22   Q.   Do you know what that company is?
23   A.   No, I don't.
24   Q.   Do you know whether or not HM Capital Partners
25   has been dismissed as a defendant in this case?

24

1    A.   No, sir.
2    Q.   And I only have one more of these.  This has
3    been marked as Exhibit 4.  And again, my question is:  Do
4    you recall having seen Exhibit 4 prior to today?
5    A.   Huh-uh.  No, sir.
6    Q.   And then also, have you taken the time before
7    today to look through Exhibit 4 to see how it is
8    substantively different, if at all, from Exhibit 3 or
9    Exhibit 2?
10   A.   Just this right here, and this.
11   Q.   So you're pointing to the first page of
12   Exhibits 2, 3 and 4 and noting that the defendants are
13   different in the various complaints?
14   A.   Yes.
15   Q.   As far as the details in the rest of Exhibit 4,
16   have you tried to look before to see what the differences
17   are between Exhibit 4 and Exhibit 3?
18   A.   These two?  Just this right here.
19        MS. CANO:  If you can.
20   Q.   Yeah, maybe the easier question for me to ask is
21   simply whether before today you've tried to compare
22   Exhibit 4 and Exhibit 3.
23   A.   Well, just now, yes.
24   Q.   Okay.  But before that, you haven't?
25   A.   No.

25

1    Q.   Okay.  I think that's all I needed to know.
2    A.   Okay.
3        MR. EBERLE:  Why don't we just take a quick
4    second.  We'll go off the record.
5        (Discussion off the record.)
6    Q.   (BY MR. EBERLE)  Why don't we go back to
7    Exhibit 11, which is the article that we were talking
8    about before.  What I'd like to do is have you go to page
9    8, numbered at the top.  And let me just read out loud the
10   first couple of sentences.
11       It says:  Amanda Salcido was helping out in
12   the training room when she noticed something wasn't right,
13   period.  Large numbers of Guatemalans had begun arriving
14   at the Cactus plant sometime in 2000, after a Swift plant
15   in Kansas burned down, and most of the new arrivals were
16   short and squat, with Mayan features and little mastery of
17   English or Spanish, end of quote.  Did I read that
18   correctly?
19   A.   Yes.
20   Q.   Okay.  And is this information that you provided
21   to the reporter that wrote the article, which is
22   Exhibit 11?
23   A.   Yes.
24   Q.   And is that information accurate?
25   A.   Yes.

S63

26

1    Q.   Okay.  And I guess my first question on the
2    first sentence is:  It refers to a training room.  What
3    was that?
4    A.   The training room is where they took them to
5    train them, to get them ready to put them out on the
6    floor, and that's where they would go first when they
7    first started working there, anybody.
8    Q.   Okay.  So these are any new employees?
9    A.   Yes.  And that's where they would make the IDs,
10    in there, and they had to fill out paperwork and stuff
11    like that in there --
12    Q.   Okay.  And --
13    A.   -- first.
14    Q.   And you were working there at least for some
15    period of time?
16    A.   Yes.  They had me -- because I -- since I knew
17    both English and Spanish, they had me helping them over
18    there sometimes when they needed me, so I would go over
19    there and help them and do filing and all that for them.
20        During this time, they had so many coming
21    down from Kansas that it was too much just for the two
22    people they had in there, that they had to bring more help
23    in to get all these people in, and they called on me to
24    help them out.
25    Q.   Okay.  I'll come back and ask a little bit more

27

1    about that.  But had you been helping out in the training
2    room prior to this time --
3    A.   Yes.
4    Q.   -- in 2000?
5    A.   Yes.
6    Q.   Okay.  How often did that happen?
7    A.   Not very often.
8    Q.   And during those times before 2000, did you
9    notice any workers who you believed might be unauthorized
10    to work?
11    A.   That were brought from over there or somebody
12    else?
13    Q.   Just in general.  Just any employees that were
14    new coming into Swift that you felt, based on what you
15    could tell, might have been illegal.
16    A.   No.  No.
17    Q.   So let's go back to this time when you were
18    helping out in 2000, after the Kansas plant had burned
19    down.  How long did you work in the training room during
20    that time frame?
21    A.   They had me in there -- I mean, I wasn't always
22    in there.  I mean, like I said, they would call on me when
23    they needed me.  They would call on me to help them out,
24    but it wasn't all the time that I --
25    Q.   For what length of time?  Was it like just a

28

1    couple days or was it --
2    A.   Oh, no.
3    Q.   -- a couple months?
4    A.   No.  It was during like the whole year.
5    Q.   Okay.
6    A.   But it was, you know, off and on.
7    Q.   During about a year period, something like that?
8    A.   Even until the last, I mean, that I got
9    terminated, they were still using me over there, so it had
10    to have been longer than that.
11    Q.   Okay.  Is it accurate to say that you spent more
12    time helping in the training room area immediately after
13    this fire in 2000 as opposed to maybe --
14    A.   Oh, yes.
15    Q.   -- later on?
16    A.   Yes.
17    Q.   Okay.  And this -- the article specifically
18    mentions your talking to the reporter about large numbers
19    of Guatemalans; is that right?
20    A.   Yes.
21    Q.   Were there any other nationalities of people
22    that were arriving in this time frame in 2000 after the
23    Kansas plant had burned?
24        MS. CANO:  Objection, form.
25    A.   No.

29

1        MS. CANO:  Calls for speculation.
2    A.   I don't remember.  Really, mostly what came --
3    came through that -- and during that time, it was just the
4    people that were coming from over there.  I guess that's
5    all they were taking, because I didn't see anybody else.
6    I mean, I know a lot of people from Dumas, I've been there
7    forty-three years, so I would have known, you know, if
8    somebody else would have came through that I would have
9    recognized.  But none of these people were anybody that I
10    recognized, and all the ones that we were getting, they
11    were coming from Kansas.
12    Q.   Okay.  And you indicated that you felt that
13    these -- was it your personal understanding that these
14    people who were coming from Kansas were originally from
15    Guatemala?
16    A.   I was told they were from Guatemala.
17    Q.   Okay.  And who told you that?
18    A.   It was one of guys that -- he was -- he came
19    with the group, and he told me he was illegal himself.
20    And the thing was that he -- I guess it's not important,
21    but he -- we had been talking and everything and he had
22    just been trying to make moves on me, and I told him I
23    didn't want nothing to do with him.
24        Okay.  So we were talking for a while and
25    everything.  Well, he was saying, you know, his name was

---

30

1  Jose or -- and then Miguel.  And I said, well, what's your
2  real name?  He goes, I'm sorry, he said, because I'm using
3  illegal documents.  He goes, I'm not, you know, from here.
4  He goes, but I want to get my papers fixed.
5       So in my mind, I thought this is what he
6  wants, you know, somebody to fix his papers, you know, so
7  I just -- no.  And he told me -- he goes, yeah, he goes, a
8  lot of these people that came, you know, we're all
9  illegals, he goes, and we're just coming here to work, you
10 know.  He goes, we came from that plant because it burned
11 down.  And I said, oh, and I go, I understand.
12     Q.  Okay.  And was this conversation you're
13 describing sometime in 2000, after the plant had --
14     A.  Yes.
15     Q.  -- shortly after the plant had --
16     A.  After.
17     Q.  -- burned down?
18     A.  Uh-huh.  Yes.
19     Q.  And the person -- and the person you're
20 describing was a new employee at the Swift plant in
21 Cactus?
22     A.  Right.  He was one of the Kansas -- employees
23 that came from Kansas, from the same plant these other
24 people came from.
25     MS. CANO:  May we have the agreement, as we

---

31

1  did in the prior depositions, that objection to form will
2  cover objections except as to privilege or
3  nonresponsiveness?
4       MR. EBERLE:  Yeah, that's fine.  I know
5  that there are under the federal rules certain objections,
6  not necessarily form, but other objections might be waived
7  under the federal rules.  But as far as form objections,
8  that's fine.
9       MS. CANO:  All right.
10     A.  In fact, he's still working there.
11     Q.  This person --
12     A.  Yes, he is.
13     Q.  -- you're talking about?  Do you know what his
14 name was that was on his -- even if it might be an
15 inaccurate one?
16     A.  I cannot remember.  Like I said, Jose and
17 Miguel, you know.  He was two different people.  But I
18 sure could get that name.  I don't have a problem with it.
19 And, in fact, I saw him last week, so --
20     Q.  Why don't we go back, if we could, to page 2 on
21 Exhibit 11.  See the first full paragraph at the top
22 there?  And this is continuing information, I believe,
23 that you had provided to the reporter.
24     It says, quote, she felt bad for the
25 Guatemalans.  She and her co-workers knew that the tiny

---

32

1  Central Americans, many of whom came from the same
2  highland area and spoke a Mayan dialect, not English or
3  Spanish, were for the most part undocumented, end of
4  quote.  Did I read that correctly?
5     A.  Yes.
6     Q.  And is that information accurate?
7           MS. CANO:  Objection, form.
8     A.  Yes.
9     Q.  Okay.  And I know you were -- I saw that you
10 were reading farther down in that paragraph.  My initial
11 question was whether the first two sentences were
12 accurate, in other words, that you and your co-workers
13 knew that these Guatemalans who were arriving starting in
14 2000 were for the most part undocumented.
15           MS. CANO:  Objection, calls for
16 speculation.
17     A.  Yes.
18     Q.  And then the paragraph continues and talks about
19 the Guatemalan workers arriving, it began as a trickle
20 around 2000 and soon became a constant stream.  Is that
21 consistent with your recollection?
22     A.  That's what I was looking -- I mean, I -- what
23 is meant by that.  I mean --
24     Q.  Well, let's back up for a second.  There were a
25 large number, I think you said, of Guatemalans who arrived

---

33

1  from the Kansas plant --
2     A.  Uh-huh.
3     Q.  -- in 2000 to begin working at the Cactus plant
4  for Swift; is that right?
5     A.  Yes, sir.
6     Q.  And then were there continually Guatemalans
7  arriving thereafter as well?
8     A.  Yes.  Uh-huh.  They were -- they kept coming in
9  and kept coming in and kept coming in.  And after that, it
10 was like that's all you saw out there anymore, you know,
11 just pure Guatemalans, you know.  I mean, you could tell
12 right away that they were.  I mean, they're little.  Some
13 of them looked like thirteen-year-olds, I mean, you know.
14 I mean, I know they had to have been at least thirteen.
15     And I know there was quite a few times
16 that, you know, that people out there would ask them how
17 old they were, and they were afraid to say.  Some of them
18 did, you know, say they were thirteen years old.
19     Q.  And it was your understanding based on the
20 communications with some of these Guatemalans that
21 they were illegal and were not --
22     A.  Oh, yes.
23     Q.  -- authorized to work in the United States?
24     A.  Yes.
25     Q.  And did you have discussions with any of your

34

1  co-workers at Swift about that while you were working
2  there?
3      A.  What I did -- when we were there doing the
4  paperwork, I did tell one of the ladies, I just can't
5  remember who she was, that I didn't want nothing to do
6  with doing any of the paperwork anymore because I was
7  afraid to get in trouble.  I didn't know what would happen
8  if they -- if Swift got busted with this deal, if I was
9  going to get involved in it, too, so I didn't want nothing
10  to do with it.  I told her I was going to go finish
11  cleaning my lockers, because I used to clean the locker
12  room, and I left from there.
13      Q.  And this woman that you spoke with, was she
14  another person from production that was helping there or
15  was she a management employee?
16      A.  She was management.  I just can't -- I can't
17  remember who she -- exactly who it was.
18      Q.  And --
19      A.  I was really about the only one that they did
20  take out from the floor -- or not from the floor, because
21  I was in the locker room.  That was my job right there.
22  But since I knew a bunch of stuff about this, I mean,
23  filling out paperwork, helping them out, they would call
24  on me to help them out when they needed somebody.
25      Q.  And after you said you didn't want to do that

35

1  work anymore, just in general did you have any
2  conversations with any of your co-workers at Swift about
3  the fact that these Guatemalans that were undocumented
4  were being hired by Swift?
5      A.  Yeah.  I mean, we -- I did, you know, and -- you
6  know, in the locker room, I did have, you know, a
7  conversation with them and, you know, told them that they
8  were hiring a lot of -- well, to me, it wasn't making fun
9  of them.  I mean, maybe I'm -- I may be wrong, but, you
10  know, I would tell them, you know, how could they work?
11  You know, they're that little.  You can tell they're
12  little kids.  I mean, they can't -- and they had to put
13  little deals, stools to -- so they could reach the tables
14  sometimes.
15          But I was telling them, you know, how
16  little they were, they couldn't -- I go, they can't even
17  speak English, I mean, and they can't even speak Spanish.
18  I said, and -- you know, but they run by these, you know,
19  white names.  I said, not even me that -- which I thought
20  it was funny in a way, you know, because I said, I've been
21  here forty-something years and I can't even run by a white
22  name.  If I got married, yes.
23          But I said, you know, somebody comes from
24  Guatemala and they're already Smith or whatever, you know.
25  I said, I can't even run by that last name.

36

1      Q.  And do you remember any of the people who you
2  specifically talked to about this in the 2000 or 2001 time
3  frame?
4      A.  No.  We all sat in the locker rooms.  I mean, it
5  was quite a few of us that would sit there, you know,
6  and -- I mean, it was quite a few women.  We -- it wasn't
7  just one person that would sit there.  All the women that
8  came from fab, from kill floor, we'd all sit there
9  together.  But I don't remember -- recall who -- who was
10  there when we were talking.
11      Q.  Would you say that it was common knowledge in
12  the 2000 and 2001 time frame that these Guatemalans were
13  not authorized to work in the United States who were now
14  working at the Cactus plant?
15      A.  We never really saw them.  We never did see
16  Guatemalans working there.  It was very unusual.  I mean,
17  it's like saying -- I'm not saying that I'm white, you
18  know, but, you know, you see somebody from Mexico coming
19  in, it's not -- you know, it's just -- you know, to you,
20  it's like somebody else, you know.  I mean, my husband is
21  from Mexico, but he's fixed, you know, so that's the way I
22  would think.
23          But when you see somebody from Guatemala,
24  it's like seeing these black people now that are there,
25  you know.  You know the difference.  I mean, that -- you

37

1  know they're coming from another country.  It's not the,
2  you know, same country that -- I mean, it's not just
3  Mexico.  You know they're coming from somewhere else
4  because they don't look nothing like the people from
5  Mexico.  I mean, they're just little kids.  I mean, they
6  look like little people.  I mean, to me, they reach to me
7  about right here, so that's how, I mean, I could tell the
8  difference, you know, that we were getting different
9  people.
10      Q.  And I guess what I wanted to focus on, though,
11  was, once the Guatemalans started arriving in 2000 and
12  2001, it sounds like there were discussions among the
13  other Swift workers that you had where you were talking
14  about the fact that these Guatemalans were there.
15      A.  Uh-huh.
16      Q.  Is that correct?
17      A.  Yes.
18      Q.  And was it your view that it was -- it just
19  became common knowledge there that these Guatemalans were
20  not authorized to work in the United States and yet they
21  were working at the Cactus plant?
22      A.  Yes.  I mean, I knew that already.  And the
23  people that I had conversations with, that's why we were
24  laughing, you know, for the fact that they were running by
25  a last name that just wouldn't match them, you know.  And

**S66**

11

38

1  that's why it just -- that's where it made it obvious
2  right there that they were illegals, you know, because of
3  the last name.
4          And I -- and the fact that I had told
5  Oscar, you know, which he's the human resource guy, about
6  that, and I told him -- I said, you know, this guy's
7  running by -- you know, his last name, you know, it's a
8  white name, Smith.  I said, not even me, that I've lived
9  here so many years, I can run by that last name.  He goes,
10 don't worry about it.  He goes, just keep filling out the
11 paperwork.
12         But he said it in a rude way, you know.  He
13 didn't say it like just keep on, just don't worry about
14 it, you know.  But he said it in a rude way, you know,
15 where it just made me think, okay, he's got something to
16 do with this.  You know, if he would have said it in a
17 joke way or something, you know -- you know, in a nice
18 way, I would have said, well, maybe he doesn't know, you
19 know.  But he said it in a rude way where -- you know,
20 don't let everybody know, you know, just don't worry about
21 it.
22     Q.  So is the Oscar you're referring to Oscar
23 Arriaga?
24     A.  Arriaga.
25     Q.  And you mentioned documentation.  Did you

39

1  actually see some of the papers that these Guatemalans
2  brought with them?
3      A.  They didn't know who they were, so they had to
4  look at the -- their -- I guess their socials or whatever
5  they were running.  That was another thing.  I mean,
6  you've got to know for so many years if you're, what -- a
7  little kid that's ten years old knows his name by now.  I
8  mean, why wouldn't an eighteen-year-old that's supposed to
9  be working there at eighteen know his name, his first name
10 and last name?
11     Q.  Did any of these Guatemalans in the 2000 or 2001
12 time frame tell you where they had received what
13 apparently were false documents?
14     A.  No.  But I knew of a lady that did -- that was
15 selling it to them.
16     Q.  Okay.  And who was that?
17     A.  She was here from Amarillo, and she would go
18 over there and sell them the papers.  And she was -- she's
19 been put in prison and everything for it already.
20     Q.  Okay.  Was this anyone that worked for Swift?
21     A.  A lady that worked there, no.
22     Q.  And you said this person you're talking about
23 that was providing false papers, so to speak, to these
24 workers has been put in jail, apparently?
25     A.  Yes.  She's already gone to prison and served

40

1  her time.
2      Q.  Were you aware of anyone else in this 2000 time
3  frame until you left Swift in October of 2002 who was
4  providing any kind of false documentation to any new
5  employees or other employees at Swift?
6      A.  There was other people besides her, but I -- she
7  had told me somebody that -- he was from Cactus -- that
8  had something to do with it, that he knew that Swift
9  had -- knew about this, you know, about what was going on.
10 So otherwise -- because I guess he would give them all the
11 documents and this is what they were supposed to run by,
12 you know, this name, and they already had the paperwork
13 there.
14         And what was so unusual was a lady I know
15 that she got terminated, too, and she was on light duty --
16 this was way after we were terminated -- she said that
17 when they terminated her -- and she said it wasn't true,
18 but she didn't have nobody to, you know, to help her prove
19 that -- you know, what they were saying against her.
20         She said that she was standing there by the
21 front office, where you walk out at Swift, and right there
22 they have that employment office right there where they
23 hire them.  And she said it was after 7:00 at night, and
24 she said that they had a bunch of Guatemalans in there.
25 And I said, what hour is that for them to have people at

41

1  that hour?  That office closes at 5:00.  They wouldn't
2  even let anybody go in there after 5:00.  But these
3  Guatemalans are in there after 7:00?  And she goes, well,
4  you know what they were up to.
5      Q.  Well, do you know the name of this woman?
6      A.  Yeah.  In fact, she goes to our church.  I gave
7  her name to somebody, but -- Rivera, Cecilia Rivera.
8      Q.  And how do you spell the last name?
9      A.  R-I-V-E-R-A.
10     Q.  And do you know when she stopped working at
11 Swift, approximately?
12     A.  I really -- I couldn't tell you exactly.  I
13 couldn't even remember the year that that happened.  I
14 know it was after us, you know, after we were terminated.
15     Q.  So it was sometime after October of 2002?
16     A.  Oh, yeah.
17     Q.  Let me have you turn to page 9 of Exhibit 11, if
18 you could.  And the second paragraph, the first sentence
19 says, quote, numerous other former workers said it was
20 common knowledge that a large number of employees were
21 using stolen IDs, end of quote.  Did I read that
22 correctly.
23     A.  Yes.  Right here.
24     Q.  And is that accurate, to your knowledge?
25         MS. CANO:  Objection, calls for

S67

42

1  speculation.
2      A.  Well, I kind of knew that already because of
3  this lady that I told you that -- that's why I knew they
4  were using stolen IDs, because of her.
5      Q.  Okay.  And this was -- you knew this in the 2000
6  time frame when the Guatemalans --
7      A.  Yes.
8      Q.  -- started arriving?
9      A.  Oh, yeah.  Yes.
10     Q.  Do you know when that woman was arrested,
11 approximately?
12     A.  She got out last year.  I think she served like
13 two years, I think, close to two years, not less.
14     Q.  So if she was out of prison in 2007, she might
15 have gone into prison around 2005?
16     A.  5.
17     Q.  Does that sound about right?
18     A.  Somewhere in there.
19     Q.  If you go down two more paragraphs -- and I'll
20 just read this.  It says, quote, Serrato, Salazar and
21 others also said that vans, even buses, full of
22 Guatemalans would sometimes arrive at the plant, end of
23 quote.
24     A.  No, they were vans.
25     Q.  Okay.

43

1      A.  Vans.
2      Q.  They were vans?
3      A.  I mean, I agree to the vans, yes.  I never saw
4  buses.  But I see -- because I never -- thought when they
5  were going to stop coming out of them vans, because, I
6  mean, there could be ten in a minivan.  I mean, they would
7  just come out one after another, and I thought, God, you
8  know, when are they going to stop coming out?  Where do
9  they have all that room to sit?
10     Q.  So I imagine -- it sounds like they were able to
11 fit quite a few of these --
12     A.  Yes.
13     Q.  -- Guatemalans in the vans.
14     A.  That's why they -- I guess they were that
15 little, they could all fit that many in there.  I don't
16 know.
17     Q.  Okay.  And what I wanted to do is just check on
18 the time frame.  Were these vans arriving with the
19 Guatemalans in the 2000 and 2001 time frame?
20         MS. CANO:  What page are you looking at?
21         MR. EBERLE:  Page 9.
22     A.  Yeah, it was around 2001, around that time.
23 Several former employees --
24     Q.  No, it's right here.
25     A.  Oh, okay.

44

1      Q.  I'm sorry.  You said it was 2000 and 2001?
2      A.  About -- between -- about -- yeah, between 2000,
3  2001 when that happened, somewhere around there, or two --
4  it was in between that time.  Because I would have to sit
5  out there and wait for my ride to come for me, and they
6  have a deal out there where you sit down, and they would
7  be arriving.  Because I would get out kind of early, so I
8  would sit out there and wait for my ride to come out from
9  inside the plant, and while I was waiting, the second
10 shift people were coming in.
11         And that's one thing that -- most of the
12 Guatemalans were put on second shift, you know.  There
13 were -- that's where I seen most of them.  They were on
14 second shift.  There was very few they had on first shift.
15         Now, when I -- when we were terminated, I
16 had gone over there because I had to go pick up my husband
17 one time from work -- this was about -- I don't even know
18 what year it was that I had gone to go pick him up.  But
19 it was where -- and I even asked him that question, you
20 know.  I said, there's quite a few Guatemalans now, you
21 know, I said, in the daytime, because I remember that they
22 were all on nights mostly.  And he goes, yeah.  He goes,
23 they're hiring quite a bit out there, he goes -- he said,
24 even in the daytime.
25         He said, but -- he goes -- I told him,

45

1  well, they never used to, and I said, now that we're not
2  there, you know, they're hiring all these, you know,
3  people in the daytime now.  He goes, well, they've been
4  hiring them for a while.  So I don't know how long a while
5  was to him, you know, but he said that they had been
6  hiring them for a while out there.
7      Q.  Okay.  I should have asked you this before, but
8  after you left working at Swift on October 14 of 2002, did
9  you ever return to work at Swift?
10     A.  No, I didn't.
11     Q.  Okay.  And then were you occasionally -- it
12 sounded like you may have been occasionally back out at
13 the plant after October of 2002; is that right?
14     A.  Gone back over there?
15     Q.  Yes.
16     A.  To take paperwork that -- I had to take some
17 paperwork back over there.  But they wouldn't really, you
18 know, let me go through, you know.  Most of the time they
19 would bring me my paperwork up there to the security, up
20 there to the front.  I guess they didn't want me in there.
21 I don't know.
22         And I did pick up -- well, this was a
23 few -- a few months ago that I had to go over there and
24 pick up a man that got real sick.  I was taking care of
25 his wife, who had cancer, and I went to go pick him up and

S68

46

1    I waited in there because I didn't know how sick he was.
2    He just called me and said he was sick and that he didn't
3    feel good at all, so I didn't know what condition he was
4    in, so I went in there and waited, but this was only a few
5    months ago.
6        Q.    And did you say -- was your husband an employee
7    at Swift as well?
8        A.    Yes.
9        Q.    And is he still working there?
10       A.    Yes.
11       Q.    Okay.  And do you know when he started working
12   there?
13       A.    In eighty -- I think it was in 1980 when he
14   started.
15       Q.    Okay.
16       A.    He's been there twenty-seven years.
17       Q.    Okay.  So he's been a long-time employee?
18       A.    Yeah.
19       Q.    Let me have you turn to the next page of
20   Exhibit 11, which is page 10.  And the next few paragraphs
21   talk about when you were talking to the Swift employees on
22   October 14, 2002.  And what I wanted to do was have you
23   focus more on the second and third paragraphs at the top
24   of page 10.
25       A.    Where it says, Salcido?

47

1        Q.    Yes.
2            MS. CANO:    Just the -- just that little
3    section or --
4            MR. EBERLE:    Yeah.
5        Q.    Let me just back up, then, and just ask a few
6    questions.  The first one is, it appears that before you
7    were called into the office on October 14, 2002, you
8    weren't aware that Swift was telling workers who were
9    under restrictions that they would be put on a leave of
10   absence for eighteen months --
11       A.    No, sir.
12       Q.    -- and if they didn't have any improvements that
13   then they would be permanently terminated.
14       A.    No.
15       Q.    So you didn't know that?
16       A.    No.  And that's what -- that's what --
17           MS. CANO:    That's the question.
18       Q.    Okay.  And then I guess my next question is:
19   When you were called in, you indicated that Mr. Arriaga
20   told you that -- it says, quote, they bought the company,
21   but not the light-duty people, closed quote.
22       A.    Right.
23       Q.    And what did you understand that to mean?
24       A.    Well, I just couldn't understand it because I
25   had been working there fifteen years.  I couldn't

48

1    understand why they would do something like that.  You
2    know, supposedly they bought out this plant how many times
3    and never did this, you know, in all them times.  It went
4    from Monfort, ConAgra, you know, to Swift and we never had
5    to go through this, so it was very unusual to us.
6        Q.    Okay.  And is it correct that you told
7    Mr. Arriaga on October 14, 2002, quote, why don't you get
8    rid of all the illegals, why me, closed quote?
9        A.    Right.  Yes, I did.  I said, if you need to get
10   rid of anybody out there, it needs to be your illegals,
11   not us.
12           MR. EBERLE:    Why don't we take a short
13   break here since we've been going for a while.
14           (Recess from 1:07 p.m. to 1:11 p.m.)
15       Q.    (BY MR. EBERLE)  Let me have you go back to
16   Exhibit 9, if I could.  And if you could turn to page 7.
17   And the question number 4 -- this is interrogatory number
18   4 on page 7 of Exhibit 9 -- asks for information that you
19   may have been aware of concerning Swift providing false
20   documents or other assistance to illegal immigrants.
21           And your response says, quote, I heard that
22   Oscar Arriaga had the Social Security numbers and name
23   cards ready for the new employees when they arrived.
24   These were statements made openly by employees, closed
25   quote.  Did I read that correctly?

49

1        A.    Yes.  What I was saying is that he would already
2    have papers ready for these people when they came in.
3    That's -- you know, whoever they were supposed to be.
4    There was, I guess -- that was, in their word, what they
5    would say, you know, the people out there, that that's how
6    it would work.
7        Q.    Okay.  When you say the people out there, who
8    are you referring to?
9        A.    Just people who work out there.
10       Q.    At the Swift plant?
11       A.    At Swift.
12       Q.    And when you're saying that these Social
13   Security numbers and name cards would be ready, were these
14   the Guatemalans that started arriving --
15       A.    Yes.
16       Q.    -- in 2000?
17       A.    Yes.  What was so weird was that not too long
18   ago, about two years ago, I was -- no -- yeah, it had been
19   two -- when that raid -- after that raid, right after that
20   raid happened, my son received a letter from the
21   insurance, from COBRA, that, you know, if he wanted to
22   keep on with his insurance, he could go ahead and keep on
23   with it, and if not, you know, that they were going to go
24   ahead and dismiss his insurance.
25           And I thought for a while.  I said, what's

50

1  going on?  My son hasn't worked out there for a long time.
2  So it just, you know, made we wonder whether they were
3  using people's papers that were working out there before,
4  if they were giving them to them.  Why would he get a
5  letter when he hasn't been working out there for years?
6  And just right after that, this letter comes in.
7      Q.  Okay.  But as far as you know, you don't have
8  any actual evidence of Swift using --
9      A.  I don't.
10     Q.  -- other former employees' identities to give to
11  new employees?
12     A.  No.
13     Q.  Backing up to this information that you say you
14  heard about Oscar Arriaga.  Did you hear about that in the
15  2000 time frame, when these Guatemalans started arriving
16  from the Kansas plant?
17     A.  It wasn't right on 2000.  It was after -- after
18  that.
19     Q.  Do you think it was more in 2001, then?
20     A.  Yeah, somewhere after that year.
21     Q.  Somewhere after 2000?
22     A.  Yeah.
23     Q.  Okay.  Do you think it was in 2001, though?
24     A.  After that.  I had to have been --
25     Q.  It was still after that?

51

1      A.  Uh-huh.
2      Q.  Do you think it was in 2002, before you left?
3      A.  About 2002, yeah.
4      Q.  So sometime in 2002, before you left the plant
5  in October, you think you heard this information about
6  Mr. Arriaga having Social Security numbers and name cards
7  ready for new employees when they arrived?
8      A.  Yes.
9      Q.  And --
10     A.  And I heard that afterwards, too.  It wasn't
11  just during that time.  It was afterwards, too.
12     Q.  Okay.  But let me just back up and focus on that
13  time frame --
14     A.  Okay.
15     Q.  -- in 2002.  Your response to interrogatory 4 in
16  Exhibit 9 also says that these statements were made openly
17  by employees, and my first question is:  Which employees?
18  Can you identify anyone specifically?
19     A.  Not right offhand.
20     Q.  And were these statements that you're referring
21  to being made, that was in the 2002 time frame, as best
22  you can recall?
23     A.  Yeah.
24     Q.  So I take it, to your knowledge, the Social
25  Security numbers and time -- name cards being ready for

52

1  the new Guatemalans, you weren't aware of that happening
2  in 2000 or 2001, as best you can recall?
3      A.  No.  I think all them people already came with
4  their papers already from Kansas.
5      Q.  Is there anything else you can think of relating
6  to the Guatemalans that you can recall, as far as either
7  their being undocumented or anything else along those
8  lines?
9          MS. CANO:  Form.  Objection, form.
10     A.  Well, just -- I mean, that's all, I mean, I know
11  because of what I experienced there in the -- I mean, when
12  I was doing that.  You know, that's what made me know, you
13  know, that they were using other people's documents.
14  Because they didn't know English.  They didn't know
15  Spanish.  They had, you know, their own language.  And so
16  I -- and then the way, you know, they had to read their
17  deals to know who they were, you know.  You know, anybody
18  who has to read what their name is -- maybe their birth
19  date is different or social, but their names -- and there
20  was something else that I wanted to say.  I don't know if
21  I'm allowed to say.
22     Q.  Go ahead.
23     A.  All the -- whenever this raid came in -- Swift
24  never before, never advertised anything, never.  I mean,
25  you would never see any advertisement nowhere.  When this

53

1  raid came in, all you saw was -- I mean, you couldn't walk
2  into a restaurant here in Amarillo on this side of town --
3  because I used to work four years here in Amarillo after,
4  you know, this deal, and I would go into any restaurant
5  and it was like I saw that thing, you know, Swift hiring,
6  on television, radio, billboards.  I mean, it was just
7  everywhere.  I mean, it was like everywhere I walked in,
8  that's all I saw, Swift, Swift, Swift.  But you never saw
9  it before, you know.
10         So if Swift didn't know about all these
11  illegals coming in, why didn't they put them billboards
12  out there before, you know, all these posted things?  Why
13  did they put it afterwards?  Because they knew all these
14  people that were coming in.  They knew who was coming in.
15  They knew they had people that were going to come in.  Why
16  did they have to go put all that out?  Because they knew
17  all these people that were coming in.  They didn't have to
18  go post nothing out.  They had people at the flea market
19  even after that, I mean, trying to get everybody they
20  could in to work for them.
21     Q.  And the time that you're talking about was the
22  raids --
23     A.  After --
24     Q.  I'll just tell you they were in December of
25  2006.

54

1    A.  Right.  This was afterwards, uh-huh.
2    Q.  And you're saying that before December of
3  2006 --
4    A.  There was nothing, nothing.  That was just so
5  obvious that -- I mean, me as -- if it was my company or
6  something, I would be posting out even before that, you
7  know.  But if I know I'm going to have all these people
8  coming in, why am I going to go post it?  Why am I going
9  to waste my money on all this stuff, you know the -- I
10  mean, that's just so obvious right there.  That's just
11  where Swift made it so obvious that they knew about it.
12  Maybe -- I mean, everybody has got their own opinion.
13    Q.  Well, let me ask you this.  You mentioned this
14  woman who did not work for Swift who has gone to jail for
15  providing false documents to employees.
16    A.  Right.
17    Q.  Are you aware of any evidence that Swift
18  employees provided -- themselves provided false documents
19  to any illegal immigrants?
20    A.  What do you mean?  Like --
21    Q.  In other words, that there was somebody at Swift
22  who was making up false Social Security cards and
23  providing them to new employees, like the Guatemalans.
24    A.  It wasn't somebody from there, but it was
25  somebody from -- it was from Kansas that was doing that,

55

1  and they were making the false cards and everything for
2  them.  But I just -- I can't remember who that person's
3  name is.
4    Q.  Okay.
5    A.  I mean, I was doing a lot of checking around
6  when -- after they did this to us.  I was checking around
7  to see what kind of information I could get and -- I
8  mean -- I mean, I wanted to get whatever I could.
9    Q.  But you weren't able to find anything other than
10  this Kansas person?
11    A.  Well, just this lady that I told you that --
12  from Amarillo.
13    Q.  Okay.
14    A.  And she said there was somebody from Cactus that
15  would put these people through through Swift and, you
16  know, help them out --
17    Q.  Okay.
18    A.  -- and just --
19    Q.  You mentioned somebody from -- did you -- maybe
20  I misunderstood.  Was it somebody in Cactus or somebody in
21  Kansas?
22    A.  No, in Kansas, there was somebody making false
23  IDs for them -- I mean, false socials for them.
24    Q.  And was it your understanding --
25    A.  In Kansas.

56

1    Q.  -- that this was a Swift employee, or was it
2  somebody else?
3    A.  No, somebody else.  It wasn't from Swift.  Now,
4  the Cactus person that I'm talking about, I think he had
5  communication with somebody there inside Swift that was
6  helping them bring in these people.
7    Q.  And I can't remember if I asked you, but do you
8  remember the name of the person in Cactus that had false
9  documents?
10        MS. CANO:  I'm sorry.  Say that again.
11        MR. EBERLE:  I was asking her whether she
12  knows the name of this person --
13    Q.  It was a man, I take it?
14    A.  It was a man.
15    Q.  Do you remember his name?
16    A.  Will you hand me my purse.  I don't know if I've
17  still got his -- because I took a bunch of stuff out of my
18  purse.  I just tried to get some quick information from
19  her, whatever I could get.  If I could remember her phone
20  number, I could call her, but I just don't remember.
21        MR. EBERLE:  We can probably just go off
22  the record for a second.  That's fine.
23        (Discussion off the record.)
24    Q.  (BY MR. EBERLE)  We discussed off the record
25  that you were going to try to see what information you

57

1  have about this person --
2    A.  Yes.
3    Q.  -- in Cactus.
4    A.  Yes.
5    Q.  And I'll follow up with Claudia about that.
6    A.  Okay.
7        MS. CANO:  Okay.
8    Q.  Just to kind of circle back so that I haven't
9  missed anything, as I understand it, you've identified
10  three people, none of whom were Swift employees, one in
11  Amarillo, one in Cactus and one in Kansas --
12    A.  Kansas.
13    Q.  -- and those people you believe provided false
14  documents to new employees at the Cactus plant?
15    A.  Yes.
16    Q.  But you're not aware of anybody -- or don't have
17  any evidence of anybody at Swift who themselves provided
18  these false documents directly to the new employees?
19    A.  I don't.  The person that would -- knew the
20  communication he had with that inside Swift employee is a
21  person from Cactus, because he's the one that would bring
22  in the people for them from there.
23    Q.  Okay.  And this is the one whose
24  identification --
25    A.  Uh-huh.

16

58

1  Q.  -- you're trying to track down for me?
2  A.  Uh-huh.  Yes, sir.
3  Q.  I think I'll come back to that in a minute.  But
4  before I forget, you worked only at the Swift plant -- or
5  at the Cactus plant for Swift, correct?
6  A.  Yes, sir.
7  Q.  Did you ever work at any of the other plants for
8  Swift?
9  A.  No, sir.
10  Q.  Do you have any information about illegal
11  immigrants that may have been hired by Swift at any of the
12  other plants?
13  A.  No, sir.
14  Q.  When you were working for Swift, were there any
15  immigration raids by government authorities that took
16  place at the Cactus plant?
17  A.  Not while I was working.  I've known of some
18  before, but not, you know, when I was there.
19  Q.  And you started there -- when was it?  19 --
20  A.  '88.
21  Q.  So between 1988 and October of 2002, you weren't
22  aware of any immigration raids by government authorities
23  at the Cactus plant?
24  A.  No, sir.
25  Q.  During that time frame from 1988 to October of

59

1  2002, were you aware of any immigration raids that had
2  been planned for the Cactus plant that never took place?
3  A.  No, sir.  Between '88 and 2002?
4  Q.  Correct.
5  A.  No.
6  Q.  And between 1988 and October of 2002, are you
7  aware of any information that Swift provided illegal
8  immigrants working at the Cactus plant with advice on how
9  to avoid being detected by government authorities?
10  A.  I mean, just word out that -- from other people
11  that they would just, you know, tell them to, you know,
12  take off running or find a place to hide or -- you know,
13  if anything like that happened.  But that was just words
14  out there, you know, from people that worked out there.
15         Because there was a lady from Guatemala,
16  but I don't remember her name, but she worked out there
17  and she would always tell me, you know, I hope Immigration
18  never comes in, I hope Immigration never comes in.  And I
19  said, well, they haven't in years.  I said, I don't see
20  why they would come now.  And she said, because -- you
21  know, they just told us, you know, if anything like that
22  happened, just to take off running.
23  Q.  Okay.
24  A.  But that was all she said.
25  Q.  And did she say who told her that, I mean

60

specifically?
A.  It was just a supervisor from -- she worked in
fab, on the fab floor.
Q.  And do you remember what time frame that
conversation took place?
A.  Exactly what time?
Q.  I mean, approximately what year that might have
been.
A.  Oh, that was like in -- because she was one of
the Kansas ladies that came.  Two thousand and -- it was a
little bit before we were -- that we had been terminated.
Q.  So sometime in 2002?
A.  Around 2002.
Q.  And while you were working for Swift before you
left in October of 2002, did you believe that your hourly
pay was lower because Swift had hired illegal immigrants
at the Cactus plant?
A.  When I feel that they lowered the pay, in the
fact that -- I mean, I know that they lowered it is they
send out a deal from Social Security all the time on, you
know, how much you make in that year and all that.  Well,
I noticed there was a real, I mean, difference.
       And I had been talking to people to try to
remember this, the people who had been there for years, if
they remember, because, I mean, I remember when my

61

husband -- I was dating him at the time.  He said they had
cut down on their pay.  And during that time, they were
hiring people from Mexico that were illegals, but it
wasn't as bad as what they were -- and so obvious, let's
put it that way, like it was in this 2000 year, from
2000 --
Q.  Okay.  You said during that time when Swift was
hiring some people from Mexico.  When was that?  Was that
in the 1990s sometime?
A.  No, that was back in 1980-something, in the
'80s.  They were already hiring illegals out there, but, I
mean, you couldn't tell who they were because there were
people from Mexico.  I mean, most of them, you know, you
would think that they would have papers.  But when you
bring in so many Guatemalans all at one time and -- I
mean, you -- it's so obvious.
Q.  Okay.  So it was your belief that the hourly
rates being paid were lower even as of the 1980s --
A.  Yes.
Q.  -- because Swift was hiring illegal immigrants?
A.  Right.
Q.  And it sounds like, and correct me if I'm wrong,
but that by 2000 and 2001 when Swift was hiring the
Guatemalans, that you believed that your hourly pay was
lower as a result of those people being hired?

## 62

1    A.   No, they were paying them less -- this is my
2    understanding, they were paying them less, but -- they
3    would pay them the right amount, but then they would take
4    out from -- after they cashed their check, they would take
5    the amount off of the, you know -- and this was like
6    supervisors, superintendents and nobody -- and somebody
7    else, you know, that worked out there.
8    Q.   Okay.  I guess I'm not understanding.  So they
9    would -- let's say they were supposed to be paid $10 an
10   hour.  That's what they would be getting paid --
11   A.   Right.  And then after they got their check
12   cashed, then it would -- you know, they would turn around
13   and hand over money to the, I guess, the higher guys out
14   there.
15   Q.   Okay.  And so it was your belief that, what,
16   essentially these illegal Guatemalans were paying money to
17   some Swift employees --
18   A.   To work.
19   Q.   -- to work there?
20   A.   Yes.
21   Q.   Okay.  And what evidence do you have of that?
22   A.   I don't, and I probably wouldn't.  The only one
23   that could tell you that is somebody that it happened to.
24   I'm sure that they would be able to say something like
25   that, you know.  But that's -- that was a good way of

## 63

1    hiding all this stuff, you know, because it wouldn't look
2    so obvious, you know, that they were paying them less.  It
3    was coming out of their check afterwards, you know, not
4    before.
5    Q.   Okay.  And so -- but just to confirm this, you
6    don't have any specific evidence --
7    A.   I don't.
8    Q.   -- showing that?
9    A.   I don't.
10   Q.   And just backing up to my question, which was,
11   while you were still working for Swift in 2000 and 2001,
12   did you think that your hourly pay was lower because Swift
13   had hired illegal immigrants at the Cactus plant?
14         MS. CANO:  Do you understand the question?
15   A.   Yeah.  Now I do, uh-huh.  No.
16   Q.   And what you're saying is that it was --
17   A.   I just feel like we didn't have enough pay.
18   That's what we didn't have.
19   Q.   You felt you should have been paid more?
20   A.   More for the work that we were doing.  I felt --
21   or not just me, but everybody else.  You know, we should
22   have been getting paid more for that type of work.
23   Q.   Well, did you believe that you weren't getting
24   paid more because Swift had hired illegal immigrants at
25   the Cactus plant?

## 64

1    A.   That's what I feel, because to me, I mean -- and
2    there was a greater chance when they started hiring all
3    these illegals more, you know, that they were getting more
4    people in, there was a greater chance.  Because even the
5    pay now is up higher since they had that raid.  The pay
6    went way up higher.  That should have been paid a long
7    time ago, I mean, that kind of money, not after that raid,
8    you know.
9    Q.   Okay.  Let me just back up, though.  We'll get
10   to the post raid stuff in a second.  But just backing
11   up -- so during the 2000 and 2001 time frame, you felt
12   that you should have been paid more for your work at the
13   Cactus plant and that the reason you hadn't been was
14   because Swift had hired illegal immigrants?
15   A.   Right.
16   Q.   And then is your source of information -- strike
17   that.
18         What is your source of information about
19   the pay going up after you left Swift and after the raids?
20   A.   Because my husband works out there.
21   Q.   Okay.
22   A.   I noticed a way much difference on his paycheck,
23   his hour -- hourly pay.
24   Q.   Hourly pay is higher?
25   A.   Yes.  I work for the Valero company, and I'm

## 65

1    getting -- I started out at $11 an hour, not even what I
2    was making on my last day that I was out at Swift, and I'm
3    not even working as hard as I was out here at Swift.  But
4    Valero doesn't hire illegals, so --
5    Q.   Let me back up again to the 2000 and 2001 time
6    frame, while you were working for Swift.  Did you have any
7    discussions with any of your co-workers at Swift about
8    their pay being lower because Swift had hired illegal
9    immigrants?
10   A.   No, sir.
11   Q.   And during this 2000 and 2001 time frame, did
12   you believe that your -- you should have been paid more
13   and your hourly pay was actually lower because Swift had
14   provided any false documents to illegal immigrants?
15   A.   No, sir.
16   Q.   I think you've given me some information about
17   after you left Swift in October of 2002, but it sounds
18   like you did -- tried to do some investigation to
19   determine information about illegal immigrants at the
20   plant; is that right?
21   A.   Yes.
22   Q.   And what did you do?
23   A.   I would just go around asking people that I
24   would think that, you know -- in fact, I knew this lady
25   from Amarillo, you know.  I already knew her before.  She

66

1  was my mother-in-law's next-door neighbor at one time, and
2  that's how I met her.  And I knew she was selling
3  documents, but I didn't know she was selling them to the
4  people from Swift, you know, until all this happened, you
5  know, finding out all this information, you know, that she
6  was selling them to a lot of people out there.
7      Q.  Did you actually talk to her in person?
8      A.  Yes, I did.
9      Q.  Okay.  And did she tell you that she was
10 providing these false documents?
11     A.  Yes, sir.
12     Q.  And those were used by people who were working
13 at Swift?
14     A.  Right.
15     Q.  And what was the approximate time frame?  It
16 sounds like this was before 2005 -- well, yeah, before
17 2005, because that's about the time she went to jail.
18     A.  Yeah.  That was -- well, I talked to her before
19 and after she got out, too, because I wanted to get that
20 information, you know, if she knew anybody else that was
21 involved, and that was after she got out of prison.
22         But before that time, you know, I knew she
23 was selling documents, but like I said, I didn't know at
24 the time until all this happened and we were in a
25 conversation, me and her one time, and we were talking

68

1      Q.  Okay.  So just so I'm clear, she never indicated
2  that she had provided false documents to employees at
3  Swift plants other than in Cactus?
4      A.  In Cactus, right.
5      Q.  It was only in Cactus?
6      A.  Cactus, that she told me about, yes.
7      Q.  After you left working for Swift in October of
8  2002, did you become aware of any information that Swift
9  was hiring illegal immigrants at any of its plants other
10 than in Cactus?
11     A.  No.
12     Q.  And did you become aware of any information --
13     A.  I mean, I wasn't worried about everybody else --
14 I mean, the other plants.  I was worried about this one
15 that fired me.
16     Q.  And you weren't aware, I take it, of any
17 information that Swift was providing any false documents
18 to employees at other plants besides --
19     A.  No, sir.
20     Q.  -- at Cactus?
21         MR. EBERLE:  Why we don't take another
22 short break and I'll see what else I have left.
23         (Recess from 1:40 p.m. to 1:47 p.m.)
24         MR. EBERLE:  I will pass the witness.  I
25 have no further questions.

67

1  about that and she said, yeah, you know, I'm -- you know,
2  that she was selling papers and she had to make trips to
3  Cactus to go take papers to people.  So she was constantly
4  going to Dumas and Cactus to take papers.
5      Q.  Did she tell you where she herself got those
6  papers?
7      A.  She would go to Laredo, that I know of, Laredo
8  and -- I don't know which other places.  I know Laredo was
9  one of the main places that she talked about.
10     Q.  Did she tell you that she had supplied false
11 documents to employees at any other Swift plants besides
12 the Cactus one?
13     A.  I'm thinking that she said in Guymon, I think,
14 at that pig plant they have there, Seaboard.
15     Q.  Is that in Kansas or --
16     A.  No, in Oklahoma, Guymon.
17     Q.  I'm not sure that that's a Swift plant.
18     A.  No, it's not.  Oh, you're talking about Swift
19 plants?
20     Q.  Yes.
21     A.  No.  No.  That I know of, no.
22     Q.  Okay.
23     A.  She didn't ever mention -- she just -- it was
24 really mainly around this close area that she would do
25 that.

69

MS. CANO:  We'll reserve our questions.
(End of Proceedings.)